1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**RUSING LOPEZ & LIZARDI, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262

Mark D. Lammers; mdlammers@rllaz.com
State Bar No. 010335

*Liaison Counsel for Plaintiff Arias Larmay*

[Additional Counsel on Signature Page]

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arias Larmay, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>          v.<br><br>Ammo, Inc., Fred W. Wagenhals, Jared R. Smith, and Robert D. Wiley,<br><br>      Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Arias Larmay ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by AMMO, Inc. ("AMMO" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by AMMO; and (c) review of other publicly available information concerning AMMO.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired AMMO securities between August 19, 2020 and September 24, 2024, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      AMMO designs, produces, and markets ammunition and ammunition component products for public consumers, manufacturers, and law enforcement and military agencies.

3.      On September 24, 2024, after the market closed, AMMO announced that its Chief Financial Officer had resigned "at the request of the Board." Further, the Company disclosed that it is conducting an independent investigation into its "internal control over financial reporting for the fiscal years 2020 through 2023." The Company further disclosed that it had retained a law firm to conduct an independent investigation into whether the Company and its management control persons at the time: "(i) accurately disclosed all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (ii) properly characterized certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; and (iii) appropriately valued unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022."

4.      On this news, the Company's share price fell $0.08, or 5.26%, to close at $1.44 per share on September 25, 2024, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the company lacked adequate internal controls over financial reporting; (2) that there was a substantial likelihood the Company failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (3) that there was a substantial likelihood the Company failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; (4) there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the

acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

10. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11. Plaintiff Arias Larmay, as set forth in the accompanying certification, incorporated by reference herein, purchased AMMO securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12. Defendant AMMO is incorporated under the laws of Delaware with its principal executive offices located in Scottsdale, Arizona. AMMO's common stock trades on the NASDAQ exchange under the symbol "POWW."

13. Defendant Fred W. Wagenhals ("Wagenhals") was the Company's Founder and Chief Executive Officer ("CEO") from 2016 until July 24, 2023.

14. Defendant Jared R. Smith ("Smith") has been the Company's Chief Executive Officer ("CEO") since July 24, 2023.

15. Defendant Robert D. Wiley ("Wiley") was the Company's Chief Financial Officer ("CFO") at all relevant times.

16. Defendants Wagenhals, Smith, and Wiley (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause

them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     AMMO designs, produces, and markets ammunition and ammunition component products for public consumers, manufacturers, and law enforcement and military agencies.

## Materially False and Misleading
## Statements Issued During the Class Period

18.     The Class Period begins on August 19, 2020.[1] On that day, AMMO submitted its annual report for the fiscal year ended March 31, 2020, on a Form 10-K filed with the SEC (the "2020 Annual Report"). The 2020 Annual Report relayed the composition and compensation of the Company's executive officers and directors, as well as the valuation of the Company's stock awards made to such individuals. Specifically, the 2020 Annual Report stated in relevant part:

### ITEM 11 EXECUTIVE COMPENSATION

\*                    \*                    \*

| Name and Principal Position | Period Ended | Salary (1) | Bonus (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fred W. Wagenhals President, Chief Executive Officer, and Director | 3/31/2020 | $ 120,000 | $    0 | $ 180,000 | $    0 | $    0 | $    0 | $    0 | $ 300,000 |
|  | 3/31/2019 | $ 120,000 | $    0 | $ 156,375 | $    0 | $    0 | $    0 | $    0 | $ 276,375 |
| Steve Hilko (4) Chief Operating Officer | 3/31/2020 | $ 120,000 | $    0 | $    0 | $    0 | $    0 | $    0 | $    0 | $ 120,000 |
|  | 3/31/2019 | $ 120,000 | $    0 | $    0 | $    0 | $    0 | $    0 | $    0 | $ 120,000 |
| Robert D. Wiley(5) Chief Financial Officer | 3/31/2020 |  |  |  |  |  |  |  |  |
|  |  | $ 103,333 | $    0 | $ 86,794 | $    0 | $    0 | $    0 | $    0 | $ 190,127 |
|  | 3/31/2019 | $  77,917 | $    0 | $ 76,395 | $    0 | $    0 | $    0 | $    0 | $ 154,312 |

\*                    \*                    \*

---
[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

**Director Compensation**

\*                    \*                    \*

| Name and Principal Position | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Robert J. Goodmanson (4) | $      0 | $   80,000 | $      0 | $      0 | $      0 | $      0 | $   80,000 |
| Russell William Wallace Jr. | $      0 | $   80,000 | $      0 | $      0 | $      0 | $      0 | $   80,000 |
| Randy Luth | $      0 | $   80,000 | $      0 | $      0 | $      0 | $      0 | $   80,000 |
| Harry Markley | $      0 | $   80,000 | $      0 | $      0 | $      0 | $      0 | $   80,000 |
| Dan O'Connor (5) | $      0 | $   90,000 | $      0 | $      0 | $      0 | $      0 | $   90,000 |
| Tom Jagemann (6) | $      0 | $   20,000 | $      0 | $      0 | $      0 | $      0 | $   20,000 |
| Kathy Hanrahan (7) | $      0 | $      0 | $      0 | $      0 | $      0 | $      0 | $      0 |

19.     The 2020 Annual Report reported the Company's purported financial results, including the Company's financing activities, and the cost of certain payments related to such offerings.  Specifically, the 2020 Annual Report stated in relevant part:

| | For the Year Ended | |
|---|---|---|
| | **March 31, 2020** | **March 31, 2019** |
| Net Sales | $     14,780,365 | $      4,565,652 |
| Cost of Products Sold | 18,455,904 | 4,795,346 |
| Gross Margin | (3,675,539) | (229,694) |
| Sales, General & Administrative Expenses | 10,161,954 | 8,750,964 |
| Loss from Operations | (13,837,493) | (8,980,658) |
| Other income (expense) | | |
| Other income (expense) | (719,187) | (2,728,754) |
| Loss before provision for income taxes | $    (14,556,680) | $    (11,709,412) |
| Provision for income taxes | | - |
| Net Loss | $    (14,556,680) | $    (11,709,412) |

\*                    \*                    \*

**Financing Activities**

We financed our operations primarily from the issuance of equity instruments. During the year ended March 31, 2020, net cash provided by financing activities was $4,524,848. This was the net effect of $2,465,540 generated from the sale of Common Stock, *net of cash payments of $285,981 in conjunction with the Unit offerings.* We issued $2,500,000 in Convertible Promissory Notes*, net of $329,000 of issuance costs.* Additionally, $9,747,281 was generated from accounts receivable factoring, which was offset by *payments of $7,741,302*. There was $819,731 of cash was generated from the issuance of a related party note payable, These increases to our financing activities were offset by *payment of $1,885,000 on the related party notes payable*, $466,421 toward our insurance premium note payable and a $300,000 payment of our Contingent Consideration Payable.

20.     The 2020 Annual Report asserted the Company did not have any off-balance sheet arrangements, stating in relevant part:

**Off-Balance Sheet Arrangements**

As of March 31, 2020, *we did not have any off-balance sheet arrangements* that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources

21.     The 2020 Annual Report purported to disclose the extent of the Company's related party transactions, reporting the following transactions and asserting "[o]ther than the foregoing" "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year." The 2020 Annual Report further stated that "[w]ith regard to any future related party transaction" the Company "plan[s] to fully disclose any and all related party transactions." Specifically, the 2020 Annual Report stated in relevant part:

### *Related Party Transactions*

From October 2016 through December 2018, our executive offices were located in Scottsdale, Arizona where we leased approximately 5,000 square feet under a month-to-month triple net lease for $3,800 per month. This space housed our principal executive, administration, and marketing functions. Our Chairman, President, and Chief Executive Officer owned the building in which these offices are currently leased. For the year ended March 31, 2020 and 2019, the Company paid $21,800 and $53,013, respectively in rent for these offices.

