Gary A. Gotto (No. 007401)
**Keller Rohrback LLP**
3101 N Central Ave., Ste. 1400
Phoenix, AZ 85012-2600
Tel: (602) 230-6322
ggotto@kellerrohrback.com
***Liaison Counsel for Lead Plaintiffs***

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Dmitry Cherches; Irene Zvagelsky; and Hideyoshi Delgado; Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMMO, Inc.; Fred W. Wagenhals; Christopher D. Larson; Jared R. Smith; Robert D. Wiley; and John P. Flynn,<br><br>Defendants. | Case No: CV-24-02619-PHX-DJH<br><br><u>CLASS ACTION</u><br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

# TABLE OF CONTENTS

TABLE OF DEFINITIONS ..... iii

INTRODUCTION ..... 1

JURISDICTION AND VENUE ..... 5

PARTIES ..... 6

SUBSTANTIVE ALLEGATIONS ..... 8

I. BACKGROUND ..... 8

A. AMMO's Manufacturing Business ..... 8

B. The SEC Bans Larson from Serving as an Officer of any Public Company ..... 9

C. Larson Violates the Consent Decree, Continuing to Run AMMO with Wagenhals ..... 10

D. Background Regarding Disclosure of Executive Officers and Executive Compensation ..... 13

E. Larson was a Related Party ..... 14

F. The Company was Required at all Times, to Disclose Off-Balance Sheet Arrangements ..... 15

G. The Manitowoc Facility was Behind Schedule and Not Capable of Producing Touted Capacity Figures ..... 16

II. FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD ..... 20

III. ADDITIONAL ALLEGATIONS OF SCIENTER ..... 61

A. Defendants Admitted to the Fraud ..... 61

B. Defendants Had Access to the Concealed Information ..... 63

C. That Defendants' Misrepresentations Involved AMMO's Core Operations Bolsters Scienter ..... 64

D. Suspicious Stock Sales Enhance an Inference of Fraud ........................... 65

PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................................ 67

COUNT I (Against Defendants AMMO, Larson, Wagenhals, Smith, Wiley, and Flynn for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c)) ............... 71

COUNT II (Against Defendants AMMO, Wagenhals, Smith, Wiley, and Flynn for Violations of Section 10(b) and Rule 10b-5(b)) ................................................................ 73

COUNT III (Against Defendants Wagenhals, Larson, Smith and Wiley for Violations of Section 20(a) of the Exchange Act) ........................................................................ 75

PRAYER FOR RELIEF ............................................................................................. 76

DEMAND FOR TRIAL BY JURY ........................................................................... 77

## TABLE OF DEFINITIONS

| Term or Acronym | Definition |
|---|---|
| AMMO or the Company | AMMO, Inc. |
| Ammunition Segment | AMMO's business division that manufactured and sold loaded ammunitions and casings |
| Brass | The cartridge casing of a round of ammunition |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Cherches | Dmitry Cherches |
| Class Period | August 19, 2020 to May 20, 2025, both dates inclusive |
| Consent Decree | A consent decree entered into between Christopher D. Larson and SEC on April 13, 2020 |
| Crown | Crown Dynamics Corporation |
| Defendants | Individual Defendants and the Company |
| Delgado | Hideyoshi Delgado |
| Exchange Act | Securities Exchange Act of 1934 |
| Flynn | John P. Flynn |
| Gemini | Gemini Direct Investments, LLC, the former holding company of the Gunbroker.com business |
| Gun powder | An explosive powder inside ammunition that is used to create the force to propel the projectile out of the gun barrel (*i.e.*, the powder inside the ammunition casing) |
| Gunbroker | Gunbroker.com, an online marketplace featuring third-party sellers listing firearms, hunting gear, fishing equipment, outdoor gear, and collectibles |
| Individual Defendants | Wagenhals, Larson, Smith, Wiley, and Flynn |

| Term or Acronym | Definition |
|---|---|
| Jagemann | Jagemann Stamping Company's ammunition casing manufacturing assets that AMMO acquired in 2019. |
| Larson | Christopher D. Larson |
| Larson SEC Settlement | A settlement agreement entered into between Larson and the SEC on June 3, 2020 |
| Lead Plaintiffs | Dmitry Cherches and Irene Zvagelsky |
| Mann | James Mann |
| MD&A | Management Discussion & Analysis |
| Merger | The 2021 merger between AMMO and the Gunbroker.com business, effectuated by merging AMMO'S subsidiary SpeedLight Group I, LLC with Gemini Direct Investments, LLC |
| Merger Agreement | The merger agreement of the Merger, dated April 30, 2021 |
| Outdoor Holding Company | The current name of the Company. On April 21, 2025, AMMO changed its name to Outdoor Holding Company |
| Plaintiffs | Cherches, Zvagelsky, and Delgado |
| Plex | A software tool that tracks all orders, quality management, recorded tooling changes, and equipment assignments at AMMO |
| POWW | NASDAQ ticker symbol of AMMO common stock |
| Press | A machine tool that changes the shape of a work-piece (usually metal) by the application of pressure |
| Primer | The component responsible for initiating the propellant combustion that will propel the projectiles out of the gun barrel |
| Projectile | The component that is expelled from the gun barrel (*e.g.*, the bullet) |
| Regions | Regions Bank |
| SEC | U.S. Securities and Exchange Commission |

| Term or Acronym | Definition |
|---|---|
| Servo | A motor that provides precise control over a mechanical component's position, speed, or torque |
| Smith | Jared R. Smith |
| Urvan | Steven Urvan |
| Verified Merger Complaint | Publicly Filed Complaint in *Urvan v. AMMO, Inc. et al.*, C.A. No. 2023-270 (Del. Chan. Ct.) |
| Wagenhals | Fred W. Wagenhals |
| Wiley | Robert D. Wiley |
| Zvagelsky | Irene Zvagelsky |

Lead Plaintiffs Dmitry Cherches ("Cherches") and Irene Zvagelsky ("Zvagelsky," and together with Cherches, "Lead Plaintiffs") and additional Plaintiff Hideyoshi Delgado ("Delgado," and collectively with Lead Plaintiffs, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Amended Complaint (the "Complaint") against Defendants (defined below), allege the following based upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, the investigation conducted by and through their attorneys, including, among other things, a review of Defendants' public statements and filings made with the U.S. Securities and Exchange Commission (the "SEC"), wire and press releases either issued by or regarding AMMO, Inc. ("AMMO" or the "Company"), analysts' reports, information obtained from the Delaware Chancery Court, interviews conducted with former employees of the Company, and other information obtainable on the internet. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired AMMO common stock between August 19, 2020 and May 20, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. During the Class Period, AMMO designed, produced and marketed ammunition and ammunition component products for public consumers, manufacturers, and law enforcement and military agencies. The ammunition business and the related party payments are the focus of the Complaint alleged herein. For most of the Class Period, the Company also operated an online marketplace called Gunbroker.com ("Gunbroker"), which the Company had acquired in April 2021 ("Merger"). Like eBay but focusing on firearms, the Gunbroker marketplace serves the firearms and shooting sports industries by

allowing third-party sellers to list items consisting of firearms, hunting gear, fishing equipment, outdoor gear, and collectibles. Throughout the Class Period, Defendants referred to AMMO's manufacturing business as its "Ammunition Segment", and the Gunbroker business as its "Marketplace Segment."

3. From the beginning of the Class Period, Defendants concealed from investors that AMMO was actually controlled in large part by a shadow co-Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), Christopher D. Larson ("Larson", and "Chris Larson"), who was banned by SEC rules from serving as an officer of the Company by virtue of a Consent Decree entered into with the SEC on April 13, 2020 ("Consent Decree"). While hiding Larson's role at the Company from investors, Larson and his immediate family members received millions of dollars from the Company and from the Company's service providers. Defendants also concealed the widespread manufacturing problems the Company was experiencing at its newly constructed facility in Manitowoc, Wisconsin ("Manitowoc Facility"). They falsely stated that the facility had then progressed such that completion would be "on time and on budget", that the facility positioned the Company to swiftly transition to higher-margin rifle casings, and that the facility was "state-of-the-art." None of this was true. Even worse, the Company did not disclose that the construction of the facility was performed by a related party company owned by Chris Larson's brother. Throughout the Class Period, Defendants knowingly failed to disclose related party transactions of Larson, including direct payments he was getting from service providers in exchange for revenue provided to that service provider by the Company.

4. Since May 2025, Steven Urvan ("Urvan") has been CEO. Urvan was a board member during the Class Period and the former CEO of Gunbroker. On April 28, 2023, in a complaint publicly released on May 3, 2023, Urvan sued the Company and its officers in Delaware Chancery Court for misrepresentations during the Merger negotiations between Urvan and the Company. *See* Publicly Filed Complaint in *Urvan v. AMMO, Inc. et al.*, C.A. No. 2023-270 (Del. Chan. Ct.) ("Verified Merger Complaint").

5. In the Verified Merger Complaint, Urvan attested that Larson had been serving as a de-facto CEO and CFO of the Company during negotiations over the Merger. Urvan alleged that in 2021, Urvan entered into negotiations with AMMO for AMMO to purchase GunBroker.com. Verified Merger Complaint ¶¶28-29. According to Urvan, these negotiations were led on the AMMO side by Defendant Larson, along with Defendants Fred Wagenhals ("Wagenhals") and Robert D. Wiley ("Wiley") (the titular CEO and CFOs, respectively, of AMMO at the time). Multiple Confidential Witnesses ("CWs"), including the VP of Sales and Marketing, confirmed that Larson was secretly functioning as an executive officer of AMMO at the time.

6. The CWs also included herein provide thorough and corroborated accounts that show that the transition to the Manitowoc Facility was then causing production delays. They also confirm that at the time that Defendants touted the production capacity of the Manitowoc Facility, production was actually constrained because the Manitowoc Facility was inundated with broken presses and other machines, limiting production.

7. On November 14, 2022 the Company began to announce production facility problems; the next day the stock price dropped 25.8% to close at $2.33 on November 15, 2022. The stock price dropped another 5.6% the following trading day, closing at $2.20 on November 16, 2022, as the market continued to absorb the news.

8. In a February 14, 2023 press release, the Company announced a 40% year-over-year decrease in net revenues that "was mainly attributable to [A]mmunition [S]egment." On February 15, 2023 the Company's stock price declined by over 12.8% to close at $1.96.

9. By no later than the evening of May 3, 2023, the public version of the Verified Merger Complaint was released, and next day the stock dropped 4.2% on May 4, 2023, closing at $1.81. However, the Company publicly denied the allegations, blunting further decline.

10. On November 9, 2023, Defendants disclosed another 29% decrease in total revenue in a press release filed on Form 8-K with the SEC. In the November 9, 2023 press

release, the Company announced a 47% decrease in loaded ammunition sales. And casing sales were 16% below the analyst estimate. During a conference call that same day, Defendants admitted that press failures at the Manitowoc Facility contributed to the poor financial results. On this partial disclosure and materialization of concealed risk, the Company's stock price declined by over 13.1% from its previous day closing price, to close at $2.18 on November 10, 2023.

11. On August 8, 2024, Defendants disclosed further softness in the Ammunition Segment in a press release filed on Form 8-K with the SEC. The total revenue decreased 10% year-over-year, loaded ammunition sales decreased 5% and casing sales were down 15%. Even worse, cost of revenues increased by $1 million and the gross margin decreased approximately 9.3% year-over-year. The August 8, 2024 press release attributed the increase in cost of revenues and decrease in gross margin to a "shift in sales mix and production inefficiencies in our ammunition segment in comparison to the prior year period." Analysts attributed the decline in sales to broken equipment hindering manufacturing. On this partial disclosure and materialization of concealed risk, the Company's stock price declined by over 6.7% to close at $1.51 on August 9, 2024. The market continued to absorb the news on the next three trading days with AMMO's stock price closing at $1.49 on August 12, 2024, $1.45 on August 13, 2024, and $1.38 on August 14, 2024.

12. On September 24, 2024, AMMO announced that Rob Wiley had resigned "at the request of the Board." Further, the Company disclosed that the Board of Directors had retained a law firm to conduct an independent investigation into, among other things, whether the Company and its management accurately disclosed all executive officers, and potential related party transactions in fiscal years 2020 through 2023. On this partial disclosure and materialization of concealed risk, the Company's stock price declined by over 5.2% to close at $1.44 on September 25, 2024.

13. By May 20, 2025, the Company released its most striking disclosure yet, admitting that Larson had actually secretly operated as an executive officer of the Company

during the Class Period, and that he and/or his immediate family received over a million dollars in kickback payments from third parties that were doing business with the Company. The Company also admitted that it had paid over $25 million to Larson Building, and that this entity was wholly owned by Larson's brother. Meanwhile, the Company disclosed additional related party transactions involving Wagenhals. The admission was the exact opposite of what Defendants told investors during the Class Period: to them they simply lied and said that AMMO had brought its accounting "up to par", had disclosed all related party transactions required under the law, and did not have any off-balance sheet arrangements.

14. AMMO shares now trade at less than half of what they were valued at in November 2022. The Company has since changed its name and sold off its ammunitions business and is now under the management of Urvan, who became the Company's CEO on May 30, 2025.

15. Defendants told investors they had brought their accounting up to par, that they had disclosed all related party transactions, and that their Manitowoc Facility was state-of-the-art. Defendants made their false statements while concealing a kickback scheme, extensive related party transactions, and that the Manitowoc Facility was overbudget, had less capacity than publicly touted, and was mired in equipment failures. When the truth emerged, Plaintiffs and the other Class Members suffered significant losses and damages.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b). The Company has its principal place of business

in Scottsdale, Arizona, and several of the Individual Defendants reside in this District. A substantial part of the events that constitute the alleged violations of the law, including the dissemination to the public of materially false and misleading statements of fact, also occurred in this District.

19. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

20. Plaintiffs, as set forth in their previously filed declarations (ECF No. 20-2 (as to Cherches and Zvagelsky) and as attached hereto as to plaintiff Delgado, acquired AMMO shares at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

21. Defendant AMMO (now known as Outdoor Holding Company) is incorporated under the laws of Delaware with its principal place of business located at 7681 E Gray Road, Scottsdale, Arizona. AMMO's shares trade on the NASDAQ under the ticker symbol "POWW."

22. Defendant Wagenhals was the Company's Co-Founder and CEO from 2016 until July 24, 2023. From July 2023 until April 2025, Wagenhals served as the Company's Executive Chairman.

23. Defendant Larson was the Company's Co-Founder, along with Wagenhals. Through at least fiscal year 2023, Larson secretly served as shadow co-CEO and CFO. Moreover, as the Company admitted at the end of the Class Period, in fiscal year 2024 Larson continued to receive payments from a third-party service provider in exchange for revenue from the Company. Larson also continued to receive substantial compensation from the Company through at least fiscal year 2023 as an independent contractor.

24. Defendant Jared R. Smith ("Smith") was the Company's CEO from July 24, 2023 until May 30, 2025. Mr. Smith previously served as President and Chief Operating Officer of AMMO from January 3, 2023 to July 24, 2023.

25. Defendant Wiley was the Company's titular CFO from the beginning of the Class Period until September 19, 2024.

26. Defendant John P. Flynn ("Flynn") served as Vice President of AMMO from the beginning of the Class Period through November 2022. In fiscal year 2023, Flynn continued to receive substantial compensation from AMMO as an independent contractor.

27. Defendants Wagenhals, Larson, Smith, Wiley, and Flynn are sometimes referred to herein as the "Individual Defendants." The Individual Defendants together with the Company are referred to herein as "Defendants."

28. The Individual Defendants possessed the power and authority to control the contents of AMMO's SEC filings, press releases, and other communications with investors throughout the Class Period. The Individual Defendants knew about AMMO's public statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within AMMO, and access to material information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from investors, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the misleading statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

## I. BACKGROUND

### A. AMMO's Manufacturing Business

29. At all relevant times, AMMO designed, produced, and marketed ammunition and ammunition component products for public consumers, manufacturers, and law enforcement and military agencies.