During the year ended March 31, 2020, we paid $184,575 in service fees to an independent contractor, $6,500 in consulting fees to our Previous Chief Financial Officer, and 60,000 shares in the aggregate to its Advisory Committee members for service for a total value of $113,000. Additionally, at March 31, 2020, the Company had a receivable of approximately, $14,700 from its previous Chief Financial Officer. During the year ended March 31, 2019, we paid approximately $168,000 in consulting fees.

In connection with the acquisition of the casing division of Jagemann Stamping Company, a promissory note was executed. The promissory note, under which $500,000 was paid on March 25, 2019 using funds raised for the acquisition, had a remaining balance at March 31, 2019 of $9,900,000. On April 30, 2019, the original due date of the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly until October 1, 2019 when the interest rate increases to 9% per annum payable monthly until principal and accrued interest are paid in full. In May of 2019, the Company paid $1,500,000 on the balance of the note. As of March 31, 2020 and March 31, 2019, we accrued interest of $352,157 and $22,196, respectively, related to the note.

In October of 2019, it was made apparent that certain equipment that was agreed to be delivered free and clear by the Seller was not achievable as Seller was not able to purchase equipment that Seller had leased. Accordingly, the remaining value of the promissory note was reduced by $2,596,200. As a result of the change to the purchase price of the transaction, the Company reduced Equipment for a net value of $1,871,306, decreased Other Intangible Assets by $766,068, increased Accounts Receivable by $31,924, and recorded an increase to Deposits for $9,250 worth of equipment that the Company agreed to transfer back to Seller. Consequently, accumulated amortization has decreased by $159,530.

Additionally, the Company entered into a lease to gain possession of the assets that were originally to be transferred. Subsequent to March 31, 2020, the Company, Enlight and JSC entered into a Settlement Agreement pursuant to which the parties mutually agreed to settle all disputes and mutually release each other from liabilities related to the Amended APA occurring prior to June 26, 2020. Pursuant to the Settlement Agreement, the Company shall pay JSC $1,269,977 and shall provide JSC with: (i) two new promissory notes, a note of $5,803,800 related to the Seller Note and note of $2,635,797 for inventory and services, both with a maturity date of August 15, 2021, (ii) general business security agreements granting JSC a security interest in all personal property of the Company. Pursuant to the Notes, the Company is obligated to make monthly payments totaling $204,295 to JSC. In addition, the Notes have a mandatory prepayment provision that comes into effect if the Company conducts a publicly registered offering. Pursuant to such provision, the Company: (a) upon the closing of an Offering of less than $10,000,000 would be obligated to pay the lesser of ninety percent (90%) of the Offering proceeds or seventy (70%) of the then aggregate outstanding balance of the Notes; and (b) upon the closing of an Offering of more than $10,000,000 would be obligated to pay one hundred percent (100%) of the then aggregate outstanding balance of the Notes. The Company was granted an option to repurchase up to 1,000,000 of the shares of the Company's common stock issued to JSC under the Amended APA at a price of $1.50 per share through April 1, 2021 so long as there are no defaults under the Settlement Agreement.

Through the Administrative and Management Services Agreement the Company with Jagemann Stamping Company, the Company purchased approximately $1.9M in Inventory, incurred $394,128 of rent expenses, and incurred $153,604 of expenses related to support costs such as engineering and maintenance, among others, for the year ended March 31, 2020.

On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company. The original interest rate was the applicable LIBOR Rate. The promissory note has since been amended and the balance at March 31, 2020 was $278,195. The note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $315,000 in principal payments in the year ended March 31, 2020. We have accrued interest on the note of $9,080. Subsequent to March 31, 2020, the related party note and accrued interest was paid in full.

In December of 2019, the Company entered into a Promissory Note of $90,000 with Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors. The Note originally matured on June 12, 2020 and had an interest rate at the applicable LIBOR Rate. The promissory note has since been amended and the balance at March 31, 2020 was $156,536 and the amended maturity date is September 18, 2020. The Company made $70,000 in principal payments in the year ended March 31, 2020. The amended note bears interest at 1.25% per month. We have accrued interest on the note of $1,287. Subsequent to March 31, 2020, the related party note and accrued interest was paid in full.

Other than the foregoing, none of the directors or executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its Common Stock, nor any associate or affiliate of such persons or companies,

has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year, or in any proposed transaction, which has materially affected or will affect the Company.

With regard to any future related party transaction, we plan to fully disclose any and all related party transactions in the following manner:

- Disclosing such transactions in reports where required;
- Disclosing in any and all filings with the SEC, where required;
- Obtaining disinterested directors consent; and
- Obtaining shareholder consent where required.

22.    On June 29, 2021, AMMO submitted its annual report for the fiscal year ended March 31, 2021, on a Form 10-K filed with the SEC (the "2021 Annual Report"). The 2021 Annual Report reported the composition and compensation of the Company's executive officers and directors, as well as the valuation of the Company's stock awards made to such individuals. Specifically, the 2021 Annual Report stated in relevant part:

**ITEM 11 EXECUTIVE COMPENSATION**

\*                    \*                    \*

| Name and Principal Position | Period Ended | Salary (1) | Bonus (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fred W. Wagenhals President, Chief Executive Officer, and Director | 3/31/2021 | $240,000 | $96,004 | $157,500 | $ 0 | $ 0 | $ 0 | $ 0 | $493,504 |
| | 3/31/2020 | $120,000 | $ 0 | $180,000 | $ 0 | $ 0 | $ 0 | $ 0 | $300,000 |
| Steve Hilko Chief Operating Officer(4) | 3/31/2021 | $163,542 | $ 0 | $ 58,333 | $ 0 | $ 0 | $ 0 | $ 0 | $221,875 |
| | 3/31/2020 | $120,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $120,000 |
| Robert D. Wiley Chief Financial Officer | 3/31/2021 | $127,500 | $ 0 | $ 90,977 | $ 0 | $ 0 | $ 0 | $ 0 | $218,477 |
| | 3/31/2020 | $103,333 | $ 0 | $ 86,794 | $ 0 | $ 0 | $ 0 | $ 0 | $190,127 |

**Director Compensation**

\*                    \*                    \*

\*                    \*                    \*

| Name and Principal Position | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Russell William Wallace Jr. | $ 0 | $ 70,000 | $ - | $ - | $ - | $ - | $ 70,000 |
| Harry Markley | $ 0 | $ 70,000 | $ - | $ - | $ - | $ - | $ 70,000 |
| Robert J. Goodmanson | $ 90,400 | $ 70,000 | $ - | $ - | $ - | $ - | $160,400 |
| Jessica M. Lockett (4) | $ 12,000 | $ 17,500 | $ - | $ - | $ - | $ - | $ 29,500 |
| Richard R. Childress (5) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Randy E. Luth (6) | $ 0 | $ 52,500 | $ 0 | $ 0 | $ 0 | $ 0 | $ 52,500 |

23.     The 2021 Annual Report stated the Company's purported financial results, including the Company's financing activities, and the cost of certain payments related to such offerings.  Specifically, the 2021 Annual Report stated in relevant part:

|  | For the Year Ended | |
|  | March 31, 2021 | March 31, 2020 |
|---|---|---|
| Net Sales | $        62,482,330 | $        14,780,365 |
| Cost of Products Sold | 51,095,679 | 18,455,904 |
| Gross Margin | 11,386,651 | (3,675,539) |
| Sales, General & Administrative Expenses | 16,766,636 | 10,161,954 |
| Loss from Operations | (5,379,985) | (13,837,493) |
| Other income (expense) |  |  |
| Other income (expense) | (2,432,309) | (719,187) |
| Loss before provision for income taxes | $        (7,812,294) | $        (14,556,680) |
| Provision for income taxes | - | - |
| Net Loss | $        (7,812,294) | $        (14,556,680) |

\*                    \*                    \*

### Financing Activities

We financed our operations primarily from the issuance of equity instruments. During the year ended March 31, 2021, net cash provided by financing activities was $139,276,235. This was the net effect of $138,612,619 generated from the sale of Common Stock, net of cash payments of $13,895,069 in conjunction with Common Stock offerings. Additionally, $40,309,292 was generated from accounts receivable factoring, which was **offset by payments of $40,473,083**. There was $3,500,000 of cash generated from the issuance of a related party note payable. These increases to our financing activities were **offset by payment of $8,783,410** on the related party notes payable, $514,746 toward our insurance premium note payable and a $1,500,000 payment on the repurchase and cancellation of 1,000,000 shares of our Common Stock.