30. AMMO was formed under a prior name in November 1990 and originally focused on manufacturing and importing textile products. Wagenhals and Larson founded what became the Ammunition Segment ("Ammunition Segment") at AMMO in 2016 when they purchased a controlling stake in the Company. In March 2017, the Company commenced ammunition manufacturing. In 2019, the Company acquired Jagemann Stamping Company's ammunition casing manufacturing and sales operations ("Jagemann").

31. Until April 2021 Urvan beneficially owned Gunbroker through his holding company, Gemini Direct Investments, LLC ("Gemini"). Urvan was the sole member of Gemini. Gunbroker is a website enabling peer-to-peer sales of firearms, ammunition and hunting/shooting accessories. The Company and Gemini merged via an agreement signed on April 30, 2021, between AMMO, AMMO's subsidiary (Speedlight Group I, LLC), Gemini and Urvan. ("Merger Agreement") The Merger closed on May 3, 2021. As a result of the Merger, the Company also owned and operated Gunbroker starting in May 2021.

32. During the Class Period, the Company told investors it was shifting focus from low margin pistol ammunition to higher margin rifle ammunition. As part of this strategy, the Company announced on January 5, 2021, that it would be moving to a newly constructed 185,000 square foot factory in Manitowoc, Wisconsin. The Company explained that this facility would house all of its manufacturing and would cost $12 million.

### B. The SEC Bans Larson from Serving as an Officer of any Public Company

33. On April 25, 2016, the SEC charged Larson with violations of federal securities laws alleging Larson schemed to manipulate the market for the stock of Crown Dynamics Corporation ("Crown"), Larson's prior employer. ("Larson SEC Action"). The SEC alleged that as part of the scheme, Larson obtained control of Crown; transferred shares to nominees; paid $400,000 for a "call center" to promote Crown; placed manipulative trades in his own account to create the appearance of market interest; and acted as the undisclosed CFO of the company. As Crown's stock price became inflated as a result of these efforts, Larson's nominees sold Crown shares and wired the sale proceeds—at least $865,000—to him.

34. On April 13, 2020, Larson entered into the Consent Decree with the SEC, which was filed in the Larson SEC Action in the United States District Court for the District of Arizona. The Consent Decree, *inter alia*, prohibited Larson "from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l [like AMMO], or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d) [like AMMO]" for five years. Under the Consent Decree, Larson was also ordered to pay disgorgement in the amount of $291,000, plus interest. On June 1, 2020, the court in the Larson SEC Action entered an order permanently enjoining Larson, by consent, from future violations of Section 17(a) of the Securities Act of 1933, and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. On June 3, 2020, Larson entered into a separate settlement agreement with the SEC ("Larson SEC Settlement") permanently prohibiting Larson from appearing or practicing before the SEC as an accountant, as well as expressly prohibiting him from participating in the financial reporting or audits of public companies. On July 28, 2021, the State of Minnesota Board of Accountancy revoked Larson's certified public accounting license and fined him $20,000. In its order revoking Larson's accounting license, the Administrative Law judge found that "revocation of Larson's

certificate is clearly necessary to protect the public from a fraudulent practitioner. More than revocation is required … based on the gravity of Larson's willful misconduct that caused significant economic harm to public investors." The judge also found that "Larson's egregious misconduct cannot be countenanced." AMMO knew about all of this yet hid this from investors.

### C. Larson Violates the Consent Decree, Continuing to Run AMMO with Wagenhals

35. In direct violation of the Consent Decree, Larson functioned as an executive officer, specifically a shadow co-CEO and CFO, of AMMO, a public company with securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, and that was required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

36. The SEC defines an executive officer broadly to encompass those who function as executive officers even without an official title. SEC regulations specify that "executive officer" includes a "[registrant's] president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance), ***any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant***. Executive officers of subsidiaries may be deemed executive officers of the registrant if they perform such policy making functions for the registrant." 17 C.F.R. § 240.3b-7.

37. During the Class Period, AMMO's common stock was at all times registered pursuant to Section 12 of the Exchange Act and the Company was required to file reports pursuant to Section 15(d) of the Exchange Act.

38. Despite the Consent Decree, Larson, during the Class Period, served as AMMO's *de facto* co-CEO and CFO, and performed "policy making" functions at AMMO, which included, but were not limited to:

- In 2021, during AMMO's Merger with Steve Urvan's Gunbroker.com, Larson was Urvan's primary contact and took a leading role in all aspects of the Merger negotiations.
- In the April 30, 2021 Merger Agreement, Larson was listed as AMMO's "Key Employee[]", along with Fred Wagenhals, the titled CEO, and Vice-President John Flynn, a then-suspended lawyer. The Merger Agreement also defined "[AMMO]'s knowledge", referring to certain representations made by AMMO in the Merger Agreement, to mean "the actual knowledge of Fred W. Wagenhals, John [] Flynn, Chris Larson and Robert D. Wiley [then-titled CFO]."
- As Urvan alleged in the Verified Merger Complaint, after the Merger, whenever Urvan raised an issue or concern with Wagenhals regarding AMMO's governance or operations, Wagenhals informed Urvan that he first needed to consult with Larson before responding to Urvan's issue. *See* Verified Merger Complaint ¶89(b).
- After the Merger, Urvan put AMMO in touch with Regions Bank regarding potential financing. Larson attended the first meeting on behalf of AMMO and presented the company's financials to Regions Bank. Ultimately Regions Bank elected not to provide financing for AMMO due to concerns about Larson's and Flynn's backgrounds. *See* Verified Merger Complaint ¶89(c).

39. Indeed, Wagenhals and Larson founded the Company together and ran the Company together during the Class Period.

40. CW1 was employed at AMMO as Vice President of Sales and Marketing from March 2020 to August 2022. CW1 reported directly to Wagenhals and interacted with Wagenhals and Larson on a daily basis. CW1 ran the sales team at the Company. According to CW1, despite Larson's SEC ban from serving as an executive officer, Larson continued making key decisions at AMMO. CW1 explained that leadership was well aware of the need for discretion while Larson maintained his role and influence within the

organization. But CW1 noted that in multiple meetings, Larson made financial decisions for the Company. According to CW1, Wiley worked under Larson and was regularly referred to as Larson's "puppet" because Wiley would simply sign financial documents and releases drafted by Larson—a situation that was openly joked about during meetings. CW1 also observed Urvan's displeasure working with Larson, Wagenhals and Flynn—noting that Urvan referred to them collectively as a "criminal triumvirate." According to CW1, based on CW1's interactions with Larson and Wagenhals, it was clear that Larson and Wagenhals were running the Company together during this period and that Larson generally drove the acquisition of Gunbroker during this period. CW1 states that Larson's role as an AMMO officer was concealed due to his SEC Consent Decree, a fact known by Wagenhals and others in the Company but deliberately hidden by Wagenhals and other Company officials.

41. According to CW1, in April or May 2021, CW1, Chris Larson, and VP John Flynn traveled to Atlanta, Georgia to meet with Steve Urvan regarding the Merger. Larson missed the meeting with Urvan, and when CW1, at Flynn's request, checked his hotel room, CW1 found Larson too drunk to attend. CW1 noted that vodka bottles were scattered around Larson's hotel room. On returning to Arizona, CW1 told Wagenhals that Larson might not be suitable to work on the Merger. CW1 reported that Wagenhals did not seem concerned. According to CW1, Larson, Flynn, and Tod Wagenhals (Wagenhals' son and executive VP at the Company) first met one another in alcohol rehab before joining AMMO.

42. CW2 was employed by AMMO as a Purchasing Manager from March 2021 to October 2023. CW2 worked out of the Company's Scottsdale, Arizona headquarters and reported to Vice President Beth Cross, who reported directly to CEO Fred Wagenhals. CW2 worked as a purchaser on the Gunbroker.com side of the Company to purchase firearms for the Company, buying inventory on Gunbroker.com. According to CW2, the Scottsdale office had a single main floor where both the AMMO manufacturing and Gunbroker executive teams worked, along with C-Suite members that included Larson

and Wagenhals. CW2 stated that Larson and Wagenhals shared an office, that Wagenhals and Larson ran the Company together, and that Wiley worked under the leadership of Larson.

43. CW3 confirmed the accounts of CW1 and CW2 regarding Larson jointly running the Company with Wagenhals. CW3 was employed by AMMO as a sales administrator from April 2020 to June 2023. CW3 worked out of the Company' Scottsdale headquarters. CW3 reported to CW1, and at times, directly to Larson and Tod Wagenhals. CW3's main responsibilities were coordinating sales of ammunition, assisting with accounting and training new employees. CW3 confirmed that prior to the SEC investigation leading to the Consent Decree, Larson served as a top officer of the Company. But after Larson lost his accounting license, CW3 stated that Larson continued to participate in meetings and jointly run the Company with Wagenhals. CW3 was informed by senior management to keep Larson's involvement in the Company confidential. CW3 stated that Larson had a higher position at the Company than Wiley, confirming CW2's account.

44. CW4 was a Senior Account Executive at AMMO from 2021 through early 2024. CW4 worked out of AMMO's Scottsdale, Arizona headquarters, and reported to the VP of Sales and Marketing, CW1. CW4's primary role was selling ammunition, including contacting clients, calling gun stores and attending conventions. CW4 reported that CW4 had meetings with Larson, primarily to present sales figures and expectations. CW4 confirmed that Larson and Wagenhals were viewed as equals in the Company and that Wiley worked under Larson.

### D. Background Regarding Disclosure of Executive Officers and Executive Compensation

45. SEC rules require a registrant to disclose all executive officers. *See* 17 C.F.R. § 229.401(b). SEC rules also require the disclosure of the total compensation received by a registrant's principal executive officer, its principal financial officer, and its other three most highly compensated executive officers. 17 C.F.R. § 229.402(a)(3).

46. In violation of this regulation, and to conceal Larson's improper involvement in the Company, AMMO excluded Larson from its list of executive officers during the Class Period, including in its executive officer biography, compensation, and related party transactions disclosures. On May 20, 2025, AMMO belatedly amended its prior fiscal years 2022, 2023, and 2024 10-K to admit that this exclusion was materially misleading, conceding that Larson was in fact an executive officer for fiscal years 2022 and 2023 ("May 20, 2025 Form 10-K/A").

47. Notably, the May 20, 2025 Form 10-K/A also acknowledged the Consent Decree that barred Larson from serving as an executive officer for an "issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act."

48. As with its failure to disclose Larson as an executive officer altogether, AMMO also failed to disclose Larson's executive compensation in its compensation disclosures. In fact, Larson was the second highest paid officer at the Company in fiscal year 2022, receiving at least $2,644,580 according to the Company's May 20, 2025 admission. In fiscal year 2023, Larson remained one of the most highly paid members of the Company, earning at least $1,514,990 in fiscal year 2023. Notably, Larson's salary in fiscal year 2023 ($1,337,187) was the highest of any executive officer's salary disclosed for that year. Yet, AMMO chose to exclude Larson in both its executive biography and compensation disclosures.

**E. Larson was a Related Party**

49. SEC rules also require disclosure of transactions with related persons. The SEC rules define "related person" clearly to include "any [] executive officer of the registrant [and] … any immediate family member of a[n] executive officer of the registrant … which means any … sibling … of such [] executive officer." 17 C.F.R. § 229.404(a). Therefore, the Company was required to disclose transactions with Larson. Specifically, for any contract, SEC rules required the Company to list all contracts over $120,000 in

which any related person had or will have a "direct or indirect material interest" and for which the Company was a party. Specifically, Rule 404 requires:

> ***(1) The name of the related person and the basis on which the person is a related person.***
> ***(2) The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction.***
> ***(3) The approximate dollar value of the amount involved in the transaction.***
> ***(4) The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amount of profit or loss.***
> (5) In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstanding during the period for which disclosure is provided, the amount thereof outstanding as of the latest practicable date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which disclosure is provided, and the rate or amount of interest payable on the indebtedness.
> (6) Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

17. C.F.R. § 229.404(a) (emphasis added).

50. As alleged herein, and confirmed by the Company at the end of the Class Period, the Company repeatedly excluded from its identification of related party transactions material contracts with Larson and Larson's immediate family members.

**F. The Company was Required at all Times, to Disclose Off-Balance Sheet Arrangements**

51. Further, SEC rules also require a registrant to "[d]escribe … off-balance sheet financing arrangements … [that] include Guarantees; retained or contingent interests in assets transferred; contractual arrangements that support the credit, liquidity or market risk for transferred assets; obligations that arise or could arise from variable interests held in an unconsolidated entity; or obligations related to derivative instruments that are both indexed to and classified in a registrant's own equity under U.S. GAAP." 17 C.F.R. § 229.303(b).

52. As alleged herein, AMMO failed to include discussion of the financing arrangements with Larson from its 10-Ks and 10-Qs for fiscal years 2020-2024, including the sections labeled "MD&A Financing Activities" and "Off Balance Sheet Arrangements."

### G. The Manitowoc Facility was Behind Schedule and Not Capable of Producing Touted Capacity Figures

53. On December 3, 2020, the Company entered into a contract with Larson Building for the construction of the Manitowoc Facility. At all relevant times, Larson Building was owned by Andy Larson, Chris Larson's brother. The Company broke ground on the Manitowoc Facility in June 2021. The facility opened in 2022. Throughout the Class Period, the Company touted the manufacturing capacity and capabilities of the Manitowoc Facility but did not disclose that the entire facility was a related party transaction being built by Larson's brother.

54. Having decided to secretly funnel this work to a related party rather than the most qualified, it was no surprise that the Manitowoc Facility was mired in production inefficiencies. Defendants were not honest with investors about these problems, instead touting an impressive but misleading production capacity which they knew was constrained by the then-existing production problems. CW1 reported that there was no bidding process for the construction of the Manitowoc Facility. CW1 also stated that the Company's actual production capacity at the time of the Merger was only 300 million rounds of ammunition, not over 750 million as the Company had publicly claimed. CW1 knew this from reports received from James Mann, the VP of Operations ("Mann"). CW1 reported that Larson was aware of these actual production capacity numbers from Mann as well. CW1 also reported that equipment needed to be relocated from Payson, Arizona to Wisconsin. CW1 states that presses needed to be shipped, which required crating before shipping, and rapid installation. CW1 stated that setting up alone would take at least four to six weeks, meaning that manufacturing would be halted during that time. CW1 explained that the Company was unable to reach its goal of producing 1 billion rounds of ammunition because of

shortages of gunpowder, projectiles, machines, and primer, which rendered ramping up production impossible.

55. CW5 was employed at AMMO from March 2021 to June 2023, as a manufacturing engineer. CW5 worked out of Manitowoc, Wisconsin. CW5 reported to Tyler Terp, Engineering Manager, who reported to Mann, the VP of Operations at the Manitowoc Facility. CW5's job duties centered on repairing machines at the Manitowoc Facility. CW5 confirmed that moving equipment from Payson, Arizona to Manitowoc, Wisconsin meant that there was downtime where equipment needed to be set up properly. CW5 reported that most machines failed during CW5's time at the Company, and that the new plant lacked operators with the skills to fix issues, which led to production delays. CW5 reported that all equipment failures and redundancies were tracked through a software tool called Plex. CW5 confirmed that during these production delays, AMMO was purchasing and repackaging ammunition it had bought overseas as its own product.

56. CW6 was employed as a Production Manager assigned to the Manitowoc Facility from December 2023 through September 2024. CW6 reported to Mann, the VP of Operations at the Manitowoc Facility, who reported to the CEO Jared Smith. CW6 oversaw press operations, production output and workflow, as well as conducted tool inspections on broken equipment. Specifically, when CW6 started working at the Company, CW6 found the Manitowoc Facility in disarray, including poor production outputs, broken tools, chronically unresolved machine issues, and virtually no training besides quality tool usage. CW6 reports that these issues existed long before CW6 started working at the facility. CW6 reported that Mann told CW6 that Wiley had noted that the Company was not able to meet the Company's transition timeline in 2022. CW6 noted that problems with the rifle presses were a chronic issue at the Manitowoc Facility. CW6 reported that output regularly dropped by more than half of reported capacity, as machines frequently failed. CW6 reported that while machines could theoretically produce 200 parts per minute, they could only reliably produce 60 parts per minute due to machine failures that occurred when the

machines were operating at maximum speed. CW6 reported that millions of brass parts were discarded due to poor output.