During the year ended March 31, 2020, net cash provided by financing activities was $4,524,848. This was the net effect of $2,465,540 generated from the sale of Common Stock, net of cash payments of $285,981 in conjunction with the Unit offerings. We issued $2,500,000 in Convertible Promissory Notes, net of $329,000 of issuance costs. Additionally, $9,747,281 was generated from accounts receivable factoring, which was **offset by payments of $7,741,302.** There was $819,731 of cash was generated from the issuance of a related party note payable. These increases to our financing activities were **offset by payment of $1,885,000** on the related party notes payable, $466,421 toward our insurance premium note payable and a $300,000 payment of our Contingent Consideration Payable.

24.     The 2021 Annual Report asserted the Company did not have any off-balance sheet arrangements, stating in relevant part:

### Off-Balance Sheet Arrangements

As of March 31, 2021, **we did not have any off-balance sheet arrangements** that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources.

25.     The 2021 Annual Report purported to disclose the extent of the Company's related party transactions, reporting the following transactions and asserting "[o]ther than the foregoing" "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year." The 2021 Annual Report further stated that "[w]ith regard to any future related party transaction" the Company "plan[s] to fully disclose any and all related party transactions." Specifically, the 2021 Annual Report stated the following, in relevant part, excluding the previously reported disclosures:

### Related Party Transactions

During the year ended March 31, 2021, we paid $152,549 in service fees to an independent contractor and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $103,000.

\*            \*            \*

In connection with the acquisition of the casing division of JSC, a promissory note was executed. JSC owned at least five percent (5%) of our shares outstanding from March 2019 through March 16, 2021. On April 30, 2019, the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly. On June 26, 2020, the Company extended the promissory note until August 15, 2021. As of March 31, 2020, we accrued interest of $352,157 related to the note. The note had a balance of $5,400,000 at March 31, 2020 and the note was paid in full on November 5, 2020.

\*            \*            \*

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately $3.4 million in inventory support services, and incurred $405,171 of rent expenses for the year ended March 31, 2021. For the year ended March 31, 2021, the Company purchased approximately $1.9 million in Inventory, incurred $394,128 of rent expenses, and incurred $153,604 of expenses related to support costs such as engineering and maintenance, among others.

On June 26, 2021, the Company and JSC entered into a Settlement Agreement pursuant to which the parties mutually agreed to settle all disputes and mutually release each other from liabilities related to the Amended APA occurring prior to June 26, 2020.

\*            \*            \*

On November 5, 2020, the Company paid $6,000,000 to JSC allocated as follows: (i) payment in full of Note A, representing the balance due from the Company to JSC relating to the acquisition of Jagemann Munition Components in March 2019 and (ii) $592,982 remitted in partial payment of Note B, resulting in the parties' execution of Amended Note B which has a starting principal balance of $1,687,664 ("Amended Note B"). The Amended Note B principal balance carries a 9% per annum interest rate and is amortized equally over the thirty six (36) month term. As a result of the payment in full of Note A JSC shall release the accompanying security interest in Company assets which secured Note A. Concurrently, upon entry into Amended Note B, JSC and the Company entered into the First Amendment to General Business Security Agreement to reflect a revised list of collateral in which JSC has a security interest. The total interest expense recognized on Note A $216,160 for the year ended March 31, 2021. The total interest expense recognized on the original Note B was $62,876 for the year ended March 31, 2021.

The Company's balance of Amended Note B was $1,490,918 at March 31, 2021. The Company recognized $60,100 in interest expense on Amended Note B for the year ended March 31, 2021.

On January 22, 2021, the Company repurchased 1,000,000 shares of the Common Stock issued to JSC at a price of $1.50 per share pursuant to the Amended APA and subsequently cancelled the total purchased shares.

On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company. The original interest rate was the applicable LIBOR Rate. The promissory note was amended and the note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $18,195 in principal payments during year ended March 2021 and the Note was paid in full in July of 2020. We recognized $10,327 of interest expenses related to the note during the year ended March 31, 2021.

In December of 2019, the Company entered into a Promissory Note of $90,000 with Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors. The Note originally matured on June 12, 2020, and had an interest rate at the applicable LIBOR Rate. The promissory note has since been amended and the amended maturity date is September 18, 2020. The Company made $25,000 in principal payments during the year ended March 31, 2021, and the Note was paid in full in July of 2020. The amended note bears interest at 1.25% per month. We recognized $5,350 of interest expense on the note for the year ended March 31, 2021.

On September 23, 2020, the Company and Enlight entered into a promissory note (the "Forest Street Note") with Forest Street, LLC ("Lender"), an Arizona limited liability company wholly owned by our current Chief Executive Officer, Fred Wagenhals, for the principal sum of $3.5 million, which accrues interest at 12% per annum. The Note has a maturity date of September 23, 2022.

Pursuant to the terms of the Forest Street Note, the Company and Enlight (collectively, the borrower pursuant to the note) shall pay Lender; (i) on a monthly basis, beginning October 23, 2020, all accrued interest (only), (ii) on a quarterly basis, a monitoring fee of 1% of the principal amount and then accrued interest; and (iii) on the maturity date, the remaining outstanding

principal balance of the Loan, together with all unpaid accrued interest thereon.

On December 14, 2020, the Company entered into a Debt Conversion Agreement with the Lender. Pursuant to the Agreement, the Company and Forest Street agreed to convert $2,100,000 of the Note's principal into 1,000,000 shares of the Common Stock. The share issuance occurred on December 15, 2020. As a result of the Debt Conversion Agreement the remaining balance of the Forest Street Note was $1,400,000. On January 14, 2021, the Company paid the remaining $1,400,000 in principal and accrued interest of the Forest Street Note. The Company recognized $137,666 in interest expense related to the Forest Street Note for the year ended March 31, 2021.

*          *          *

With regard to any future related party transaction, we plan to fully disclose any and all related party transactions in the following manner:

- Disclosing such transactions in reports where required;
- Disclosing in any and all filings with the SEC, where required;
- Obtaining disinterested director consent; and
- Obtaining shareholder consent where required.

26.    On June 29, 2022, AMMO submitted its annual report for the fiscal year ended March 31, 2022, on a Form 10-K filed with the SEC (the "2022 Annual Report"). The 2022 Annual Report reported the composition and compensation of the Company's executive officers and directors, as well as the valuation of the Company's stock awards made to such individuals. Specifically, the 2022 Annual Report stated in relevant part:

**ITEM 11 EXECUTIVE COMPENSATION**

*          *          *

| Name and Principal Position | Period Ended | Salary (1) | Bonus (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fred W. Wagenhals Chief Executive Officer, and Director | 3/31/2022 | $298,750 | $572,463 | $481,250 | $ 0 | $ 0 | $ 0 | $ 0 | $1,352,463 |
| | 3/31/2021 | $240,000 | $ 96,004 | $157,500 | $ 0 | $ 0 | $ 0 | $ 0 | $ 493,504 |
| Robert D. Wiley Chief Financial Officer | 3/31/2022 | $217,083 | $ 0 | $350,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 567,083 |
| | 3/31/2021 | $127,500 | $ 0 | $ 90,977 | $ 0 | $ 0 | $ 0 | $ 0 | $ 218,477 |
| Robert J. Goodmanson (4) President | 3/31/2022 | $240,000 | $ 0 | $595,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 835,000 |
| Steve Hilko Chief Operating Officer(5) | 3/31/2021 | $163,542 | $ 0 | $ 58,333 | $ 0 | $ 0 | $ 0 | $ 0 | $ 221,875 |