57. CW6 stated that in 2023 the Company hired Brooks International, a consulting firm, paying them several million dollars to address efficiency problems at the Manitowoc Facility, but they were not resolved. CW6 explained that persistent equipment failures such as machine breakdown and dye shortages prevented the Company from transitioning to rifle casings. CW6 met with Smith during his employment, and stated that CW6 reported seeing Smith and other C-Suite executives at the Manitowoc Facility. CW6 confirmed that AMMO used Plex Software to track production and efficiency.

58. CW6 reported that machine servo failures occurred frequently, which caused repeated downtime. CW6 recalls one incident where a machine blew its servo for two consecutive days, leaving AMMO unable to produce quality parts or meet quotas. CW6 noted that broken presses often sat idle, which created a poor impression when ammunition buyers toured the facility. Frequently, non-functional equipment was moved out of the facility away from the view of visitors. CW6 confirmed that when the Company was not able to produce enough 7.62mm rifle rounds, AMMO purchased ammunition from overseas and repackaged it as its own, shipping to customers without a head stamp. This occurred throughout CW6's employment.

59. CW7 served as a Machine Operator for AMMO out of the Manitowoc Facility from January 2024 through April 2025. CW7 reported to CW6, who reported to Mann. CW7 worked in Press Operations and CW7's responsibilities included quality checks, as well as operating older Jagemann stamping presses. CW7's team worked on all casing-wash operations, secondary priming and loading tasks. CW7 reported that AMMO was using outdated machines, many of which were inherited from Jagemann, several of which were not operational. CW7 noted that most of the employees were inexperienced and unable to fix the broken machines. CW7 reported that the machines not working resulted in low production, as well as safety concerns. CW7 reported that production was low due to poor quality parts. CW7 noted that all orders, quality management, recorded

tooling changes, and equipment assignments were tracked in Plex. CW7 reported that Mann would frequently approve non-conforming parts for use. CW7 reported that management responded to complaints about machine issues and problems with non-conforming parts by reprimanding employees. CW7 confirmed that some presses remained idle for extended periods.

60. CW8 worked as a production manager at AMMO in Manitowoc, Wisconsin, reporting to Mann. CW8 had previously worked at Jagemann, and joined AMMO when AMMO opened the Manitowoc Facility in Summer of 2022, and stayed at AMMO until December 2023. CW8 confirmed that AMMO was experiencing frequent equipment problems affecting production and causing downtime, including persistent servo issues that kept them offline for months at a time in the brass presses. CW8 also reported that the annealing process frequently caused delays and inconsistent batch quality, with some parts coming out too hard or too soft to use. CW8 reported that presses frequently suffered tooling failures. CW8 confirmed that the Company used Plex to track production and downtimes at the Manitowoc Facility. CW8 also stated that after COVID, getting primers delivered to the Manitowoc Facility was challenging, and stated some machines needed to be shut down while components were delayed. CW8 also confirmed that the Company engaged in substantial repackaging and re-selling of ammunition that the Company purchased from overseas.

61. CW4 confirms that the Manitowoc Facility experienced supply chain issues, and that the Company's production of casings was hindered by difficulties in obtaining materials. For example, CW4 reported that the Company had ongoing issues obtaining primers, for example, CW4 recalled that an order the Company had made during COVID for primers was never delivered, harming production. CW4 also reported that Company did not have the capacity to produce 1 billion rounds of ammunition. CW4 explained that the Company's manufacturing numbers were inflated by purchasing and repackaging ammunition that was not its own manufacturing, and relabeling the ammunition as from

the Company. CW4 also reported that the interruption in production capacity meant months-long backlogs.

62. CW3 confirmed that in the leadup to the opening of the Manitowoc Facility, the legacy Payson, Arizona manufacturing facility was permanently closed, causing a two-month delay in shipments. CW3 confirmed that certain machines for brass casings were not operational throughout CW3's employment, until June 2023.

## II. FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

63. On August 19, 2020, AMMO furnished its annual report for the fiscal year ending March 31, 2020 on Form 10-K filed with the SEC ("2020 Form 10-K"). The 2020 Form 10-K was signed by Defendants Wagenhals and Wiley, among others. The 2020 Form 10-K purported to disclose the extent of the Company's related party transactions, reporting the following transactions and asserting "***[o]ther than the foregoing" "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year."*** The 2020 Form 10-K stated that "[w]ith regard to any future related party transaction" the Company "plan[s] to fully disclose any and all related party transactions." Specifically, the 2020 Form 10-K stated the following:

> ***Related Party Transactions***
>
> From October 2016 through December 2018, our executive offices were located in Scottsdale, Arizona where we leased approximately 5,000 square feet under a month-to-month triple net lease for $3,800 per month. This space housed our principal executive, administration, and marketing functions. Our Chairman, President, and Chief Executive Officer owned the building in which these offices are currently leased. For the year ended March 31, 2020 and 2019, the Company paid $21,800 and $53,013, respectively in rent for these offices.
>
> During the year ended March 31, 2020, we paid $184,575 in service fees to an independent contractor, $6,500 in consulting fees to our Previous Chief Financial Officer, and 60,000 shares in the aggregate to its Advisory Committee members for service for a total value of $113,000. Additionally, at March 31, 2020, the Company had a receivable of approximately $14,700

from its previous Chief Financial Officer. During the year ended March 31, 2019, we paid approximately $168,000 in consulting fees.

In connection with the acquisition of the casing division of Jagemann Stamping Company, a promissory note was executed. The promissory note, under which $500,000 was paid on March 25, 2019 using funds raised for the acquisition, had a remaining balance at March 31, 2019 of $9,900,000. On April 30, 2019, the original due date of the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly until October 1, 2019 when the interest rate increases to 9% per annum payable monthly until principal and accrued interest are paid in full. In May of 2019, the Company paid $1,500,000 on the balance of the note. As of March 31, 2020 and March 31, 2019, we accrued interest of $352,157 and $22,196, respectively, related to the note.

In October of 2019, it was made apparent that certain equipment that was agreed to be delivered free and clear by the Seller was not achievable as Seller was not able to purchase equipment that Seller had leased. Accordingly, the remaining value of the promissory note was reduced by $2,596,200. As a result of the change to the purchase price of the transaction, the Company reduced Equipment for a net value of $1,871,306, decreased Other Intangible Assets by $766,068, increased Accounts Receivable by $31,924, and recorded an increase to Deposits for $9,250 worth of equipment that the Company agreed to transfer back to Seller. Consequently, accumulated amortization has decreased by $159,530. Additionally, the Company entered into a lease to gain possession of the assets that were originally to be transferred. Subsequent to March 31, 2020, the Company, Enlight and JSC entered into a Settlement Agreement pursuant to which the parties mutually agreed to settle all disputes and mutually release each other from liabilities related to the Amended APA occurring prior to June 26, 2020. Pursuant to the Settlement Agreement, the Company shall pay JSC $1,269,977 and shall provide JSC with: (i) two new promissory notes, a note of $5,803,800 related to the Seller Note and note of $2,635,797 for inventory and services, both with a maturity date of August 15, 2021, (ii) general business security agreements granting JSC a security interest in all personal property of the Company. Pursuant to the Notes, the Company is obligated to make monthly payments totaling $204,295 to JSC. In addition, the Notes have a mandatory prepayment provision that comes into effect if the Company conducts a publicly registered offering. Pursuant to such provision, the Company: (a) upon the closing of an Offering of less than $10,000,000 would be obligated to pay the lesser of ninety percent (90%) of the Offering proceeds or seventy (70%) of the then aggregate outstanding balance of the Notes; and (b) upon the closing of an Offering of more than $10,000,000 would be obligated to pay one hundred percent (100%) of the then aggregate

> outstanding balance of the Notes. The Company was granted an option to repurchase up to 1,000,000 of the shares of the Company's common stock issued to JSC under the Amended APA at a price of $1.50 per share through April 1, 2021 so long as there are no defaults under the Settlement Agreement.
>
> Through the Administrative and Management Services Agreement the Company with Jagemann Stamping Company, the Company purchased approximately $1.9M in Inventory, incurred $394,128 of rent expenses, and incurred $153,604 of expenses related to support costs such as engineering and maintenance, among others, for the year ended March 31, 2020.
>
> ***On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company***. The original interest rate was the applicable LIBOR Rate. The promissory note has since been amended and the balance at March 31, 2020 was $278,195. The note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $315,000 in principal payments in the year ended March 31, 2020. We have accrued interest on the note of $9,080. Subsequent to March 31, 2020, the related party note and accrued interest was paid in full.
>
> In December of 2019, the Company entered into a Promissory Note of $90,000 with Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors. The Note originally matured on June 12, 2020 and had an interest rate at the applicable LIBOR Rate. The promissory note has since been amended and the balance at March 31, 2020 was $156,536 and the amended maturity date is September 18, 2020. The Company made $70,000 in principal payments in the year ended March 31, 2020. The amended note bears interest at 1.25% per month. We have accrued interest on the note of $1,287. Subsequent to March 31, 2020, the related party note and accrued interest was paid in full.

64. The statements identified in Paragraph 63 were materially false and misleading when made because they omitted to disclose that: (a) the "shareholder" with whom it had entered into a $375,000 promissory note was in fact a senior officer of the Company and its second highest paid officer; (b) the officer, Larson, was not permitted to serve as an officer of AMMO or any other Company; and (c) the Company had other undisclosed related party dealings with Larson.

65. The 2020 Form 10-K also purported to "set[] forth the names and ages of our current directors and executive officers", listing the following persons: Wagenhals, Wiley, Steve Hilko, Randy Luth, Harry S. Markley, Russell William Wallace, and Robert Goodmanson.

66. The statements in Paragraph 65 were false and misleading when made because they failed to disclose Larson as an executive officer of the Company, when he was in fact operating as such at the time.

67. The 2020 Form 10-K disclosed as Risk factor that it "may not" comply with applicable laws and regulatory requirements:

> ***Failure to comply with applicable laws and changing legal and regulatory requirements could harm our business and financial results.***
>
> ***Our policies and procedures are designed to comply with all applicable laws, accounting and reporting requirements, tax rules and other regulations and requirements, including those imposed by the SEC, and foreign countries, as well as applicable trade, labor, safety, environmental, labeling, anti-bribery and corruption laws.*** The complexity of the regulatory environment in which we operate and the related cost of compliance are both increasing due to additional or changing legal and regulatory requirements, our ongoing expansion into new markets and new channels, and the fact that foreign laws occasionally conflict with domestic laws. ***In addition to potential damage to our reputation and brand, failure by us or our business partners to comply with the various applicable laws and regulations***, as well as changes in laws and regulations or the manner in which they are interpreted or applied, ***may result in litigation, civil and criminal liability, damages, fines and penalties, increased cost of regulatory compliance and restatements of our financial statements and have an adverse impact on our business and financial results.***

68. The statements identified in Paragraph 67 were materially false and misleading when made because: (a) the Company was already not complying with the law by not disclosing its shadow co-CEO and CFO in Chris Larson; (b) the Company was already violating the law by employing a banned individual as an officer; (c) the Company was violating the law by concealing related party transactions from investors; and (d) all

of which rendered the statement that the Company's then-existing "policies and procedures are designed to comply with all applicable laws" misleading when made.

69. On June 29, 2021, AMMO furnished its annual report for the fiscal year ending March 31, 2021 on Form 10-K filed with the SEC ("2021 Form 10-K"). The 2021 Form 10-K was signed by Defendants Wagenhals and Wiley, among others. The 2021 Form 10-K purported to disclose the extent of the Company's related party transactions, reporting the following transactions and asserting "[o]ther than the foregoing" "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year." The 2021 Form 10-K stated that "[w]ith regard to any future related party transaction" the Company "plan[s] to fully disclose any and all related party transactions." Specifically, the 2021 Form 10-K stated the following:

> ***Related Party Transactions***
>
> During the year ended March 31, 2021, we paid $152,549 in service fees to an independent contractor and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $103,000.
>
> During the year ended March 31, 2020, we paid $184,575 in service fees to an independent contractor, $6,500 in consulting fees to our previous Chief Financial Officer, and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $113,000. Additionally, at March 31, 2020, the Company had a receivable of approximately, $14,700 from its previous Chief Financial Officer.
>
> In connection with the acquisition of the casing division of JSC, a promissory note was executed. JSC owned at least five percent (5%) of our shares outstanding from March 2019 through March 16, 2021. On April 30, 2019, the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly. On June 26, 2020, the Company extended the promissory note until August 15, 2021. As of March 31, 2020, we accrued interest of $352,157 related to the note. The note had a balance of $5,400,000 at March 31, 2020 and the note was paid in full on November 5, 2020.
>
> In October of 2019, it was made apparent that certain equipment that was agreed to be delivered free and clear by the Seller was not achievable as

Seller was not able to purchase equipment that Seller had leased. Accordingly, the remaining value of the promissory note was reduced by $2,596,200. As a result of the change to the purchase price of the transaction, the Company reduced Equipment for a net value of $1,871,306, decreased Other Intangible Assets by $766,068, increased Accounts Receivable by $31,924, and recorded an increase to Deposits for $9,250 worth of equipment that the Company agreed to transfer back to Seller. Consequently, accumulated amortization has decreased by $159,530. Additionally, the Company entered into a lease to gain possession of the assets that were originally to be transferred.

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately $3.4 million in inventory support services, and incurred $405,171 of rent expenses for the year ended March 31, 2021. For the year ended March 31, 2021, the Company purchased approximately $1.9 million in Inventory, incurred $394,128 of rent expenses, and incurred $153,604 of expenses related to support costs such as engineering and maintenance, among others.
On June 26, 2021, the Company and JSC entered into a Settlement Agreement pursuant to which the parties mutually agreed to settle all disputes and mutually release each other from liabilities related to the Amended APA occurring prior to June 26, 2020. Pursuant to the Settlement Agreement, the Company shall pay JSC $1,269,977 and shall provide JSC with: (i) two new promissory notes, a note of $5,803,800 related to the Seller Note and note of $2,635,797 for inventory and services, both with a maturity date of August 15, 2021, (ii) general business security agreements granting JSC a security interest in all personal property of the Company. Pursuant to the Notes, the Company is obligated to make monthly payments totaling $204,295 to JSC. In addition, the Notes have a mandatory prepayment provision that comes into effect if the Company conducts a publicly registered offering. Pursuant to such provision, the Company: (a) upon the closing of an Offering of less than $10,000,000 would be obligated to pay the lesser of ninety percent (90%) of the Offering proceeds or seventy (70%) of the then aggregate outstanding balance of the Notes; and (b) upon the closing of an Offering of more than $10,000,000 would be obligated to pay one hundred percent (100%) of the then aggregate outstanding balance of the Notes. The Company was granted an option to repurchase up to 1,000,000 of the shares of Common Stock issued to JSC under the Amended APA at a price of $1.50 per share through April 1, 2021 so long as there are no defaults under the Settlement Agreement.

On November 5, 2020, the Company paid $6,000,000 to JSC allocated as follows: (i) payment in full of Note A, representing the balance due from the Company to JSC relating to the acquisition of Jagemann Munition Components in March 2019 and (ii)$592,982 remitted in partial payment of

Note B, resulting in the parties' execution of Amended Note B which has a starting principal balance of $1,687,664 ("Amended Note B"). The Amended Note B principal balance carries a 9% per annum interest rate and is amortized equally over the thirty six (36) month term. As a result of the payment in full of Note A JSC shall release the accompanying security interest in Company assets which secured Note A. Concurrently, upon entry into Amended Note B, JSC and the Company entered into the First Amendment to General Business Security Agreement to reflect a revised list of collateral in which JSC has a security interest. The total interest expense recognized on Note A $216,160 for the year ended March 31, 2021. The total interest expense recognized on the original Note B was $62,876 for the year ended March 31, 2021.

The Company's balance of Amended Note B was $1,490,918 at March 31, 2021. The Company recognized $60,100 in interest expense on Amended Note B for the year ended March 31, 2021.

On January 22, 2021, the Company repurchased 1,000,000 shares of the Common Stock issued to JSC at a price of $1.50 per share pursuant to the Amended APA and subsequently cancelled the total purchased shares.