*          *          *

**Director Compensation**

\*                    \*                    \*

| Name and Principal Position | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Russell William Wallace Jr. | $     0 | $140,000 | $          - | $          - | $          - | $          - | $140,000 |
| Harry Markley | $     0 | $140,000 | $          - | $          - | $          - | $          - | $140,000 |
| Jessica M. Lockett | $ 48,000 | $140,000 | $          - | $          - | $          - | $          - | $188,000 |
| Richard R. Childress | $     - | $140,000 | $          - | $          - | $          - | $          - | $140,000 |
| Steve Urvan (4) | $     - | $105,000 | $          - | $          - | $          - | $          - | $105,000 |

27.    The 2022 Annual Report reported the Company's purported financial results, including the Company's financing activities, and the cost of certain payments related to such offerings.  Specifically, the 2022 Annual Report stated in relevant part:

| | For the Year Ended | |
|---|---|---|
| | March 31, 2022 | March 31, 2021 |
| Net Sales | $   240,269,166 | $    62,482,330 |
| Cost of Revenues | 151,505,657 | 51,095,679 |
| Gross Margin | 88,763,509 | 11,386,651 |
| Sales, General & Administrative Expenses | 51,614,147 | 16,766,636 |
| Income (loss) from Operations | 37,149,362 | (5,379,985) |
| Other income (expense) | | |
| Other income (expense) | (615,957) | (2,432,309) |
| Income (loss) before provision for income taxes | $    36,533,405 | $    (7,812,294) |
| Provision for income taxes | 3,285,969 | - |
| Net Income (Loss) | $    33,247,436 | $    (7,812,294) |

\*                    \*                    \*

**Financing Activities:**

During the year ended March 31, 2022, net cash used in financing activities was approximately $28.2 million. This was the net effect of a $50.0 million payment on debt assumed from Gemini, $35.0 million of proceeds from the sale of our preferred stock net of approximately $3.2 million of issuance costs, approximately $2.5 million of preferred stock dividends paid, approximately $2.2 million of insurance premium note payments, approximately $0.9 million was generated from common stock issued for exercised warrants, the $4.0 million repayment of a note payable, and an approximate $0.3 million reduction in our Inventory Credit Facility. Additionally, approximately $121.5 million was generated from accounts receivable factoring, which was offset by payments of approximately $122.8 million.

28.    The 2022 Annual Report asserted the Company did not have any off-balance sheet arrangements, stating in relevant part:

**Off-Balance Sheet Arrangements**

As of March 31, 2022, ***we did not have any off-balance sheet arrangements*** that have or are reasonably likely to have a current or future material effect on

our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resource

29.     The 2022 Annual Report purported to disclose the extent of the Company's related party transactions, reporting the following transactions and asserting "[o]ther than the foregoing" "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year." The 2022 Annual Report further stated that "[w]ith regard to any future related party transaction" the Company "plan[s] to fully disclose any and all related party transactions." Specifically, the 2021 Annual Report stated the following, in relevant part, excluding the previously reported disclosures:

**NOTE 17 – RELATED PARTY TRANSACTIONS**

During the year ended March 31, 2022, we paid $229,083 in service fees to an independent contractor and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $173,000. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of an entity that transacts with Gemini. We recognized $1,042,277 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship.

*               *               *

In connection with the acquisition of the casing division of JSC, a promissory note was executed. On April 30, 2019, the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly. On June 26, 2020, the Company extended the promissory note until August 15, 2021. As of March 31, 2021, we accrued interest of $352,157 related to the note. The was paid in full on November 5, 2020. JSC owned at least five percent (5%) of our shares outstanding from March 2019 through March 16, 2021.

*               *               *

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $1.7 million in inventory support services, and $408,852 of rent expenses for the year ended March 31, 2022. For the year ended March 31, 2021, the Company purchased approximately $3.4 million in inventory support services, and incurred $405,171 of rent expenses for the year ended March 31, 2021.

*               *               *

The Company's balance of Amended Note B was $865,771 and $1,490,918 at March 31, 2022 and 2021, respectively. The Company recognized $110,518 and $60,100 in interest expense on Amended Note B for the years ended March 31, 2022 and 2021, respectively.

On January 22, 2021, the Company repurchased 1,000,000 shares of the Company's common stock issued to JSC at a price of $1.50 per share pursuant to the Amended APA.

On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company. The original interest rate was the applicable LIBOR Rate. The promissory note was amended and the note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $18,195 in principal payments during the nine months ended December, 2020 and the Note was paid in full in July of 2020. We recognized $10,327 of interest expenses related to the note during the year ended March 31, 2021.

30.     On June 14, 2023, AMMO submitted its annual report for the fiscal year ended March 31, 2023, on a Form 10-K filed with the SEC (the "2023 Annual Report"). The 2023 Annual Report reported the Company's purported financial results, including the Company's financing activities, and the cost of certain payments related to such offerings. Specifically, the 2023 Annual Report stated in relevant part

|  | For the Year Ended | |
| --- | --- | --- |
|  | March 31, 2023 | March 31, 2022 |
| Net Sales | $    191,439,801 | $    240,269,166 |
| Cost of Revenues | 136,031,204 | 151,505,657 |
| Gross Margin | 55,408,597 | 88,763,509 |
| Sales, General & Administrative Expenses | 58,667,516 | 51,614,147 |
| Income (loss) from Operations | (3,258,919) | 37,149,362 |
| Other income (expense) | | |
| Other income (expense) | (606,881) | (615,957) |
| Income (loss) before provision for income taxes | $    (3,865,800) | $    36,533,405 |
| Provision for income taxes | 730,238 | 3,285,969 |
| Net Income (Loss) | $    (4,596,038) | $    33,247,436 |

*                    *                    *

***Financing Activities***

During the year ended March 31, 2023, net cash used in financing activities was approximately $6.7 million. This was the result of approximately $3.0 million of preferred stock dividends paid, $2.1 million of insurance premium note payments, $0.7 million in payments of our related party note payable, and an approximate $0.8 million reduction in our Inventory Credit Facility. These items were offset by $1.0 million generated from our construction note payable and $0.1 million of proceeds from warrants exercised for common stock. Additionally, approximately $71.3 million was generated from accounts receivable factoring, which was ***offset by payments of approximately $72.3 million***.

During the year ended March 31, 2022, net cash used in financing activities was approximately $28.2 million. This was the net effect of a $50.0 million payment on debt assumed from Gemini, $35.0 million of proceeds from the sale of our preferred stock net of approximately $3.2 million of issuance costs,

approximately $2.5 million of preferred stock dividends paid, approximately $2.2 million of insurance premium note payments, approximately $0.9 million was generated from common stock issued for exercised warrants, the $4.0 million repayment of a note payable, and an approximate $0.3 million reduction in our Inventory Credit Facility. Additionally, approximately $121.5 million was generated from accounts receivable factoring, which was offset by ***payments of approximately $122.8 million***.

31.     The 2023 Annual Report asserted the Company did not have any off-balance sheet arrangements, stating in relevant part:

**Off-Balance Sheet Arrangements**

As of March 31, 2023, ***we did not have any off-balance sheet arrangements*** that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources

32.     The 2023 Annual Report stated the following, in relevant part, regarding the Company's purported related party transactions, excluding the previously reported disclosures:

**NOTE 16– RELATED PARTY TRANSACTIONS**

On November 3, 2022, AMMO, Inc. (the "Company") entered into a Settlement Agreement (the "Settlement Agreement") with Steven F. Urvan and Susan T. Lokey (collectively with each of their respective affiliates and associates, the "Urvan Group").

Pursuant to the Settlement Agreement, the Urvan Group has agreed to withdraw its notice of stockholder nomination of its seven director candidates (the "Urvan Candidates") and its demand to inspect books and records, pursuant to Section 220 of the General Corporation Law of the State of Delaware, and the Company agreed to immediately increase the size of the Board from seven to nine directors and appoint Christos Tsentas and Wayne Walker (each, a "New Director" and the New Directors together with Mr. Urvan, the "Urvan Group Directors") to the Board to serve as directors with terms expiring at the 2022 annual meeting of stockholders (the "2022 Annual Meeting"). The Company will include the Urvan Group Directors in its director candidates slate for the 2022 Annual Meeting and any subsequent annual meeting of the Company occurring prior to the Termination Date (as defined below). The Company has agreed to not increase the size of the Board above nine directors prior to the Termination Date unless the increase is approved by at least seven directors. Mr. Wagenhals will continue to serve as a director and Chairman of the Board.