***On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company***. The original interest rate was the applicable LIBOR Rate. The promissory note was amended and the note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $18,195 in principal payments during year ended March 2021 and the Note was paid in full in July of 2020. We recognized $10,327 of interest expenses related to the note during the year ended March 31, 2021.

In December of 2019, the Company entered into a Promissory Note of $90,000 with Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors. The Note originally matured on June 12, 2020, and had an interest rate at the applicable LIBOR Rate. The promissory note has since been amended and the amended maturity date is September 18, 2020. The Company made $25,000 in principal payments during the year ended March 31, 2021, and the Note was paid in full in July of 2020. The amended note bears interest at 1.25% per month. We recognized $5,350 of interest expense on the note for the year ended March 31, 2021.

On September 23, 2020, the Company and Enlight entered into a promissory note (the "Forest Street Note") with Forest Street, LLC ("Lender"), an Arizona limited liability company wholly owned by our current Chief Executive Officer, Fred Wagenhals, for the principal sum of $3.5 million,

> which accrues interest at 12% per annum. The Note has a maturity date of September 23, 2022.
>
> Pursuant to the terms of the Forest Street Note, the Company and Enlight (collectively, the borrower pursuant to the note) shall pay Lender; (i) on a monthly basis, beginning October 23, 2020, all accrued interest (only), (ii) on a quarterly basis, a monitoring fee of 1% of the principal amount and then accrued interest; and (iii) on the maturity date, the remaining outstanding principal balance of the Loan, together with all unpaid accrued interest thereon.
>
> On December 14, 2020, the Company entered into a Debt Conversion Agreement with the Lender. Pursuant to the Agreement, the Company and Forest Street agreed to convert $2,100,000 of the Note's principal into 1,000,000 shares of the Common Stock. The share issuance occurred on December 15, 2020. As a result of the Debt Conversion Agreement the remaining balance of the Forest Street Note was $1,400,000. On January 14, 2021, the Company paid the remaining $1,400,000 in principal and accrued interest of the Forest Street Note. The Company recognized $137,666 in interest expense related to the Forest Street Note for the year ended March 31, 2021.

70. The statements identified in Paragraph 69 were materially false and misleading when made because they omitted to disclose that: (a) the "shareholder" with whom it had entered into a $375,000 promissory note was in fact a senior officer of the Company and its second highest paid officer; (b) the officer, Larson, was not permitted to serve as an executive officer of AMMO or any other public company; (c) the Company had other undisclosed related party dealings with Larson; (d) the Company had entered into a $4.0 million related-party note on November 5, 2020, with an immediate family member of Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors at the time; (e) the Company had entered into a related-party contract with Larson Building in December, 2020; and (f) the Company had issued 200,000 shares of common stock in February, 2021 to an entity controlled by an immediate family member of Chris Larson.

71. The 2021 Form 10-K also purported to "set[] forth the names and ages of our current directors and executive officers", listing the following persons: Wagenhals, Wiley,

Harry S. Markley, Russell William Wallace, Robert Goodmanson, Jessica Lockett, Richard R. Childress and Urvan.

72. The statements in Paragraph 71 were false and misleading when made because they failed to disclose Larson as an executive officer of the Company.

73. The 2021 Form 10-K stated the following with respect to the Company's compliance with applicable laws and regulations:

> **Regulatory Matters**
> The manufacture, sale, and purchase of ammunition are subject to extensive federal, state, local, and foreign government allows. We are also subject to the rules and regulations of the US Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and various state and international agencies that control the manufacture, export, import, distribution and sale of firearms, explosives, and ammunition. Such regulations may adversely affect demand for our products by imposing limitations that increase the costs or limit the availability of our products.
>
> Our failure to comply with applicable rules and regulations may result in the limitation of our growth or business activities and could result in the revocation of licenses necessary for our business. Applicable laws and regulations provide for the following:
>
> - require the licensing of all persons manufacturing, exporting, importing, or selling ammunition as a business;
> - require serialization, labeling, and tracking of the acquisition and disposition of certain types of ammunition;
> - regulate the interstate sale of certain ammunition;
> - restrict or prohibit the ownership, use, or sale of specified categories of ammunition;
> - require registries of so-called "ballistic images" of ammunition fired from new guns;
> - govern the sale, export, and distribution of ammunition;
> - regulate the use and storage of gun powder or other energetic materials;
> - regulate the employment of personnel with certain criminal convictions;
> - restrict access to ammunition manufacturing facilities for certain individuals from other countries or with criminal convictions; and
> - require compliance with International Traffic in Arms Regulations.

74. The statements identified in Paragraph 73 were materially false and misleading when made because: (a) the Company was already not complying with the law by not disclosing its *de facto* co-CEO and CFO in Chris Larson; (b) the Company was already violating the law by employing a banned individual as an officer; and (c) the Company was violating the law by concealing related party transactions from investors.

75. The 2021 Form 10-K also made the following statements about the Company's manufacturing capabilities:

> Our manufacturing operations are currently based out of Manitowoc and Two Rivers, Wisconsin. We conduct ammunition and ammunition casing manufacturing, research and development, and inspection operations at these leased properties. ***On an annual basis, we can produce 650 million rounds of ammunition with the ability to scale to 1 billion rounds and 750 million ammunition casings with the ability to scale in excess of 1 billion on an annual basis. Our inspection process is intended to enhance the performance and reliability of our products***.

76. The statements identified in Paragraph 75 were materially false and misleading when made because: (a) the Company's manufacturing capacity at the time was less than half of 650 million rounds, as confirmed by CW1; (b) the Company was unable to reach its goal of producing 1 billion rounds of ammunition because of shortages of gunpowder, projectiles, machines, and primer; and (c) the statements omitted that production at the facilities were further constrained because machines were not properly maintained and chronically broken.

77. By no later than fiscal year 2022, AMMO's secret related-party graft to Larson became even more egregious. As the Company later admitted in its May 20, 2025 Form 10-K/A, starting in fiscal year 2022, at the latest, Larson received kickbacks from a third-party services provider of AMMO in exchange for this service provider receiving business from the Company. From 2022 through 2024, Larson personally received $814,863 in total as a percentage of revenue received in connection with, and a commission

from, services rendered to AMMO by this third-party service provider that AMMO had a master services agreement with. This payment was never disclosed during the Class Period and amounted to kickbacks. As the Company admitted in its May 20, 2025 Form 10-K/A disclosure, these payments continued through March 2024. CW1 confirmed that during this time, Larson was receiving kickbacks from service providers.

78. On August 16, 2021, the Company held its first quarter earnings call for the 2022 fiscal year. At this call, Wagenhals made the following statement regarding the Company's accounting team:

> **Wagenhals (Scripted Portion):**
> ***
> ***Rob Wiley, our CFO, and Susan Lokey, CFO of GunBroker.com, and their team have worked around the clock to bring our accounting team up to par with the growth of our company. We are fortunate to have our new accounting firm PKF in place.***
> ***

79. The statements identified in Paragraph 78 were materially false and misleading when made because: (a) the Company's accounting was materially deficient and operated by banned individuals, not "up to par"; (b) the statements concealed that Larson was then serving as de-facto co-CEO and CFO; and (c) the statements omitted that Wiley was not actually functioning as CFO; Larson was, and Wiley was working under his direction and control.

80. On November 15, 2021, the Company held its second quarter earnings call for the 2022 fiscal year. During the scripted portion of the call, Wagenhals repeated the statements about bringing the accounting team up to par identified in Paragraph 78. The statements were misleading for the same reasons as in Paragraph 79.

81. Also on that same call, Wagenhals stated the following regarding the Company's transition to the new Manitowoc Facility:

> **Wagenhals (Scripted Portion)**
> ***

> ***I would like to bring you up-to-date [] answer most of the questions that I get hit daily with from investors. The move-in date for our new state-of-the-art 165,000 square foot building in Manitowoc, Wisconsin is the summer of 2022. Tod Wagenhals, our Executive VP has assured me that it will be on time and under budget. We have pictures on our website for any one of you to view on a weekly basis.***
>
> ***

82. The statements identified in Paragraph 81 were materially false and misleading when made because: (a) the Manitowoc Facility was not "under budget" at the time, but as the Company later admitted, it paid Larson Building over $25 million for this project, more than twice the $12 million budget disclosed to investors; (b) the Manitowoc Facility was not "state-of-the-art" but instead was mired in broken equipment, as confirmed by CW1, CW3, CW5, CW6, CW7, and CW8; (c) the statements omitted that the touted move-in date in summer of 2022 then lacked reasonable basis.

83. During the Question and Answer Session on that same call, Defendants were asked about their production capacities. Defendants Wagenhals and Wiley, on behalf of AMMO, said the following:

> **Q - Matthew Koranda**
> Okay. Okay, fair enough. And then just a couple more for me. I'm curious, if you could maybe just provide an update on loaded ammo production capacity and where we are in the ramp? I guess maybe just, Fred, if you could just characterize, you've helped in terms of per day production numbers before, but where are we in that ramp-up in the third quarter here currently? Where do you think we end up the year in terms of loaded ammo production versus capacity? And then, how well are you guys covered on primers?
>
> I mean, it sounds like with the Vista contract going for a number of years, you should be reasonably covered on loaded ammo rounds, but just wanted to get your thoughts on sort of how we should think about the pain points in the supply chain?
>
> **A - Fred W. Wagenhals**
> ***We don't have a problem with primers. I mean, we hear that all the time. And it's a constant war every day, but we don't have a problem getting primers.***

**A - Robert D. Wiley**
***And, Matt, on some of your other questions regarding the capacity build out every -- we're increasing capacity daily, whether it be through the automation that we're putting in, the machines that we've added. It is going -- I can't give you -- I'll just give you a rough number and say it's approximately 450 million currently, but something you need to keep in mind is, at the new building when we start, which should be let's say mid-summer we'll be producing out of that building, that building will produce over a billion rounds a year.***

84. The statements identified in Paragraph 83 were materially false and misleading when made because: (a) the Manitowoc Facility lacked the capacity to produce one billion rounds per year, as confirmed by CW1 and CW4; (b) the Company's actual production capacity at the time was only around 300 million rounds, as confirmed by CW1; (c) the statements failed to disclose that several machines at the referenced facility were not operational; and (d) the Company was in fact having problems at the time obtaining sufficient primers, as confirmed by CW1, CW4, and CW8.

85. On June 29, 2022, the Company held its earnings call for the fourth quarter of 2022. During the question and answer session, Wiley made the following statements about the Manitowoc Facility's production capacity:

**Q - Matt Koranda**
Okay. Got it. And then just, I wanted to make sure I understood what you said in terms of the ramp up in capacity in Manitowoc. So I think in the release, you guys talked about a billion in incremental rounds. And I guess my assumption was that the facility was probably going to add more like half a billion rounds in the near term. So maybe just speak to sort of how much capacity are we adding this fiscal year for 2023 and then over time, if we get to the billion how soon do we get there? Maybe just so I can kind of understand how -- so folks can kind of help so you can help folks model this out for the next year or two?

**A - Rob Wiley**
***Yes. I think the way to think of it is once you're fully installed and in the new facility day one that our capacity would essentially double.*** And our

> goal is to get at a run rate of a billion rounds a year by the end of this fiscal year. So if that helps, we'll -- add a little bit more color to it.
>
> ***

86. The statements in Paragraph 85 were false and misleading when made because: (a) they omitted that the Company had actually stopped producing at the legacy manufacturing facility, causing a material decline in overall production; (b) they failed to disclose that the Manitowoc Facility was not in a position to operate at full capacity on "day one" because several machines were broken; and (c) the statements omitted that the Company was concealing its own lack of production by buying ammunition from other companies, often from overseas, and reselling it, as confirmed by CW4, CW5 CW6, and CW8.

87. As the call continued, Wiley was asked about the Company's capital expenditures in fiscal year 2023. In response, the Company made the following false statement about the Manitowoc Facility:

> **Q - Edward Reilly**
> Got you. Thanks for that. Last question for me given the facilities nearly online, how should we maybe be thinking about CapEx going forward?
>
> **A - Rob Wiley**
> ***Thanks for the question. As far as capital expenditures in relation to the new facility and the production that's coming online with that. And most of the capital expenditures virtually all to this point has been expended today.*** So looking forward, unless we go through and add significantly more capacity from this point all of the costs have been incurred to this from this point. So we're really just are looking forward to the benefit that we -- that comes from that, and as I mentioned before, very excited to move into the new facility.

88. The statements in Paragraph 87 were false and misleading when made because: (a) "virtually all" of the expenditures needed for the Manitowoc Facility were not then already made; (b) the statements concealed that the amount of expenditures was inflated well beyond budget because it secretly funneled the work to a related party, Larson

Building; and (c) the statements omitted that production "coming online" was then constrained because of the rampant machine breakdowns at the facility.

89. On June 29, 2022, the Company furnished its annual report for the fiscal year ending March 31, 2022, to the SEC on Form 10-K (2022 Form 10-K). The 2022 Form 10-K was signed by Defendants Wagenhals and Wiley, among others. The 2022 Form 10-K purported to disclose the extent of the Company's related party transactions, reporting the following transactions and asserting "[o]ther than the foregoing" "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year." The 2022 Form 10-K further stated that "[w]ith regard to any future related party transaction" the Company "plan[s] to fully disclose any and all related party transactions." Specifically, the 2022 Form 10-K stated the following, in relevant part:

> Through our acquisition of Gemini, a related party relationship was created since Mr. Urvan owns an entity that transacts with Gemini. We recognized $1,042,277 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship.
>
> Additionally, we paid $229,083 in service fees to an independent contractor who provides sales and administrative services to the Company and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $173,000.
>
> During the year ended March 31, 2021, we paid $152,549 in service fees to an independent contractor who provides sales and administrative services to the Company and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $103,000.
>
> In connection with the acquisition of the casing division of JSC, a promissory note was executed. JSC owned at least five percent (5%) of our shares outstanding from March 2019 through March 16, 2021. On April 30, 2019, the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly. On June 26, 2020, the Company extended the promissory note until August 15, 2021. The note was paid in full on November 5, 2020.
>
> Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $1.7

million in inventory support services, and $408,852 of rent expenses for the year ended March 31, 2022. For the year ended March 31, 2021, the Company purchased approximately $3.4 million in inventory support services, and incurred $405,171 of rent expenses for the year ended March 31, 2021.

On June 26, 2020, the Company and JSC entered into a Settlement Agreement pursuant to which the parties mutually agreed to settle all disputes and mutually release each other from liabilities related to the Amended APA occurring prior to June 26, 2020. Pursuant to the Settlement Agreement, the Company shall pay JSC $1,269,977 and shall provide JSC with: (i) two new promissory notes, a note of $5,803,800 related to the Seller Note and note of $2,635,797 for inventory and services, both with a maturity date of August 15, 2021, (ii) general business security agreements granting JSC a security interest in all personal property of the Company. Pursuant to the Notes, the Company is obligated to make monthly payments totaling $204,295 to JSC. In addition, the Notes have a mandatory prepayment provision that comes into effect if the Company conducts a publicly registered offering. Pursuant to such provision, the Company: (a) upon the closing of an Offering of less than $10,000,000 would be obligated to pay the lesser of ninety percent (90%) of the Offering proceeds or seventy (70%) of the then aggregate outstanding balance of the Notes; and (b) upon the closing of an Offering of more than $10,000,000 would be obligated to pay one hundred percent (100%) of the then aggregate outstanding balance of the Notes. The Company was granted an option to repurchase up to 1,000,000 of the shares of Common Stock issued to JSC under the Amended APA at a price of $1.50 per share through April 1, 2021 so long as there are no defaults under the Settlement Agreement.

On November 5, 2020, the Company paid $6,000,000 to JSC allocated as follows: (i) payment in full of Note A, representing the balance due from the Company to JSC relating to the acquisition of Jagemann Munition Components in March 2019 and (ii) $592,982 remitted in partial payment of Note B, resulting in the parties' execution of Amended Note B which has a starting principal balance of $1,687,664 ("Amended Note B"). The Amended Note B principal balance carries a 9% per annum interest rate and is amortized equally over the thirty six (36) month term. As a result of the payment in full of Note A JSC shall release the accompanying security interest in Company assets which secured Note A. Concurrently, upon entry into Amended Note B, JSC and the Company entered into the First Amendment to General Business Security Agreement to reflect a revised list of collateral in which JSC has a security interest. The total interest expense recognized on Note A $216,160 for the year ended March 31, 2021. The total interest expense recognized on the original Note B was and $62,876 for the years ended March 31, 2021.