Unless otherwise mutually agreed to in writing by each party, the Settlement Agreement will remain in effect until the date that is the earlier of (i) 30 days prior to the earlier of (A) the deadline set forth in the notice requirements of Federal "Universal Proxy Rules" promulgated under Rule 14a-19(a) and Rule 14a-19(b) under the Securities Exchange Act of 1934, as amended (the "UPR Deadline") relating to the Company's 2023 annual meeting of stockholders

(the "2023 Annual Meeting") and (B) any deadline that may be set forth in the Company's Amended and Restated Certificate of Incorporation (as amended from time to time, the "Certificate") or Bylaws (the "Bylaws") following the execution of the Settlement Agreement relating to the nomination of director candidates for election to the Board at the 2023 Annual Meeting, and (ii) 90 days prior to the first anniversary of the 2022 Annual Meeting (such date, the "Termination Date"). However, if the Company notifies Mr. Urvan in writing at least 15 days prior to such Termination Date that the Board irrevocably offers to re-nominate the Urvan Group Directors for election at the 2023 Annual Meeting and Mr. Urvan accepts such offer within 15 days of receipt of such notice, the Termination Date will be automatically extended until the earlier of (i) 30 days prior to the earlier of (A) the UPR Deadline relating to the Company's 2024 annual meeting of stockholders (the "2024 Annual Meeting") and (B) any deadline that may be set forth in the Certificate or the Bylaws following execution of the Settlement Agreement relating to the nomination of director candidates for election to the Board at the 2024 Annual Meeting, and (ii) 90 days prior to the first anniversary of the 2023 Annual Meeting. Notwithstanding the foregoing, the "Termination Date" shall not occur prior to 20 days after Mr. Urvan's departure from the Board.

Pursuant to the Settlement Agreement, the Company will suspend the previously announced separation of Company into Action Outdoor Sports, Inc. and Outdoor Online, Inc., pending the further evaluation of strategic options by the Board. The Company paid approximately $500,000 of the Urvan Group's costs, fees and expenses per the terms of the Settlement Agreement. Additionally, the Company issued 125,000 shares of Common Stock for a total value of $437,500 to an employee and issued 110,000 shares of Common Stock for a total value of $385,000 to an independent contractor as a result of termination without cause per the terms of the Settlement Agreement.

The foregoing summary of the Settlement Agreement does not purport to be complete and is subject to, and qualified in its entirety, by reference to the full text of the Settlement Agreement, a copy of which was previously filed as Exhibit 10.1 in the Form 8-K filed with the SEC on November 7, 2022, and incorporated herein by reference.

During the year ended March 31, 2023, we paid $551,916 in service fees to two independent contractors of which $223,333 were created as a result of termination without cause as a result of our Proxy Settlement Agreement. The two independent contractors 141,419 shares of our common stock for a total value of $494,967 in addition to the issuances described in the foregoing paragraphs. We issued 45,000 shares in the aggregate to its advisory committee members for service for a total value of $129,750. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of entities that transacts with Gemini. We recognized $215,300 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $182,344 included in our Accounts Receivable at March 31, 2023 as a result of this relationship.

During the year ended March 31, 2022, we paid $229,083 in service fees to an independent contractor and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $173,000. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of an entity that transacts

with Gemini. We recognized $1,042,277 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $139,164 included in our Accounts Receivable at March 31, 2022 as a result of this relationship.

*      *      *

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $2.0 million in inventory support services, and $170,355 of rent expenses for the year ended March 31, 2023. Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $1.7 million in inventory support services, and $408,852 of rent expenses for the year ended March 31, 2022. For the year ended March 31, 2021, the Company purchased approximately $3.4 million in inventory support services, and incurred $405,171 of rent expenses for the year ended March 31, 2021.

*      *      *

The Company's balance of Amended Note B was $180,850 and $865,771 at March 31, 2023 and 2022, respectively. The Company recognized $48,665, $110,518, and $60,100 in interest expense on Amended Note B for the years ended March 31, 2023, 2022, and 2021, respectively.

33.     On July 31, 2023, AMMO filed an amendment to its annual report for the fiscal year ended March 31, 2023, on a Form 10-K/A with the SEC (the "Amended 2023 Annual Report"). The Amended 2023 Annual Report was filed to, *inter alia*, amend and restate disclosure of the Company's directors, executive officers and corporate governance, executive compensation, and certain relationships and related transactions. The Amended 2023 Annual Report reported the composition and compensation of the Company's executive officers and directors, as well as the valuation of the Company's stock awards made to such individuals. Specifically, the Amended 2023 Annual Report stated in relevant part:

## ITEM 11 EXECUTIVE COMPENSATION

\*                    \*                    \*

| Name and Principal Position | Year | Salary (1) | Bonus (1) | Stock Awards (2) | All other compensation (3) | Total |
|---|---|---|---|---|---|---|
| Fred W. Wagenhals (4) Chief Executive Officer, and Director | 2023 | $ 475,000 | $ 478,636 | $ 840,000 | $ 24,062 | $1,817,698 |
| | 2022 | $ 298,750 | $ 572,463 | $ 481,250 | $ 0 | $1,352,463 |
| | 2021 | $ 240,000 | $ 96,004 | $ 157,500 | $ 0 | $ 493,504 |
| Robert D. Wiley Chief Financial Officer | 2023 | $ 240,000 | $ 0 | $ 350,000 | $ 15,084 | $ 605,084 |
| | 2022 | $ 217,083 | $ 0 | $ 350,000 | $ 0 | $ 567,083 |
| | 2021 | $ 127,500 | $ 0 | $ 90,977 | $ 0 | $ 218,477 |
| Jared R. Smith (5) President and Chief Operating Officer | 2023 | $ 118,750 | $ 118,750 | $ 175,000 | $ 29,086 | $ 441,586 |
| Robert J. Goodmanson (6) President | 2023 | $ 180,000 | 0 | $ 446,250 | $ 84,973 | 711,223 |
| | 2022 | $ 240,000 | 0 | $ 595,000 | $ 0 | $ 835,000 |
| Steve Hilko Chief Operating Officer (7) | 2021 | $ 163,542 | $ 0 | $ 58,333 | $ 0 | $ 221,875 |

\*                    \*                    \*

## Director Compensation

\*                    \*                    \*

| Name | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards | Nonequity incentive plan compensation | Change in Pension Value and Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Russell William Wallace Jr. | $ 0 | $ 140,000 | $ - | $ - | $ - | $ - | $ 140,000 |
| Harry Markley | $ 0 | $ 140,000 | $ - | $ - | $ - | $ - | $ 140,000 |
| Jessica M. Lockett | $ 48,000 | $ 140,000 | $ - | $ - | $ - | $ - | $ 188,000 |
| Richard R. Childress | $ - | $ 140,000 | $ - | $ - | $ - | $ - | $ 140,000 |
| Steve Urvan (3) | $ 183,692 | $ 140,000 | $ - | $ - | $ - | $ 15,561 | $ 339,253 |
| Wayne Walker (4) | $ - | $ 17,500 | $ - | $ - | $ - | $ - | $ 17,500 |
| Christos Tsentas (4) | $ - | $ 17,500 | $ - | $ - | $ - | $ - | $ 17,500 |
| Randy E. Luth (5) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

34.   The Amended 2023 Annual Report reported the following regarding certain related transactions which the Company engaged in, excluding those previously reported disclosures, stating in relevant part:

The following is a description of each transaction since April 1, 2022 and each currently proposed transaction in which:

- we have been or are to be a participant;
- the amount involved exceeds $120,000; and
- any related person had or will have a direct or indirect material interest.