The Company's balance of Amended Note B was $865,771 and $1,490,918 at March 31, 2022 and 2021, respectively. The Company recognized $110,518 and $60,100 in interest expense on Amended Note B for the years ended March 31, 2022 and 2021, respectively.

On January 22, 2021, the Company repurchased 1,000,000 shares of the Common Stock issued to JSC at a price of $1.50 per share pursuant to the Amended APA and subsequently cancelled the total purchased shares.

***On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company.*** The original interest rate was the applicable LIBOR Rate. The promissory note was amended and the note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $18,195 in principal payments during year ended March 2021 and the Note was paid in full in July of 2020. We recognized $10,327 of interest expenses related to the note during the year ended March 31, 2021.

In December of 2019, the Company entered into a Promissory Note of $90,000 with Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors. The Note originally matured on June 12, 2020, and had an interest rate at the applicable LIBOR Rate. The promissory note has since been amended and the amended maturity date is September 18, 2020. The Company made $25,000 in principal payments during the year ended March 31, 2021, and the Note was paid in full in July of 2020. The amended note bears interest at 1.25% per month. We recognized $5,350 of interest expense on the note for the year ended March 31, 2021.

On September 23, 2020, the Company and Enlight entered into a promissory note (the "Forest Street Note") with Forest Street, LLC ("Lender"), an Arizona limited liability company wholly owned by our current Chief Executive Officer, Fred Wagenhals, for the principal sum of $3.5 million, which accrues interest at 12% per annum. The Note has a maturity date of September 23, 2022.

Pursuant to the terms of the Forest Street Note, the Company and Enlight (collectively, the borrower pursuant to the note) shall pay Lender; (i) on a monthly basis, beginning October 23, 2020, all accrued interest (only), (ii) on a quarterly basis, a monitoring fee of 1% of the principal amount and then accrued interest; and (iii) on the maturity date, the remaining outstanding principal balance of the Loan, together with all unpaid accrued interest thereon.

On December 14, 2020, the Company entered into a Debt Conversion Agreement with the Lender. Pursuant to the Agreement, the Company and Forest Street agreed to convert $2,100,000 of the Note's principal into

> 1,000,000 shares of the Common Stock. The share issuance occurred on December 15, 2020. As a result of the Debt Conversion Agreement the remaining balance of the Forest Street Note was $1,400,000. On January 14, 2021, the Company paid the remaining $1,400,000 in principal and accrued interest of the Forest Street Note. The Company recognized $137,666 in interest expense related to the Forest Street Note for the year ended March 31, 2021.

90. The statements identified in Paragraph 89 were materially false and misleading when made because they omitted to disclose that: (a) the "shareholder" with whom it had entered into a $375,000 promissory note was in fact a senior officer of the Company and its second highest paid officer; (b) the officer, Larson, was not permitted to serve as an executive officer of AMMO or any other Company; (c) the Company had other undisclosed related party dealings with Larson; (d) the Company had entered into a $4.0 million related-party note on November 5, 2020, with an immediate family member of Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors at the time; (e) the Company had entered into a related-party contract with Larson Building in December 2020; (f) the Company had issued 200,000 shares of common stock in February 2021 to an entity controlled by an immediate family member of Chris Larson; and (g) Larson was then receiving kickbacks from a third-party service provider, as the Company later admitted.

91. The 2022 Form 10-K also purported to "set[] forth the names and ages of our current directors and executive officers", listing the following persons: Wagenhals, Wiley, Russell William Wallace Jr., Harry S. Markley, Robert Goodmanson, Jessica M. Lockett, Richard R. Childress, and Urvan.

92. The statements in Paragraph 91 were false and misleading when made because they failed to disclose Larson as an executive officer of the Company.

93. The 2022 Form 10-K also disclosed the executive compensation of Wagenhals, Wiley, Robert Goodmanson and Steve Hilko. However, it misleadingly omitted disclosure of compensation paid to Larson, its second-highest paid officer.

94. The 2022 Form 10-K also said the following about the Company's off-balance sheet arrangements:

> ***Off-Balance Sheet Arrangements***
> As of March 31, 2022, we did not have any off-balance sheet arrangements that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources.

95. The statements in Paragraph 94 were false and misleading when made because they failed to disclose that at the time Larson was receiving kickbacks from a service provider.

96. The 2022 Form 10-K stated the following regarding its compliance with applicable laws and regulations:

> **Regulatory Matters**
> The manufacture, sale, and purchase of ammunition are subject to extensive federal, state, local, and foreign governmental laws. We are also subject to the rules and regulations of the US Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and various state and international agencies that control the manufacture, export, import, distribution and sale of firearms, explosives, and ammunition. Such regulations may adversely affect demand for our products by imposing limitations that increase the costs or limit the availability of our products.
> Our failure to comply with applicable rules and regulations may result in the limitation of our growth or business activities and could result in the revocation of licenses necessary for our business. Applicable laws and regulations provide for the following:
>
> - require the licensing of all persons manufacturing, exporting, importing, or selling ammunition as a business;
> - require serialization, labeling, and tracking of the acquisition and disposition of certain types of ammunition;
> - regulate the interstate sale of certain ammunition;
> - restrict or prohibit the ownership, use, or sale of specified categories of ammunition;
> - require registries of so-called "ballistic images" of ammunition fired from new guns;
> - govern the sale, export, and distribution of ammunition;

- regulate the use and storage of gun powder or other energetic materials;
- regulate the employment of personnel with certain criminal convictions;
- restrict access to ammunition manufacturing facilities for certain individuals from other countries or with criminal convictions; and
- require compliance with International Traffic in Arms Regulations.

97. The statements identified in Paragraph 96 were materially false and misleading when made because: (a) the Company was already not complying with the law by not disclosing its shadow co-CEO and CFO in Larson; (b) the Company was already violating the law by employing a banned individual as an officer; and (c) the Company was violating the law by concealing related party transactions from investors.

98. The 2022 Form 10-K also said the following about the Company's manufacturing capabilities:

> **Manufacturing**
> Our manufacturing operations are currently based out of Manitowoc and Two Rivers, Wisconsin. We conduct ammunition and ammunition casing manufacturing, research and development, and inspection operations at these leased properties. On an annual basis, ***we can produce 450 million rounds of ammunition with the ability to scale to 1 billion rounds and 750 million ammunition casings with the ability to scale in excess of 1 billion on an annual basis***. Our inspection process is intended to enhance the performance and reliability of our products. The Company is scheduled to relocate and consolidate most manufacturing and related operations in the Summer of 2022 into its new state-of-the-art plant located in Manitowoc, Wisconsin, near the current leased plant location.

99. The statements in Paragraph 98 were false and misleading when made because: (a) the Company had no reasonable basis to assert that it was then able to produce 450 million rounds of ammo, with the ability to scale to 1 billion rounds, and could only manufacture 300 million rounds, as confirmed by CW1; (b) the Company had no reasonable basis to assert that it was then able to produce 750 million ammunition casings,

with the ability to scale to "in excess of 1 billion rounds"; (c) the statements omitted then known shortages of primers and breakages in production machines.

**The Truth is Gradually Revealed**

100. On November 14, 2022, the Company first admitted it had some problems with production, admitting a 21% decrease in net revenue attributed in large part to "performance of our manufacturing operations" and offline production, which was both a partial materialization of the risks previously concealed by Defendants, and informed investors that their prior statements were not completely true.

101. During the earnings call on the same day, AMMO attributed the 27% decrease in loaded ammunition sales, which was the primary reason for the revenue decrease, to production constraints at the new Manitowoc facility:

> **Q - Mark Smith**
>
> Hi, guys. First one from me, wondering if you could quantify kind of the lost sales as you work through the transition from one plant to another in Manitowoc. And at the same time, we will alternatively talk about the backlog?
>
> **A - Robert D. Wiley**
>
> Hi Mark, thanks for the question. This is Rob Wiley. So yeah, we definitely had some loss of revenue due to the move into our new manufacturing facility, which in turn will increase our capacity quite significantly. Another reason for the revenue decrease was in our previous facility, we were limited by the space that we had.

102. Analysts from Roth Capital Partners also attributed the reasons of the revenue decline to issues at the Manitowoc facility and downgraded rating of AMMO to "Neutral":

> AMMO missed expectations on revenue/adj EBITDA and took down F2023 guidance as production constraints at the new Manitowoc facility dragged on results. . . . we see sustained headwinds ahead, and downgrade to Neutral . . .

> Loaded ammunition sales of $29.4mn (-27% YoY) were behind [Roth Capital Partners Estimate of] $44.6m due to lower-than-anticipated production at the new Manitowoc facility.

Matt Koranda, *POWW: Tough 2FQ; Stepping to Sidelines*, ROTH CAPITAL PARTNERS, November 15, 2022, at 1-2.

103. As a result of these partial disclosures and/or materialization of concealed risks, AMMO shares declined 25.8% the next day to close at $2.33, and further declined the following trading day, closing at $2.20 on November 16, 2022, as the market continued to absorb the news. However, the Defendants prevented a much more substantial decline by continuing to misrepresent production capacity and concealing their illicit related party dealings with Larson.

104. For example, on an earnings call that day, Wagenhals said the following about the company's production capacity:

> **Fred Wagenhals (Scripted Portion)**
> ***
> The new plant is Humming with its ribbon-cutting ceremony a few months ago in Wisconsin. ***We are increasing capacity across the Board and are in a position to support the domestic and expanding overseas ammunition demand.***
> ***

105. The statements in Paragraph 104 were false and misleading when made because: (a) the plant was not "humming" at the time but was instead mired in equipment failure, as confirmed by CW1, CW3, CW5, CW6, CW7, and CW8; (b) production capacity at the time was not "increasing across the board"; and (c) the Company was not then in a position to support overseas demand and in fact was then importing overseas ammunition, not exporting it, as confirmed by CW5, CW6, and CW8.

106. On that same November 14, 2022 call, Flynn made the following statements regarding the manufacturing capability of the Manitowoc Facility, falsely stating that the facility was "on time and within budget":

> **John Flynn (Scripted Portion)**
> ***
> I wanted to give everyone an update on the new plants. ***As you are undoubtedly aware, the plant opened on time and within budget. In and of itself, a notable achievement managed by a dedicated team in our Arizona office, in Wisconsin and because of the world-class work our contractor and his subs did in standing up that plant.***
> ***
> ***The facility now houses equipment and machinery we have been acquiring over the past couple of years, all of which allows us to strategically and incrementally increase production with the plan to elevate loaded ammunition moving out of the 13 May shipping docks from 400 million to 1 billion, allowing AMMO to further ascend within the global ammunition marketplace among our peers.***

107. The statements identified in Paragraph 106 were materially false and misleading when made because: (a) the Manitowoc Facility was not "under budget" at the time, but as the Company later admitted, it paid Larson Building over $25 million for this project, more than twice the $12 million budget disclosed to investors; (b) the statements omitted that AMMO's costs were inflated because it secretly steered work to a related party contractor; (c) the Manitowoc Facility was not "state-of-the-art" but instead was mired in broken equipment, as confirmed by CW1, CW3, CW5, CW6, CW7, and CW8; and (c) the statements omitted that these production constraints limited actual capacity at the time.

108. On February 14, 2023, the Company announced that its net revenue had declined 40% year-over-year "mainly attributable to [A]mmunition segment." This was both a partial materialization of the risks previously concealed by Defendants, and informed investors that their prior statements were partially untrue. As a result, AMMO shares declined the next day by over 12.8% to close at $1.96 on February 15, 2023. Again, the Defendants avoided a much more significant decline by continuing to make misrepresentations to investors.

109. For example, on an earnings call held on February 14, 2023, Smith was asked about brass case manufacturing:

**Q - Mark Smith**

Okay. Then just as we think purely about brass casing manufacturing, walk us through, kind of added capacity in the new plant and maybe where you're at today on what's your meeting, as far as your capacity just as we look purely at casings?

**A - Jared Smith**

Historically, in the past, the maximum cases that ever came out of any previous facility related to AMMO, the maximum cases that ever came out of any previous facility related to AMMO within that 350 million to 400 million space. ***The capacity that's available out of this plant exceeds 750 million in our current shift operation. So, we can double the capacity of cases. We have ample manufacturing and loading space to go after these opportunities.*** It's not going to be for a lack of capacity going forward.

***

110. The statements identified in Paragraph 109 were materially false and misleading when made because: (a) capacity was not then "doubl[ing]", but rather was constrained as confirmed by CW1, CW5, and CW6; and (b) brass casing machines were at that time not operational, as confirmed by CW3 and CW8.

111. On May 3, 2023, a public version of the Merger Complaint then made available by the Delaware Chancery Court asserted that Larson had served as *de facto* co-CEO and CFO since the merger, and that production capacity in the Manitowoc Facility was far less than the 750 million rounds touted to investors (Merger Complaint ¶¶28-29, 115). AMMO stock dropped 4.2% on May 4, 2023, to close at $1.81. However, the Company blunted further decline by publicly denying the allegations, and by continuing to repeat and make additional misrepresentations to investors.

112. On June 14, 2023, AMMO furnished its annual report for the fiscal year ended March 31, 2023, on a Form 10-K filed with the SEC (the "2023 Form 10-K"). The 2023 Form 10-K was signed by Defendants Wagenhals and Wiley, among others. The

2023 Form 10-K repeated the substantially the same misleadingly incomplete regulatory statements set forth in Paragraph 96.

113. The statements identified in Paragraph 112 were materially false and misleading when made because: (a) the Company was already not complying with the law by not disclosing its *de facto* co-CEO and CFO in Chris Larson; (b) the Company was already violating the law by employing a banned individual as an officer; and (c) the Company was already violating the law by concealing related party transactions from investors.

114. Also on June 14, 2023, the Company held its fourth quarter earnings call for fiscal year 2023. At this call, the Smith made the following statement about the Company's manufacturing capabilities during the scripted portion of the conversation:

> **Jared Smith (Scripted Portion)**
> ***
> At the same time, we must create a conversation with our consumers who are getting lost in the aisles and options to choose from in the ammunition category. We will do this by rebranding and repackaging the AMMO, Inc signature lines to stand out on the shelf. ***This will communicate the strength of our best-in-class brass we manufacture and the highest quality of components we source from other premium US manufacturers. We are superior and take great pride in being a US manufacturer based in Manitowoc, Wisconsin.***
>
> As we transition our future product offering, we will continue to move our products into stable niche markets with loyal customers. Over the last six months, our AMMO division has transitioned away from top-line revenue and focused on margin creation in conjunction with contractual growth with our premium OEM partners. Sales margins improved, volumes stabilized, and strict inventory reduction plans have been put into place**.** ***We are filling in the factory that came on last fall and continue to see machine efficiencies increase, while we find new demand for this capacity.*** We will continue to build out our sales and marketing teams to move the needle in a profitable and sustainable manner.
> ***

115. The statements identified in Paragraph 114 were materially false and misleading when made because: (a) efficiencies were then not increasing, but they were

experiencing widespread equipment failure; (b) they lacked redundancies for a key press, which at or about this time, ultimately failed: (c) the manufacturing was not "best in class" as confirmed by the accounts of CW1, CW3, CW5, CW6, and CW7 that detail widespread equipment failures; (d) the "superior" statement was misleading as Defendants at the time were resorting to purchasing ammunition that was not their own manufacturing, often from overseas, and repackaging the ammunition and passing it off as their own, as confirmed by CW4, CW5, CW6 and CW8.