*While the Company does not current have a written policy regarding approval of transactions between the Company and a related party, our Board of Directors, as matter of appropriate corporate governance, reviews and approves all such transactions, to the extent required by applicable rules and regulations.* Generally, management would present to the Board of Directors for approval at the next regularly scheduled Board of Directors meeting any related party transactions proposed to be entered in by us. *The Board of Directors may approve the transaction if it is deemed to be in the best interests of our shareholders and the Company.*

\*          \*          \*

During the year ended March 31, 2023, we paid $551,916 in service fees to two independent contractors of which $223,333 were created as a result of termination without cause as a result of our Proxy Settlement Agreement. The two independent contractors were issued 141,419 shares of our common stock for a total value of $494,967. We issued 45,000 shares in the aggregate to our advisory committee members for service for a total value of $129,750. Through our acquisition of Gemini, a related party relationship was created with Mr. Urvan by ownership of entities that transacts with Gemini. We recognized $215,300 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $182,344 included in our Accounts Receivable at March 31, 2023 as a result of this relationship.

35.    On June 13, 2024, AMMO submitted its annual report for the fiscal year ended March 31, 2024, on a Form 10-K filed with the SEC (the "2024 Annual Report"). The 2024 Annual Report reported the Company's purported financial results, including the Company's financing activities, and the cost of certain payments related to such offerings. Specifically, the 2024 Annual Report stated in relevant part:

| | For the Year Ended | |
| --- | --- | --- |
| | March 31, 2024 | March 31, 2023 |
| Net Revenues | $ 145,054,572 | $ 191,439,801 |
| Cost of Revenues | 102,431,803 | 136,031,204 |
| Gross Margin | 42,622,769 | 55,408,597 |
| Sales, general & administrative expenses | 61,199,966 | 58,667,516 |
| Income (loss) from Operations | (18,577,197) | (3,258,919) |
| Other income (expense) | | |
| Other income (expense) | (779,066) | (606,881) |
| Income (loss) before provision for income taxes | $ (19,356,263) | $ (3,865,800) |
| Provision for income taxes | (3,791,063) | 730,238 |
| Net Income (Loss) | $ (15,565,200) | $ (4,596,038) |

\*          \*          \*

**Financing Activities**

During the year ended March 31, 2024, net cash used in financing activities was $8.7 million, consisting of $3.2 million of insurance premium note payments, $3.0 million of preferred stock dividends paid, $2.2 million used to repurchase shares of Common Stock pursuant to our repurchase plan, and $0.2 million in payments of our related party note payable. These items were offset by $0.1 million of proceeds from warrants exercised for common stock. Additionally, $37.3 million was generated from accounts receivable factoring, which was offset by payments of $37.3 million.

During the year ended March 31, 2023, net cash used in financing activities was $6.7 million, consisting of $3.0 million of preferred stock dividends paid, $2.1 million of insurance premium note payments, an $0.8 million reduction in our Inventory Credit Facility, and $0.7 million in payments of our related party note payable. These items were offset by $1.0 million generated from our construction note payable and $0.1 million of proceeds from warrants exercised for common stock. Additionally, approximately $71.3 million was generated from accounts receivable factoring, which was offset by payments of approximately $72.3 million.

36.     The 2024 Annual Report asserted the Company did not have any off-balance sheet arrangements, stating in relevant part:

**Off-Balance Sheet Arrangements**

As of March 31, 2024, *we did not have any off-balance sheet arrangements* that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources.

37.     The 2024 Annual Report purported to disclose the Company's related party transactions, excluding those previously reported disclosures, stating in relevant part:

**NOTE 17 – RELATED PARTY TRANSACTIONS**

During the year ended March 31, 2024, we paid $410,173 in service fees to two independent contractors consisting of a $244,640 payment due upon termination without cause. The two independent contractors were issued 168,581 shares of Common Stock for a total value of $350,345, which consisted of an issuance of 134,240 shares due upon termination without cause. We issued 25,000 shares in the aggregate to our advisory committee members for service for a total value of $53,250. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of entities that transacts with Gemini. There was $201,646 included in our Accounts Receivable at March 31, 2024 as a result of this relationship. Additionally, we owed $150,866 to Jagemann Precision Tooling, a division of JSC, at March 31, 2024.

On July 24, 2023, Fred Wagenhals departed as CEO and the Board appointed Mr. Wagenhals the Company's Executive Chairman. Mr. Wagenhals remains a member of the Board. Mr. Wagenhals received the following payments in connection with his transition from CEO to Executive Chairman: (i) total cash payments of $1,060,290; (ii) 300,000 shares of Common Stock for a total value of $624,000.

On July 26, 2023, we obtained a $1.6 million letter of credit with Northern Trust for collateral for a bond related to a judgement assessed to GunBroker. On July 17, 2023, we generated a $1.6 million certificate of deposit with Northern Trust for security on the letter of credit. The term of the certificate of deposit is twelve months and includes interest of approximately 5%. Per the terms of the Merger Agreement, filed with the Commission on a Current Report on Form 8-K on May 6, 2021 (the "Current Report"), the Seller is required to pay or be liable for these losses (capitalized terms are defined the Current Report).

In July of 2023, the Company filed suit in the Delaware Chancery Court against Director and Shareholder Steve Urvan for claims arising out of the Company's acquisition of certain companies referenced as the GunBroker family of companies. The claims arise based upon Mr. Urvan's repeated failure and refusal to honor contractual defense and indemnification obligations arising under that certain Merger Agreement, along with alleged misrepresentations.

*            *            *

During the year ended March 31, 2023, we paid $551,916 in service fees to two independent contractors of which $223,333 were created as a result of termination without cause as a result of our Proxy Settlement Agreement. The two independent contractors were issued 141,419 shares of our common stock for a total value of $494,967 in addition to the issuances described in the foregoing paragraphs. We issued 45,000 shares in the aggregate to its advisory committee members for service for a total value of $129,750. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of entities that transacts with Gemini. We recognized $215,300 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $182,344 included in our Accounts Receivable at March 31, 2023 as a result of this relationship.

During the year ended March 31, 2022, we paid $229,083 in service fees to an independent contractor and we issued 60,000 shares in the aggregate to its advisory committee members for service for a total value of $173,000. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of an entity that transacts with Gemini. We recognized $1,042,277 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $139,164 included in our Accounts Receivable at March 31, 2022 as a result of this relationship.

*            *            *

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $2.0 million in inventory support services, and $170,355 of rent expenses for the year ended March 31, 2023. Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately $1.7 million in inventory support services, and $408,852 of rent expenses for the year ended March 31, 2022.

*            *            *

The Company paid off the balance of Amended Note B during the year ended March 31, 2024. The Company's balance of Amended Note B was $180,850 and $865,771 at March 31, 2023 and 2022, respectively. The Company recognized $1,788, $48,665, $110,518, and $60,100 in interest expense on Amended Note B for the years ended March 31, 2024, 2023, and 2022, respectively.