116. On July 31, 2023, Ammo furnished an amended annual report amending the 2023 Form 10-K, on a Form 10-K/A filed with the SEC (the "2023 Form 10-K/A"). The 2023 Form 10-K/A was signed by Defendants Smith and Wiley. The 2023 Form 10-K/A purported to disclose the extent of the Company's related party transactions, reporting the following transactions:

> On November 3, 2022, the Company entered into the Settlement Agreement with Steven F. Urvan and Susan T. Lokey (collectively with each of their respective affiliates and associates, the "Urvan Group").
>
> Pursuant to the Settlement Agreement, the Urvan Group agreed to withdraw its notice of stockholder nomination of its seven director candidates and its demand to inspect books and records, pursuant to Section 220 of the General Corporation Law of the State of Delaware, and the Company agreed to immediately increase the size of the Board from seven to nine directors and appoint Christos Tsentas and Wayne Walker (together with Mr. Urvan, the "Urvan Group Directors") to the Board to serve as directors with terms expiring at the 2022 annual meeting of stockholders (the "2022 Annual Meeting"). The Company included the Urvan Group Directors in its director candidates slate for the 2022 Annual Meeting and will do so at any subsequent annual meeting of stockholders of the Company occurring prior to the Termination Date (as defined below). The Company has agreed to not increase the size of the Board above nine directors prior to the Termination Date unless the increase is approved by at least seven directors.
>
> Unless otherwise mutually agreed to in writing by each party, the Settlement Agreement will remain in effect until the date that is the earlier of (i) 30 days prior to the earlier of (A) the deadline set forth in the notice requirements of the federal "universal proxy rules" set forth in Rule 14a-19 under the Exchange Act (the "UPR Deadline") relating to the Company's 2023 annual meeting of stockholders (the "2023 Annual Meeting") and (B) any deadline that may be set forth in the Company's Amended and Restated Certificate of

Incorporation (as amended from time to time, the "Certificate") or Bylaws (the "Bylaws") following the execution of the Settlement Agreement relating to the nomination of director candidates for election to the Board at the 2023 Annual Meeting, and (ii) 90 days prior to the first anniversary of the 2022 Annual Meeting (such date, the "Termination Date"). However, if the Company notifies Mr. Urvan in writing at least 15 days prior to such Termination Date that the Board irrevocably offers to re-nominate the Urvan Group Directors for election at the 2023 Annual Meeting and Mr. Urvan accepts such offer within 15 days of receipt of such notice, the Termination Date will be automatically extended until the earlier of (i) 30 days prior to the earlier of (A) the UPR Deadline relating to the Company's 2024 annual meeting of stockholders (the "2024 Annual Meeting") and (B) any deadline that may be set forth in the Certificate or the Bylaws following execution of the Settlement Agreement relating to the nomination of director candidates for election to the Board at the 2024 Annual Meeting, and (ii) 90 days prior to the first anniversary of the 2023 Annual Meeting. Notwithstanding the foregoing, the "Termination Date" shall not occur prior to 20 days after Mr. Urvan's departure from the Board.

Pursuant to the Settlement Agreement, the Company suspended the previously announced separation of Company into Action Outdoor Sports, Inc. and Outdoor Online, Inc., pending the further evaluation of strategic options by the Board. The Company paid approximately $500,000 of the Urvan Group's costs, fees and expenses per the terms of the Settlement Agreement. Additionally, the Company issued 125,000 shares of Common Stock for a total value of $437,500 to an employee and issued 110,000 shares of Common Stock for a total value of $385,000 to an independent contractor as a result of termination without cause per the terms of the Settlement Agreement.

The foregoing summary of the Settlement Agreement does not purport to be complete and is subject to, and qualified in its entirety, by reference to the full text of the Settlement Agreement, a copy of which was previously filed as Exhibit 10.1 in the Form 8-K filed with the SEC on November 7, 2022, and incorporated herein by reference.

During the year ended March 31, 2023, we paid $551,916 in service fees to two independent contractors of which $223,333 were created as a result of termination without cause as a result of our Proxy Settlement Agreement. The two independent contractors were issued 141,419 shares of our common stock for a total value of $494,967. We issued 45,000 shares in the aggregate to our advisory committee members for service for a total value of $129,750. Through our acquisition of Gemini, a related party relationship was created with Mr. Urvan by ownership of entities that transacts with Gemini. We

> recognized $215,300 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $182,344 included in our Accounts Receivable at March 31, 2023 as a result of this relationship.

117. The statements identified in Paragraph 116 were materially false and misleading when made because they omitted to disclose that: (a) the Company had other undisclosed related party dealings with Larson; (b) the Company had entered into a related-party contract with Larson Building in December, 2020; (c) the Company had issued 200,000 shares of common stock in February 2021 to an entity controlled by an immediate family member of Chris Larson; and (d) Larson was then receiving kickbacks from a third-party service provider, as the Company later admitted.

118. The 2023 Form 10-K/A also purported to "set[] forth the names and ages of our current directors and executive officers" and the compensation of the five highest-paid executives.

119. The statements misleadingly concealed that Larson was then functioning as an executive officer, and concealed the vast compensation paid to Larson, including via secret related party transactions.

120. On July 31, 2023, Smith wrote a letter to shareholders in which he touted the new Manitowoc Facility:

> ***We are utilizing our new 185,000 square-foot facility to produce those items that create real margin for the company,*** and that match our engineering capabilities with the products and services needed by the shooting, law enforcement, and military communities. Additionally, we will continue to create leaner and more efficient operations while creating cash from our inventories.

121. The statements identified in Paragraph 120 were materially false and misleading when made because: (a) a key press machine that Smith later admitted was a "big deal" affecting approximately 100 million in rounds had already failed; (b) margins were not then improving as the facility sat idle and the Company was expending around a

million dollars just to fix the broken machine; and (c) the new facility was not more "efficient."

122. On August 9, 2023, the Company issued a press release touting the gross margins focusing on brass sales: "***And our gross margins have increased on our ammunition segment as we are beginning to see the benefits of the transition to our leaner operating model with a higher focus on brass sales.***"

123. The statement in Paragraph 122 was misleading when made because the major brass press had already failed, rendering the statement about improving margins misleading.

124. Also in that August 9, 2023 press release, Smith said the following regarding improving profitability:

> **Jared Smith**
> ***"Our work toward achieving our strategic goals are starting to pay off as we have already begun to see the positive effects here in the 1st quarter, with significant improvements in gross margin and strong cash flow. Despite a difficult industry environment in the near term, I remain confident that the initiatives we have undertaken in both the marketplace and ammunition divisions will continue to improve profitability."***

125. The statement in Paragraph 124 was misleading when made because: (a) the initiatives were not then "improving profitability" or paying off; (b) blaming industry factors for the Company's failures ignored the larger issues of manufacturing problems at the Company, and that the Company was mired illicit self-dealing.

126. Also on August 9, 2023, the Company held its second quarter of 2024 earnings call. During the scripted portion of the call Smith said the following:

> **Jared Smith (Scripted Portion):**
> Thank you, Fred, and afternoon everyone. This is my first Earnings Call as CEO and I couldn't be more excited to be here. The last six months, we've been rolling up our sleeves and making tremendous strides and creating real operational lift inside and outside the four walls. As I laid out in my letter to shareholders on July 31, we're driving the business to three major categories. First category, we're expanding GunBroker.com's platform and reach to

centralized payment processing, carding, and the addition of services to complement the products relevant to our community.

***The second category is, we're focusing the ammunition division on enhancing margins through expansion of our rifle brass lines, continuous improvement measures, and vertical integration into projectile manufacturing. And finally, and most importantly, we're aligning the goals, compensation and incentives of the management team with shareholder interest.***

***

127. The statements identified in Paragraph 126 were materially false and misleading when made because: (a) they failed to disclose that a key press machine that Smith later admitted was a "big deal" affecting approximately 100 million in rounds had already failed; (b) margins were not then improving as the facility sat idle and the Company was expending almost one million dollars just to fix the broken machine; and (c) and the interests of management and shareholders were not then aligned, as the Company was still employing Larson as a shadow executive, skirting his SEC ban, allowing a kickback scheme, and concealing compensation and related party transactions with Larson and others from investors.

128. During the question and answer portion of the call, Smith was asked about how the company could improve margins. In his response, Smith touted rifle brass capacity, without disclosing that the press was broken:

**Q- Matt Koranda**
Yes, got it. That makes sense. Last one for me. Aside from any unforeseen discounting if the demand environment gets worse, how should we think about the progression and timing of getting loaded ammo gross margins back to the 20% range? Do you think we can get there by year end? Just how are we thinking about how that maybe just scales over time?

**A - Jared Smith**
***Yes, I think for our business margins improved, we have more rifle brass capacity coming on in the two quarters ahead. That's clearly where we***

> ***can make margin we can defer kind of the nonvertically integrated piece of our production over a larger dollar value and margins increase. And once again, it really, our focus is rifle ammunition and playing a much, much larger role in that rifle space, both domestically and internationally.***

129. The statements identified in Paragraph 128 were materially false and misleading when made because: (a) a key press machine that Smith later admitted was a "big deal" affecting approximately 100 million in rounds had already failed; (b) margins were not then improving as the facility sat idle and the Company was expending around a million dollars just to fix the broken press.

130. On November 9, 2023, Defendants disclosed another 29% decrease in total revenue in a press release filed on Form 8-K with the SEC. In the November 9, 2023 press release, the Company announced a 47% decrease in loaded ammunition sales and that casing sales were 16% below the analyst estimate. During the November 9, 2023 earnings call, Defendants admitted press failures at the Manitowoc facility contributed to the poor financial results:

> **Jared Smith (Scripted Portion)**
> ***
> [O]ur results were further impacted because the major investments we've made in contact tooling for brass production equipment did not come online in the quarter and our overhead absorption for the plant suffered. This is by no means from a lack of demand, but due to the mechanical and electrical failure of our primary presses for our rifle case production.
> ***
>
> **Robert Wiley (Scripted Portion)**
> ***
> The decrease in gross profit margin was related to the shift in our sales mix, but was also related to higher costs associated with our manufacturing process in our ammunition segment. Primarily, our cost absorption suffered due to the setbacks we experienced as a result of the rifle casing presses going down in the reported quarter.
> ***

131. On the earnings call that day, Smith also admitted to the "failure of our primary presses for our rifle case production." He acknowledged that AMMO incurred an additional $1.75 million in expenses for the quarter, including "$800,000 in tool expenses" to address the broken presses. Smith also admitted that the press affected between 90-to-120-million-piece capacity and emphasized that the broken press was "a big deal for us and has been."

132. On this partial disclosure and materialization of concealed risks, the Company's stock price declined by over 13.1% from its previous day closing price of $2.51 to close at $2.18 on November 10, 2023. Again, a further drop was prevented because the Company declined to tell the whole truth to investors and continued to make misrepresentations.

133. On February 8, 2024, the Company held its third quarter of 2024 earnings call. At the call, Smith touted the Company's "impeccable balance sheet":

> **Jared Smith (Scripted Portion)**
> Good afternoon, everyone. Calendar 2023 was a challenging year for our industry and for the U.S. economy. Despite this backdrop, AMMO continued to transition its business to a stronger and leaner operating model as we push through this very tough economic period. ***We have emerged from this time with an impeccable balance sheet, and we are encouraged about the significant opportunities we have before us here in the fourth quarter and going forward.***
> *******

134. The statements identified in Paragraph 133 were materially false and misleading when made because: (a) as the Company later admitted, at the time the Company was mired in related party transactions and kickbacks; (b) the financial reporting was false and needed to be revised.

135. On June 13, 2024, AMMO furnished its annual report for the fiscal year ended March 31, 2024, on a Form 10-K filed with the SEC (the "2024 Form 10-K"). The 2024 Form 10-K was signed by Defendants Smith, Wagenhals and Wiley, among others.

The 2024 Form 10-K also said the following about the Company's off-balance sheet arrangements:

> ***Off-Balance Sheet Arrangements***
> As of March 31, 2024, we did not have any off-balance sheet arrangements that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources.

136. The statements in Paragraph 135 were false and misleading when made because they failed to disclose that at the time Larson was receiving kickbacks from a service provider.

137. The 2024 Form 10-K also repeated the substantially same regulatory statements set forth in Paragraph 96.

138. The statements identified in Paragraph 137 were materially false and misleading when made because: (a) the Company was already not complying with the law by not disclosing its *de facto* co-CEO and CFO in Chris Larson; (b) the Company was already allowing a banned individual to function as an officer; (c) the Company was already violating the law by concealing related party transactions from investors.

139. On July 29, 2024, Ammo furnished an amended annual report amending the 2024 Form 10-K, on a Form 10-K/A filed with the SEC (the "2024 Form 10-K/A"). The 2024 Form 10-K/A was signed by Defendants Smith and Wiley. The 2024 Form 10-K/A purported to disclose the extent of the Company's related party transactions, misleadingly reporting the following transactions:

> ***Related Party Transactions***
> ***
> During the year ended March 31, 2024, we paid $410,173 in service fees to two independent contractors, who provided services to the company, which included a $244,640 payment due upon termination without cause to one of the independent contractors. The two independent contractors were issued 168,581 shares of Common Stock for a total value of $350,345, which included an issuance of 134,240 shares due upon termination without cause for one of the independent contractors. We issued 25,000 shares in the aggregate to our advisory committee members for service for a total value of $53,250.

> Through our acquisition of Gemini Direct Investments, LLC ("Gemini"), a related party relationship was created through one of our directors, Mr. Steve Urvan, by his ownership of entities that provided services to Gemini. There was $201,646 included in our Accounts Receivable at March 31, 2024 from entities owned by Mr. Urvan.
>
> The Company paid off the balance of a promissory note to Jagemann Stamping Company ("JSC") during the year ended March 31, 2024. JSC became a shareholder of the Company through the Company's acquisition of JSC's brass casing division. The payment made to JSC during fiscal 2024 consisted of $181,132 in principal and $2,784 in interest on the note. Additionally, we owed $150,866 to Jagemann Precision Tooling, a division of JSC, at March 31, 2024.

140. The statements identified in Paragraph 139 were materially false and misleading when made because they omitted to disclose that: (a) the extent of the Company's dealings with Larson, an individual banned from serving as an officer at the time; and (b) Larson's kickbacks from a third party service provider, which the Company later admitted.

141. On August 8, 2024, Defendants disclosed further softness in the Ammunition Segment in a press release filed on Form 8-K with the SEC. The total revenue decreased 10% year-over-year and the loaded ammunition sales and casing sales were down 5% and 15%, respectively. The cost of revenues increased by $1 million and the gross margin decreased to 31.6% from 40.9% in the prior year period. The August 8, 2024 press release attributed the increase in cost of revenues and decrease in gross profit margin to "shift in sales mix and ***production inefficiencies*** in our ammunition segment in comparison to the prior year period." Matt Koranda of Roth Capital Partners also related the soft sales to "key equipment being down during the period." Matt Koranda, *POWW: Still Waiting for Sustained AMMO Segment Improvement*, ROTH CAPITAL PARTNERS, August 11, 2024, at 1.

142. On this partial disclosure and materialization of concealed risk, the Company's stock price declined by over 6.7% to close at $1.51 on August 9, 2024. Shares

continued to decline as they absorbed the news over the next three trading days, closing at $1.49 on August 12, 2024, $1.45 on August 13, 2024, and $1.38 on August 14, 2024.

143. On September 24, 2024, AMMO announced that Wiley had resigned "upon the request by the Board." Further, the Company disclosed that its Board formed a special committee and hired an outside law firm to conduct an independent investigation into its "internal control over financial reporting for the fiscal years 2020 through 2023," acknowledging the seriousness of the transgressions that Defendants had previously concealed. Specifically, in a press release filed with the SEC on September 24, 2024, AMMO stated:

> ***Resignation of Mr. Rob Wiley as Chief Financial Officer***
>
> On September 19, 2024, the Company received a notice of resignation from its Chief Financial Officer, Rob Wiley, effective September 20, 2024. Mr. Wiley resigned upon request by the Board. Pursuant to a recommendation by the Compensation Committee, the Board exercised its discretion to approve a separation agreement ("Separation Agreement") for Mr. Wiley. Mr. Wiley signed the Separation Agreement on September 19, 2024. Pursuant to the Separation Agreement, Mr. Wiley will be entitled to separation compensation in the amount of $406,250.00 paid in equal bi-monthly installments over fifteen calendar months; fifty thousand shares of common stock; a lump sum payment for accrued and unused vacation and paid time off; family health benefits under the Company's employer sponsored plans until September 30, 2025; and unreimbursed expenses. Mr. Wiley gave the Company a general liability release, and the Parties agreed to several standard restrictive covenants. Additionally, the Separation Agreement requires Mr. Wiley to provide cooperation and assistance to the Company to facilitate the transfer of duties to his successor.
>
> ***Independent Investigation***
>
> A Special Committee of the Board of Directors has retained a law firm to conduct an independent investigation, focused on fiscal years 2020 through 2023, including determining whether the Company and its management control persons at the time: (i) accurately disclosed all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (ii) properly characterized certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; and (iii) appropriately valued unrestricted stock awards to officers, directors,

> employees and others in fiscal years 2020 through 2022. The Company's outside auditors have indicated that they are not prepared to rely on representations from the Company's management team from the period in question until such time that the aforementioned investigation and all appropriate remediation, if necessary, is completed. This independent investigation is in its early stages, and to ensure the fairness of that process, the Company does not plan further comment pending completion of the investigation.