38.     On July 29, 2024, AMMO filed an amendment to its annual report for the fiscal year ended March 31, 2024, on a Form 10-K/A with the SEC (the "Amended 2024 Annual Report"). The Amended 2024 Annual Report was filed to, *inter alia*, amend and restate disclosure of the Company's directors, executive officers and corporate governance, executive compensation, and certain relationships and related transactions. The Amended 2024 Annual Report reported the composition and compensation of the Company's executive officers and directors, as well as the valuation of the Company's stock awards made to such individuals. Specifically, the Amended 2024 Annual Report stated in relevant part:

**ITEM 11 EXECUTIVE COMPENSATION**

\*                    \*                    \*

| Name and principal position | Year | Salary ($)(1) | Bonus ($)(1) | Stock awards ($)(2) | Option awards ($)(3) | All other compensation (4) | Total |
|---|---|---|---|---|---|---|---|
| Jared R. Smith (6) CEO, and Director | 2024 | $ 492,215 | $ - | $ 425,800 | $ 430,457 | $ 33,943 | $ 1,382,415 |
| | 2023 | $ 118,750 | $ 118,750 | $ 175,000 | $ - | $ 29,086 | $ 441,586 |
| Robert D. Wiley CFO | 2024 | $ 310,833 | $ 129,000 | $ 225,000 | $ - | $ 14,567 | $ 679,400 |
| | 2023 | $ 240,000 | $ - | $ 350,000 | $ - | $ 15,084 | $ 605,084 |
| | 2022 | $ 217,083 | $ - | $ 350,000 | $ - | $ - | $ 567,083 |
| Fred W. Wagenhals (5)(7) Chairman of the Board of Directors, Executive Chair | 2024 | $ 423,270 | $ 85,438 | $ 1,129,650 | $ - | $ 1,079,508 | $ 2,717,866 |
| | 2023 | $ 475,000 | $ 478,636 | $ 840,000 | $ - | $ 24,062 | $ 1,817,698 |
| | 2022 | $ 298,750 | $ 572,463 | $ 481,250 | $ - | $ - | $ 1,352,463 |
| Anthony Tate Vice President of Sales & Marketing | 2024 | $ 246,566 | $ 62,000 | $ 206,250 | $ - | $ - | $ 514,816 |
| Beth Cross Chief Operating Officer, GunBroker | 2024 | $ 250,000 | $ 62,000 | $ 168,750 | $ - | $ 25,979 | $ 506,729 |
| Tod Wagenhals Executive Vice President, Secretary | 2024 | $ 230,000 | $ - | $ 203,000 | $ - | $ 18,517 | $ 451,517 |

\*                    \*                    \*

**Director Compensation**

| | * | * | * | | |
|---|---|---|---|---|---|
| Name and Principal Position | Fees earned or paid in cash ($)(1) | Stock awards ($)(2)(3) | Option awards ($) | | Total ($) |
| Russell William Wallace Jr. | $          - | $     90,000 | $          - | $ | 90,000 |
| Jessica M. Lockett (5) | $    48,000 | $     90,000 | $          - | $ | 138,000 |
| Richard R. Childress | $          - | $     90,000 | $          - | $ | 90,000 |
| Steve Urvan | $          - | $     90,000 | $          - | $ | 90,000 |
| Wayne Walker | $          - | $   101,351 | $          - | $ | 101,351 |
| Christos Tsentas | $          - | $   101,351 | $          - | $ | 101,351 |
| Randy E. Luth | $          - | $   109,875 | $          - | $ | 109,875 |
| Harry S. Markley(4) | $          - | $     26,725 | $          - | $ | 26,725 |

39.     The Amended 2024 Annual Report reported the following regarding certain related transactions which the Company engaged in, in relevant part

**Related Party Transactions**

Our Related Party Transactions Policy provides guidance for addressing actual or potential conflicts of interests, including those that may arise from transactions and relationships between us and our executive officers or directors. The Audit Committee and Board, as matter of appropriate corporate governance, reviews and approves all such transactions, to the extent required by applicable rules and regulations. Generally, management would present to the Board for approval at the next regularly scheduled Board meeting any related party transactions proposed to be entered into by us. The Audit Committee and Board may approve the transaction if it is deemed to be in the best interests of the Company

The following is a description of each transaction since April 1, 2023 and each currently proposed transaction in which:

●      we have been or are to be a participant;

●      the amount involved exceeds $120,000; and

●      any related person had or will have a direct or indirect material interest.

During the year ended March 31, 2024, we paid $410,173 in service fees to two independent contractors, who provided services to the company, which included a $244,640 payment due upon termination without cause to one of the independent contractors. The two independent contractors were issued 168,581 shares of Common Stock for a total value of $350,345, which included an issuance of 134,240 shares due upon termination without cause for one of the independent contractors. We issued 25,000 shares in the aggregate to our advisory committee members for service for a total value of $53,250.

Through our acquisition of Gemini Direct Investments, LLC ("Gemini"), a related party relationship was created through one of our directors, Mr. Steve Urvan, by his ownership of entities that provided services to Gemini. There was $201,646 included in our Accounts Receivable at March 31, 2024 from entities owned by Mr. Urvan.

The Company paid off the balance of a promissory note to Jagemann Stamping Company ("JSC") during the year ended March 31, 2024. JSC became a shareholder of the Company through the Company's acquisition of JSC's brass casing division. The payment made to JSC during fiscal 2024 consisted of $181,132 in principal and $2,784 in interest on the note. Additionally, we owed $150,866 to Jagemann Precision Tooling, a division of JSC, at March 31, 2024.

40. The above statements identified in ¶¶ 18-39 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the company lacked adequate internal controls over financial reporting; (2) that there was a substantial likelihood the Company failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (3) that there was a substantial likelihood the Company failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; (4) there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

41. On September 24, 2024, after the market closed, AMMO announced that its Chief Financial Officer had resigned "at the request of the Board." Further, the Company disclosed that it is conducting an independent investigation into its "internal control over financial reporting for the fiscal years 2020 through 2023." Specifically, on that date, the Company filed a form 8-K with the SEC which stated, in relevant part:

*Resignation of Mr. Rob Wiley as Chief Financial Officer*

On September 19, 2024, the Company received a notice of resignation from its Chief Financial Officer, Rob Wiley, effective September 20, 2024. ***Mr. Wiley resigned upon request by the Board.*** Pursuant to a recommendation by the Compensation Committee, the Board exercised its discretion to approve a separation agreement ("Separation Agreement") for Mr. Wiley. Mr. Wiley

signed the Separation Agreement on September 19, 2024. Pursuant to the Separation Agreement, Mr. Wiley will be entitled to separation compensation in the amount of $406,250.00 paid in equal bi-monthly installments over fifteen calendar months; fifty thousand shares of common stock; a lump sum payment for accrued and unused vacation and paid time off; family health benefits under the Company's employer sponsored plans until September 30, 2025; and unreimbursed expenses. Mr. Wiley gave the Company a general liability release, and the Parties agreed to several standard restrictive covenants. Additionally, the Separation Agreement requires Mr. Wiley to provide cooperation and assistance to the Company to facilitate the transfer of duties to his successor.

### Independent Investigation

*A Special Committee of the Board of Directors has retained a law firm to conduct an independent investigation, focused on fiscal years 2020 through 2023, including determining whether the Company and its management control persons at the time: (i) accurately disclosed all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (ii) properly characterized certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; and (iii) appropriately valued unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022*. The Company's outside auditors have indicated that *they are not prepared to rely on representations from the Company's management team from the period in question* until such time that the aforementioned investigation and all appropriate remediation, if necessary, is completed. This independent investigation is in its early stages, and to ensure the fairness of that process, the Company does not plan further comment pending completion of the investigation.

42.     On this news, the Company's share price fell $0.08, or 5.26%, to close at $1.44 per share on September 25, 2024, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired AMMO securities between August 19, 2020 and September 24, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, AMMO's shares actively traded on the

NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of AMMO shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by AMMO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of AMMO; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

48.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

1

**UNDISCLOSED ADVERSE FACTS**

2      49.     The market for AMMO's securities was open, well-developed and efficient at

3  all relevant times.  As a result of these materially false and/or misleading statements, and/or

4  failures to disclose, AMMO's securities traded at artificially inflated prices during the Class

5  Period.  Plaintiff and other members of the Class purchased or otherwise acquired AMMO's

6  securities relying upon the integrity of the market price of the Company's securities and

7  market information relating to AMMO, and have been damaged thereby.

8      50.     During the Class Period, Defendants materially misled the investing public,

9  thereby inflating the price of AMMO's securities, by publicly issuing false and/or

10  misleading statements and/or omitting to disclose material facts necessary to make

11  Defendants' statements, as set forth herein, not false and/or misleading.  The statements and

12  omissions were materially false and/or misleading because they failed to disclose material

13  adverse information and/or misrepresented the truth about AMMO's business, operations,

14  and prospects as alleged herein.

15      51.     At all relevant times, the material misrepresentations and omissions

16  particularized in this Complaint directly or proximately caused or were a substantial

17  contributing cause of the damages sustained by Plaintiff and other members of the Class.