144. On this partial disclosure and materialization of concealed risk, the Company's stock price declined by over 5.2% to close at $1.44 on September 25, 2024. Defendants prevented a full decline by continuing to conceal the truth about Larson and fraudulent accounting practices.

145. On May 20, 2025, AMMO finally admitted accounting errors and related party transactions with Larson in the May 20, 2025 Form 10-K/A, which consisted of amendments to previous annual and quarterly reports filed with the SEC for the fiscal years ended March 31, 2024, 2023, and 2022. In this filing, AMMO conceded:

> In filing this Amendment, we are restating our previously issued (i) audited consolidated financial statements as of and for the fiscal years ended March 31, 2024, 2023 and 2022 and (ii) unaudited condensed consolidated interim financial information for each of the quarters within the fiscal year ended March 31, 2024 to account for the issues described in "Background of the Restatement" below. In addition, we intend to file an amendment to our Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2024 (such period, collectively with the fiscal years ended March 31, 2024, 2023 and 2022 and the quarters within the fiscal year ended March 31, 2024, the "Affected Periods"), originally filed with the SEC on August 8, 2024, which amendment will include restated unaudited condensed consolidated interim financial information as of and for the three months ended June 30, 2024 and 2023 (such report, together with this Amendment, the "Amended Reports"). The previously issued financial statements for the Affected Periods should no longer be relied upon. All material restatement information will be included in the Amended Reports, and we do not intend to separately amend other filings that we have previously filed with the SEC.
>
> …

As discussed in Note 3 to the accompanying consolidated financial statements in this Amendment, we have restated our consolidated financial statements and the related disclosures for fiscal years ended March 31, 2024, 2023 and 2022. Specifically, we have restated our consolidated balance sheet as of March 31, 2024, 2023, and 2022 and the related consolidated statements of operations, stockholders' equity and cash flows, including related disclosures, for the fiscal years ended March 31, 2024, 2023, and 2022. The accompanying Management's Discussion and Analysis of Financial Condition and Results of Operations in Part II, Item 7, has been updated to reflect the effects of the restatement.

In addition, this Amendment includes unaudited restated condensed consolidated financial information for the fiscal quarters ended June 30, 2023, September 30, 2023 and December 31, 2023.

The cumulative effect of the errors attributable to periods prior to April 1, 2021 have been reflected in the balance sheet data as a decrease to retained earnings at March 31, 2021 of $19.7 million for fiscal years 2017 through 2021.

…

**Our management has concluded that we have material weaknesses in our internal control over financial reporting and that our disclosure controls and procedures are not effective. If we fail to develop or maintain an effective system of internal control, we may not be able to accurately report our financial results or prevent financial fraud. As a result, current and potential stockholders could lose confidence in our financial reporting.**

As a public company, we are required to comply with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Section 404 requires us to include management's assessment of the effectiveness of our internal control over financial reporting as of the end of the fiscal year in our Annual Report on Form 10-K/A. This report must also include disclosure of any material weaknesses in internal control over financial reporting that we have identified.

Based on the results of the Special Committee Investigation, our review of our financial records, and other work completed by our management, the Special Committee has concluded that there were material misstatements in the previously filed consolidated financial statements as of and for the fiscal years ended March 31, 2024, 2023 and 2022. Accordingly, our Board of Directors and management concluded that our consolidated financial statements for these periods should no longer be relied upon and that such financial statements required restatement. Based upon an evaluation of our

> disclosure controls and procedures, our CEO and CFO have concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of March 31, 2024.
>
> In addition, as further described in this Amendment in Item 9A "Controls and Procedures", as of March 31, 2024, management has identified material weaknesses in our internal control processes that involve the control environment, information and communication, monitoring activities, and control activities components of the COSO framework.
>
> These material weaknesses, if not remediated, create an increased risk of misstatement of the Company's financial results, which, if material, may require future restatement thereof. A failure to implement improved internal control over financial reporting, or difficulties encountered in their implementation or execution, could cause future delays in our reporting obligations, and could have a negative effect on us and the trading price of our Common Stock. If these weaknesses and inadequate disclosure controls and procedures continue, investors could lose confidence in the accuracy and completeness of our financial reports and other disclosures.
>
> Effective internal control over financial reporting and related controls and procedures are necessary for us to provide reliable financial reports and effectively prevent fraud. If we cannot provide reliable financial reports or prevent fraud, we could be subject to regulatory action or other litigation and our business and operating results could be harmed.

146. The May 20, 2025 Form 10/K-A also for the first time identified Chris Larson as an "executive officer" and disclosed Chris Larson's executive compensation, including the stock awards granted to Larson:

> **ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**
>
> …

| Fiscal Year 2022 | |
|---|---|
| **Name** | **Title** |
| Fred W. Wagenhals | Chairman of the Board and Chief Executive Officer |
| Robert D. Wiley | Chief Financial Officer |
| Anthony Tate | Director of National Accounts |
| Chris Larson | Vice President of Finance |

| Fiscal Year 2023 | |
|---|---|
| **Name** | **Title** |
| Fred W. Wagenhals | Chairman of the Board and Chief Executive Officer |
| Robert D. Wiley | Chief Financial Officer |
| Jared R. Smith | Chief Operating Officer(1) |
| Anthony Tate | Vice President of Sales |
| Robert J. Goodmanson | President(2) |
| Chris Larson | Vice President of Finance |
| Tod Wagenhals | Executive Vice President, Secretary |
| Beth Cross | Chief Operating Officer, GunBroker |

. . .

**Chris Larson**, age 52, was a founder of the Company and served in several roles in his capacity as an employee from December 2016 until November 2022. Mr. Larson served as a consultant to the Company from November 2022 to February 2023. Prior to joining the Company, Mr. Larson founded and served as the CFO of Cash Systems, Inc from 1999 to 2005 and served on its board through 2006. Mr. Larson also served on the board of Western Capital Resources, Inc. during 2009. In 2006 Mr. Larson founded and served as president of National Cash & Credit. In April 2016, the SEC filed a civil enforcement action against Mr. Larson and four other individuals alleging various violations of the federal securities laws for conduct that was wholly unrelated to Mr. Larson's employment at the Company. On June 1, 2020, without admitting or denying the allegations of the SEC's complaint, Mr. Larson consented to the entry of a final judgment by the U.S. District Court for the District of Arizona (the "Final Judgment") which, among other things, permanently enjoined him from future violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act. The Final Judgment also barred Mr. Larson, for a period of five years, from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act. Separately, pursuant to Mr. Larson's Offer of Settlement, on June 3, 2020, the SEC suspended Mr. Larson from appearing or practicing before the SEC as an accountant pursuant to Rule 102(e) of the SEC's Rules of Practice. On or about July 28, 2021, the Minnesota Board of Accountancy revoked Mr. Larson's certified public accountant certificate.

147. The May 20, 2025 Form 10/K-A also disclosed Chris Larson's Class Period executive employment agreement with AMMO for the first time:

***Larson Employment Agreement***

On May 1, 2021, the Company and Mr. Larson entered into an employment agreement. The agreement had an initial three-year term, which either party had the right to extend for up to three additional one-year terms. The agreement would have terminated automatically upon Mr. Larson's death, and could have been terminated (i) by either the Company or Mr. Larson upon 90 days written notice, (ii) by either party with or without cause in accordance with state and federal law, or (iii) by the Company upon Mr. Larson's disability, as defined in the employment agreement. Mr. Larson's employment agreement provided for (i) a base salary of $240,000 per year, (ii) an annual equity award of 100,000 restricted shares of Common Stock during the initial three years of the term of the agreement and (iii) a quarterly bonus equal to 0.25% of the Company's gross sales. Mr. Larson's employment agreement also contained confidentiality provisions.

In the event that the Company terminated Mr. Larson's employment without cause, then, subject to his compliance with all surviving provisions of any confidentiality agreement that he may have signed, he would have received (i) salary, bonus and insurance benefits for a period of 12 months from the effective date of termination, and (ii) 100% of his remaining unissued equity compensation, all of which would have become vested and issuable on the date of his termination.

In the event that the Company terminated Mr. Larson's continuous status as an employee without cause or Mr. Larson had terminated his employment with the Company for good reason, in either case upon or within 12 months after a change in control, as defined in the employment agreement, then, subject to his execution of a standard release of claims in favor of the Company or its successor, Mr. Larson would have received (i) salary for a period of 12 months, (ii) 100% of his remaining unissued and/or unvested equity compensation, and (iii) his performance bonus for the duration of the term of his employment agreement.

In the event that the Company terminated Mr. Larson's employment as a result of his or her death or disability, Mr. Larson or his estate, as applicable, would have received (i) all of his unpaid salary through the date of death/disability and a severance benefit of three months' pay, (ii) all reimbursable expenses and benefits owed to him through the date of death/disability together with any benefits payable under any life insurance program in which he is a participant, if applicable, (iii) the unvested and unissued portion of any equity compensation and (iv) any pro-rata share of a bonus to which he was entitled, payable at the end of the applicable fiscal year.

On November 4, 2022, Mr. Larson resigned as an employee of the Company. In connection with his resignation, also on November 4, 2022, Mr. Larson

> and the Company entered into an independent contractor agreement, pursuant to which Mr. Larson provided services to the Company for a period of six months. During the period of the independent contractor agreement, Mr. Larson assisted with services relating to leveraging the Company's online operations with regards to the carting and processing of ACH and associated credit card processing transactions. In consideration of these services, Mr. Larson received a salary of $7,500 per pay period, and a quarterly equity award of 25,000 shares of Common Stock earned on a daily pro-rata basis from the date of execution of the independent contractor agreement. Pursuant to the independent contractor agreement, Mr. Larson was eligible for family health benefits under the Company's employer-sponsored plans. The independent contractor agreement also contained confidentiality, non-disclosure and non-disparagement provisions. In the event the Company terminated the independent contractor agreement with Mr. Larson without cause or as a result of death or disability, or if Mr. Larson terminated the agreement for good reason, Mr. Larson would have received any approved reimbursable business expenses incurred as of the date of termination, maintenance of health benefits and payment of all contract benefits provided for in the agreement. In the event the Company terminated the independent contractor agreement with Mr. Larson with cause, Mr. Larson would have been entitled to receive the approved business expense reimbursement and payment of salary earned through the date of termination.

148. AMMO also disclosed other related party transactions in a Form 10-Q/A furnished on May 20, 2025, amending the quarter ending June 30, 2024. In this filing, AMMO disclosed around $720,034 increase in employee salaries and related expenses and stated:

> In September 2024, the Special Committee initiated the Special Committee Investigation through independent legal counsel and independent forensic accountants. During the course of the investigation, the Special Committee discovered accounting and financial reporting errors that required restatement resulting primarily from (i) inaccurate valuation of, and accounting for share-based compensation awards to employees, non-employee directors, and other service providers, and shares issued in exchange for goods and services, (ii) inappropriate capitalization of certain share issuance costs, and (iii) inappropriate accounting for certain convertible notes and warrants issued by the Company. During the course of the Special Committee Investigation, the Special Committee also found that the Company had not properly disclosed certain executive officers, executive compensation and related party transactions. In conjunction with the restatement of the items above, we also made corresponding income tax

> adjustments to our consolidated financial statements as these balances were impacted by the aforementioned adjustments.
>
> The accounting and financial reporting errors identified as part of the investigation and subsequent restatement preparation are described and summarized as follows:
>
> *Share-based payments*
>
> The valuation and amortization of expense related to stock-based payments to employees and non-employee directors and shares issued to service providers in exchange for goods and services were historically calculated incorrectly. The Company previously accounted for stock-based payments using a grant date fair value that was discounted from the fair value under the incorrect interpretation that the shares were restricted. In addition, the determination of the grant date was incorrectly determined with respect to historically issued stock-based payments. The Company re-evaluated the grant date fair value of stock-based payments under ASC 718. Under ASC 718, the grant date is the date at which the grantor and grantee have a mutual understanding of the key terms and conditions of the stock-based compensation agreement. The Company reviewed all stock-based payment awards to ensure the correct grant date was identified going back to the year ending December 31, 2017. The Company then evaluated the grant date fair value of all stock-based payment awards. The Company used the publicly available closing price of its stock on the date nearest the grant date as this is considered the best indicator of value.

149. On this final disclosure, the Company's stock price declined by over 8.2% to close at $1.66 on May 21, 2025. AMMO shares continued to absorb the news on the next trading day, closing at $1.64 on May 22, 2025.

## III. ADDITIONAL ALLEGATIONS OF SCIENTER

### A. Defendants Admitted to the Fraud

150. Smith admitted in November 2023 that the "big deal" rifle press failed by June 2023, and that he had observed in April 2023 during a walk-through of the facility that this lacked any redundancy to address equipment failures. Despite this, Defendants made several statements in Summer of 2023 touting their shift to prioritizing rifle casings and touting the manufacturing capabilities of the new facility.

151. The Company admitted Larson's status as a related party and illicit related party transactions, including the kick-back scheme, in its May 20, 2025 Form 10-K/A Disclosure. Specifically, the Company admitted that Larson was in fact an executive officer of the Company during the Class Period, that he was the second highest paid officer at the Company, and that he had received related party payments, specifically, the Company disclosed the following:

> ***Transactions Involving Chris Larson***
>
> On May 3, 2019, the Company entered into a promissory note of $375,000 with Southwest Highlands Group, LLC, an Arizona limited liability company wholly owned by Chris Larson. The original interest rate was the applicable LIBOR Rate. The promissory note was amended on March 18, 2020 and the note's original maturity date of August 3, 2019, was extended to September 18, 2020. The amended note bore interest at 1.25% per month. The Company made $278,195 in principal payments during the year ended March 31, 2021. The note was fully paid off as of March 31, 2021. The Company recognized $10,327 of interest expense related to the note during the year ended March 31, 2021.
>
> In December 2020, the Company entered into an agreement with Larson Building to serve as the general contractor for the construction of its Manitowoc, WI manufacturing facility. Larson Building is wholly owned by the brother of Chris Larson, who was an executive officer of the Company at the time. During the years ended March 31, 2023 and 2022, the Company paid $14,584,805 and $11,221,738, respectively, to Larson Building in connection with this project.
>
> ***In February 2021, the Company issued 200,000 shares of Common Stock to an entity controlled by an immediate family member of Chris Larson. The shares were issued to pay for services valued at $1,080,000. The Company issued these shares to reimburse Mr. Larson and/or his spouse for providing a third-party service provider with 200,000 shares of the Company's Common Stock in January 2021 through a separate entity.***
>
> ***After the initial filings of the Company's Form 10-Ks for the years ended March 31, 2024, 2023 and 2022, the Company was made aware that Chris Larson had received undisclosed payments totaling $814,863 from a vendor with which the Company had a Master Services Agreement and from which the Company received services. The payments were made by this third-party service provider. This third party made payments to Mr. Larson from***

> ***approximately January 2022 through March 2024 based on a percentage of revenue received in connection with, and as a commission from, services rendered to the Company.*** Mr. Larson separated as an employee from the Company effective November 4, 2022 and was later engaged as a contractor for approximately six months.

152. These admissions stand in stark contrast to the Company's prior representations that it had disclosed all related party transactions.