18  As described herein, during the Class Period, Defendants made or caused to be made a series

19  of materially false and/or misleading statements about AMMO's financial well-being and

20  prospects.   These material misstatements and/or omissions had the cause and effect of

21  creating in the market an unrealistically positive assessment of the Company and its financial

22  well-being and prospects, thus causing the Company's securities to be overvalued and

23  artificially inflated at all relevant times.  Defendants' materially false and/or misleading

24  statements during the Class Period resulted in Plaintiff and other members of the Class

25  purchasing the Company's securities at artificially inflated prices, thus causing the damages

26  complained of herein when the truth was revealed.

27

28

1

**LOSS CAUSATION**

2   52.   Defendants' wrongful conduct, as alleged herein, directly and proximately

3   caused the economic loss suffered by Plaintiff and the Class.

4   53.   During the Class Period, Plaintiff and the Class purchased AMMO's securities

5   at artificially inflated prices and were damaged thereby.   The price of the Company's

6   securities significantly declined when the misrepresentations made to the market, and/or the

7   information alleged herein to have been concealed from the market, and/or the effects

8   thereof, were revealed, causing investors' losses.

9   **SCIENTER ALLEGATIONS**

10   54.   As alleged herein, Defendants acted with scienter since Defendants knew that

11   the public documents and statements issued or disseminated in the name of the Company

12   were materially false and/or misleading; knew that such statements or documents would be

13   issued or disseminated to the investing public; and knowingly and substantially participated

14   or acquiesced in the issuance or dissemination of such statements or documents as primary

15   violations of the federal securities laws.   As set forth elsewhere herein in detail, the

16   Individual Defendants, by virtue of their receipt of information reflecting the true facts

17   regarding AMMO, their control over, and/or receipt and/or modification of AMMO's

18   allegedly materially misleading misstatements and/or their associations with the Company

19   which made them privy to confidential proprietary information concerning AMMO,

20   participated in the fraudulent scheme alleged herein.

21   **APPLICABILITY OF PRESUMPTION OF RELIANCE**

22   **(FRAUD-ON-THE-MARKET DOCTRINE)**

23   55.   The market for AMMO's securities was open, well-developed and efficient at

24   all relevant times.   As a result of the materially false and/or misleading statements and/or

25   failures to disclose, AMMO's securities traded at artificially inflated prices during the Class

26   Period.   On June 30, 2021, the Company's share price closed at a Class Period high of $9.79

27   per share.   Plaintiff and other members of the Class purchased or otherwise acquired the

28

1  Company's securities relying upon the integrity of the market price of AMMO's securities
2  and market information relating to AMMO, and have been damaged thereby.

3      56.    During the Class Period, the artificial inflation of AMMO's shares was caused
4  by the material misrepresentations and/or omissions particularized in this Complaint causing
5  the damages sustained by Plaintiff and other members of the Class.  As described herein,
6  during the Class Period, Defendants made or caused to be made a series of materially false
7  and/or misleading statements about AMMO's business, prospects, and operations.  These
8  material misstatements and/or omissions created an unrealistically positive assessment of
9  AMMO and its business, operations, and prospects, thus causing the price of the Company's
10 securities to be artificially inflated at all relevant times, and when disclosed, negatively
11 affected the value of the Company shares.  Defendants' materially false and/or misleading
12 statements during the Class Period resulted in Plaintiff and other members of the Class
13 purchasing the Company's securities at such artificially inflated prices, and each of them has
14 been damaged as a result.

15     57.    At all relevant times, the market for AMMO's securities was an efficient
16 market for the following reasons, among others:

17         (a)    AMMO shares met the requirements for listing, and was listed and
18 actively traded on the NASDAQ, a highly efficient and automated market;

19         (b)    As a regulated issuer, AMMO filed periodic public reports with the
20 SEC and/or the NASDAQ;

21         (c)    AMMO regularly communicated with public investors via established
22 market communication mechanisms, including through regular dissemination of press
23 releases on the national circuits of major newswire services and through other wide-ranging
24 public disclosures, such as communications with the financial press and other similar
25 reporting services; and/or

26         (d)    AMMO was followed by securities analysts employed by brokerage
27 firms who wrote reports about the Company, and these reports were distributed to the sales

28

force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

58. As a result of the foregoing, the market for AMMO's securities promptly digested current information regarding AMMO from all publicly available sources and reflected such information in AMMO's share price. Under these circumstances, all purchasers of AMMO's securities during the Class Period suffered similar injury through their purchase of AMMO's securities at artificially inflated prices and a presumption of reliance applies.

59. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

60. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of AMMO who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

61.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase AMMO's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

63.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for AMMO's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

64.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct to conceal adverse material information about AMMO's financial well-being and prospects, as specified herein.

65.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of AMMO's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about AMMO and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

66.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

67.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

1   Such defendants' material misrepresentations and/or omissions were done knowingly or
2   recklessly and for the purpose and effect of concealing AMMO's financial well-being and
3   prospects from the investing public and supporting the artificially inflated price of its
4   securities. As demonstrated by Defendants' overstatements and/or misstatements of the
5   Company's business, operations, financial well-being, and prospects throughout the Class
6   Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or
7   omissions alleged, were reckless in failing to obtain such knowledge by deliberately
8   refraining from taking those steps necessary to discover whether those statements were false
9   or misleading.

10      68.     As a result of the dissemination of the materially false and/or misleading
11  information and/or failure to disclose material facts, as set forth above, the market price of
12  AMMO's securities was artificially inflated during the Class Period.  In ignorance of the
13  fact that market prices of the Company's securities were artificially inflated, and relying
14  directly or indirectly on the false and misleading statements made by Defendants, or upon
15  the integrity of the market in which the securities trades, and/or in the absence of material
16  adverse information that was known to or recklessly disregarded by Defendants, but not
17  disclosed in public statements by Defendants during the Class Period, Plaintiff and the other
18  members of the Class acquired AMMO's securities during the Class Period at artificially
19  high prices and were damaged thereby.

20      69.     At the time of said misrepresentations and/or omissions, Plaintiff and other
21  members of the Class were ignorant of their falsity, and believed them to be true.  Had
22  Plaintiff and the other members of the Class and the marketplace known the truth regarding
23  the problems that AMMO was experiencing, which were not disclosed by Defendants,
24  Plaintiff and other members of the Class would not have purchased or otherwise acquired
25  their AMMO securities, or, if they had acquired such securities during the Class Period, they
26  would not have done so at the artificially inflated prices which they paid.

27      70.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange
28  Act and Rule 10b-5 promulgated thereunder.

71.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

72.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

73.   Individual Defendants acted as controlling persons of AMMO within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.   In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.   As set forth above, AMMO and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful

conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

1  DATED:  September 27, 2024

2                                          By:   */s/ Mark D. Lammers*
                                           **RUSING LOPEZ & LIZARDI, P.L.L.C.**
3                                          6363 North Swan Road, Suite 151
                                           Tucson, Arizona 85718
4                                          Telephone: (520) 792-4800
                                           Facsimile: (520) 529-4262
5
                                           Mark D. Lammers; mdlammers@rllaz.com
6                                          State Bar No. 010335

7                                          *Liaison Counsel for Plaintiff Arias Larmay*

8                                          **GLANCY PRONGAY & MURRAY LLP**
9                                          Robert V. Prongay
                                           Charles Linehan
10                                         1925 Century Park East, Suite 2100
                                           Los Angeles, California 90067
11                                         Telephone: (310) 201-9150
12                                         Facsimile: (310) 201-9160
                                           Email:  clinehan@glancylaw.com
13
14                                         **THE LAW OFFICES OF FRANK R. CRUZ**
                                           Frank R. Cruz
15                                         1999 Avenue of the Stars, Suite 1100
                                           Los Angeles, CA 90067
16                                         Telephone: (310) 914-5007
17
18                                         *Counsel for Plaintiff Arias Larmay*

19

20

21

22

23

24

25

26

27

28