**B. Defendants Had Access to the Concealed Information**

153. Defendants knew that the Manitowoc Facility was mired in production delays and equipment failures. Production and machine failures were tracked on Plex software, as confirmed by CW5, CW6, CW7, and CW8. And Defendants regularly toured the facility, and received production and capacity updates from Mann, as confirmed by CW1. As CW1 states, Larson knew of the actual production capacity figures from Mann. In addition, Wagenhals said at the August 16, 2021 earnings call that ***he tracks production capacity every day***, including that "*we get on a call every morning at 8 o'clock and we focus on numbers, numbers, numbers.*"

154. That Larson functioned as an executive officer of the Company was well known to the Individual Defendants. Each interacted with Larson at high level meetings. Multiple CWs reported knowing that Larson was officially banned from serving as an executive officer of the Company but that the Company allowed him to serve in a *de facto* role anyway. CW1, a senior level executive at the company, noted that employees joked about Wiley acting as Larson's puppet. As Urvan, the current CEO of AMMO, stated in the Verified Merger Complaint, Larson was functioning as *de facto* co-CEO and CFO of the Company during the Class Period. Only investors were left in the dark about that vital fact. Further given the close relationship between Larson and the other Individual Defendants, especially Wagenhals and Wiley, Defendants were aware of the related party dealings of Larson, including the contract to his brother's Company and the kickbacks that were later admitted to by the Company.

### C. That Defendants' Misrepresentations Involved AMMO's Core Operations Bolsters Scienter

155. Defendants' scienter is also supported by the fact that the alleged misstatements and omissions concerned AMMO's core operations: its Ammunition Segment.

156. At the start of the Class Period, before the consummation of the Merger, the Ammunition Segment was AMMO's only revenue source.

157. After the consummation of the Merger on May 3, 2021, the Ammunition Segment still made up for more than 63% of AMMO's revenue.

158. Therefore, the Ammunition Segment was *the* driving factor of AMMO's revenue during the Class Period. For example, on February 2, 2022, Roth Capital Partners put out a report on AMMO and noted that "the shortfall relative to consensus appears to be driven by the ***core*** ammunition segment, which was seemingly capacity constrained during portions of the quarter." Matt Koranda, *POWW: 3FQ22 Downside Pre-Announcement; Updating Model*, ROTH CAPITAL PARTNERS, February 2, 2022, at 1 (emphasis added). The report then went on to stress the importance of the Manitowoc Facility, "which would enable >1bn in loaded ammo capacity once completed." *Id*.

159. Analysts continued to categorize as the *core* segment throughout the Class Period. For example, on November 15, 2022, Lake Street Capital Markets noted that AMMO "saw lower results sequentially at its *core* ammunition business. . . . We are encouraged by strong growth in proprietary ammunition and think growth in this segment is important to the long-term success of the business." Mark Smith, *2Q:F23 Results Miss Expectations And Management Slashes Guidance, Cutting Estimates And Lowering PT To $5; Maintaining Buy Rating*, LAKE STREET CAPITAL MARKETS, November 15, 2022, at 2 (emphasis added). Again, on December 14, 2023, Sadif Investment Analytics noted the Ammunition segment as AMMO's "core[] business." Sadif Investment Analytics, *Will AMMO Inc Continue its Slide?*, December 14, 2023, at 2.

160. Moreover, Defendants admitted that the Ammunition Segment was AMMO's core revenue driver. During the August 16, 2021 earnings call, Defendant Wagenhals stated that "[t]he ammunition segment was a key sales driver, reflecting strong demands for our core product." During the same earnings call, Wiley stated that "[t]he significant improvement in adjusted EBITDA was due to the increased sales and improved gross margins reflecting growth in the ***core*** ammunition segment, plus the addition of our higher margin marketplace segment." During the November 15, 2021 earnings call, Wiley again stated that "[t]he significant improvement in adjusted EBITDA was due to increased sales and improved margins reflecting growth in our core ammunition segment, plus the addition of our higher-margin Marketplace segment." Similar verbiage was then repeated by Wiley on February 14, 2022 and June 29, 2022. During the February 14, 2023 earnings call, Smith admitted that manufacturing at the Manitowoc Facility was where AMMO's "skill set and core competencies" are.

161. Therefore, it would be absurd to infer that AMMO's most senior executives were unaware of the construction and manufacturing issues experienced by the Manitowoc Facility, the *only* facility that would manufacture products for the Ammunition Segment after the planned move to the facility.

### D. Suspicious Stock Sales Enhance an Inference of Fraud

162. During the Class Period, Defendant Wagenhals took advantage of AMMO's artificially inflated stock price to reap over $1,105,891.44 in insider sales:

| **Defendant** | **Trade Date** | **Shares Sold** | **Price per Share** | **Proceeds** |
|---|---|---|---|---|
| **Fred Wagenhals** | 2/15/2024 | 181,230 | $2.500 | $453,075.00 |
| **Fred Wagenhals** | 2/16/2024 | 11,343 | $2.500 | $28,357.50 |
| **Fred Wagenhals** | 2/29/2024 | 5,699 | $2.400 | $13,677.60 |
| **Fred Wagenhals** | 3/1/2024 | 30,590 | $2.400 | $73,416.00 |
| **Fred Wagenhals** | 3/4/2024 | 221,138 | $2.430 | $537,365.34 |
| | | | SUM | $1,105,891.44 |

In violation of his duties to disclose all material information or refrain from trading during the Class Period when false and misleading representations were made, Wagenhals profited

from stock sales in a manner that was out of line with prior trading histories over a comparable period in the past. The disproportionate trading Defendants engaged in enhances an inference of fraud.

163. That other officers of the Company, including Larson and Flynn, failed to file any Form 4s showing their trades also enhances the inference of scienter. Section 16(a) of the Exchange Act requires "[e]very person who is … an officer of the issuer" to timely file statements regarding purchase and sale of the issuer's stock. 15 U.S.C. § 78p.

164. While the Company has admitted that Larson was actually an officer at the time, so was Flynn. Flynn personally participated in negotiations with Urvan about the Merger. *See* Merger Complaint ¶¶31-33.

165. Flynn was also listed as AMMO's "Key Employee[]", along with Fred Wagenhals, the acting CEO, and Chris Larson, in the Merger Agreement. The Merger Agreement also defined "[AMMO]'s knowledge", referring to certain representations made by AMMO in the Merger Agreement, to mean "the actual knowledge of Fred W. Wagenhals, John[] Flynn, Chris Larson and Robert D. Wiley [then-acting CFO]."

166. During the April 14, 2021 emerging growth conference, Wiley introduced Flynn as "Vice President of [AMMO], who is [a] key member of [AMMO's] management team, who also heads [AMMO's] military sales." Flynn participated AMMO's earnings calls throughout 2021 and 2022. Flynn answered analyst questions regarding AMMO's core business operations.

167. AMMO admitted that John Flynn negotiated with the local government regarding the construction of the Manitowoc Facility. Fred Wagenhals stated during the August 16, 2021 earnings call that "[AMMO's] Vice President, John Flynn, did a great job in securing enough land from the City of Manitowoc, to build our new factory on the room -- and room for expansion in the future."

168. Therefore, John Flynn also performed "policy making function" and acted as an "officer" of AMMO during the Class Period.

169. However, AMMO did not properly disclose John Flynn, or Larson, in its Section 16(a) disclosure for stock transactions made by "an officer," and John Flynn did not file any Form 3 or Form 4 during the Class Period.

170. As of the date of this Amended Complaint, neither Chris Larson nor John Flynn has filed any Form 3 or Form 4 for stock transactions during the Class Period.

171. Plaintiffs believe that adequate discovery will reveal that Chris Larson and John Flynn took advantage of AMMO's artificially inflated stock price and the material non-public information known to them to reap profits from insider sales during the Class Period.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

172. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired AMMO common stock during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, current and former officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants are or were affiliated or have or had a material interest.

173. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AMMO shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are several hundred or potentially more than a thousand members in the proposed Class. AMMO's most recent Form 10-K indicates that it has over 116 million outstanding shares. Members of the Class may be identified from records maintained by AMMO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

174. Plaintiffs' claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

175. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

176. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AMMO;
- whether the Individual Defendants caused AMMO to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of AMMO common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

177. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

178. Plaintiffs will rely, in part, upon the presumption of reliance established by

the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- AMMO shares are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold AMMO shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

179. The market for AMMO's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, AMMO common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of AMMO common stock and market information relating to AMMO and have been damaged thereby.

180. During the Class Period, the artificial inflation of AMMO's shares was caused by the omissions and misrepresentations particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about AMMO's business, prospects, and operations. Defendants' material omissions and misstatements created an unrealistically positive assessment of AMMO and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' omissions and misleading statements during the Class Period resulted in Plaintiffs and other members

of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

181. At all relevant times, AMMO common stock traded in an efficient market for the following reasons, among others:

(a) AMMO shares were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, AMMO filed regular periodic public reports with the SEC;

(c) AMMO regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) AMMO was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

182. As a result of the foregoing, the market promptly digested current information regarding AMMO from all publicly available sources and reflected such information in AMMO's share price. Under these circumstances, all purchasers of AMMO shares during the Class Period suffered similar injury through their purchase at artificially inflated prices, and a presumption of reliance applies.

183. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are primarily grounded on Defendants' material omissions rather than affirmative misrepresentations.

## COUNT I

**(Against Defendants AMMO, Larson, Wagenhals, Smith, Wiley, and Flynn for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c))**

184. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

185. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (b) cause Plaintiffs and other members of the Class to purchase AMMO shares at artificially inflated prices. Defendants engaged in manipulative and deceptive acts as alleged herein, including knowingly engaging in a kickback scheme, concealing the employment of Larson, a banned individual, as shadow co-CFO and CEO, and hiding his role from investors, and concealing related party payments to the Company's senior officers. In furtherance of this scheme, Defendants provided false reports to the SEC and withheld related party transactions and Larson's role from investors.

186. Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of AMMO as specified herein.

187. Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct, as alleged herein, in an effort to reassure investors that the Company was in compliance with all applicable laws, conceal that an executive officer of the Company was receiving kickback payments, concealing related party construction contracts from investors, and assuring investors that the new facility was state of the art, when in fact it was mired in production deficiencies. These acts were manipulative and deceptive under the securities laws, and the truth was knowingly concealed from

Plaintiffs throughout the Class Period, and operated as a fraud and deceit upon the purchasers of AMMO securities during the Class Period.

188. As a result of the Defendants' fraudulent scheme and failure to disclose material facts, as set forth above, the market price for AMMO common stock was artificially inflated during the Class Period.

189. In ignorance of the fact that market prices of AMMO's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements disseminated by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired AMMO common stock during the Class Period at artificially high prices and were damaged thereby.

190. At the time these misrepresentations and omissions were made as part of Defendants' fraudulent scheme, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding AMMO, Plaintiffs and other members of the Class would not have purchased or otherwise acquired AMMO common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices at which they did.

191. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

192. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) & (c) promulgated thereunder and are liable to Plaintiffs and the Class members who have been damaged as a result of such violations.

**COUNT II**

**(Against Defendants AMMO, Wagenhals, Smith, Wiley, and Flynn for Violations of Section 10(b) and Rule 10b-5(b))**

193. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

194. This Count is asserted against AMMO and Wagenhals, Smith, Wiley, and Flynn for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

195. During the Class Period, Defendants made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase and sale of securities. Such omissions and misrepresentations were intended to, and throughout the Class Period, did: (i) deceive the investing public, including the Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of AMMO common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire AMMO shares at artificially inflated prices.

196. Specifically, Defendants AMMO, Wagenhals, Smith, Wiley, and Flynn made material misrepresentations and omitted to disclose material information that rendered their statements misleading.

197. The Defendants either had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive the Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Company and Defendants AMMO, Wagenhals, Smith, Wiley, and Flynn. In addition to the facts alleged herein demonstrating

a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control. As the senior managers of AMMO, Wagenhals, Smith, Wiley, and Flynn had knowledge of the details of AMMO's internal affairs that were inconsistent with their public statements.

198. As officers and directors of a publicly-held company, Wagenhals, Smith, Wiley, and Flynn had a duty to disseminate timely, accurate, and truthful information regarding the Company's operations and related party transactions. As a result of the dissemination of the aforementioned false and misleading statements, the market price of AMMO common stock was artificially inflated throughout the Class Period. Additionally, as sellers of AMMO stock during the Class Period, Wagenhals, Smith, Wiley, and Flynn had an affirmative duty to disclose or refrain from trading on AMMO's artificially inflated stock price.

199. In ignorance of the adverse facts concerning AMMO's business, operations and related party transactions, which were concealed by the misrepresentations and omissions alleged herein, Plaintiffs and the other members of the Class purchased or otherwise acquired AMMO common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the common stock or upon statements disseminated by Defendants, and were damaged thereby.

200. During the Class Period, AMMO shares were traded on an active and efficient market. Plaintiffs and the other members of the Class, directly relying on the materially false and misleading statements described herein, or relying upon the integrity of the market, purchased or otherwise acquired shares of AMMO at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said shares or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases or acquisitions by Plaintiffs and the Class, the true value of AMMO's securities was substantially lower than the prices paid by Plaintiffs and the

other members of the Class. The market price of AMMO's securities declined sharply upon the public disclosure of the facts or materialization of the risks concealed from and to the injury of Plaintiffs and other Class members.

201. By virtue of the conduct alleged herein, AMMO and Wagenhals, Smith, Wiley, and Flynn knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

202. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof, causing the price of AMMO's securities to decline. AMMO and Wagenhals, Smith, Wiley, and Flynn are thus liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## COUNT III

**(Against Defendants Wagenhals, Larson, and Smith for Violations of Section 20(a) of the Exchange Act)**

203. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

204. During the Class Period, Wagenhals, Larson, and Smith, participated in the day-to-day operation and management of AMMO, and controlled, directly and indirectly, in the conduct of AMMO's business affairs. Because of their admitted senior positions as executive officers of the Company, they knew the adverse non-public information concealed from investors that rendered AMMO's public statements false and misleading.

205. As the most senior officers and directors of a publicly owned company, Wagenhals, Larson, and Smith had a duty to disseminate accurate and truthful information with respect to AMMO's inability or unwillingness to comply with existing law, and regarding their manufacturing capabilities once they put those statements in

play, and to correct promptly any public statements issued by AMMO, which had become materially false and misleading.

206. Because of their positions of control and authority as senior officers, Wagenhals, Larson, and Smith were able to, and did, control the Company's statements, which AMMO disseminated in the marketplace during the Class Period concerning AMMO's operations. Wagenhals, Larson, and Smith exercised their power and authority to cause AMMO to engage in the wrongful acts complained of herein. Wagenhals, Larson, and Smith therefore, were "controlling persons" of AMMO within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of AMMO shares.

207. Wagenhals, Larson, and Smith, therefore, acted as controlling persons of AMMO. By reason of their senior management positions at AMMO, Wagenhals, Larson, and Smith had the power to direct the actions of, and exercised the same to cause, AMMO to engage in the unlawful acts and conduct complained of herein. Wagenhals, Larson, and Smith exercised control over the general operations of AMMO and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiffs, and the other members of the Class, complain.

208. As control persons, Wagenhals, Larson, and Smith are liable pursuant to Section 20(a) of the Exchange Act for the primary violations of the Exchange Act committed by AMMO.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class Representatives;

B. Requiring Defendants to pay damages sustained by the Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: September 22, 2025

Respectfully Submitted,

*/s/ Brian P. O'Connell*

**POMERANTZ LLP**
Joshua B. Silverman (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
Jianan Jiang (*pro hac vice*)
10 S. LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com
boconnell@pomlaw.com
ajiang@pomlaw.com

*Co-Lead Counsel for Plaintiffs*

**BRONSTEIN GEWITZ & GROSSMAN LLC**
Peretz Bronstein (*pro hac vice*)
Michael Boyle (*pro hac vice*)
60 E 42nd St., Ste. 4600
New York, NY 10165
Tel: (212) 697-6484
peretz@bgandg.com
mboyle@bgandg.com
*Co-Lead Counsel for Plaintiffs*

**KELLER ROHRBACK LLP**
Gary A. Gotto (No. 007401)
3101 N Central Ave., Ste. 1400
Phoenix, AZ 85012-2600
Tel: (602) 230-6322
ggotto@kellerrohrback.com
*Liaison Counsel for Plaintiffs*