Gary A. Gotto (No. 007401)
**Keller Rohrback LLP**
3101 N Central Ave., Ste. 1400
Phoenix, AZ 85012-2600
Tel: (602) 230-6322
ggotto@kellerrohrback.com
*Liaison Counsel for Lead Plaintiffs*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Dmitry Cherches; Irene Zvagelsky; and Hideyoshi Delgado; Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMMO, Inc.; Fred W. Wagenhals; Christopher D. Larson; Jared R. Smith; Robert D. Wiley; and John P. Flynn,<br><br>Defendants. | Case No: CV-24-02619-PHX-DJH<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br><u>ORAL ARGUMENT REQUESTED</u> |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

    I.    STATEMENT OF RELEVANT FACTS ............................................... 4

    II.   Argument ........................................................................................ 16

        A. Legal Standard .......................................................................... 16

        B. Plaintiffs Adequately Allege Violations of Rule 10b-5(b) ........................... 17

            1. The Complaint Pleads Actionable False Statements ............................... 17

               a. Statements Omitting that Larson Was Acting as an Executive of the Company are Actionable ................................................. 18

               b. Misrepresentations About the Company's Related-Party Transactions Are Actionable ................................................. 19

               c. Defendants' Risk Factor Statements Are Actionable Because They Already Occurred ................................................. 21

               d. Statements Concealing the "Big Deal" Press Failure for Several Months While Touting Manitowoc Production Are Actionable ......... 23

               e. Misrepresentations Regarding the Manitowac Facility's Construction Costs Are Actionable ................................................. 24

               f. Misrepresentations Regarding the Company's Manufacturing Capacity Regarding the New Manitowac Facility Are Actionable .................... 28

               g. False Statements Regarding the Manitowac Facility Are Material .... 33

            2. Plaintiffs Raise a Strong Inference of Scienter ....................................... 35

               a. Defendants Admitted They Concealed Material Information in Their Statements From Investors ................................................. 37

               b. Defendants had access to and actual knowledge of the concealed information ................................................. 39

               c. That Defendants' Misrepresentations Involved AMMO's Core Operations Bolsters Scienter ................................................. 44

               d. The CW accounts are reliable and bolster the inference of scienter... 48

e.  Insider Sales Support an Inference of Scienter ................................... 54

f.  Motive, While Not Required, Is Alleged ............................................ 55

3.  Plaintiffs Plead Loss Causation ................................................................. 56

C.  Plaintiffs Plead a Scheme Liability Claim ........................................................ 61

D.  Wagenhals, Larson, and Smith Were Control Persons .................................... 65

III.    The Complaint's Allegations are Well-Pled ......................................................... 69

CONCLUSION .......................................................................................................................... 71

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdo v. Fitzsimmons*,
No. 17-cv-00851-EDL, 2017 WL 6994539 (N.D. Cal. Nov. 3, 2017) ........................ 67

*Alameda v. Nuveen Municipal High Income Opportunity Fund*,
No. C 08–4575 SI, 2009 WL 1424529 (N.D. Cal. May 20, 2009) .............................. 33

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009) ...................................................................... 23

*Baird v. BlackRock Institutional Tr. Co., N.A.*,
403 F. Supp. 3d 765 (N.D. Cal. 2019) ....................................................................... 25

*Bajjuri v. Raytheon Techs. Corp.*,
641 F. Supp. 3d 735 (D. Ariz. 2022) .......................................................................... 33

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .................................................................................................... 18

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) ...................................................................................... 28

*Bernstein v. Ginkgo Bioworks Holdings, Inc.*,
No. 4:21-CV-08943-KAW, 2023 WL 11996105 (N.D. Cal. Mar. 10, 2023) ............. 41

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ......................................................................... 17, 24, 46

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022) ..................................................................... 21

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019) ................................................................... 58, 68

*Brookman v. Webtoon Ent. Inc.*,
No. 2:24-cv-07553, 2025 WL 3484589 (C.D. Cal. Dec. 2, 2025) ................. 23, 24, 35

*City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*,
153 F.4th 288 (2d Cir. 2025) ...................................................................................... 29

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
527 F. Supp. 3d 1151 (N.D. Cal. 2021) ...................................................................... 56

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020) .......................................................................... 51

*Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc*,
    No. 24-4909, 2026 WL 292424 (9th Cir. Feb. 4, 2026) ...................................... *passim*

*Craig Frazier Design, Inc. v. Zimmerman Agency LLC*,
    No. C 10–1094 SBA, 2010 WL 3790656 (N.D. Cal. Sept. 27, 2010)........................ 16

*Cullen v. Ryvyl Inc.*,
    No. 3:23-CV-0185-GPC-SBC, 2024 WL 4536471 (S.D. Cal. Oct. 21, 2024).............. 3

*Cutler v. Kirchner*,
    696 F. App'x 809 (9th Cir. 2017) ................................................................................ 30

*Dedrick v. Valuable Techs., Inc.*,
    No. 22CV4341 (EP) (JBC), 2023 WL 8802820 (D.N.J. Dec. 20, 2023) .................... 43

*Destfino v. Kennedy*,
    No. CV-F-8-1269, 2008 WL 4810770 (E.D. Cal.  Nov. 3, 2008) .............................. 70

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..................................................................................................... 56

*Dytch v. Yoon*,
     No. C-10-02915-MEJ, 2011 WL 839421 (N.D. Cal. Mar. 7, 2011) .......................... 21

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ........................................................................................ 55

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ..................................................................................... 71

*E. Ohman J v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ............................................................................. 35, 50, 51

*Esfandiari v. Edgio Inc.*,
    No. CV-23-00691-PHX-DJH, 2025 WL 2444072 (D. Ariz. Aug. 25, 2025) ....... 21, 35

*Espinosa v. Bluemercury, Inc.*,
    No. 16-cv-07202-JST, 2017 WL 1079553 (N.D. Cal. March 22, 2017)..................... 69

*Espy v. J2 Glob., Inc.*,
    99 F.4th 527 (9th Cir. 2024).......................................................................................... 40

*Evanston Police Pension Fund v. McKesson Corp.*,
    411 F. Supp. 3d 580 (N.D. Cal. 2019) ........................................................................ 60

*Ezzes v. Vintage Wine Ests., Inc.*,
    No. 2:22-CV-01915-GMN-DJA, 2024 WL 5689745 (D. Nev. Dec. 13, 2024).......... 51

*Felipe v. Playstudios Inc.*,
    No. 2:22-CV-01159-RFB-NJK, 2024 WL 1380802 (D. Nev. Mar. 31, 2024) ..... 27, 31

*Fosbre v. Las Vegas Sands Corp.*,
    No. 2:10-CV-00765-KJD-GWF, 2011 WL 3705023 (D. Nev. Aug. 24, 2011).......... 27

*Garbaccio v. Starbucks Corp.*,
    No. 2:24-CV-01362-JHC, 2025 WL 3228275 (W.D. Wash. Nov. 19, 2025)............... 59

*George v. Grossmont Cuyamaca Cmty. Coll. Dist. Bd. of Governors*,
    No. 22-cv-0424, 2022 WL 17330467 (S.D. Cal. Nov. 29, 2022)............................... 70

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023)  ..............................................................................*passim*

*Green v. Maison Sols. Inc.*,
    No. 2:24-CV-00063-SPG-KS, 2025 WL 2817550
    (C.D. Cal. Sept. 30, 2025)........................................................................ 20, 28, 31, 32

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) .................................................................................... 65

*Hollinger v. Titan Capital Corp.*,
    914 F.2d 1564 (9th Cir. 1990) ............................................................................ 65, 67

*Hughey v. Camacho*,
    No. 2:13-cv-2665, 2014 WL 5473184 (E.D. Cal. Oct. 23, 2014) .............................. 70

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ................................................................................ 50

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
    No. 11 CIV. 2279 CM, 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)....................... 55

*In re Allstate Life Ins. Co. Litig.*,
    No. CV-09-08162-PHX-GMS, 2013 WL 789106 (D. Ariz. Mar. 1, 2013) ...  65, 66, 67

Case 2:24-cv-02619-DJH   Document 73   Filed 02/05/26   Page 7 of 87

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ................................................................................. 17, 36

*In re Apple Inc. Sec. Litig.*,
  No. 19-CV-02033-YGR, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ............... 36, 38

*In re Apollo Grp.*,
  No. CV-10-1735-PHX-JAT, 2011 WL 5101787 (D. Ariz. Oct. 27, 2011) ........... 67, 68

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021) ......................................................................... 54

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) .................................................................... 16, 17, 18, 39

*In re Barrick Gold Secs. Litig.*,
  No. 13 Civ. 3851 (SAS), 2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)...................... 28

*In re BioMarin Pharm., Inc. Sec. Litig.*,
  No. 3:20-cv-06719-WHO, 2022 WL 597037 (N.D. Cal. Feb. 28, 2022).............. 27, 31

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)......................................................................... 56, 59, 60

*In re B. Riley Fin., Inc. Sec. Litig.*,
  No. 2:24-CV-00662-SPG-AJR, 2025 WL 3637602 (C.D. Cal. Dec. 12, 2025) ......... 43

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015) ..................................................................................... 64

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
  416 F. Supp. 2d 779 (N.D. Cal. 2005) ........................................................................ 55

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008)....................................................................... 58

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ................................................................................... 34

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) ..................................................................... 41

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ................................................................................... 53

OPPOSITION TO MOTIONS TO DISMISS
Case No. CV-24-02619-PHX-DJH
vi

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017*)* ........................................................................ 20

*In re Facebook Inc. Secs. Litig.*,
    87 F.4th 934 (9th Cir. 2023) ............................................................................. 21, 32

*In re Fibrogen, Inc.*,
    No. 21-CV-02623-EMC, 2022 WL 2793032 (N.D. Cal. July 15, 2022) ........ 23, 36, 40

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ..................................................................... 20, 62

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...................................................................... 16, 32, 56

*In re Guilford Mills, Inc. Sec. Litig.*,
    No. 98 Civ. 7739 (CLB), 1999 WL 33248953 (S.D.N.Y. July 21, 1999) ................... 54

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ......................................................................... 25

*In re Intel Corp. Sec. Litig.*,
    No. 5:20-CV-05194-EJD, 2023 WL 2767779 (N.D. Cal. Mar. 31, 2023) ................... 21

*In re Leapfrog Enter. Sec. Litig.*,
    237 F. Supp. 3d 943 (N.D. Cal. 2017) ...................................................................... 4, 17

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011) ......................................................................... 31

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
    218 F.R.D. 76 (S.D.N.Y. 2003) .................................................................................. 67

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) .......................................................................... 54

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ..................................................................................... 48

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ....................................................................................... 57

*In re Paysign, Inc. Sec. Litig.*,
    No. 220CV00553GMNDJA, 2023 WL 1868476 (D. Nev. Feb. 9, 2023) ............. 19, 49

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015) ................................................................. 20, 21

*In re Quality Sys.*,
865 F.3d 1130 (9th Cir. 2017) .......................................................................*passim*

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) ........................................................................ 53

*In re Smith Barney Transfer Agent Litig.*,
884 F. Supp. 2d 152 (S.D.N.Y. 2012) ........................................................................ 43

*In re Toyota Motor Corp. Sec. Litig.*,
No. CV 10-922 DSF (AJWX), 2011 WL 2675395 (C.D. Cal. July 7, 2011)........ 36, 37

*In re UBS Ag Sec. Litig.*,
No. 07 Civ. 11225(RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).................... 41

*In re Under Armour Sec. Litig.*,
540 F. Supp. 3d 513 (D. Md. 2021) ............................................................................ 63

*In re Vaxart, Inc.*,
No. 20-CV-05949-VC, 2023 WL 3637093 (N.D. Cal. May 25, 2023)................. 62, 64

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ..................................................................................... 36

*In re VistaCare, Inc. Sec. Litig.*,
No. 04-CV-1661-PHX-FJM, 2005 WL 8160681 (D. Ariz. Aug. 19, 2005) .............. 37

*In re WageWorks*,
No. 18-cv-01523-JSW, 2020 WL 2896547 N.D. Cal. June 1, 2020) .......................... 39

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
No. 17-CV-05558-HSG, 2018 WL 4181954 (N.D. Cal. Aug. 31, 2018).................... 34

*Irving v. Firemen's Relief & Ret. Fund v. Uber Tech., Inc.*,
998 F.3d 397 (9th Cir. 2020) ...................................................................................... 59

*Jackson v. Microchip Tech., Inc.*,
No. CV-18-02914-PHX-JJT, 2020 WL 1170843 (D. Ariz. Mar. 11, 2020) .............. 68

*Jaeger v. Zillow Grp., Inc.*,
644 F. Supp. 3d 857 (W.D. Wash. 2022).................................................................... 58

*Johnson v. Knapp*,
No. CV 02–9262–DSF (PJW), 2009 WL 764521 (C.D. Cal. Mar. 16, 2009)............. 16

*Jong Min Park v. GoPro, Inc.*,
No. 18-cv-00193-EMC, 2019 WL 1231175 (N.D. Cal. Mar. 15, 2019) ..................... 26

*Kang v. PayPal Holdings, Inc.*,
620 F. Supp. 3d 884, 897 (N.D. Cal. 2022) ................................................................. 42

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ...............................................................................*passim*

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
403 F.3d 1050 (9th Cir. 2005) .................................................................................... 33

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .................................................................................... 60

*Lomingkit v. Apollo Educ. Grp. Inc.*,
No. CV-16-00689-PHX-JAT, 2017 WL 633148 (D. Ariz. Feb. 16, 2017)................. 21

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) .................................................................................... 71

*Lorenzo v. SEC*,
587 U.S. 71 (2019)....................................................................................................... 61

*Maiman v. Talbott*,
No. SACV 09-0012 AG (ANx), 2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) ........ 36

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011).......................................................................................... 16, 17, 54

*Maverick Fund v. Comverse Tech.*,
801 F. Supp. 2d 41 (E.D.N.Y. 2011) ........................................................................... 67

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir.  2018) ..................................................................................... 59

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ........................................................................ 45

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................... 33, 35

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966, 980 (N.D. Cal. 2015) ................................................................ 50

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*,
    No. 15 CIV. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) .................... 41

*No. 84 Empl.-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ...................................................................................... 65

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .............................................................................. 37, 54

*Nuverra Envtl. Sols. Secs. Litig.*,
    No. 2:13-CV-01800-JWS, 2015 WL 3887235 (D. Ariz. June 24, 2015) .................... 33

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
    No. CV158574PSGMRWX, 2016 WL 6782768 (C.D. Cal. Aug. 9, 2016) ................ 62

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*,
    58 F.4th 195 (5th Cir. 2023) ...................................................................................... 51

*Physicians Care Alliance, LLC v. All Day Beauty, LLC*,
    No. 2:18-cv-2602, 2019 WL 176782 (D. Ariz. Jan. 10, 2019) .................................. 69

*Pittleman v. Impac Mortg. Holdings, Inc.*,
    No. SACV 07-0970 AG (MLGx), 2009 WL 648983 (C.D. Cal. Mar. 9, 2009) ......... 46

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) .............................................................................. 47, 55

*Purple Mountain Tr. v. Wells Fargo & Co.*,
    432 F. Supp. 3d 1095 (N.D. Cal. 2020) ...................................................................... 61

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ........................................................................... 23, 44, 45

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) .................................................................................... 24

*Rubke v. Capitol Bancorp, Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) .................................................................................... 26

*Saeger v. Pac. Life Ins. Co.*,
  94 F. App'x 544 (9th Cir. 2004) ...................................................................... 25

*Salzman v. ImmunityBio, Inc.*,
  753 F. Supp. 3d 1050 (S.D. Cal. 2024) ........................................................... 22

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ................................................................... 17, 35

*SEC v. Am. Patriot Brands, Inc.*,
  No. 2:23-cv-05379-AH-(BFMx), 2025 WL 1932505 (C.D. Cal. June 16, 2025) ....... 19

*S.E.C. v. Bardman*,
  216 F. Supp. 3d 1041 (N.D. Cal. 2016) ........................................................... 69

*S.E.C. v. China Ne. Petroleum Holdings Ltd.*,
  27 F. Supp. 3d 379 (S.D.N.Y. 2014) ......................................................... 55, 56

*S.E.C. v. Fraser*,
  No. CV-09-00443, 2010 WL 5776401 (D. Ariz. Jan. 28, 2010) ................................. 69

*SEC v. Husain*,
  No. 216CV03250ODWE, 2017 WL 810269 (C.D. Cal. Mar. 1, 2017) ...................... 18

*SEC v. Prakash*,
  718 F. Supp. 3d 1098 (N.D. Cal. 2024) ........................................................... 64

*S.E.C. v. Prince*,
  942 F. Supp. 2d 108 (D.D.C. 2013) ................................................................ 39

*S. Ferry LP v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ........................................................ 39, 43, 44, 45, 46

*Shenwick v. Twitter, Inc.*,
  282 F. Supp.3d 1115 (N.D. Cal. 2017) ............................................................ 40

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ....................................................................... 44

*Sneed v. Talphera, Inc.*,
  147 F.4th 1123 (9th Cir. 2025) ....................................................................... 51

*Snellink v. Gulf Res., Inc.*,
  870 F. Supp. 2d 930 (C.D. Cal. 2012) ............................................................. 20

*Sollberger v. Wachovia Sec., LLC*,
    No. SACV 09-0766AGANX, 2010 WL 2674456 (C.D. Cal. June 30, 2010)............. 70

*Strasburger v. Blackburne & Sons Realty Capital Corp.*,
    No. CV 20-00220-CJC(JCx), 2020 WL 6128069 (C.D. Cal. Apr. 22, 2020) ............. 16

*Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
    690 F. Supp. 2d 959 (D. Ariz. 2010) ........................................................................... 65

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................... 36, 54, 62

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)......................................................................................... 33, 35

*Turocy v. El Pollo Loco Holdings, Inc.*,
    No. SACV 15-1343-DOC (KESx), 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ..... 40

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
    759 F. Supp. 3d 926 (D. Ariz. 2024) .................................................................. 23, 68

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
    No. CV-22-02126-PHX-MTL, 2024 WL 863709 (D. Ariz. Feb. 29, 2024) ............... 64

*Vanguard Specialized Funds v. VEREIT Inc.*,
    No. CV-15-02157-PHX-ROS, 2016 WL 5858735 (D. Ariz. Oct. 3, 2016) .......... 41, 67

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ...................................................................................... 48

*Weiss v. Amkor Tech. Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007) .......................................................................... 53

*Wenger v. Lumisys*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) .......................................................................... 53

*Weston Family P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ....................................................................................... 28

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ........................................................................ 59

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .............................................................................. 27, 30

*Wool v. Tandem Computers Inc.*,
    818 F.2d 1433 (9th Cir. 1987) ................................................................................. 65

*World Surveillance Grp. Inc. v. La Jolla Cove Invs., Inc.*,
    66 F. Supp. 3d 1233 (N.D. Cal. 2014) ....................................................................... 60

*Yourish v. California Amplifier*,
    191 F.3d 983 (9th Cir. 1999) .................................................................................. 26

*Zagami v. Nat. Health Trends Corp.*,
    540 F. Supp. 2d 705 (N.D. Tex. 2008) ....................................................................... 56

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) *as amended* (Feb. 10, 2009).......................................... 48

**Statutes & Regulations**

17 C.F.R. § 240.3b-7 ..................................................................................... 42, 43

17 CFR §240.10b-5 ....................................................................................*passim*

Fed. R. Civ. P. 9(b)...................................................................................... 17, 62

Federal Rule of Evidence 201 .............................................................................. 3

Section 10(b) of the Securities Exchange Act of 1934 .................................. 5, 60, 61, 64

Section 17(a) of the Securities Act of 1933 ............................................................. 5

Section 20(a) of the Securities Exchange Act of 1934................................................. 65, 68

Private Securities Litigation Reform Act of 1995.........................................................*passim*

**Additional References**

*In re Ammo, Inc. n/k/a Outdoor Holding Company*,
    SEC Admin. Pro. File No. 3-22571 (Dec. 15, 2025)........................................ 3, 39, 63

SEC Staff Accounting Bulletin No. 99,
    64 Fed. Reg. 45, 150 (1999), 1999 WL 1123073 (Aug. 12, 1999) ("SAB No. 99") .. 34

*SEC v. Frederick W. Wagenhals, Robert D. Wiley, and Christopher D. Larson*,
    No. 2:25-cv-04696-SMB (D. Ariz., filed Dec. 15, 2025)..................... 3, 42, 54, 55, 61

*https://www.thecorporatecounsel.net/blog/2025/05/warren-buffett-quotes-10-of-my-*
    *favorites.html.* ................................................................................................. 18

Lead Plaintiffs Dmitry Cherches ("Cherches") and Irene Zvagelsky ("Zvagelsky," and together with Cherches, "Lead Plaintiffs") and additional Plaintiff Hideyoshi Delgado ("Delgado," and collectively with Lead Plaintiffs, "Plaintiffs"), respectfully submit this opposition to Defendants' motions to dismiss the Amended Complaint ("Complaint").[1]

## PRELIMINARY STATEMENT

That this case should proceed to discovery should not be in dispute. The Complaint properly details a fraudulent scheme, and misrepresentations and omissions in furtherance of that scheme, all of which clearly violated federal securities laws. Specifically, it alleges that Defendants concealed that Chris Larson illegally served as AMMO's *de facto* co-CEO and CFO at the same time he was barred from serving as an officer or director of any public company by a Consent Decree entered into with the SEC ("Consent Decree"). ¶3. Defendants' Class Period representations to investors also hid that third-party contractors of the Company gave kickbacks to Larson; that AMMO's largest and most disastrous capital expenditure was actually a no-bid related-party transaction benefiting Larson's brother; and that AMMO paid Larson its highest or second-highest executive compensation in violation of compensation disclosure requirements. ¶¶48, 54, 77.

Defendants compounded their scheme to hide the truth about Larson during the Class Period by falsely representing the capabilities and status of the Manitowoc Facility

---

[1] Defendants are, collectively, AMMO, Inc. ("AMMO" or the "Company"), Jared R. Smith ("Smith"), Fred W. Wagenhals ("Wagenhals"), Robert D. Wiley ("Wiley"), Christopher D. Larson ("Larson"), and John P. Flynn ("Flynn"). Pursuant to the stipulation entered by the Court on January 7, 2026, Plaintiffs submit this omnibus response in opposition to each motion to dismiss. (Doc. 71). Defendant AMMO and Smith's "Motion to Dismiss Plaintiffs' Amended Complaint and Memorandum of Points and Authorities" (Doc. 66) is referred to herein as "AMMO/Smith Br."); Defendant Wagenhals' "Motion to Dismiss Plaintiffs' Amended Complaint and Memorandum of Points and Authorities" (Doc. 69) is referred to herein as "Wagenhals Br."); "Defendant Robert D. Wiley Rule 12(b)(6) Motion to Dismiss Amended Complaint" (Doc. 68) is referred to herein as "Wiley Br."); Defendant Larson's "Rule 12(b)(6) Motion To Dismiss Amended Complaint" (Doc. 67) is referred to herein as "Larson Br."; Defendant Flynn's "Motion to Dismiss the Amended Complaint and Memorandum of Points and Authorities of Defendant John P. Flynn" (Doc. 64) is referred to herein as "Flynn Br."). All "¶__" references are to the Complaint (Doc. 42), unless indicated otherwise. All emphases herein are added and internal citations and quotations are omitted unless otherwise noted.

("Manitowoc Facility") itself. The facility was supposed to cost $12 million. ¶32. But after being secretly awarded to a Larson family business without competitive bidding, ¶54, costs ballooned to over $25 million and widespread issues with equipment hampered production. ¶13. Defendants touted that it would increase capacity and could produce one billion rounds of ammunition and one billion rounds of brass casings. ¶¶75, 83, 85, 98, 109. However, known facility problems, machinery failures, and supply chain interruptions made this impossible. ¶¶55, 61-62. For months, the problems were so severe that no ammunition was produced at all. *Id.*

Complaint allegations are not only supported by multiple confidential witnesses ("CWs") who previously worked for AMMO and were in a position to know the information that Defendants withheld from investors, but also by the Company's own admissions, two subsequent SEC enforcement actions, and an earlier lawsuit from the Company's current CEO, Steve Urvan ("Urvan"). Current CEO Urvan accused the Company of concealing much of the fraud alleged in the Complaint. *See* ¶¶5, 38, 111. Defendants admitted to even more of the fraud in an end-of-Class Period SEC filing that conceded AMMO needed to amend prior periodic reports to disclose the information concealed from investors during the Class Period. Specifically, the May 20, 2025 filing admits that Larson did in fact serve as an undisclosed executive officer during the Class Period despite being banned from doing so, that Larson was either the highest or second highest paid officer at the Company despite being omitted from Company compensation tables, and that he had received kickbacks, and that the Company had awarded a massive related-party contract to his brother, neither of which was ever mentioned in the Company's listing of related-party transactions. ¶¶77, 145-48. Likewise, Defendants admitted that they had concealed a major press failure at their Manitowoc Facility affecting approximately one hundred million rounds of rifle casings for more than five months. ¶¶131, 150. Numerous credible and reliable CWs corroborate and expand upon these admissions, confirming the rampant fraud at the Company. ¶¶40, 42-44, 55-62.

The SEC has brought two enforcement actions based on the same nexus of allegations. On December 15, 2025, the SEC sued Wagenhals, Wiley, and Larson for engaging in the same conduct alleged in this action, including "hiding that one of Ammo's key business leaders, and a co-founder of the company, Defendant Christopher Larson, played a critical executive and management role notwithstanding a federal court order from 2020 that prohibited him from holding and performing an executive role at a public company." *SEC v. Frederick W. Wagenhals, Robert D. Wiley, and Christopher D. Larson*, No. 2:25-cv-04696-SMB (D. Ariz.) ("SEC Complaint" or "SEC Compl.").[2] The SEC also entered into a Cease and Desist and Order Making Findings against AMMO. *In re Ammo, Inc. n/k/a Outdoor Holding Company*, SEC Admin. Pro. File No. 3-22571 ("SEC Order Making Findings,"). Both are entirely consistent with the allegations here.[3]

Defendants' five briefs totaling 85 pages raise no pleading deficiency. For each statement or omission, Plaintiffs allege who made it, when, where, and how it was disseminated, and why it was false or misleading when made. ¶¶63-76, 78-92, 94-99, 104-07, 109-10, 112-29, 133-40. Such details satisfy the Private Securities Litigation Reform

---

[2]   While Flynn is not mentioned by name in the SEC Complaint, he is referred to extensively by his role: an "in-house counsel" with a suspended law license. The SEC Complaint alleges "In-House Counsel" (*i.e.*, Flynn) participated in the scheme, including lying to auditors about Larson's role at the Company by creating a fraudulent back-dated separation agreement, as well as creating a shell company to secretly funnel undisclosed share grants to Larson's family. SEC Compl. ¶¶30, 40, 49. Given Flynn's role, a suspended attorney who functioned as a general counsel but could not be named as such because of his suspension (*see* Doc. 66-1 ¶6), Plaintiffs are informed and believe that the person referenced in the SEC Complaint is Flynn.

[3] The SEC Complaint and the SEC Order Making Findings are attached to the accompanying Declaration of Brian P. O'Connell as Exhibits 1 and 2, respectively. The SEC Complaint was filed in this district and therefore is generally known within the trial court's territorial jurisdiction, and both the SEC Complaint and SEC Order Making Findings are matters of public record, whose accuracy cannot be reasonably questioned, and are thus subject to judicial notice. *See* Federal Rule of Evidence 201; *Cullen v. Ryvyl Inc.*, No. 3:23-CV-0185-GPC-SBC, 2024 WL 4536471, at *3 (S.D. Cal. Oct. 21, 2024) (taking judicial notice of an SEC order instituting proceedings).

Act's ("PSLRA") particularity requirements. *See In re Leapfrog Enter. Sec. Litig.*, 237 F. Supp. 3d 943, 950 (N.D. Cal. 2017).

Defendants' challenges to scienter and loss causation are even weaker. Well-pled factual allegations demonstrate that Defendants had actual knowledge of, and access to, information contradicting their public statements, which involved AMMO's core operations. They had motive as well: the executives used the scheme to sell stock at inflated prices as well as to enrich themselves through extravagant undisclosed salaries and banned kickback schemes. Finally, Plaintiffs allege that AMMO's share price dropped promptly with the corrective disclosures. That law does not require more.

Accordingly, Defendants' motions should be denied.

## I.    STATEMENT OF RELEVANT FACTS

***AMMO's Core Business as an Ammunition Manufacturer:*** At the beginning of the Class Period, AMMO was an ammunition manufacturer run by Wagenhals and Larson. ¶30. The Ammunition Segment was AMMO's core business. Initially, it manufactured and sold lower-margin pistol ammunition. ¶32. During the Class Period, it sought to pivot to higher-margin rifle ammunition as well as casings (the brass part of ammunition in which the bullet is seated, which AMMO also separately sold to other ammunition manufacturers). *Id*. For most of the Class Period, the Company also operated an online marketplace called Gunbroker.com ("Gunbroker"), which the Company had acquired in April 2021 ("Merger"). ¶2. After the Merger, the Ammunition Segment remained over 63% of AMMO's revenue. ¶157. During the Class Period, Wiley repeatedly referred to the Ammunition Segment as the Company's "core." ¶160. Analysts did the same. ¶158.

***Larson Secretly Controls the Company in Violation of the SEC Consent Decree***: From the beginning of the Class Period, Defendants concealed from investors that Larson secretly served as an AMMO senior executive fulfilling co-CEO and CFO roles, even though it was illegal for him to do so. ¶3. After getting caught in a prior fraudulent scheme involving concealed related-party transactions at a different company, Larson entered into a Consent Decree with the SEC on April 13, 2020, prohibiting him "from acting as an

officer or director" of any public company, including AMMO, for five years. ¶34. On June 1, 2020, the court overseeing the SEC action against Larson entered a further order, by consent, permanently enjoining him from future violations of Section 17(a) of the Securities Act of 1933, and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. *Id.* On June 3, 2020, Larson entered into a separate settlement agreement with the SEC ("Larson SEC Settlement") permanently prohibiting Larson from practicing before the SEC ***or participating in the financial reporting or audits of public companies***. *Id.* On July 28, 2021, the State of Minnesota Board of Accountancy revoked Larson's certified public accounting license and fined him $20,000. *Id.* In the order, the administrative law judge found that "revocation of Larson's certificate is clearly necessary to protect the public from a fraudulent practitioner. More than revocation is required … based on the gravity of Larson's willful misconduct that caused significant economic harm to public investors." *Id.* The judge also found that "Larson's egregious misconduct cannot be countenanced." *Id.* AMMO knew about these sanctions on one of its key executives, but instead of revealing the truth to its own investors, it concealed Larson's ongoing role at AMMO and related-party contracts and kickbacks involving Larson. *Id.*

As Defendants later admitted, Larson ***did*** serve as an executive officer of the Company in violation of the Consent Decree and the Larson SEC Settlement. ¶¶146, 151, 154. Through at least fiscal year 2023, Larson secretly served as shadow co-CEO and CFO. ¶38. Larson and Wagenhals worked closely together in running the Company and shared an office at the Company's Scottsdale headquarters. ¶42. Throughout the Class Period, Larson also served in key policymaking roles in direct violation of the Consent Decree, including but not limited to: leading negotiations with Gunbroker regarding the Merger; serving as a "Key Employee" in the Merger; and negotiating financing for the Company. ¶¶35-38. Further, Larson made key financial decisions for the Company, took a supervisory role in preparing the financial statements and related disclosures in the Company's SEC filings, and directed Wiley to sign the SEC filings on his behalf. ¶40. According to AMMO's former Vice President of Sales and Marketing ("CW1"), a senior

official at the Company who reported directly to Wagenhals, it was clear during the Class Period that Larson and Wagenhals were running the Company together and that Larson led the acquisition of Gunbroker. *Id.* CW1 also personally traveled with Larson and Flynn to meet with Urvan regarding the negotiation of the Merger. ¶41. During this trip, following Flynn's direction to check on Larson at his hotel room, CW1 found Larson too inebriated in his hotel room to attend the meeting. ¶41.

During the Class Period, Wiley worked under Larson, who had a higher position at the Company than Wiley. ¶¶42-44. As the Company admitted at the end of the Class Period, Larson was the second highest paid executive officer at the Company, receiving at least $2,644,580 in fiscal year 2022 according to the Company's May 20, 2025 Restatement. ¶48. In fiscal year 2023, Larson's base salary was the highest of ***any*** executive officer at AMMO, reflecting his central role. *Id.*

As the Company admitted at the end of the Class Period, in fiscal year 2024 Larson continued to receive what the Company described as "payments" from a third-party service provider in exchange for revenue from the Company, or what a regular person would call a "kickback." ¶23. And, even after Larson ceased being called an executive officer internally, the Company continued to give him substantial additional compensation as an independent contractor. *Id.*

CW1 stated that Larson was functioning as leading officer in the Company and the Company was concealing his role due to the SEC Consent Decree. ¶¶40-41. Senior employees at the Company joked about keeping Larson's role at the Company a secret, even referring to Wiley as Larson's "puppet" during the Class Period. ¶154. Urvan alleged in a separate lawsuit that Larson was actually functioning as *de facto* co-CEO and CFO of the Company during the Class Period. *Id.* (citing Verified Merger Complaint). Within the Company, senior management instructed employees to keep Larson's involvement with the Company a secret. ¶43. In violation of his Consent Decree, Larson continued to participate in meetings and jointly run the Company with Wagenhals. *Id.* According to CW1, Wagenhals and other senior officers knew that Larson was functioning as an officer

of the Company but concealed Larson's role, just as they were told to do. ¶40. In violation of SEC rules, the Company excluded Larson's name from its list of executive officers and its executive officer biographies in SEC filings. ¶¶45-46. The Company also excluded disclosure of Larson's compensation in its identification of executive officer compensation, and excluded disclosure of kickbacks and related-party transactions with Larson in the related-party disclosure section of its periodic filings. *Id.*

Other knowledgeable former employees at the Company confirm the accounts of CW1 that Larson was running the Company with Wagenhals. CW2, a purchasing manager who worked at the Company's headquarters on the same floor with Wagenhals and Larson, confirms that Wagenhals and Larson ran the Company together during the Class Period as co-CEOs, that Larson and Wagenhals shared an office, and that titular CFO Wiley actually worked under Larson. ¶42. CW3 confirmed this account based on having worked as a sales administrator at the Company's headquarters, at times reporting directly to Larson, Tod Wagenhals (Wagenhals' son), and to CW1. ¶43. CW3 confirmed CW2's account that Larson was superior to Wiley in executive officer ranking at the Company, and that top Company management told CW3 to hide Larson's involvement at the Company. *Id*. CW4, a senior account executive , who also worked at the Company headquarters who reported to CW1, confirmed that Larson and Wagenhals were viewed as equals at the Company, and that Wiley worked under Larson. ¶44.

By no later than fiscal year 2022, Larson started to receive kickbacks from a third-party services provider of AMMO in exchange for AMMO giving business to this service provider. ¶77. From fiscal year 2022 through at least March, 2024, Larson personally received $814,863 as a percentage of revenue received in connection with, and a commission from, services rendered to AMMO by this third-party service provider with which AMMO had a master services agreement. *Id.* These kickbacks were never disclosed during the Class Period,. *id.*, but the Company admitted to them in the May 20, 2025 Form 10-K/A disclosure ("May, 2025 Form 10-K/A Disclosure"). ¶151. CW1 separately

confirmed that during this time, Larson was receiving kickbacks from service providers. ¶77.

The kickbacks were not the only illicit related-party transaction involving Larson. The Company also granted 200,000 shares of common stock in February 2021 to an entity controlled by Larson's immediate family member to pay for undisclosed related-party services valued at $1,080,000. ¶151. Although reporting companies are required to disclose such related-party transactions in periodic 10-Q and 10-K filings, AMMO withheld all mention of related-party transactions involving Larson from its filings until May, 20, 2025. *Id.*

Even worse, on December 3, 2020, the Company entered into another undisclosed related-party transaction, a no-bid contract with Larson Building for the construction of the $12 million Manitowoc Facility. ¶¶32, 53-54. Larson's brother Andy owned Larson Building. *Id.* Throughout the Class Period, the Company repeatedly touted the construction and move to the Manitowoc Facility but did not disclose that the entire facility was being built under a no-bid related-party contract gifted to Larson's brother. ¶¶53-54. Having avoided competitive bidding or unrelated contractors, it was no surprise that the Manitowoc Facility was mired in problems. ¶54.

Wagenhals also helped himself to his own undisclosed related-party transactions. For example, on November 5, 2020, the Company entered into an undisclosed $4.0 million note with an immediate family member of Wagenhals. ¶90.

Defendants were not honest with investors about these problems, instead touting an impressive but misleading production capacity, which they knew was constrained by the then-existing production problems. ¶54.

***Defendants Misrepresent Their Production Capacity and Ability to Scale Production at the new Manitowoc Facility***. At the time of the Merger, the Company's ammunition production capacity was 300 million rounds per year. *Id.* However, at the time, the Company claimed that it was 750 million per year. *Id.* In its 2021 Form 10-K filed on June 29, 2021, the Company stated that it could scale to 1 billion rounds of ammunition.

¶75. Similarly, in earnings calls, Defendants stated that the Manitowoc Facility, once completed, would have the production capacity of over 1 billion rounds per year "when we start" in the summer of 2022, ¶¶83, 85, and that by "day one" in the new facility "our capacity would essentially double." ¶85. The 2022 Form 10-K filed on June 29, 2022 repeated the representation in the 2021 Form 10-K that the Company could scale to 1 billion rounds of ammunition per year. ¶98. Analysts understood that the Ammunition Segment was driving growth at AMMO, and repeated the Company's representations that the Manitowoc Facility would have 1 billion in ammunition capacity "once completed." ¶158.

However, CW1 and other knowledgeable former employees explained that the Company would not be able to produce 1 billion rounds of ammunition upon facility completion, because shortages of gunpowder, projectiles, machines, and primer rendered ramping up production to the touted levels impossible. ¶54. CW4 confirmed CW1's account that the Company lacked the capacity to produce 1 billion rounds of ammunition, and explained that the Manitowoc Facility suffered from supply chain problems, including ongoing issues obtaining primers. ¶¶44, 61. The Company's transition to the Manitowoc Facility also created a months-long inactive period where the Company was not producing *any* ammunition. ¶¶55, 61-62. Once the Company opened the Manitowoc Facility, it became the Company's only manufacturing site. ¶161.

The Company tracked equipment failures in real time using a software suite called Plex Software ("Plex"), and information regarding production capacity and updates from the Manitowoc Facility were regularly shared with the Company's top executives. ¶¶54-57, 153. Larson received regular production and capacity updates from the manager of the Manitowoc Facility, James Mann ("Mann"), the VP of Operations, as confirmed by CW1. ¶¶54, 151, Defendants also toured the Manitowoc Facility frequently. ¶153. At the August 16, 2021, earnings call, Wagenhals said that *he tracked production capacity every day*, from an update at "8 o'clock" every morning. *Id.*

CW5, a manufacturing engineer at the Manitowoc Facility, reported that moving equipment from Arizona to Wisconsin created significant downtime while equipment was set up, that most machines failed during CW5's tenure at the Company, and that the new plant lacked operators with the skills to fix issues, all of which led to production delays. ¶55. CW5 confirmed that all equipment failures and redundancies were tracked through Plex. *Id.* CW5 said that during production delays, the Company bought and repackaged ammunition manufactured overseas, passing it off to customers as its own product. *Id.*

CW6 was a production manager at the Manitowoc Facility, who reported directly to Mann, who reported to CEO Smith. ¶56. CW6 confirmed CW5's account that the Company purchased ammunition from overseas and repackaged it as its own, shipping to customers without a head stamp. ¶58. This occurred throughout CW6's employment. *Id.* This was also corroborated by CW8, another production manager, as well as a senior employee who worked out of the Scottsdale headquarters (¶61, CW4).

CW6 oversaw press operations, and, production output and workflow, as well as conducted tool inspections on broken equipment. ¶56. When CW6 started working at the Company, the Manitowoc Facility was in disarray, including poor production outputs, broken tools, chronically unresolved machine issues, and virtually no training besides quality tool usage. *Id*. CW6 reported that these issues existed long before CW6 started working at the facility. *Id*. CW6 said that Mann told CW6 that Wiley had admitted that the Company was not able to meet the Company's transition timeline in 2022. *Id*.

CW6 noted that the rifle ammunition presses chronically broke at the Manitowoc Facility. ¶¶56-57. CW6 reported that output regularly dropped by more than half of reported capacity, as machines frequently failed. ¶56. CW6 reported that while the machines were supposed to produce 200 parts per minute, they could only reliably produce 60 parts per minute due to failures that occurred when operating at maximum speed. *Id.* CW6 reported that millions of brass parts were discarded due to poor quality output. *Id.*

CW6 met with Smith during his employment, and saw Smith and other C-Suite executives at the Manitowoc Facility. CW6 confirmed that AMMO used Plex to track

production and efficiency. ¶57. CW6 reported that machine servo failures occurred frequently, which caused repeated downtime. ¶58. CW6 recalls one incident where a machine blew its servo for two consecutive days, leaving AMMO unable to produce quality parts or meet quotas. *Id*. CW6 noted that broken presses often sat idle, which created a poor impression when ammunition buyers toured the facility. *Id.* Frequently, non-functional equipment was moved out of the facility to hide from visitors. *Id*.

CW7, a machine operator at the Manitowoc Facility who reported to CW6, who reported to Mann, confirmed CW6's account that there were frequent downtimes and added that the parts were poor quality and most employees were unable to fix broken machines. ¶59.

CW8, a production manager who reported to Mann, confirmed ongoing and chronic production problems at the Manitowoc Facility, including persistent servo issues that kept brass presses offline for months. ¶60.

Nevertheless, in June 29, 2022 earnings call, Wiley also stated that "virtually all" of the capital expenditures had already been made for the Manitowoc Facility and that the production, was "coming online." ¶87. In fact, the expenditures were not then virtually complete, the production remained in shambles, and full capacity operations were not then coming online due to rampant machine breakdowns. ¶88.

***AMMO Begins to Admit Production Problems but Downplays the Extent and Continues to Conceal Related-Party Dealings***: On November 14, 2022, the Company first admitted it had some problems with production, reporting a 21% decrease in net revenue caused largely by the "performance of our manufacturing operations" and persistently offline production at the Manitowoc Facility. ¶¶100-01. As a result, AMMO shares declined 25.8% the next day to close at $2.33, and further declined the following trading day, closing at $2.20 on November 16, 2022, as the market continued to absorb the news. ¶103.

Defendants prevented a much more substantial decline by continuing to misrepresent production capacity and concealing their illicit related-party dealings with

Larson. Wagenhals told investors on an investor call on November 14, 2022 that the Manitowoc Facility was "[h]umming" and that "[w]e are increasing capacity across the Board." ¶104. Flynn told investors on that same call that the Manitowoc Facility had "opened on time and within budget," which he said was a "notable achievement… because of the world-class work our contractor and his subs did in standing up that plant," and boasted that the new facility allowed AMMO to produce 1 billion rounds per year. ¶106.

On February 14, 2023, the Company announced that its net revenue had declined 40% year-over-year "mainly attributable to [the] ammunition segment." ¶108. As a result, AMMO shares declined the next day by over 12.8% to close at $1.96 on February 15, 2023. *Id.* However, the Defendants again avoided a much more significant decline by continuing to make misrepresentations to investors. For example, later that day, Smith stated that the capacity of brass casing was "double[d]" in the new plant, and "exceeds 750 million in our current shift operation." ¶109. Smith omitted that multiple brass casing machines were broken at the time, and continued to hide related-party transactions. ¶¶60, 62.

***Gunbroker CEO Urvan Sues AMMO***: On May 3, 2023, the Merger Complaint was made available by the Delaware Chancery Court, asserting that Larson had served as *de facto* co-CEO and CFO since the Merger, and that production capacity at the Manitowoc Facility was far less than 750 million rounds. ¶111. In reaction to this news, AMMO stock dropped 4.2% on May 4, 2023, to close at $1.81. *Id.* However, the Company blunted further decline by publicly denying the allegations, and by continuing to repeat and make additional misrepresentations to investors. *Id.*

On June 14, 2023, Smith told investors at the Company's fourth quarter of fiscal year 2023 earnings call that they have the "best-in-class brass we manufacture and the highest quality of components we source from other premium US manufacturers. 2FWe are superior and take great pride in being a US manufacturer based in Manitowoc,

Wisconsin." ¶114.[4] Smith omitted that the Company was then relying on foreign-made products that it was simply restamping as the Company's own before then selling.

Also on July 31, 2023, the Company furnished an Amended Form 10-K for fiscal year 2023 ("2023 Form 10-K/A"). ¶116. The 2023 Form 10-K/A purported to disclose the Company's related-party transactions, but omitted the disclosure of transactions involving Larson or Flynn, or even that they were executive officers of the Company. ¶¶116-19.

***Defendants Admit to Concealing a "Big Deal" Press Failure:*** Between June and November 2023, Smith and the Company repeatedly touted supposed improved margins in the Ammunition Segment due to the new Manitowoc Facility, that their efforts to move to higher price ammunition was working and "starting to pay off," and that they were already then seeing "positive effects" including "improve[d] profitability," "enhance[ed] margins," and "more [] capacity." ¶¶120, 122, 124, 126, 128. On November 9, 2023, Defendants disclosed another 29% decrease in total revenue in a press release filed on Form 8-K with the SEC. ¶130. In that press release, the Company said that ammunition sales had decreased 47% and that casing sales were 16% below analyst estimates. *Id*. During the November 9, 2023 earnings call, Defendants admitted press failures at the Manitowoc Facility that began in June 2023, which Smith referred to as a "big deal" contributing to the poor financial results. ¶131. Smith admitted he knew about these problems long before he told investors. Specifically, Smith conceded that the "big deal" rifle press failed by June 2023, and that he had observed in April 2023 during a walk-through of the Manitowoc Facility that it lacked redundancy to address equipment failures. ¶150. At no point while touting the Company's supposed manufacturing progress during these several months did the Defendants disclose that a major press had failed and remained inoperable. When finally disclosed on November 9, 2023, the Company stock dropped by over 13.1% from its previous day closing price of $2.51 to close at $2.18 on November 10, 2023. ¶132.

---

[4] At the time, AMMO was on a fiscal year that ran from Apri1 1, to March 31. ¶151.

***Defendants Continue to Hide Millions of Dollars in Related-Pary Deals and Kickbacks***: The Company continued to conceal its related-party transactions into calendar year 2024. On February 8, 2024, the Company held its third quarter of 2024 earnings call. ¶133. On the call, Smith touted the Company's "impeccable balance sheet," omitting extensive related-party transactions and kickbacks and that its financial reporting was false. ¶133-34. On June 13, 2024, AMMO furnished its annual report for the fiscal year ended March 31, 2024, on a Form 10-K filed with the SEC (the "2024 Form 10-K") signed by Defendants Smith, Wagenhals and Wiley. ¶135. The 2024 Form 10-K purported to disclose the Company's related-party transactions, but omitted known transactions with Larson, and omitted Larson from the list of officers of the Company. ¶¶135-38. During this same time period, from February 15 to March 4, 2024, Wagenhals took advantage of AMMO's inflated stock, selling more than $1 million in AMMO stock. ¶162.

Also on July 29, 2024, the Company furnished an Amended Form 10-K for fiscal year 2024 ("2024 Form 10-K/A"). ¶139. The 2024 Form 10-K/A was signed by Defendants Smith and Wiley. The 2024 Form 10-K/A purported to disclose the extent of the Company's related-party transactions, but misleadingly again omitted any dealings of Larson. ¶¶139-40.

***The Production Crisis, Labeled as "inefficiencies," at the Manitowoc Facility Continues to Drag Sales***:  On August 8, 2024, Defendants disclosed further softness in the Ammunition Segment in a press release filed on Form 8-K with the SEC, including a 10% year-over-year decrease in overall revenue, a 5% decrease in loaded ammunition sales, and a 15% decrease in casing sales. ¶141. The August 8, 2024 press release attributed decreasing gross margin to a "shift in sales mix and production inefficiencies in our ammunition segment in comparison to the prior year period." *Id*. On this partial disclosure and materialization of concealed risk, the Company's stock price declined by over 6.7% to close at $1.51 on August 9, 2024 and continued to decline to $1.38 over the next three trading days. ¶142.

***The Related-party Transactions and Kickback Scheme Begin to be Revealed***: On September 24, 2024, AMMO announced that Wiley had resigned "upon the request by the Board" and that the Board formed a special committee and hired an outside law firm to conduct an independent investigation into its "internal control over financial reporting for the fiscal years 2020 through 2023." ¶143. As a result, the Company's stock price declined by over 5.2% to close at $1.44 on September 25, 2024. ¶144.

AMMO finally admitted accounting errors and related-party transactions with Larson in the May, 2025 Form 10-K/A Disclosure, which consisted of amendments to previous annual and quarterly reports filed with the SEC for the fiscal years ended March 31, 2024, 2023, and 2022. ¶145. The May, 2025 Form 10-K/A Disclosure also acknowledged the Consent Decree that barred Larson from serving as an executive officer for AMMO or any other public company. ¶146. The Company admitted that Larson was a related-party, and that Larson was the second highest paid officer at the Company in fiscal year 2022, receiving at least $2,644,580. ¶¶46-48. It further revealed that Larson remained one of the most highly paid members of the Company, earning at least $1,514,990 in fiscal year 2023. *Id.* Notably, Larson's salary in fiscal year 2023 ($1,337,187) was the highest of any executive officer's salary disclosed for that year. *Id.*

The Company admitted that Larson had secretly operated as an executive officer of the Company during the Class Period, and that he and/or his immediate family received over a million dollars in kickback payments from third parties that were doing business with the Company. ¶¶146-47, 151. The Company also admitted that it had paid over $25 million to Larson Building and that this entity was wholly owned by Larson's brother. ¶151. Meanwhile, the Company disclosed additional related-party transactions involving Wagenhals. *See*, *e.g.*, ¶¶63, 69, 89. On these disclosures, AMMO stock declined by over 8.2% to close at $1.66 on May 21, 2025. ¶149. AMMO shares continued to absorb the news on the next trading day, closing at $1.64 on May 22, 2025. *Id*.

## II.   Argument

### A.  Legal Standard

As the United States Supreme Court instructs, securities fraud plaintiffs "need only allege enough facts to state a claim for relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).3F On a Rule 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s] them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017). "[T]he purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to decide its merits." *Craig Frazier Design, Inc. v. Zimmerman Agency LLC*, No. C 10–1094 SBA, 2010 WL 3790656, at *6 (N.D. Cal. Sept. 27, 2010). "The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted." *Strasburger v. Blackburne & Sons Realty Cap. Corp.*, No. CV 20-00220-CJC(JCx), 2020 WL 6128069, at *2 (C.D. Cal. Apr. 22, 2020); *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (a district court construing a Rule 12(b)(6) motion "is not sitting as a trier of fact"). Rather, "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *Gilead*, 536 F.3d at 1057. Importantly, the PSLRA "did not impose an insurmountable standard." *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc*, No. 24-4909, 2026 WL 292424, at *9 (9th Cir. Feb. 4, 2026). Rather, it was "designed to eliminate frivolous or sham actions, but not actions of substance." *Id.* (citing cases).

The Court's analysis is confined to the Complaint and any materials that are the proper subject of judicial notice or incorporation by reference. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Critically, defendants cannot insert their own version of the facts in place of a complaint's particularized allegations. *See Johnson v. Knapp*, No. CV 02–9262–DSF (PJW), 2009 WL 764521, at *4 (C.D. Cal. Mar. 16, 2009). At this stage, "a complaint's factual allegations remain entitled to a presumption

of truth." *Funko*, 2026 WL 292424, at \*9.

### B. Plaintiffs Adequately Allege Violations of Rule 10b-5(b)

Rule 10b-5(b) makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 563 U.S. at 37. The elements of a claim are: (1) a misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Atossa*, 868 F.3d at 793.

### 1.    <u>The Complaint Pleads Actionable False Statements</u>

A statement is false or misleading if it "directly contradict[s] what the defendant knew at that time" or "omits material information." *Khoja*, 899 F.3d at 1008-09; *see Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023). In determining whether a statement is misleading, this Court applies an objective standard of a "reasonable investor." *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021). Importantly, when defendants "tout positive information to the market," they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (quotation marks and citation omitted). A statement giving a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists" is misleading and actionable. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Further, omitting material facts that render a statement misleading is actionable. *Khoja*, 899 F.3d at 1008-09. For each statement or omission, Plaintiffs allege who made it, when, where, and how it was disseminated, and why it was false or misleading when made. ¶¶63-76, 78-92, 94-99, 104-07, 109-10, 112-29, 133-40. Such details are all that the PSLRA and Rule 9(b) require. *Leapfrog*, 237 F. Supp. 3d at 950.

### a. Statements Omitting that Larson Was Acting as an Executive of the Company Are Actionable.

AMMO and Individual Defendants consistently concealed from investors that Larson was a top officer of the Company. The question of who is actually running a company is material because it is paramount in an investor's decision to buy its shares. Among the "*the* most important pieces of information available to an investor" is the identity of corporate leadership. *SEC v. Husain*, No. 216CV03250ODWE, 2017 WL 810269, at *8 (C.D. Cal. Mar. 1, 2017) (emphasis in the original). Legendary investor Warren Buffett explained why: "you look for three qualities: integrity, intelligence, and energy. And if you don't have the first, the other two will kill you."[5]

It would be difficult to find a company for which management identity and integrity mattered more than AMMO. Its shadow co-CEO and CFO was banned by the SEC, had a history of kickbacks and related-party transactions, was compromising AMMO with the same including a massive no-bid construction contract gifted to his brother. That a "reasonable investor" would have viewed the omission of disclosures of Larson's leadership "as having significantly altered the 'total mix' of information made available" is not just a "substantial likelihood," but a virtual certainty. *Atossa*, 868 F.3d at 794 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

For these reasons, SEC rules unquestionably require companies to disclose in periodic reports their executive officers and the total compensation of the CEO, CFO, and its three other most highly compensated officers. ¶45. Each of AMMO's 2020-2023 Form 10-Ks purported to set[] forth the names and ages of our current directors and executive officers", but none listed Larson. ¶¶65, 71, 91, 118. These omissions from the list of officers were misleading because, as the Company later admitted, Larson was serving as an executive officer during the Class Period. ¶¶146, 151. Further, he was the second highest paid employee during fiscal year 2022, receiving at least $2,644,580. ¶¶48, 77, 151. And

---

[5] *See* https://www.thecorporatecounsel.net/blog/2025/05/warren-buffett-quotes-10-of-my-favorites.html.

in fiscal year 2023, Larson's salary was the highest at the Company. ¶48. Courts routinely find that misrepresentations about an officer's leadership role are actionable, especially where as here they are used to hide employment of a banned officer. *See SEC v. Am. Patriot Brands, Inc.*, No. 2:23-cv-05379-AH-(BFMx), 2025 WL 1932505, at *7 (C.D. Cal. June 16, 2025) (finding material the misrepresentations about the continued involvement of a since-retired, previous board member of defendant company's predecessor); *In re Paysign, Inc. Sec. Litig.*, No. 220CV00553GMNDJA, 2023 WL 1868476, at *5 (D. Nev. Feb. 9, 2023) (omitting that a banned officer was preparing SEC filings was actionable).

### b. Misrepresentations About the Company's Related-Party Transactions Are Actionable

The Complaint alleges in detail each statement in which Defendants falsely concealed related-party transactions in violation of mandatory disclosure requirements, and misrepresented that their disclosure was complete when it in fact they left out the most important information. The Complaint alleges that the Company hid Larson's related-party transactions by omitting any mention of them in its fiscal year 2020, 2021, and 2022 Form 10-K filings, which were each signed by Wiley and Wagenhals. ¶¶63, 69, 89. Worse, each falsely confirmed that the list was complete, expressly stating that other than the listed transactions, "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred." *Id*. Likewise, the 2023 Form 10-K/A and 2024 Form 10-K/A, signed by Smith and Wiley, purported to disclose the extent of the Company's Related-Party transactions, but omitted the Company's dealings with Larson. ¶¶116, 139. The Company also repeatedly assured investors that it "did not have any off-balance sheet arrangements" likely to have a material effect on the Company. ¶¶51, 94, 135. This too was false—at the time the Company was defined by an off-balance sheet arrangement it had with Larson. Wagenhals furthered the cover-up by boasting that the Company's accounting team was "up to par" at the same time

it was secretly run by the banned Larson and the Company was showering Larson and his family with related-party windfalls. ¶78.[6]

Specifically, AMMO failed to disclose the no-bid contract with Larson Building, owned by Larson's brother, for the construction of the Manitowoc Facility. ¶¶53, 54, 151. It also failed to disclose the 200,000 shares of Common Stock granted to an entity controlled by an immediate family member of Larson for services valued at $1,080,000. ¶151. It similarly concealed that the $375,000 promissory note it took out was with a company wholly owned by Larson. *Id*. Moreover, Defendants hid from investors until the end of the Class Period that Larson received $814,863 in kickbacks from fiscal year 2022 until at least March 2024 from a third-party provider that rendered services to AMMO. ¶77. The Company also failed to disclose that a $4.0 million related-party note on November 5, 2020, was given to an immediate family member of Wagenhals. ¶90.

Undisclosed related-party transactions such as these are material because they are important to the core business. *See Green v. Maison Sols. Inc.*, No. 2:24-CV-00063-SPG-KS, 2025 WL 2817550, at *7 (C.D. Cal. Sept. 30, 2025). That the Company opted to not disclose the related-party nature of the construction of its only manufacturing facility (and the largest capital expenditure in its corporate history) to investors, including that it was gifted to Larson's brother via a no-bid contract, is a material omission. *See Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) (failure to disclose related-party deals with large customers in SEC filings is a material omission).

Defendants' failure to disclose related-party kickbacks was also a material omission. *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 465 (S.D.N.Y. 2017) (omission of kickbacks from public statements actionable); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d

---

[6] Wiley, Wagenhals, and Smith are primarily liable for the misstatements and misleading omissions in the SEC filings they signed. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1185 (D. Or. 2015) ("The signatories to those documents, and through them, [the corporate defendant], are "makers" of statements contained in those documents").

368, 374-75, 380-82 (S.D.N.Y. 2015) (same); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 662 (M.D. Tenn. 2022) (actionable omission to withhold kickbacks from related-party disclosures). None of the Defendants dispute this or challenge that AMMO omitted kickbacks from their SEC filings and public statements. Their failure to address these adverse allegations concedes them through silence. *In re Intel Corp. Sec. Litig.*, No. 5:20-CV-05194-EJD, 2023 WL 2767779, at *26 n.11 (N.D. Cal. Mar. 31, 2023). Any assertions made for the first time in a reply brief should not be considered. *See*, *e.g.*, *Dytch v. Yoon*, No. C-10-02915-MEJ, 2011 WL 839421, at *3 (N.D. Cal. Mar. 7, 2011).[7]

### c. Defendants' Risk Factor Statements Are Actionable Because They Already Occurred

A company cannot "warn[] that risks 'could' occur when, in fact, those risks had already materialized." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948-49 (9th Cir. 2023). The 2020 Form 10-K listed as a mere possibility that it "may" not be able to comply with all laws, but that "[o]ur policies and procedures are designed to comply with all applicable laws, accounting and reporting requirements, tax rules and other regulations and requirements, including those imposed by the SEC, and foreign countries, as well as applicable trade, labor, safety, environmental, labeling, anti-bribery and corruption laws."

---

[7] Defendants' concealing the related-party transactions cannot be dismissed as mere puffery. Taken in context, the statement is a concrete representation of the state of AMMO's financial reporting and accounting team, instead of a vague "feel-good" gesture. *See Esfandiari v. Edgio Inc.*, No. CV-23-00691-PHX-DJH, 2025 WL 2444072, at *8 (D. Ariz. Aug. 25, 2025) (finding that optimistic statements grounded in false representations do not constitute puffery). This is unlike *Lomingkit v. Apollo Educ. Grp. Inc.*, No. CV-16-00689-PHX-JAT, 2017 WL 633148, at *23 (D. Ariz. Feb. 16, 2017), in which the statements deemed puffery were regarding adopting a set of compliance principles. AMMO/Smith Br. at 17. Here, the statements blatantly omitted a kickback scheme. Further, Wagenhals' specific statement about its supposed improved accounting systems getting "up to par" would be interpreted by a reasonable investor to be a representation that (at a minimum) the accounting practices of Ammo at the time of the representation met generally acknowledged accounting standards. In truth, AMMO was relying on a banned individual as their *de facto* co-CEO and CFO at the time, allowing him to receive kickbacks, and showering his family with millions of dollars in benefits via undisclosed related-party transactions. ¶145.

¶67; *see also* ¶¶73, 96, 112, 137 (merely addressing the possibility that it could fail to comply with regulations in 2021, 2022, 2023 and 2024 Form-10-Ks).

The risk factor statements here were actionable because they were doing precisely what is forbidden: speaking hypothetically about risks that had already occurred. *See Salzman v. ImmunityBio, Inc.*, 753 F. Supp. 3d 1050, 1065 (S.D. Cal. 2024). By the time the statement above was made in August 2020, AMMO was already making a mockery of the securities laws by employing an SEC-banned individual as its shadow co-CEO and CFO, and withholding the disclosure of key related-party transactions involving him and his family. The Company had also already signed its egregious no-bid related-party contract with Larson Building and was not disclosing the conflict in its SEC filings.

These risk disclosures were not forward-looking statements, as AMMO/Smith and Wagenhals wrongly suggest. AMMO/Smith Br. at 11 n.6, 14-16; Wagenhals Br. at 13. "Where a statement about the future is in the form of a warning about a risk that might hurt business in the future, the statement implicitly serves as a comment on the *present* state of affairs, because it suggests that the circumstance posing the risk has not yet occurred." *Funko*, 2026 WL 292424, at *13 (emphasis in the original). Here, the undisclosed related-party transactions were ***already*** then occurring and Larson was ***already*** then functioning as an officer in violation of his SEC ban. ¶¶35-44. Such then-existing facts are not forward-looking. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). Further, the omission of these related-party deals could never be protected because they were not accompanied by meaningful cautionary language. *Forescout*, 63 F.4th at 781 (cautionary language is not "meaningful" when it "amounts to boilerplate listing of generic risks and does not mention the specific risk" to which the company has been alerted).

Nor can the manifestly false statements be cast aside as mere puffery, as some Defendants incorrectly assert. *See* AMMO/Smith Br. at 11 n.6, 14-16; Wagenhals Br. at 13-14. The fact that Defendants were violating the law in hiding the disclosure of the identity of AMMO's executive officers, executive compensation, and related party transactions was "capable of objective verification," and therefore cannot constitute

puffery. *Brookman v. Webtoon Ent. Inc.*, No. 2:24-cv-07553, 2025 WL 3484589, at *3 (C.D. Cal. Dec. 2, 2025). Similarly, concealing that a hypothetical risk has already materialized is not puffery. *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 955-56 (D. Ariz. 2024).

### d. Statements Concealing the "Big Deal" Press Failure for Several Months While Touting Manitowoc Production Are Actionable

Defendants admitted to concealing the failure of a critical rifle press machine affecting 90-120 million cases in November 2023, which Defendants admit knowing had broken the previous June, and admitted understanding that the machine failure was a "big deal." ¶131. That admission alone is sufficient to allege an actionable omission. *See Reese v. Malone*, 747 F.3d 557, 573 (9th Cir. 2014) (when an executive later admits that previous statements were false, a material misstatement has been alleged); *In re Fibrogen, Inc.*, No. 21-CV-02623-EMC, 2022 WL 2793032, at *15 (N.D. Cal. July 15, 2022) (sustaining claims when facts admitted after the statements were made rendered them misleading); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1180 (S.D. Cal. 2009) (similar).

Specifically, Smith conceded that the "big deal" rifle press failed by June 2023, and that he had observed in April 2023 during a walk-through of the Manitowoc Facility that it lacked redundancy making it vulnerable to equipment failures. ¶150. Yet, instead of being honest, Defendants spoke repeatedly to investors about supposed manufacturing progress during Summer 2023, while concealing that the crucial machinery had failed and remained inoperable. Between June and November 2023, Smith and the Company repeatedly trumpeted supposed improved margins in the Ammunition Segment due to the new Manitowoc Facility, that their efforts to move to higher price brass casings was working and "starting to pay off," and that they were already then seeing "positive effects" including "improve[d] profitability", "enhance[ed] margins," and "more [] capacity." ¶¶120, 122, 124, 126, 128. Smith admitted he knew about the failed machinery

compromising the Company's most important operations at the time, and that the brass press that failed was a big deal. The statements, therefore, are actionable.

### e. Misrepresentations Regarding the Manitowoc Facility's Construction Costs Are Actionable

Wagenhals misrepresented to investors that the Manitowoc Facility would open as "state-of-the-art" and "under budget," and Flynn falsely said that "the [Manitowoc] plant opened on time and within budget." ¶¶81, 106. On June 29, 2022, Wiley participated in an earnings call in which he told investors that "[a]s far as capital expenditures in relation to the new facility and the production that's coming online with that. And most of the capital expenditures virtually all to this point has been expended today." ¶87. These were manifestly untrue, as was their description of the price tag. Defendants announced the facility would cost $12 million, when in fact the cost was over $25 million. ¶¶32, 151. Simple math shows that the announced cost did not reflect "most of the capital expenditures," which were greatly inflated under the no-bid award to Larson Building. No amount of tortured logic renders a $25 million expenditure "under budget" or "within budget" when the announced cost was $12 million.

Understanding these statements were untruthful, Wagenhals asks that they be excused as merely expressing corporate optimism. Wagenhals Br. at 13. They were not. The statements were objectively false and capable of verification at the time made. Either the Facility was "under budget" or it was not. Either "virtually all" of the expenditures had already been incurred and incorporated within the $12 million figure, or not. *See*, *Webtoon Ent. Inc.*, 2025 WL 3484589, at *3. "A statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quoting *Berson*, 527 F.3d at 985).

Flynn commits even worse error, asking the Court to violate controlling precedent by assuming the truth of his statement regarding the budget, despite well-pled factual allegations in the Complaint demonstrating why Flynn's statement was false. Flynn Br. at

4-6. At best, Flynn's argument raises factual issues for trial, not the pleading stage. *See Saeger v. Pac. Life Ins. Co.*, 94 F. App'x 544, 546 (9th Cir. 2004) (reversing dismissal because whether defendants made material misrepresentations was a question of fact that should not have been resolved at the pleading stage); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1025 (S.D. Cal. 2005) (refusing to wade into factual disputes on a motion to dismiss). Flynn's injection of external documents that were neither attached to the Complaint nor incorporated by reference is also improper. *See* Flynn Exs. 2-5. Such selective external documents should not be used to dispute well-pled Complaint allegations. *Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F. Supp. 3d 765, 777 (N.D. Cal. 2019) (refusing to deem an SEC filing incorporated by reference because the defendant relied on it to dispute the complaint's allegations). They should be disregarded. Further, should Flynn advance this baseless argument at trial, he will lose. Flynn cannot dispute that the actual construction figures do not match his litigation narrative. AMMO represented in January 2021 that the Manitowoc Facility would cost $12 million. ¶32; Flynn Br. at 5.[8]  It cost over $25 million. *Id*. at 6. A reasonable jury will not find that "within budget."

Wiley takes great liberty in his attempt to recast his statements as forward-looking. Wiley Br. at 4-5. Although the false statement alleged expressly referenced expenditures "to this point" and "today," he suggests that the reader instead look at a different sentence that contains the words "looking forward." *Id.* That a later sentence used the words "looking forward" does not transform Wiley's previous sentence that capital expenditures had been completed into a forward-looking statement. *See*, *e.g.*, *Quality Sys.*, 865 F.3d at 1141-42. A defendant cannot transform non-forward-looking statements into forward-looking ones by fixating on certain words or phrases in a vacuum or combining statements about past or current facts with statements about projections. *Id.* Moreover, the safe harbor

---

[8] Flynn's further attempt to cast the $12 million figure as a one-off estimate is a factual dispute that will be proven wrong at trial. *See Khoja*, 899 F.3d at 1000-01. Defendants repeated the same figure in their 2021 Form 10-K and 2022 Form10-K, and other SEC filings.

does not apply to even mixed statements that contain both forward-looking and current or historical components. *See*, *e.g.*, *id.* at 1148. That is true even if some element relates to a future goal or event. *Id.*; *Forescout*, 63 F.4th at 774 (similar).

As with the budget claims, Wiley made an explicit representation that most of the expenditures were already complete. ¶87. In doing so, he omitted that the Manitowoc Facility was inundated with machine breakdowns at the facility that constantly required fixing and presented the Manitowoc Facility as a finished product, when it was not, as the Company later admitted when it conceded that it paid Larson Building over $11 million in fiscal year 2023 alone. ¶151. Wiley and the other Defendants cannot make these false and misleading statements to investors about then-existing facts to entice investor interest at the time, then escape liability by recasting the statements as "forward-looking statements." *See Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (noting that challenges by plaintiffs to purportedly forward-looking statements "can be satisfied by pointing to inconsistent contemporaneous statements. . . .") (quoting *Yourish v. California Amplifier*,191 F.3d 983, 993 (9th Cir. 1999)); *Forescout*, 63 F.4th at 774 (statement that pipeline "continuing to grow ... describe past and current conditions").[9]

Nor was Wagenhals' statement a "forward-looking" statement protected by the safe harbor provision of the PSLRA. "The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events. But the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts." *Quality Sys.*, 865 F.3d at 1142. Statements are not forward-looking where "their truth or falsity could be determined at the time they were

[9] *Jong Min Park v. GoPro, Inc.*, No. 18-cv-00193-EMC, 2019 WL 1231175, at *18 (N.D. Cal. Mar. 15, 2019), does not support Defendants' analysis. In *Park,* the challenged statement used the phrases, "[o]ur expected results" to introduce defendant's expected results. *Id*. Also, in *Park,* the challenged statement used the phrase, "As we look ahead," to introduce defendant's intention "to drive operating efficiencies." *Id*. Here, Wiley's phrase, "So looking forward," introduced the conclusion that "all of the costs have been incurred" already and did not introduce future plans or intentions. ¶87.

spoken." *Fosbre v. Las Vegas Sands Corp.*, No. 2:10-CV-00765-KJD-GWF, 2011 WL 3705023, at *7 (D. Nev. Aug. 24, 2011). "[A] concrete factual assertion about a specific present or past circumstance goes beyond the assertion of a future goal, and beyond the articulation of predicate assumptions, because it describes specific, concrete circumstances that have already occurred." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021). "If such factual assertions are made and are false, then they are outside the safe harbor and potentially actionable." *Id.*

Further, even if they had been purely forward-looking, the PSLRA safe harbor would not apply because Defendants did not include meaningful cautionary language. The hypothetical boilerplate Defendants included in their periodic filings does not qualify. Cautionary language is "not 'meaningful' [because it] discusses as a mere possibility a risk that has already materialized." *Felipe v. Playstudios Inc*., No. 2:22-CV-01159-RFB-NJK, 2024 WL 1380802, at *11 (D. Nev. Mar. 31, 2024). To provide safe harbor protection, cautionary language must be so clear and forceful that the "risk of real deception drops to nil." *In re BioMarin Pharm., Inc. Sec. Litig*., No. 3:20-cv-06719-WHO, 2022 WL 597037, at *3, *5 n.1 (N.D. Cal. Feb. 28, 2022). Nothing in Wiley's statement or the warnings he cites disclosed that the Company still had over $11 million to spend in the project in 2023 alone, instead Wiley gave the impression that "virtually all" capital expenditures in relation to the Manitowoc Facility were complete.

Multiple CWs confirmed that the construction of the Manitowoc Facility was behind schedule and that critical machinery was in a state of disrepair, not "state-of-the-art." *See* ¶¶53-55. That these statements were verifiable at the time they were made renders the safe harbor inapplicable. Concrete math, which the Company has since admitted, proves that the project was not "within budget." At the time Flynn stated in November 2022 that the

project was within budget, it is undisputed that costs had ballooned over 100%. ¶¶106, 151. This is not a forward-looking statement, but a false statement about a then-present fact.[10]

As such, it does not fall within the safe harbor provisions.[11]

### f. Misrepresentations Regarding the Company's Manufacturing Capacity Regarding the New Manitowoc Facility Are Actionable

Before the Manitowoc Facility was opened in August 2022, the Company stated in its 2021 Form 10-K, that it had production capacity of 650 million rounds of ammunition, with the ability to scale to one billion, and that it could also produce 750 million brass casing and could scale over one billion casings. *See*, *e.g.*, ¶75. The Company made similar representations in its 2022 Form 10-K. ¶98. The Company also assured investors that once the new facility opened, capacity would increase immediately. *See* ¶¶83, 85.[12]  When the Manitowoc Facility opened, Wagenhals assured investors that the Company had overcome a few setbacks, was then "increasing capacity across the [b]oard," and that the new

---

[10] Flynn also attacks the original announcement of the Manitowoc Facility's budget as $12 million as a forward-looking statement. Flynn Br. at 7-8. This is a red herring. The original projection was not pled as false, but rather as the reference by which investors measured Defendants' false representations that the project was "within budget" or "under budget."

[11] Defendants' authorities do not disturb this conclusion. *Fosbre* and *In re Barrick Gold Secs. Litig.*, No. 13 Civ. 3851 (SAS), 2015 WL 1514597, at *8 (S.D.N.Y. Apr. 1, 2015) stand for the proposition that cost *projections* are forward-looking statements. However, the November 2022 statement is not a projection of future expenditures, but a statement about a supposedly completed project. *Weston Family P'ship LLLP v. Twitter, Inc.*, holds that a company is not required to provide continuous updates as to corporate operations. 29 F.4th 611, 620 (9th Cir. 2022). But whether AMMO had an affirmative duty to update is irrelevant. When it ***chose*** to update investors on the construction and its relation to the previously announced budget, it was bound to do so truthfully and without omission of material fact. *See  Khoja*, 899 F.3d at 1010; *Maison Sols*, 2025 WL 2817550, at *8.

[12] Wiley asserts in his brief that the statements in Paragraphs 83 and 85 attributed to him were not made by him. Wiley Br. at 3-4. The quotes attributed to Wiley in the Complaint were transcribed by Bloomberg, a leading national business newswire, and  Bloomberg reported  that these statements were Wiley's. Regardless, this factual dispute should not be resolved at this stage of the litigation. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir. 2005) (holding that the PSLRA does not provide a license to resolve disputed facts at the pleading stage); *see Khoja*, 899 F.3d at 1000.

Manitowoc Facility was "[h]umming." ¶104. Flynn stated in November 2022 that "[t]he facility now houses equipment and machinery we have been acquiring over the past couple of years, all of which allows us to strategically and incrementally increase production with the plan to elevate loaded ammunition moving out of the 13 May shipping docks from 400 million to 1 billion." ¶106. Smith stated that brass casing capacity then exceeded 750 million and that they can double the capacity. ¶109.

While the credible accounts of one witness are sufficient to show falsity, here multiple corroborated CW accounts show that these statements were false when made. *See City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc*., 153 F.4th 288, 300-01 (2d Cir. 2025). CW1, one of the most senior officers at the Company, explained that the Company lacked the capacity to produce 1 billion rounds of ammunition per year. ¶54. Further, CW1 explained that the Company was unable to reach its goal of producing 1 billion rounds of ammunition because of shortages in projectiles, machines, and primer, which made any significant ramping up of production impossible. *Id.* CW8 also detailed frequent equipment failures that rendered the figures stated impossible when made. ¶60. CW4, CW5, CW6, and CW8 corroborated severe Manitowoc Facility production delays and explained that the Company was forced to resort to secretly selling ammunition purchased from overseas because of their own inability to produce at scale, further substantiating that the statements regarding production capacity were misleading. ¶¶55, 58, 60, 61

The CW allegations were also confirmed by the Company's current CEO in his Verified Merger Complaint. There, Urvan admitted that the production capacity of the Manitowoc Facility was far less than the 750 million rounds touted to investors. *See* ¶111. AMMO may not be judicially estopped from reversing that position here for strategic purposes, but its CEO's earlier admission only emphasizes that the Complaint allegation of the same fact is well-pled and plausible.

Some Defendants incorrectly assert that false statements regarding the production capacity and ability to scale of the Manitowoc Facility should be excused as "forward-looking." AMMO/Smith Br. at 14-16; Flynn Br. at 8.12F   But statements about the

production capacity of the facility were of ***then-current fact.***[13] *See Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017) (statements such as "ready to scale", "working" and other statements indicating the company was ready to scale up not forward-looking).

Neither the PSLRA's safe harbor nor any cited case holds that a defendant can misrepresent past or current fact, even in response to a question that may allude to the future. Instead, Ninth Circuit law requires courts to closely examine each overall statement and sever non-forward-looking portions from forward-looking portions when considering falsity. *Quality Sys.*, 865 F.3d at 1141-42. A statement can be false and misleading where it misstates current or past events or conditions, even if some element relates to a future goal or event. *See*, *e.g.*, *id.* (holding that a defendant cannot invoke the safe harbor by making current misrepresentations of fact even if they relate to future revenues as a whole); *Forescout*, 63 F.4th at 774 (similar).

Here, the statements regarding the production capacity of the Manitowoc Facility had both present and future components. Defendants readily spoke about production capacity that was then available or that was available on "day one," and the then-current state of the Manitowoc Facility. ¶¶83, 85, 87, 98, 104, 106, 109, 128. That they also spoke to investors about the future at times does not negate liability for these misrepresentations. *In re Quality Sys.*, 865 F.3d at 1141-42; *Forescout*, 63 F.4th at 774.

Further, even if they had been purely forward-looking, the PSLRA safe harbor would not apply because Defendants did not include meaningful cautionary language. The hypothetical boilerplate Defendants included in their periodic filings does not qualify.

---

[13] Even Defendants' authorities reflect this distinction. *Wochos*, citing *Quality Sys.*, carefully parsed the statement made by Tesla to determine whether the company made factual, present tense claims about its operations intermixed with forward-looking projections. *Wochos,* 985 F.3d at 1192-93. *Wochos* does not apply to concrete misrepresentations as here whose truth or falsity can be discerned, but is limited to inherently forward-looking statements such as claims that a company is "on track" to meet future targets.

Cautionary language is "not 'meaningful' [because it] discusses as a mere possibility a risk that has already materialized." *Playstudios*, 2024 WL 1380802, at \*11; *In re BioMarin Pharm., Inc. Sec. Litig.*, 2022 WL 597037, at \*3, \*5 n.1 (the cautionary language must be so clear and forceful that the "risk of ***real deception drops to nil***.").

Eschewing these requirements, Defendants cite language that could apply to any business that produces goods. *See*, *e.g.*, AMMO/Smith Br. at 16 ("The Company's business and supply chain may be adversely affected by instability, disruption or destruction in a geographic region in which it operates, regardless of cause"). None of the supposed cautionary language referenced then-known material problems at the Manitowoc Facility.

Wiley's attempt to characterize statements regarding the production capacity of the Manitowoc Facility as "fraud by hindsight" conflates facts and ignores well-pled Complaint allegations. *See* Wiley Br. at 5.  As alleged, and as will be proved at trial, the "later manufacturing challenges" that temporarily reduced production capacity Wiley references are separate and distinct from Plaintiffs' claims regarding capacity. The alleged deficiencies were endemic to the project from the beginning and known to Wiley and other Defendants. ¶¶153-61. That the full extent of the problems Defendants concealed came to light later does not render their misrepresentation of then-current fact at the time "fraud by hindsight." *See In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809 (C.D. Cal. 2011) (noting "[f]raud is almost always detected after the fact, typically based on evidence developed subsequent to the allegedly fraudulent statements.").

Flynn also erroneously asserts that Defendants were free to hide from investors that "Ammo's production capacity was limited due to production constraints," because it belatedly disclosed other production shortfalls stemming from "the move into our new facility." Flynn Br. at 9-10. But eventually telling the truth about one problem does not permit one to lie about another. "[O]nce Defendants choose to speak on a topic, they are 'bound to do so in a manner that wouldn't mislead investors'" *Maison Sols.*, 2025 WL 2817550, at \*8 (quoting *Khoja*, 899 F.3d at 1010). Asserting that disruptions were only temporary and caused by relocation was intended to assuage investors into concluding that

the production shortfalls would quickly resolve. As the Complaint alleges, the "production constraints" were not so limited, but involved far more impactful deficiencies with the relocated machines themselves, their state of disrepair, AMMO's lack of redundancy, and supply-chain shortfalls, and even that the problem was so dire that the Company had to resort to secretly buying and re-selling ammunition purchased from overseas. ¶¶54-55, 58, 60-61, 76.[14]

In addition, Flynn erroneously asserts that Plaintiffs failed to link the use of Defendant Larson's brother's construction company with the inflated costs at the Manitowoc Facility. Flynn Br. at 10.[15] Here, the statements are directly correlated—there was an undisclosed relationship between an individual who was functioning as the *de facto* co-CEO and CFO and the contractor of the Company's most expensive and important construction project, and that same project came in at more-than-twice the amount budgeted. The precise mechanics of how invoices were inflated does not matter. The fact that an undisclosed related-party transaction gave rise to such a huge expense is sufficient to survive a motion to dismiss. *See Maison Sols. Inc.*, 2025 WL 2817550, at \*8 (finding

---

[14] *Facebook*, cited by Flynn, actually supports Plaintiffs' position. *Facebook* dealt with statements regarding information security risks that were framed as hypothetical concerns, when in fact they had actually occurred. 87 F.4th at 958-59. The Ninth Circuit held that the failure to disclose that the risk had occurred was an actionable misrepresentation. 87 F.4th at 948-49. "[T]he problem is that Facebook represented the risk of improper access to or disclosure of Facebook user data as purely hypothetical when that exact risk had already transpired. A reasonable investor reading the 10-K would have understood the risk of a third party accessing and utilizing Facebook user data improperly to be merely conjectural." *Id.* In other words, *Facebook* stands for the premise that statements, as here, that misleadingly downplay a problem or its impact are actionable misrepresentations.

[15] As part of this argument, Flynn asserts that the Manitowoc Facility was in fact within budget. As previously discussed, a facility that eventually cost twice the original estimate is not "within budget." *See* Section II.B.1.e. To the extent Flynn has any admissible evidence countering this clear math, he may introduce it at trial. Such factual disputes have no place at the pleadings stage. *See Gilead*, 536 F.3d at 1057 (admonishing that "a district court ruling on a motion to dismiss is not sitting as a trier of fact …. A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable").

that failure to disclose an undisclosed related-party transaction was sufficient in itself to support an allegation of falsity).[16]

### g. False Statements Regarding the Manitowoc Facility Are Material

Materiality determinations "are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *see Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) (same). Materiality "should ordinarily be assessed by a jury" and that may be resolved only on a motion to dismiss if it is "so obvious that reasonable minds could not differ." *Alameda v. Nuveen Municipal High Income Opportunity Fund*, No. C 08–4575 SI, 2009 WL 1424529, at *7 (N.D. Cal. May 20, 2009). Defendants do not even come close to meeting this stringent standard.

The Manitowoc Facility was AMMO's largest capital expenditure and intended to be **the only factory** for the Ammunition Segment (¶32) that was AMMO's driving revenue source. (¶¶156-60). Hiding problems plaguing the Manitowoc Facility "radically altered the picture" of the company's "overall economic health and viability." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 403 F.3d 1050, 1056 (9th Cir. 2005).

Flynn's citation to *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 755 (D. Ariz. 2022) is misplaced. In *Bajjuri*, plaintiffs' claimed that specific financial line items including recorded revenue were misrepresented. *Id*. at 755-56. To support those claims, plaintiffs would have to plead financial impact and financial position. Here, the claims regarding the Manitowoc Facility focus on its construction cost and production capacity. For both of those items, Plaintiffs' Complaint alleges exactly the amount that Defendants falsely claimed, the amount that was actually true, and that the delta between fact and the fiction sold to investors was significant. ¶¶83, 85, 98, 111 (capacity claimed to be 1 billion rounds but was actually less than 750 million rounds); ¶¶32, 151 (Manitowoc Facility was

---

[16] *Nuverra Envtl. Sols. Secs. Litig.*, No. 2:13-CV-01800-JWS, 2015 WL 3887235, at *6 (D. Ariz. June 24, 2015) is distinguishable because in that case the plaintiffs alleged defendants concealed that their project costs had increased, but the statements pled as false were about the revenues of the project and business development prospects rather than their costs.

supposed to cost $12 million when actual cost was more than $25 million). These huge discrepancies far surpass the standard 5% accounting threshold for a presumptive finding of materiality. *See* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999), 1999 WL 1123073, at *2 (Aug. 12, 1999) ("SAB No. 99"). Plaintiffs further allege the centrality of the Manitowoc Facility to AMMO's business operations. ¶¶155-61. Plaintiffs easily surpass the minimal burden necessary to plead materiality.

Wiley makes a similar, equally baseless argument. Citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108-09 (9th Cir. 2010) and *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-CV-05558-HSG, 2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018), he asserts that his statements were immaterial because he "was simply disclosing the reality – evident to any reasonable investor – of having to spend money on equipment and a new facility." Wiley Br. at 5-6. But that says nothing about his omission of known improprieties regarding those expenditures. Neither case he cites remotely supports his deception. In *Cutera*, the court held that the district court correctly concluded that there was no material difference between an earlier disclosure and a later disclosure that merely contained additional details of the sales force reorganization. 610 F.3d at 1110.

Here, there were enormous differences in Wiley's misleading statements and subsequent disclosures. Wiley said nothing about known broken machinery in the new facility or a corrupt no-bid contract to the brother of a banned executive. Instead, he just spoke about temporary setbacks attending the move into the new facility. ¶101. Wiley's reference to *Uber* fares no better. *Uber* was dismissed because "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves." 2018 WL 4181954, at *5. The opposite is true here. Each of the statements Defendants concealed is alleged to relate directly to the subject matter of the statements they did make.

Given the utmost importance of a company's leadership and profitability pitfalls to reasonable investors, the misrepresentation and omission of Larson's *de facto* but illegal co-CEO and CFO role, the related-party transactions and kickbacks at AMMO, and the

cost overruns and machinery breakdowns at the Manitowoc Facility, there can be no question that a reasonable investor could find Defendants' misrepresentations and omissions regarding these subjects impacted the total mix of information. Defendants need not agree, but they raise no basis to take this factual dispute away from the jury. *TSC Indus.*, 426 U.S. at 450; *Impax Labs*, 36 F. Supp. 3d at 966.

Nor are the statements regarding the Company's manufacturing and supposed margin improvements mere puffery, as Defendants assert. "[E]ven general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143. Here, each of the statements in question was so tethered. For example, Defendants' statement "I remain confident that the initiatives we have undertaken in both the marketplace and ammunition divisions will continue to improve profitability" is preceded by the statement "***we have already begun to see the positive effects here in the 1st quarter, with significant improvements in gross margin and strong cash flow***," an objective, verifiable statement. ¶124 (*see* AMMO/Smith Br. at 17). Similarly, Defendants focus on the phrase "world-class" but ignore that it is tied to the concrete but false statement by Flynn and AMMO that the facility had opened on-time and within budget, omitting the widespread problems with the Manitowoc Facility affecting production not only then but throughout the remainder of the Class Period. ¶106. Taken as a whole, the statements make concrete representations about AMMO's financial position and the Manitowoc Facility. Therefore, they are not puffery. *See Esfandiari*, 2025 WL 2444072, at *8 (statements regarding financial position are not puffery); *Webtoon*, 2025 WL 3484589, at * 3 (statements regarding monthly active user levels were not puffery).

### 2.    Plaintiffs Raise a Strong Inference of Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *E. Ohman J v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023); *Arena*, 840 F.3d at 705. Contrary to the assertions of several Defendants,

motive need not be alleged. *See* Wiley Br. at 6; Flynn Br. at 14; Wagenhals Br. at 11. Pleading deliberate recklessness is sufficient. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324-26 (2007). A "strong inference" "need not be irrefutable … or even the most plausible," and no "smoking-gun" is required. *Tellabs*, 551 U.S. at 324-26. A complaint survives a motion to dismiss if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id* at 323-24. A tie cannot justify dismissal. *Id.* Defendants must establish a non-culpable inference that is cogent and ***more compelling*** to win dismissal. *See*, *e.g.*, *Maiman v. Talbott*, No. SACV 09-0012 AG (ANx), 2010 WL 11421950, at *6 (C.D. Cal. Aug. 9, 2010).

To plead scienter, a complaint may plead a "combination" of facts, none of which need to be from confidential witnesses, internal reports, or other specific sources. *See Alphabet*, 1 F.4th at 706-07 (collecting authority for proposition "[a]llegations of suspicious stock sales or information from confidential witnesses are not needed"); *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 6482014, at *8 (N.D. Cal. Nov. 4, 2020) (crediting "the combination of the core operations doctrine . . . post-class admissions . . . and the close temporal proximity between the challenged statements and actions inconsistent with those statements"). A defendant's ***knowledge of facts or access to information that renders a statement misleading is classic evidence of scienter.*** *See Fibrogen*, 2022 WL 2793032, at *23 (collecting cases).

The scienter assessment involves a "dual inquiry" review where in addition to assessing whether any of the allegations alone establish scienter, the court conducts a review to see "if the allegations, when considered together, give rise to a strong inference of scienter." *Funko*, 2026 WL 292424, at *17; *see also Tellabs*, 551 U.S. at 326 (explaining that scienter allegations must be assessed holistically). Countering allegations through a "divide-and-conquer" strategy is not permissible without a holistic review. *See In re Toyota Motor Corp. Sec. Litig.*, No. CV 10-922 DSF (AJWX), 2011 WL 2675395, at *4 (C.D.

Cal. July 7, 2011). Defendants ignore *Tellabs* and instead embark on the impermissible "divide-and-conquer" approach. *See* AMMO/Smith Br. at 7-14 (countering scienter allegations one-by-one and arguing they do not "establish" or "give rise" to scienter individually); Wiley Br. at 6-16 (attacking allegations individually without any holistic analysis); Flynn Br. at 11-15 (same); Larson Br. at 5-11 (same); Wagenhals Br. at 5-12 (same). Plaintiffs allege overwhelming facts that, when viewed holistically, establish a strong inference of scienter:

### a. Defendants Admitted They Concealed Material Information in Their Statements From Investors

Here, Defendants' admissions to the facts they concealed from investors leave no doubt that they were at least deliberately reckless in omitting those same facts from their Class Period statements. ¶¶150-52. Specifically, AMMO admitted to Larson's status as a related-party and to his illicit related-party transactions, including the kickback scheme in its May, 2025 Form 10-K/A Disclosure. ¶151. It also admitted employing Larson as an executive officer of the Company in violation of the SEC ban prohibiting such employment, that Larson was either the first or second highest paid officer at the Company, and that he had received related-party payments. ¶151. AMMO even admitted that Larson received kickbacks from a third-party vendor of AMMO. ¶¶77, 151. Such admissions provide "evidence… that [Defendants] had knowledge of the falsity of their financial reports." *In re VistaCare, Inc. Sec. Litig.*, No. 04-CV-1661-PHX-FJM, 2005 WL 8160681, at *2 (D. Ariz. Aug. 19, 2005). "It is reasonable to believe that [Defendants] had known" prior to the admissions of the information they hid from investors, *see Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231-32 (9th Cir. 2004), particularly since the concealed information was known and obvious within AMMO.[17]

---

[17] AMMO's current CEO Urvan also admitted to Larson's role as an officer Defendant when Gunbroker sued AMMO in 2023, asserting that Larson had served as *de facto* co-CEO and CFO since the Merger, and that it was wrong for AMMO to withhold the information alleged regarding Related-Party transactions from Gunbroker during the Merger negotiations. ¶111.

Defendants' admissions also show scienter with respect to the concealment of machine failures. Smith admitted in November 2023 that he understood that the rifle press machine was a "big deal" to the Company, that he had known since April 2023 that AMMO lacked any redundancy to address equipment failures at the factory, and had known since June 2023 that the crucial equipment had failed. ¶150. This admitted knowledge not only of a huge operational vulnerability, but that the risk had already materialized, allows no other inference than that Smith and AMMO were at least deliberately reckless by omitting any mention of the problems from their positive Summer 2023 statements to investors about the machinery and production at the Manitowoc Facility. *See* ¶114 (claiming "superior" manufacturing at the Manitowoc Facility); *id.* (claiming that they "continue to see machine efficiencies increase" there); ¶120 (claiming that the Manitowoc Facility was "creat[ing] real margin for the Company"); ¶126 (claiming to be "enhancing margins through expansion of our rifle brass lines, [*i.e.*, the lines impacted by the failure of the rifle press]"). That Smith later conceded knowing that a major press was broken was an "I knew it all along" type of admission that easily support scienter. *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10.

Defendants raise no credible reason why these admissions do not reflect their knowledge during their Class Period misrepresentations. AMMO and Smith have no response to the admission about Smith's knowledge of the press failure in their motion. AMMO/Smith Br. at 7-14. Regarding the related-party transactions, they simply claim that the May, 2025 Form 10-K/A Disclosure is "not enough" because it does not expressly admit when Defendants became aware of the admitted facts. This argument, which is unsupported by any authority, ignores the obvious nature of the concealed information within AMMO *and* well-pled Complaint allegations that show that Defendants knew the concealed information "all along." *See*, *e.g.*, ¶40 ("it was clear" within AMMO that "Larson and Wagenhals were running the Company together during this period"); *id.* ("CW1 states that Larson's role as an AMMO officer was concealed due to his SEC Consent Decree, a fact known by Wagenhals and others in the Company"); ¶41 (in 2021

Larson negotiated the Merger with Flynn and now-CEO Urvan); ¶42 (Larson and Wagenhals openly shared an office and ran the Company together during the Class Period); ¶43 (Larson and Wagenhals Larson "continued to participate in meetings and jointly run the Company" after the Consent Decree, but employees were directed to keep Larson's role confidential).[18]

Wagenhals attempts to dodge these admissions by misstating the law. He claims that because the admissions were made by others and he personally never specifically admitted to the fraud, the admissions do not support scienter as to him. Wagenhals Br. at 11. But scienter is never dependent on an express admission from each defendant (or even an admission at all). Instead, an admission by the Company is sufficient to infer scienter as to the executives involved at the time of the previously-concealed events. *See, e.g.*, *In re WageWorks, Inc., Sec. Litig.*, No. 18-cv-01523-JSW, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020) (although Company admitted concealed information after a CEO had resigned, the Company's admission supported the finding of scienter as to former CEO).

### b. Defendants had access to and actual knowledge of the concealed information

That Defendants had access to, and notice of, the concealed information "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information." *S. Ferry LP v. Killinger*, 542 F.3d 776, 785-86

[18] AMMO/Smith's and Wagenhals' reliance on a summary judgment ruling in *S.E.C. v. Prince*, 942 F. Supp. 2d 108, 136 (D.D.C. 2013) for the proposition that they did not know he was an officer is misplaced because in that case, the testimony showed that the person charged was not actually functioning as an officer. AMMO/Smith Br. at 7; Wagenhals Br at 6. Here AMMO does not dispute that Larson was functioning as an officer during the Class Period. Plaintiffs allege Defendants knowingly concealed Larson's role due to the Consent Decree. *See, e.g.*, ¶¶40-43. These allegations are accepted as true at this stage of the proceedings, and they show that the reasonable inference is that Defendants knew they were acting unlawfully in their pattern of concealment. *Atossa.*, 868 F.3d at 793. To the extent Defendants challenge the well-pled allegations and the Company's own admissions, they may do so at trial. *Compare* Wiley Br. at 12 (attempting to argue Larson was not an executive officer) *with* ¶146 (the Company's admission that Larson was an executive officer during the Class Period, *and* SEC Order Making Findings ¶¶14-20, 22-29 (making findings that Larson was an executive officer during Plaintiffs' Class Period).

(9th Cir. 2008); *see also Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV 15-1343-DOC (KESx), 2017 WL 3328543, at *16-17 (C.D. Cal. Aug. 4, 2017) (scienter established by allegations showing defendants had access contradictory information); *Shenwick v. Twitter, Inc.*, 282 F.Supp.3d 1115, 1147 (N.D. Cal. 2017) (similar); *Fibrogen*, 2022 WL 2793032, at *23 (defendant's knowledge or access to information "suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter").

Defendants knew that the Manitowoc Facility was mired in production delays and equipment failures. ¶153. Production and machine failures were tracked internally on Plex, as confirmed by CW5, CW6, CW7, and CW8. ¶¶151, 153. And Defendants regularly toured the facility, and received production and capacity updates from Mann, the VP of Operations who managed the Manitowoc Facility, as confirmed by CW1. ¶¶54, 153. As CW1 states, Larson knew of the actual production capacity figures from Mann. ¶153. In addition, Wagenhals said at the August 16, 2021 earnings call that he tracks production capacity every day, including that "we get on a call every morning at 8 o'clock and we focus on numbers, numbers, numbers." *Id*. Smith specifically knew about the redundancy issues with the brass press from a walkthrough at the facility in April 2023, yet continued to make false statements about the Company's manufacturing capabilities and supposed improved margin for nearly 6 months after the press failed in June 2023. ¶150.[19]

Further, that Larson functioned as an executive officer of the Company was well known to the Individual Defendants and has since been admitted by AMMO. ¶¶151, 154.

---

[19] Smith/AMMO's and Wagenhals' reliance on *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 538 (9th Cir. 2024) for the proposition that because *some* facts regarding production issues were disclosed, there should not be an inference of scienter, is unfounded. In *Espy*, there were no allegations Defendants knew about the undisclosed relationships. Here, Smith's own statements concede understanding that the press failure was a "big deal" affecting between 90-120 million in rifle cases, and Defendants' decision to conceal that information for at least five months while they made statements touting their production facility is strongly indicative of scienter. ¶¶131, 150. Similarly, Wagenhals never conceded that major equipment was failing for extended periods, or that the capacity was not anywhere close to what they were capable of producing, or that their problems were so severe that they resorted to buying ammunition from overseas and secretly selling it as their own. *See., e.g.*, ¶105.

Each interacted with Larson at high level meetings. ¶154. Multiple CWs reported knowing that Larson was officially banned from serving as an executive officer of the Company but that the Company allowed him to serve in a *de facto* role anyway. *Id.* Larson even shared an office with Wagenhals. ¶42; *see Bernstein v. Ginkgo Bioworks Holdings, Inc.*, No. 4:21-CV-08943-KAW, 2023 WL 11996105, at *7 (N.D. Cal. Mar. 10, 2023) (scienter "easily inferred" where the defendants shared office space with related parties and mischaracterized their relationship with them). CW1, a Vice President of AMMO, stated that Wiley knew of Larson's illicit role at the Company, that Larson would draft SEC filings and have Wiley sign them for him, and that employees joked that Wiley was Larson's "puppet." ¶¶40, 154. Flynn so significantly aided Larson in circumventing his SEC officer ban by helping him serve as a shadow co-CEO/CFO that a merger partner called Flynn, Larson and Wagenhals the "criminal triumvirate," ¶40, as well as by leading Merger negotiations with Larson and forcing an employee to check on a drunk Larson so that Merger negotiations would not proceed without him. ¶41.

As Urvan, the current CEO of AMMO, verified in his own lawsuit, Larson functioned as *de facto* co-CEO and CFO of the Company during the Class Period. ¶154.[20] Only investors were left in the dark about that vital fact. The close relationship between Larson and the other Individual Defendants, especially Wagenhals and Wiley, as well as their open co-leadership within AMMO, leaves no doubt that all other Defendants were

---

[20] Wiley's downplaying of Urvan's allegations in the Merger Complaint is misplaced. Wiley Br. at 10. Wiley's caselaw is limited to the "parrot[ing] allegations" in someone else's complaint for "which counsel has not conducted independent investigation." *In re UBS Ag Sec. Litig.*, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012). Here Plaintiffs extensively investigated the matters alleged herein and gathered the accounts of several credible former employees who corroborate CEO Urvan's allegations. *See In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1080-81, 1083 (N.D. Cal. 2001) (crediting allegations in an SEC complaint); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15 CIV. 6034 (RJS), 2016 WL 5794774, at *8 (S.D.N.Y. Sept. 30, 2016) (distinguishing allegations involving CWs from the mere "cribbling uncorroborated allegations"). Further Courts credit verified complaints, such as the one Urvan filed. See *Vanguard Specialized Funds v. VEREIT Inc.*, No. CV-15-02157-PHX-ROS, 2016 WL 5858735, at *14 (D. Ariz. Oct. 3, 2016).

aware of the illicit arrangement, related-party dealings of Larson, including the contract to his brother's Company and the kickbacks that the Company later admitted.[21] No Defendant raises a credible reason why it should not be inferred as obvious to them that awarding an eight-figure no-bid contract to Larson Building was a related-party transaction for the benefit of Larson. That Wagenhals and Wiley both knew that Larson's brother owned and managed Larson Building further bolsters their scienter. SEC Compl. ¶61.

That Larson now claims he did not know that his duties at AMMO "fell within the scope of the Consent Decree's prohibition," *see* Larson Br. at 7, is belied by the allegations in the Complaint that showed Larson unquestionably took on the duties and responsibilities of an executive officer, as AMMO itself admits and as AMMO's current CEO warned during the Class Period. An executive officer includes not just CEOs and CFOs, but also "any vice president … in charge of a principal business unit … (such as … finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant." ¶36; 17 C.F.R. §240.3b-7.

Well-pled Complaint allegations erase any doubt that Larson was serving in this function in violation of his Consent Decree. For example, Larson negotiated the most important merger transaction in the Company's history and the agreement he negotiated with now-CEO Urvan concedes that Larson was a "Key Employee" along with senior officers Wagenhals, Wiley and Flynn. ¶38. The Merger agreement Larson negotiated even placed him in the same status as Wagenhals and Wiley, C-level officers whose knowledge is imputed to AMMO. *Id.* Larson jointly ran the Company with Wagenhals, thus functioning as co-CEO. ¶¶38, 40-44. And, he oversaw preparation of SEC filings, the

---

[21] Wiley invokes *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 897 (N.D. Cal. 2022) for the argument that statements about compliance are not knowingly misleading simply because a later regulatory inquiry occurs. Wiley Br. at 16. But this case is a far cry from *PayPal*, nowhere in PayPal was a kickback scheme alleged, rampant undisclosed related-party dealings enriching the officer defendants, or allegations that senior executives covered up the employment of a banned officer. PayPal was about certain advertisements were misleading under CFPB rules but there were no allegations showing malfeasance by the officer defendants. 620 F. Supp. 3d at 897-98.

function of a CFO. ¶40. Larson's salary erased any remaining doubt that he was actually serving as an executive officer, which AMMO now admits. ¶¶48, 146. Larson was one of the most highly compensated executive officers at AMMO from FY 2020 to FY 2023. *See* ¶48. The only plausible inferences these facts allow are that: (a) Larson understood he was violating his Consent Order; or (b) he was reckless as to whether he was doing so and made no effort to ascertain the truth before engaging in the alleged scheme. Either supports scienter.[22]

Wiley's attempt to shield himself as Larson's "puppet" does not absolve him of his knowledge or reckless disregard of the misconduct alleged. *See* Wiley Br. at 7-8. Regardless of control person status, Wiley is liable for his false statements as the maker of his statements. *See In re Smith Barney Transfer Agent Litig*., 884 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2012). Further, Wiley's abrupt resignation at the request of the Board of Directors towards the end of the Class Period also supports scienter. ¶12; *In re B. Riley Fin., Inc. Sec. Litig.*, No. 2:24-CV-00662-SPG-AJR, 2025 WL 3637602, at *11 (C.D. Cal. Dec. 12, 2025). Nor is there anything "inconsistent" about describing Wiley's role as subordinate to Larson's but that Wiley served as AMMO's titular CFO who, among other things, served as a senior officer with "actual knowledge" of the Merger Agreement, and regularly functioned as the investor-facing financial officer of the Company. *See*, *e.g.*,

---

[22] Nor is Flynn's argument that he was not an officer AMMO credible. The Complaint alleges that Flynn was one of four AMMO "Key Employees" in the leadup to the Merger agreement, he took a leading role in negotiating the Merger, led the negotiation over the Manitowoc Facility, and regularly answered analyst questions regarding core business operations. ¶¶165-68. Flynn also ran the military sales division, which falls squarely under the definition of executive officer under 17 C.F.R. § 240.3b-7 (including, among other things "any vice president.... In charge of a division or function."); *see also Dedrick v. Valuable Techs., Inc*., No. 22CV4341 (EP) (JBC), 2023 WL 8802820, at *6 (D.N.J. Dec. 20, 2023) (noting that the VP of Sales "title alone confers executive officer status" provided it was not merely ceremonial) (citing *Nat'l Med. Enters.,* 680 F.2d 83, 84 (9th Cir. 1982)). That Flynn and the Company avoided his disclosure as an officer supports an inference of scienter. Regardless, the allegations in the Complaint show that he had access to the information alleged to be false. *See, e.g*., ¶¶38-40.

¶¶25, 81, 87, 101, 130, 165.

### c. That Defendants' Misrepresentations Involved AMMO's Core Operations Bolsters Scienter

Core operations allegations show scienter if: (1) "the nature of the relevant [information] is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," or (2) "they are particular and suggest that defendants had actual access to the disputed information." *S. Ferry*, 542 F.3d at 786; *see also, e.g.*, *Reese*, 747 F.3d at 575-76. The Complaint supports a strong inference of scienter under both tests. Defendants' "actual access" to the concealed information is described in Section II.B.2.b above.

There is nothing more important to a company than who leads it. It "would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 786. Each of the Individual Defendants personally worked with Larson in the Arizona headquarters from which he operated. ¶¶38-44. Wagenhals even shared an office with him and employees throughout the organization understood they were leading the Company together. ¶¶42-43, 154. Larson was open about co-leading the Company, and was sent to oversee its most important Merger. ¶¶38-44. It would make no sense to infer that another senior officer, in the same headquarters, was unaware of Larson's role. And, the Company was sued (by its current CEO no less) for Larson's illicit role. ¶38. AMMO and its high-level executives would have known the nature of that lawsuit. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("Moreover, the inference that high-level executives ... would know that the company was being sued in a product liability action is sufficiently strong.").

It would similarly be specious to infer that the Individual Defendants were unaware of the related-party construction contract for the Manitowoc Facility. Several of the Individual Defendants repeatedly acknowledged understanding the prominence of that project during the Class Period. *See, e.g.*, ¶¶81, 85, 87, 101, 106, 109, 120. It was known within the Company that the contract was awarded on a no-bid basis to Larson Building.

¶54. That construction, with a budgeted cost of $12 million and an actual cost of $25 million, is believed to be the largest capital expenditure of the Company. ¶¶32, 87. It would be absurd to believe that Larson did not have actual knowledge that awarding the contract to his brother's company was a related-party transaction, and would be absurd to infer that other Individual Defendants did not actually know that Larson Building was a related-party of Larson, or were at least deliberately reckless in not inquiring. *S. Ferry*, 542 F.3d at 786.

It would be equally absurd to infer that any of the Individual Defendants were unaware of the production problems at the Manitowoc Facility that rendered their production statements misleading, or that to make up this shortfall, they were secretly relying on foreign manufactured ammunition that the Company was passing off as its own. During the Class Period, the Ammunition Segment was the driving factor in AMMO's revenue. *See* ¶158. Defendants repeatedly stressed the importance of the Manitowoc Facility's production capacity to investors. ¶¶54, 83-85, 153.

Wagenhals admitted that he received production capacity updates every morning and "we focus on numbers, numbers, numbers." ¶153. That he would not have known about the rampant production problems and logged breakdowns at the Manitowoc Facility, "despite … constant monitoring … rises to the level of the 'absurd.'" *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1027 (N.D. Cal. 2020). Wagenhals also described Ammunition as "our core product", and given the emphasized importance of the Manitowoc Facility as the Company's only ammunition manufacturing facility, it is absurd to suggest that he and the other Individual Defendants did not know of its severe problems. *See* ¶160. Wiley on multiple earnings calls referred to the Company's "core ammunition segment" with the Marketplace (Gunbroker) revenue playing a more minor, albeit significant, role. *Id.* Smith also referred to the manufacturing at the Manitowoc Facility as where AMMO's "skill set and core competencies" are. *Id.* Given the Defendants' focus on this Manitowoc Facility and the Ammunition Segment, and their prominence to AMMO, it would be "absurd" to believe that Defendants "did not have knowledge of information contradicting [their] statements" and were not at least "deliberately reckless." *Reese*, 747 F.3d at 576; *see also*

*Funko*, 2026 WL 292424, at \*19 ("Taking Plaintiffs' allegations as true, a rational fact finder could find that it would be absurd for Funko's CEO or CFO not to have closely monitored the company's management of its inventory, especially in its highly touted [newly constructed warehouse and distribution center]"); *Berson*, 527 F.3d at 988 ("[I]t is hard to believe that [defendants] would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work.").

The Complaint alleges that the Ammunition Segment remained over 63% of AMMO's revenue during the Class Period after the Merger in 2021. ¶157. Further, Wagenhals admitted that Flynn negotiated with the local government regarding the construction of the Manitowoc Facility. ¶167. And given that Larson's brother was secretly awarded the lucrative contract, it strains logic to believe that he was somehow unaware of the deficiencies in the facility. ¶54. Wagenhals assured investors that the facility would be finished "on time and under budget." ¶81. Smith spoke extensively about the facility, including specific press failures, and even admitted that he knew the facility lacked redundancies for the "big deal" press failure in June 2023 two months before it failed. ¶150. All of these allegations bolster the already strong inference of scienter. *See S. Ferry*, 542 F.3d at 785 (core operations allegations "may be used in any form along with other allegations that, when read together, raise an inference of scienter").

Defendants misquote the caselaw to attempt to escape the obvious application of the core operations doctrine here. AMMO and Smith claim *S. Ferry* holds that the core-operations inference is "exceedingly rare." *See* AMMO/Smith Br. at 13. What *S. Ferry* actually noted in a footnote was that there are some instances, albeit rare, where core operations, without more facts alleged, can establish scienter by itself. *See S. Ferry*, 542 F.3d at 785 n. 3; *see also Pittleman v. Impac Mortg. Holdings, Inc.*, No. SACV 07-0970 AG (MLGx), 2009 WL 648983, at \*3 (C.D. Cal. Mar. 9, 2009) (relying on *S. Ferry*).[23] In

[23] The AMMO/Smith Brief also incorrectly states the standard that both absurdity and actual access are required to raise the core operations inference. *See* AMMO/Smith Br. at 13. The test is disjunctive: either absurdity or actual access supports the core operations inference. *See S. Ferry*, 542 F.3d at 786.

any case, Defendants' argument is misplaced because, where a business is concentrated at a highly touted and newly-constructed facility such as the Manitowoc Facility, the inference that the executives were monitoring the concealed problems falls under the circumstance in which the core operations inference is established on its own. *See Funko*, 2026 WL 292424, at *18-21. But still, Plaintiffs here do not solely rely on the core operations inference to establish scienter, but rather allege that core operations "bolsters" the inference of scienter, along with the other allegations, such as Defendants' admitted fraud, kickback schemes, their access to the concealed information, the CW accounts, and their pecuniary motive to commit fraud.

Wagenhals asserts in conclusory fashion that the core operations inference should not apply to him, but does not explain how it would be remotely possible for him not to know the concealed information given that he jointly ran the Company with Larson, physically worked with him in the same headquarters, and personally monitored the production information that was misrepresented. *Compare* Wagenhals Br. at 11 (attempting to rebut allegations he admitted to the fraud revealed in the May, 2025 10-K/A Disclosure, which was not pled as part of the core operations inference) *with* ¶151 (stating that he tracks production capacity every day, including that "we get on a call every morning at 8 o'clock and we focus on numbers, numbers, numbers") and ¶160 (Wagenhals referring to Ammunition segment as the Company's core business). This more than enough to raise a strong inference that Wagenhals should have known of the problems at the Manitowoc Facility, which is all that is required: Plaintiffs "do not need to establish affirmative knowledge so long as they raise a strong inference that Defendants would have known of the issues given their importance to [defendants'] business." *Funko*, 2026 WL 292424, at *20.

Larson's cited authorities do not provide any basis for shielding him from a core operations inference. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021) concerned whether compliance or research groups were the core operation of an investment bank. *See* Larson Br. at 9. *Webb v. Solarcity Corp*. concerned whether an

accounting error affecting 10% of the business gave rise to the core operations inference: "SolarCity's sales division is a relatively minor portion of the company's overall business" and held that's why absurdity did not apply. 884 F.3d 844, 857 (9th Cir. 2018).[24]

Here, Larson is specifically alleged to have received actual production capacity figures from Mann, ¶54, and his brother's company was the contractor in charge of manufacturing the facility, therefore it is absurd to think he did not know about the production delays. There can be no reasonable question that Larson knew these facts, and knew that the "Ammunition Segment" was the core operation of the Company he co-lead called "AMMO."

### d. The CW Accounts Are Reliable and Bolster the Inference of Scienter

The eight CWs alleged in the Complaint further establish Defendants' scienter. A CW's account is sufficient to establish scienter if the CW is reliable and has personal knowledge, and the account itself is indicative of scienter. *In re Quality Sys.*, 865 F.3d at 1144-45. The CWs here satisfy both prongs. The Complaint alleges their titles, who the CWs reported to, what they worked on, and how those facts relate to the fraud. ¶¶40, 42-44, 55-62.

When allegations derived from the CWs are read together with the other facts alleged, the inference of scienter is not just strong but overwhelming. The CW accounts

---

[24] *In re NVIDIA Corp. Sec. Litig.,* 768 F.3d 1046, 1063 (9th Cir. 2014) is likewise inapposite. *NVIDIA* simply cautioned that without "some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter, the core operations inference will often fall short of a strong inference of scienter." *Id.* (cleaned up). Here there is a plethora of other allegations showing fraud of each Defendant, and Defendant Larson specifically. *Supra* at Section II.B.2.a-b. Likewise, in *Zucco Partners, LLC v. Digimarc Corp.*, the misstatements at issue concerned a technical accounting error, not the core operation of the company. 552 F.3d 981, 1001 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ("Because these misrepresentations are largely definitional, the falsity of the original representations would not be immediately obvious to corporate management.").

consistently demonstrate that the Company and Defendants Wagenhals, Wiley, Smith, and Flynn made statements concealing the related-party dealings, Larson's role as an officer of the Company, and the production problems the Company was having at the Manitowoc Facility with at least reckless disregard for their truth. *See Forescout*, 63 F.4th at 772-74 (finding inference of scienter bolstered where former employees alleged the CEO had access to the information underlying the false and misleading statements).

*CW accounts related to AMMO's illegal employment of Larson and concealed related-party transactions:* CW1 states based on daily interactions with Wagenhals and Larson and the fact that CW1 reported directly to Wagenhals, that Larson made financial decisions for the Company, that Wiley actually worked under Larson, and that it was clear that Larson and Wagenhals were running the Company together. ¶¶40-41. CW1 also explained that Larson drove the Gunbroker Merger. ¶41. CW1 states that the Company concealed Larson's role at the Company due to the SEC Consent decree. ¶40. CW1's account establishes both that Larson was functioning as the leading officer in the Company and that the Company was concealing his role due to the SEC Consent Decree. ¶¶40-41.

Other knowledgeable former employees at the Company confirm the accounts of CW1. CW2, a purchasing manager who was one level below Wagenhals' direct reports at the Company who worked at the Company's headquarters, confirms that Wagenhals and Larson ran the Company together during the Class Period, and that Larson and Wagenhals shared an office, and that Wiley worked under the leadership of Larson. ¶42; *see Paysign*, 2023 WL 1868476, at *5 (crediting CW allegations about adjacent office space and close interactions between a banned individual and a defendant). CW3 confirmed this account, which CW3 knew because CW3 worked as a sales administrator at the Company's headquarters, at times reporting directly to Larson, and also Tod Wagenhals (Wagenhals' son) and to CW1. ¶43. CW3 confirmed CW2's account that Larson had a higher position at the Company than Wiley, and that CW3 was informed by top management at the Company to keep Larson's involvement at the Company. *Id.* CW4, a senior account executive at AMMO who worked out of the Scottsdale headquarters and reported to CW1,

confirmed that Larson and Wagenhals were viewed as equals at the Company and that Wiley worked under Larson. ¶44.[25]

AMMO/Smith and Larson's attempts to brush off these well-pled allegations as "office gossip" or "generalized recollections" is misplaced and defies common sense. AMMO/Smith Br. at 9-10; Larson Br. at 8-9. CW1, besides reporting to Wagenhals and interacting with both Wagenhals and Larson *daily*, provided specific details about Larson's role as an illicit officer of the Company. For example, CW1 explained details of the Merger negotiations involving Larson which derived from his own personal involvement and could only be known if he was there. ¶¶40-41. Other Defendants' challenges regarding whether the witnesses regularly interacted with the individual defendants likewise fail.[26] AMMO/Smith Br. at 9-10; Wiley Br. at 13. All CWs who provide accounts regarding Larson's involvement with the Company either reported to Wagenhals (CW1) or were one level down in the organization from reporting to a named Defendant. ¶¶40-44. Moreover, Wagenhals' attempt to downplay CW1's account by questioning why the Complaint does not plead how Wagenhals came to interpret the SEC Consent Decree is not relevant. Wagenhals Br. at 9-10. Plaintiffs are not required to plead all facts that Defendants may find relevant. *See Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1250-51 (10th Cir. 2022) (holding that courts need not evaluate defendants' hypotheticals to analyze sufficiency).

---

[25] Larson is incorrect that CWs must overlap with a defendant in time period to be credited. *See* Larson Br. at 9. *See NVIDIA*, 81 F.4th at 940 (scienter analysis hinged on the account of a former employee who left during the Class Period); *Quality Sys.*, 865 F.3d at 1145-46 (crediting a former employee who left the defendant company more than a year before the class period, finding scienter and reversing dismissal); *see also Forescout*, 63 F.4th at 773-74 (reversing dismissal and crediting the accounts of several former employees from before the class period). In any case, his point has no relevance to analysis as to his scienter because he is attacking the accounts of two witnesses (CW6 and CW7) who do not discuss the allegations as to Larson.

[26] These allegations that show specific interactions with Larson and Wagenhals from the CWs are unlike those in *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 980 (N.D. Cal. 2015), where the CWs all either did not have any reference to the defendant CFOs or were not employed during the relevant time period, rendering their accounts "office gossip."

Further, AMMO/Smith's argument that CWs must interact with individual defendants violates controlling authority. For example, *NVIDIA* credited a former employee who, as the dissent noted, never personally interacted with the individual defendant, was five levels removed from the defendant in the hierarchy, and resided nearly in different countries. *NVIDIA*, 81 F.4th at 938, 958. In *Forescout*, the Ninth Circuit reversed dismissal even though virtually all the former employees did not talk to or hear from the defendants. 63 F.4th at 772-74. In *Quality Sys*., 865 F.3d at 1144-45, the Ninth Circuit credited numerous accounts of CWs who did not interact with any defendant. *See also Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp*., 58 F.4th 195, 216 n.18 (5th Cir. 2023) (discrediting the same argument as inconsistent with the PSLRA); *Ezzes v. Vintage Wine Ests., Inc.*, No. 2:22-CV-01915-GMN-DJA, 2024 WL 5689745, at *5 (D. Nev. Dec. 13, 2024) (even though most CWs did not personally interact with individual defendants, they were credited because they described the CW's job responsibilities, how the problem manifested, as corroborated by other witnesses demonstrated the defendants "exposure to factual information within the company.").[27]

***CW accounts regarding the Manitowoc Facility and production problems:*** Properly alleged CW accounts also show that the statements regarding the Manitowoc Facility and the Company's manufacturing were made with reckless disregard for their truth. For example, CW1 reported that AMMO just gave the contract to Larson's brother

---

[27] Similarly, Wagenhals' and Wiley's attempts to brush off these allegations as "hearsay", but the law is clear that Court "may properly take account of the alleged testimony of CW[s] even though some of [their] testimony is based on hearsay and indirect knowledge." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc*., 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020). Defendants AMMO/Smith's and Wagenhals' reliance on *Talphera* is misplaced. AMMO/Smith Br. at 10; Wagenhals Br. at 10. There, the Ninth Circuit held that a marketing slogan taken in context would not mislead a reasonable investor, and that the account of the witness who did interact with the defendants was dismissed as a mere difference of opinion. *Sneed v. Talphera, Inc*., 147 F.4th 1123, 1134 (9th Cir. 2025). Here, the Defendants admitted at the end of the Class Period that their related-party statements during the Class Period were false. Thus, there is no corporate disagreement here. Instead, the Complaint alleges Wagenhals, Wiley, Larson, and the other senior officers understood Larson was in violation of his Consent Decree and deliberately tried to hide it. Nor can a kickback scheme such as is alleged here be a mere "difference of opinion." *Id.*

without competitive bidding. ¶54. CW1 also explained that the Company's actual production capacity at the time of the Merger was only 300 million rounds of ammunition, not the 750 million as publicly claimed. *Id*. CW1 knew this from reports from the VP of Operations, James Mann. *Id.* Larson received these same updates from Mann. *Id.* CW1 also reported that manufacturing would be halted for several weeks to transport equipment from Payson, Arizona to Wisconsin and set it up, which alone would take at least four to six weeks. *Id*. CW1 also explained that shortages of gunpowder, projectiles, machines, and primer, which rendered ramping up production to the touted rates impossible. *Id*.

CW5, a manufacturing engineer at the Manitowoc Facility who reported to Tyler Terp, who reported to Mann, corroborated the manufacturing downtime reported by CW1. CW5 stated that most machines failed during CW5's tenure at the Company, and that the new plant lacked operators with the skills to fix issues, which led to production delays. ¶55.

CW6 was in an ideal position to see the production problems reported. CW6 oversaw ammunition press operations, production output and workflow, as well as conducted tool inspections on broken equipment. ¶56. CW6 corroborated that the Manitowoc Facility was plagued by chronic and unresolved machine problems. *Id*. CW5 reported that all equipment failures and redundancies were tracked through a software tool called Plex. ¶55. CW6, CW7 and CW8 all corroborated that AMMO used Plex to track production and efficiency. ¶¶57, 59, 60.

The Plex reports likewise would have reflected the rifle press breakdowns that CW6 corroborated were a chronic issue at the Manitowoc Facility. ¶56. CW6 reported that output regularly dropped by more than half of reported capacity, as machines frequently failed. CW6 reported that while machines could theoretically produce 200 parts per minute, they could only reliably produce 60 parts per minute due to machine failures that occurred when the machines were operating at maximum speed. *Id.* CW6 reported that millions of brass parts were discarded due to poor output. *Id.*

CW6 met with Smith during his employment, and stated that CW6 reported seeing Smith and other C-Suite executives at the Manitowoc Facility, where they could observe

the breakdowns and failure to meet production quotas firsthand. ¶57. CW6 also reported that CW6's boss, Mann, said that Wiley admitted that the Company was not able to meet the Company's transition timeline in 2022. ¶56.

Defendants AMMO and Smith wrongly characterize these well-pled allegations as "vague." AMMO/Smith Br. at 11. But, each CW who worked out of the Manitowoc Facility either reported directly to Mann, who managed the facility, or was one level of reporting below. Mann reported to the CEO (Wagenhals, then Smith). *See* ¶56. Each CW, and each Individual Defendant, was in a position to know the disputed information. CW4 reported directly the VP of Sales and Marketing, who reported to the CEO and Larson. ¶¶40, 44. CW4's knowledge comes from working out of the Company's headquarters and working with the most senior level executives at the Company. ¶44. The extensive corroboration of severe Manitowoc Facility production delays and that the Company was forced to resort to secretly selling ammunition purchased from overseas supports scienter, which is corroborated by CW4, CW5, CW6, and CW8. ¶¶55, 58, 60, 61; *see In re Daou Sys., Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005) (crediting CW accounts corroborating details); *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 732 (N.D. Cal. 2022) (crediting the accounts of nine former employees, who present overlapping and corroborative information).

AMMO and Smith's attempt to discount these allegations as "merely… business issues the Company faced at the Manitowoc Facility" (AMMO/Smith Br. at 12-13) misses the point: the securities laws require truthfulness about all material facts once a defendant speaks on that issue, including "business issues." Moreover, Smith himself acknowledged the issues were a "big deal." ¶131.[28]

---

[28] *Weiss v. Amkor Tech. Inc*., 527 F. Supp. 2d 938, 954-55 (D. Ariz. 2007) and *Wenger v. Lumisys*, 2 F. Supp. 2d 1231, 1247 (N.D. Cal. 1998) did not contain allegations from CWs contradicting the public statements, whereas here the CWs show that the 1 billion production capacity statements were false. *See, e.g*., ¶¶54, 56, 561.

### e.  Insider Sales Support an Inference of Scienter

Likewise, while no insider sales are required to show scienter, the Complaint pleads insider sales that bolster the inference. *See Tellabs,* 551 U.S. at 325; *Matrixx Initiatives*, 563 U.S. at 48. Plaintiffs pled that Wagenhals reaped more than $1 million in suspicious insider sales in the one-month period from February 15 to March 4, 2024. ¶162. Suspiciousness touches on three factors: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *In re Quality Sys.*, 865 F.3d at 1146; *Oracle Corp.*, 380 F.3d at 1232. Here, all three factors confirm that Wagenhals' stock dump was suspicious.

*First*, Wagenhals sold more than $1 million in stock, more than twice his base salary in 2024. ¶162; SEC Compl. ¶176. Also, Wagenhals began his sales less than one week after the company touted its "impeccable" financial statement and the "significant opportunities" ahead. ¶133. Courts have held insider sales made in similar circumstances were suspicious. *See In re Quality Sys.*, 865 F.3d at 1146 (sale made within one month of company reaffirming earnings guidance held to be suspicious); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 646 (E.D. Va. 2000) (insider sales that took place within an 8-day period immediately following an allegedly misleading announcement suspicious); *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 173 (S.D.N.Y. 2021) ("sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter"); *In re Guilford Mills, Inc. Sec. Litig.*, No. 98 Civ. 7739 (CLB), 1999 WL 33248953, at *4 (S.D.N.Y. July 21, 1999) (defendant's sale of 10% of his shares for over $1 million supported inference of scienter).

*Second*, Wagenhals had not voluntarily sold any stock before the suspicious sales since at least March 2020, when he filed an initial insider holdings report. This Circuit has held that a first stock sale in a similar length of time suspicious. *See Oracle Corp.*, 380 F.3d at 1232 (first stock sale of 2.1% of the insider's holdings in five years held to be suspicious).

### f.  Motive, While Not Required, is Alleged

The scienter element can be satisfied by alleging a personal financial motive – that the insiders stand to gain a substantial profit by engaging in deceptive behavior. *See Prodanova*, 993 F.3d at 1107; *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (motive existed when defendant "benefitted in [a] concrete and personal way from the purported fraud."). As discussed above, the Complaint alleges that Wagenhals benefited by selling stock with insider knowledge at artificially inflated prices. *Supra* at Section II.B.2.e.

The Complaint also alleges "concrete and personal" benefits to Larson. Larson and his family benefited from: (1) the repayment plan that involved AMMO gifting 200,000 shares to Larson's immediate family, ¶151; (2) the self-dealing kickback scheme where Larson negotiated on behalf of AMMO to enter into contract with a third-party service provider controlled by Larson, which then in turn paid Larson $814,863 as a sales commission, *Id.*, (*see also* SEC Compl. ¶¶54-59); and (3) AMMO's windfall $25 million construction project that was awarded without competitive bidding or board approval to Larson Building, a company wholly owned by Larson's brother. ¶¶53-54, SEC Compl. ¶¶60-64. This is more than enough to show Larson's scienter. *See In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 416 F. Supp. 2d 779, 790-91 (N.D. Cal. 2005) (holding substantial motive existed when the defendant benefited from undisclosed related-party transaction); *S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 389 (S.D.N.Y. 2014) (when "a corporate insider's family member is the" beneficiary of a fraudulent scheme, that can "constitute[ ] a sufficiently concrete and personal benefit to infer motive."); *In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11 CIV. 2279 CM, 2012 WL 3758085, at *11 (S.D.N.Y. Aug. 29, 2012) (where a defendant issued misleading statements and then partook in a series of undisclosed related-party transactions, "the

inference that [the defendant] did so with fraudulent intent is not merely strong, it is inescapable.").[29]

The allegations of motive as to other Individual Defendants are also strong. It is simply implausible that Wiley, Smith, and Flynn did not know Larson's related-party transaction should be disclosed, especially given their "high positions within the company" and that AMMO has disclosed other related-party transactions "on other occasions." *See Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 713 (N.D. Tex. 2008); ¶¶63, 69, 139 (disclosures of other related-party transactions). Each was motivated to conceal the unlawful activity in which they were complicit, and to conceal that Larson was functioning as a banned individual and the illicit kickback scheme. *See China Ne. Petroleum.*, 27 F. Supp. 3d at 389 (finding plaintiffs' alleged motive where they alleged defendants sought to conceal unlawful activity).

### 3.   **Plaintiffs Plead Loss Causation**

Loss causation "is a matter of proof at trial and [generally] not to be decided on a Rule 12(b)(6) motion to dismiss." *Gilead*, 536 F.3d at 1057. The Supreme Court emphasizes that pleading loss causation in securities fraud cases is not "burdensome" and requires only that a plaintiff "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 338 (2005). Similarly, the Ninth Circuit explains that a plaintiff need only give notice of their loss causation theory and "provide the court some assurance that the theory has a basis in fact." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 793-94 (9th Cir. 2020).

---

[29] Larson's argument downplaying his motivation as limited to concealing his base salary omits that he was motivated to conceal the related-party payments and kickbacks, and motivated to be able to continue to function as a banned officer. *See* Larson Br. at 7-8. Larson's citation to *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1192 (N.D. Cal. 2021) is not on point, as it merely concerned the unremarkable case where generally a motivation for officers to be compensated is not sufficient to raise an inference of scienter.

Plaintiffs' Complaint does just that. It indicates each of the events that Plaintiffs contend were corrective, explains why, and describes the resulting share price loss for each event:

| Date | Corrective Event | Concealed information revealed / Misrepresentations corrected | Resulting stock price drop alleged (next trading day) |
|---|---|---|---|
| November 14, 2022 | AMMO admits production problems at Manitowoc Facility (¶¶100-02) | Informs the market that the statements about Manitowoc Facility "day one" capacity were false and that there were substantial operational deficiencies at that facility. | Dropped 25.8% in reaction and dropped another 5.6% the following trading day as the market continued to absorb the news (¶¶7, 103) |
| February 14, 2023 | AMMO admits that results were hurt by problems within its Ammunition Segment (¶108) | Informs the market that the production problems were even greater than initially revealed. | Declined by over 12.8% (¶¶8, 108) |
| May 3, 2023 | Urvan's Verified Complaint is made public (*i.e.*, the Merger Complaint) (¶111) | Its allegations informed investors that at least one insider believed that Larson was illegally serving as a company officer in violation of his SEC ban, although the Company denied. Also informed investors that overall capacity of the Manitowoc Facility was lower than touted. | Dropped 4.2% (¶¶9, 111) |
| November 9, 2023 | Company attributes miss largely to "press failures at the Manitowoc Facility" (¶¶130-31) | Informed investors of concealed manufacturing problems at the Manitowoc Facility, including the breakdown of the "big deal" rifle press that was known internally since June 2023 but concealed. | Dropped 13.1% (¶¶10, 132) |
| August 8, 2024 | Company attributes miss in part to "production inefficiencies" which analysts attribute to "key equipment being down" (¶141) | Informed investors of continued production problems at Manitowoc Facility. | Declined by over 6.7% (¶¶11, 142) |
| September 24, 2024 | Announced Rob Wiley's resignation and independent board investigation into related-party transactions (¶143) | First Company admission that there may have been some incomplete related-party transaction disclosures. | Declined by over 5.2% (¶¶12, 144) |

| May 20, 2025 | Company admits its prior filings were materially false because they concealed related-party transactions, Larson's role, and his compensation (¶¶145-48) | Informed investors that the Company agreed it had illegally allowed Larson to operate as an executive officer, informed investors that Larson had taken kickbacks in connection with Company contracts, and informed investors about massive illicit compensation to Larson. | Declined by over 8.2% (¶149) |

Courts have consistently held that pleading such partial correctives in this manner is appropriate. *See Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019) (recognizing three partial disclosures on aircraft maintenance issues); *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 875 (W.D. Wash. 2022) (holding loss causation sufficiently alleged when a resultant stock drop accompanied each partial disclosure). This is particularly true where the Company denies the truth of a disclosure by another, such as when AMMO denied the allegations in the Merger Complaint, or where they avoid a more severe drop by continuing to make misrepresentations to investors. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173 (C.D. Cal. 2008) ("[T]his is a case where there was a series of partial corrective disclosures and corrective disclosures coupled with continued misrepresentations to blunt the effect of the corrections.").

*In re Oracle Corp. Sec. Litig.*, was a summary judgment case which had nothing to do with pleading standards. For that reason alone, it has no weight here. 627 F.3d 376, 393 (9th Cir. 2010). Additionally, unlike *Oracle*, the corrective events alleged here directly reflect the revelation and/or materialization of concealed risks, including Larson's illegal role at AMMO, the concealed Larson related-party transactions and compensation, and production shortfalls stemming from concealed Manitowoc Facility deficiencies. ¶¶100-02, 108, 111, 130-31, 141, 143, 145-48. Thus, unlike *Oracle*, the Complaint here alleges that "the market…learn[ed] of" the allegedly fraudulent practices "and reacted to those particular practices themselves" – not simply to bad news about a company. 627 F.3d at 392. And, unlike *Oracle* where all admissible evidence tied the stock drop to economic

uncertainty surrounding the dotcom crash, here there is no evidence of any alternate causation. Moreover, Courts have repeatedly held that pleading that a stock fell upon the revelation of an earnings miss tied to the consequence of fraud, as here, is enough at this stage. *Garbaccio v. Starbucks Corp.*, No. 2:24-CV-01362-JHC, 2025 WL 3228275, at \*23 (W.D. Wash. Nov. 19, 2025) (citing *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018)); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 887 (N.D. Cal. 2023) (similar).

*Irving v. Firemen's Relief & Ret. Fund v. Uber Tech., Inc.*, 998 F.3d 397 (9th Cir. 2020) did not even involve a public company, a stock price drop, or a federal securities claim. It has no bearing on this case and never should have been cited by Defendants. Instead, *Irving* involved changes in the amount that venture capital firms estimated for the total corporate value of then-private Uber, the claims failed because none of those changes immediately followed a corrective event and none were attributed to any particular concealed information. This case involves the exact opposite scenario in every respect: a public company, with stock price drops immediately following public disclosures. *See*, *generally*, table at 57-58 *supra.* Moreover, here each alleged partial corrective disclosure specifically countered prior misstatements. *See id*.; *see also*, *e.g.*, ¶¶101-02 (connecting stock drop to Manitowoc Facility production capacity, which contradicts claim made in ¶98); ¶111 (revealing new information that Larson served as *de facto* CEO and CFO, in contradiction to AMMO's executive officer disclosure (¶¶46, 63, 65, 69, 71, 91), and Manitowoc Facility had far less production capacity than previously touted to investors (¶¶98, 104, 109)); ¶131 (Smith admitted that the broken press affected between 90-120-million in casing capacity (¶¶98, 104, 109, 120)); ¶141 (analyst related soft sales to "key equipment being down during the period" (¶¶98, 104, 109, 120, 127, 133)).

*In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d at 792 held that disclosure of information in a lawsuit, as Urvan's lawsuit did here, can establish loss causation. That it also held with respect to a different disclosure that an anonymous article repeating well-known information will not suffice is of no consequence. The corrective disclosures here

each involved gradual disclosure of new information, *see* table at 57-58, not repetition of already-accepted fact.[30]

Nor are Defendants' remaining loss causation arguments colorable. While certain Defendants assert that over time AMMO's price remained "largely flat" they cannot deny that it in fact went down, and did so in a statistically significant manner after the alleged corrective disclosures. *See* table, at 57-58 (quantifying significant drops following each alleged drop). And the argument of some that the Company's investigation cannot serve as a corrective event violates the controlling authority. Courts have held that "announcement of an investigation can 'form the basis for a viable loss causation theory' if the complaint also alleges a subsequent corrective disclosure by the defendant." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016); *see Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 604 (N.D. Cal. 2019) (similar). Here, the Plaintiffs pled exactly that. ¶143 (independent investigation of disclosure regarding "all executive officers, members of management, and potential related party transactions") that culminated in Company admissions of material wrongdoing, directly tied to the concealed information, ¶¶145-48 (disclosing Larson and related-party transactions concerning Larson and other AMMO individuals, admitting weakness in internal controls).

The argument from some Defendants that the investigation announcement or restatement was duplicative is likewise specious. *See* AMMO/Smith Br. at 19-20. The Merger Complaint allegations were less detailed, unproved, and challenged as untrue at the time by the Company, whereas, the announcement of investigation was the Company's first admission of potential related-party problems, and the restatement confirmed and detailed those problems. *See CVB Fin. Corp.*, 811 F.3d at 1210-11 (holding investigation and company admission both correctives as each of the contemporaneous stock drop "reflected,

---

[30] Wiley's reliance on *World Surveillance Grp. Inc. v. La Jolla Cove Invs., Inc.* is misplaced as the cited section was not about loss causation but about the Court's holding that a breach of contract claim did not give rise to a § 10(b) claim. 66 F. Supp. 3d 1233, 1237-38 (N.D. Cal. 2014); *cf. In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d at 789 (loss causation is about whether "defendant's wrongful conduct caused the plaintiff's injury.").

at least in part, the market's concerns" about the alleged misstatement); *see also Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1106 (N.D. Cal. 2020) (holding both third-party report and later company confirmation with more specific information were proper corrective disclosures). Further, the Merger Complaint disclosed new information about Larson's role at AMMO and production issues at Manitowoc Facility but did not disclose Larson's kickbacks or the related-party transactions where a family member was given 200,000 shares, and some additional production issues at Manitowoc Facility, including the press issues, had not fully materialized in May 2023. Therefore, the Merger Complaint could only possibly be a partial corrective disclosure, not identical to either earlier or later corrective disclosures.

### C. Plaintiffs Plead a Scheme Liability Claim

The SEC has already found that AMMO, Wagenhals, Wiley and Larson, at least, engaged in the fraudulent scheme alleged here. *See*, *e.g.*, SEC Order Making Findings at ¶¶14-20, 22-29. AMMO has consented to the entry of these findings. *Id.* at Section II ("Respondent consents to the entry of this Order … Making Findings"). A separate civil enforcement action names Wagenhals, Wiley and Larson for their respective roles in the scheme. *See* SEC Compl. ¶146 (stating, *inter alia*, that the deceptive conduct included "a scheme by Wagenhals and Wiley to conceal Larson's senior executive role and disciplinary history…a scheme by Larson to receive kickbacks.").

The Complaint's scheme liability claim is consistent with SEC findings and clearly fits the broad definition of scheme liability under Section 10(b) and Rule 10b-5(a) and (c). As the Supreme Court emphasizes, such liability claims "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). That stems from the broad language of Rule 10b-5: Rule 10b-5(a) and (c) prohibit "employ[ing] any device, scheme, or artifice to defraud" or "engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit" upon an investor. 17 CFR § 240.10b-5.

Reckless or intentional "dissemination of false or misleading statements" alone can give rise to scheme liability, even without additional conduct. *Lorenzo*, 587 U.S. at 78-79.

As a result, "there is 'considerable overlap' between the subsections of Rule 10b-5, and scheme liability under (a) and (c) can be based on a scheme to take advantage of misleading statements—even while subsection (b) speaks to the actual making of such statements." *In re Vaxart, Inc.*, No. 20-CV-05949-VC, 2023 WL 3637093, at \*3 (N.D. Cal. May 25, 2023) (quoting *Lorenzo*).

As Defendants acknowledge, the scheme needs only be pled in accordance with Rule 9(b). *See*, *e.g.*, Flynn Br. at 16 n.8; *see also Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, No. CV158574PSGMRWX, 2016 WL 6782768, at \*14 (C.D. Cal. Aug. 9, 2016). "[A]llegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *Galena Biopharma*, 117 F. Supp. 3d at 1193 (citation omitted). The Complaint does so. *See*, *e.g.*, ¶¶5, 38-40, 42-44, 63-74, 78, 89-93, 112-13, 146, 151, 154. Only scienter is subject to the PSLRA's heightened pleading requirements, and even that requires no "smoking-gun." *Tellabs*, 551 U.S. at 324.

The Complaint's scheme liability claim easily meets all applicable pleading requirements. Count I of the Complaint alleges a fraudulent scheme to: (a) conceal that Larson was operating as the Company's *de facto* co-CEO and CFO, despite being banned by the SEC from holding such roles at any public company as a result of prior fraud by him; (b) conceal that third-party contractors of the Company gave kickbacks to Larson; (c) conceal related-party transactions between the Company and Larson; and (d) pay Larson one of AMMO's highest executive salaries while excluding the same from executive compensation tables (¶48). ¶¶184-92. The Complaint also specifies each Individual Defendant's acts in furtherance of the scheme:

- **Larson:** Accepted secret kickbacks from third-parties (*e.g.,* ¶151), accepted compensation for his family members from the Company through undisclosed related-party transactions (¶151), secretly operated as an executive officer of AMMO in violation of his SEC ban (¶¶146, 154) including by negotiating key acquisitions (¶¶5,38) and controlling AMMO's titular C-level executives (¶40).

**Wagenhals:** Held himself out as the Company's sole CEO through July 2023, concealing that Larson was then actually functioning as co-CEO and CFO (¶¶22-23); ensured that Larson operated as and was treated as an executive officer even though the SEC ban prohibited from serving as such (¶¶38, 40), including by sharing an office with him and jointly operating the Company with him (¶¶42-44); by signing and certifying SEC filings to disseminate false and misleading information to investors concerning Larson, related-party transactions, and kickback schemes (¶¶63-68, 69-74, 89-93, 112-13); and by falsely describing Wiley in a conference call as the CFO when it fact Larson served that role and Wiley was his "puppet" (¶¶78-79, 154).[31]

- **Wiley:** Held himself out as the Company's sole CFO through September 2024, concealing that Larson was then actually functioning in that role and that he was operating under Larson's command, or as a CW put it, as his "puppet" (¶¶22-23, 40, 42-44, 154); ensured that Larson operated as and was treated as an executive officer even though the SEC ban prohibited from serving as such (¶¶38, 40), including by signing and certifying SEC filings to disseminate false and misleading information to investors concerning Larson, related-party transactions, and kickback schemes (¶¶63-74, 89-93, 112-13, 116-19, 135-40). Wiley also concealed the related-party dealings with Larson Building when summarizing the construction in investor calls (¶¶87-88).

- **Smith:** Took action to conceal the Company's dealings with Larson and kickback scheme, including by signing and certifying SEC filings to disseminate false and misleading information to investors concerning Larson, related-party transactions, and kickback schemes (¶¶116-19, 135-36, 139-40), and allowed the Company under his watch to continue to employ Larson as a shadow executive in violation of his SEC ban (¶¶126-27).

- **Flynn:** So significantly aided Larson in circumventing his SEC officer ban by helping him serve as a shadow co-CEO/CFO that a merger partner called Flynn, Larson and Wagenhals the "criminal triumvirate" (¶40), including by serving as Larson's assistant in merger negotiations and forcing a subordinate to check on a drunk Larson so that merger negotiations would not proceed without him (¶41), and

---

[31] The SEC Order Making Findings also made additional findings about "factual details which may support the Plaintiffs' allegations in the" Complaint regarding scheme liability. *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 522 (D. Md. 2021). For example, the SEC found that "Wagenhals and Wiley repeatedly made false representations to AMMO's external auditors that Larson was not employed at the company and would not return to the company as an employee." *See* SEC Order Making Findings at ¶19. Though these new details are not necessary to adequately allege scheme liability, they further demonstrate the plausibility of the scheme alleged and show that such claims will likely be proved at trial.

making oral statements to conceal related-party dealings with Larson Building in investor calls (¶¶106-07).

Each of these acts is properly imputed to AMMO. For Rule 10b-5 actions, the Ninth Circuit has "adopted the general rule of imputation and held that a corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who has actual or apparent authority.'" *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015). Likewise, the "scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority." *Id.* (internal quotation and citation omitted).

Defendants devote little of their five briefs to Plaintiffs' scheme claim, and the sparse argument they do submit misstates the law. For example, AMMO, Smith and Wiley argue that scheme liability must be premised on conduct, not misrepresentations and omissions. *See* AMMO/Smith Br. at 22; Wiley Br. at 17. This argument has squarely been rejected by the Supreme Court. *See*, *e.g.*, *Vaxart*, 2023 WL 3637093, at *3 ("The Supreme Court has rejected the argument that these provisions are 'violated only when conduct other than misstatements is involved.'"); *SEC v. Prakash*, 718 F. Supp. 3d 1098, 1108 (N.D. Cal. 2024) (same); *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 2024 WL 863709, at *8 (D. Ariz. Feb. 29, 2024) (same). And, the Complaint *does* allege conduct for each Individual Defendant. *See supra* at 62-63.

Wagenhals takes even more liberties. He argues that investors knew the truth about Larson Building based on a supposed sign on the building and Manitowoc municipal permits that are not alleged or part of any request for judicial notice. *See* Wagenhals Br. at 7. This argument has no place in a Rule 12(b)(6) motion. *Khoja*, 899 F.3d at 998 ("Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)"). Worse, it is factually untrue. Should it be raised at trial, Plaintiffs will demonstrate that *none* of the referenced documents

actually informed investors that Larson was an executive or that the construction contract was a related-party transaction. Moreover, they could never satisfy the Ninth Circuit standard for truth-on-the-market, which requires that any corrective information be conveyed "with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir. 1992).

Wagenhals' attempt to mischaracterize Complaint allegations as "hindsight speculation that Larson should be deemed an Ammo officer" fares even worse. *See* Wagenhals Br. at 7. Whether Wagenhals likes it or not, AMMO expressly admitted in its May 20, 2025 Form 10/K-A that Larson was, in fact, an executive officer. ¶146.

### D. Wagenhals, Larson, and Smith Were Control Persons

Both through their roles as well as through their actions, Wagenhals, Larson, and Smith controlled AMMO. Each served as a titular CEO or shadow co-CEO, and each directed the policy of the Company. *See, e.g.*, ¶¶203-08.

Section 20(a) control person claims are subject only to the notice pleading requirements of Rule 8. *Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 970 (D. Ariz. 2010). The allegations of the Complaint easily meet the relaxed standards for pleading control person liability. To make a *prima facie* case under the Section 20(a), "a plaintiff must prove '(1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator." *In re Allstate Life Ins. Co. Litig.*, No. CV-09-08162-PHX-GMS, 2013 WL 789106, at *3 (D. Ariz. Mar. 1, 2013) (quoting *No. 84 Empl.-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003)). This "two-pronged test . . . should be construed liberally and flexibly." *Allstate*, 2013 WL 789106, at *3 (quoting *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987), *overruled on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990)). Also, "[t]he plaintiff need not prove that the defendant had scienter or that he culpably

participated in the primary violation to establish control." *Allstate*, 2013 WL 789106, at *3.

Complaint allegations easily give Defendants notice of the nature of Plaintiffs' control person claim. Wagenhals, Larson, and Smith were the Company's CEOs. ¶22-24.[32] Wagenhals and Larson were also the Company's co-founders. ¶¶22-23. Wagenhals was AMMO's Executive Chairman, and Larson was its CFO. *Id.* Smith was also AMMO's President and COO. ¶24. Larson, and Wagenhals, were listed as "Key Employees" in the Merger Agreement. ¶38. In short, they were all C-Suite members.

Allegations of their activities, as well, confirm their status as control persons. After the Merger, Wagenhals would respond to Urvan that he needed to consult with Larson whenever an issue regarding AMMO's governance or operations came up. *Id*. That means that whatever Larson was officially titled, Larson, together with Wagenhals, oversaw corporate governance and operations. CW1[33] reported that Larson made financial decisions and drafted financial documents and releases for the Company. ¶40. CW2 stated that Larson and Wagenhals, as C-Suite members, shared an office and ran the Company together. *Id*. at 42. Wagenhals signed the 2020, 2021, 2022, 2023, and 2024 Forms 10-Ks and spoke on the 1Q 2022, 2Q 2022, and November 2022 earnings calls. ¶¶63, 69, 78, 80, 81, 83, 89, 104, 112, 135. Smith signed the 4Q 2023 Form 10-K, the 2023 and 2024 Forms 10-K/A, and the 2024 Form 10-K; was quoted in the August 2023 press release; spoke on the 4Q 2023, 2Q 2024 and 3Q 2024 earnings calls; and issued the July 2023 letter to shareholders. ¶¶114, 116, 124, 126, 133, 135, 139.

The allegations of Wagenhals, Larson, and Smith's roles and activities thus demonstrate "the traditional indicia of control," such as "having a prior lending relationship, owning stock in the target company, or having a seat on the board, as well as

---

[32] Larson was co-CEO and CFO in fact but not in name so as to be facially compliant with the Consent Decree. See the falsity section at II.B.1.a for a fuller discussion of Larson's *de facto* CEO status.

[33] See the falsity and scienter sections at II.B.2.d for a discussion on the sufficiency of CW reports.

the less structured and more fact-intensive accoutrements of power reflected in 'the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'" *Allstate*, 2013 WL 789106, at *3.

Wagenhals, Larson, and Smith contend that because the Complaint fails to plead the predicate violation, the control liability claim fails on the first prong. Wagenhals Br. at 15-16; Larson Br. at 11; and AMMO/Smith Br. at 21. For the reasons set forth in the falsity and scienter sections at Section II.B.1-2, the Complaint passes the first prong, and their contention falls.

Similarly, Larson erroneously argues that he cannot be liable as a control person for the period following his departure from the Company. Larson Br. at 12-13 (citing *Maverick Fund v. Comverse Tech.*, 801 F. Supp. 2d 41, 62 (E.D.N.Y. 2011), *Abdo v. Fitzsimmons*, 2017 WL 6994539, at *21 (N.D. Cal. Nov. 3, 2017), and *Allegiant Travel Co.*, 412 F. Supp. 1265. As *Maverick* qualifies, however, defendant officers cannot be liable as control persons for the period after they left the Company "*absent evidence that they continued to control [the company] after stepping down as officers.*" *Maverick*, 801 F. Supp. 2d at. Here, Larson continued to control the Company even after he stepped down as its officer at least into fiscal year 2024, as more fully set forth in the falsity section at II.B.1.a. Consequently, *Abdo* and *Brendon* are inapposite since there were no allegations in those cases that defendants carried on as shadow officers, like Larson did, after officially stepping down.

Larson also erroneously challenges the allegations of his control person status. Larson Br. at 12, n.2. Those arguments raise factual issues for trial. He cannot dispute that the allegations here give him notice of the basis for Plaintiffs' control person claim related to him. *In re Apollo Grp.*, No. CV-10-1735-PHX-JAT, 2011 WL 5101787, at *10-11 n.5 (D. Ariz. Oct. 27, 2011) does not hold otherwise.[34] As a threshold matter, *Apollo* analyzed

---

[34] Larson also cites *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.,* 218 F.R.D. 76, 78 (S.D.N.Y. 2003), another out-of-circuit decision, for the same proposition - that allegations from another lawsuit are unreliable. As addressed in note 20, *supra*, this argument is misplaced, and courts credit verified complaints, such as the one Urvan filed. *VEREIT Inc.*, 2016 WL 5858735, at *14 (D. Ariz. Oct. 3, 2016).

the sufficiency of allegations from other lawsuits for purposes of pleading scienter, *id.*, not control person liability, which is subject to a more relaxed pleading standard and is to be liberally construed as discussed at the outset of this section. Substantively, *Apollo* expressly recognized the reliability of facts from other lawsuits where those facts were independently verified. *Id.* Here, as detailed at length in the falsity section at II.B.1.a., Larson's controlling role in the Merger and the Company overall was based on several sources in addition to the Verified Merger Complaint.[35] Also, the same basis for distinguishing *Apollo* from the facts before the court in *Jackson* applies here. In *Jackson*, the court held that *Apollo* was inapposite noting that *Apollo* discredited allegations that were based on allegations in a second lawsuit where the plaintiffs in the second lawsuit had no first-hand knowledge of the facts underlying their allegations. *Jackson* then held that because the plaintiffs in the second lawsuit being relied upon in its case *did* have first-hand knowledge of the facts - inasmuch as they concerned actions that they themselves took or oversaw - the allegations in the second lawsuit could be considered. *Jackson v. Microchip Tech., Inc.*, No. CV-18-02914-PHX-JJT, 2020 WL 1170843, at *10 (D. Ariz. Mar. 11, 2020). Here, the Verified Merger Complaint was filed by Urvan, the person who himself negotiated the Merger, who clearly had first-hand knowledge of the facts underlying his allegations, including the dominant role played by Larson as driver of the Merger.

Indeed, against the background of the Consent Decree and Larson's shadow co-CEO and CFO role, attachment of control person liability to him would fulfill the very purpose of Section 20(a), which "is 'intended to prevent evasion of the law by organizing dummies who will undertake the actual things forbidden.'" *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d at 982 (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d at 1577).

---

[35] For the same reason, Larson's characterization of the Complaint as serving up boilerplate allegations of control that fall short of showing how Larson, as a mere VP, can exercise control over those of higher rank - is inaccurate. The Complaint abundantly particularizes how Larson could and did exercise control over the Company, served as co-CEO, and treated its titular CFO as his "puppet." *See, e.g.*, ¶¶35-44.

**III.     The Complaint's Allegations are Well-Pled**

Larson's attempt to mischaracterize the Complaint as a "shotgun pleading" is simply wrong and provides no escape from the clear, well-pled allegations against him. Larson Br. at 4-5. "Shotgun pleadings are pleadings that overwhelm defendants with an unclear mass of allegations and make it difficult or impossible for defendants to make informed responses to the plaintiff's allegations." *Physicians Care Alliance, LLC v. All Day Beauty, LLC*, No. 2:18-cv-2602, 2019 WL 176782, at *2 (D. Ariz. Jan. 10, 2019) (quoting *S.E.C. v. Bardman*, 216 F. Supp. 3d 1041, 1051 (N.D. Cal. 2016)). Contrary to Larson's assertions, "a complaint does not employ impermissible shotgun pleading just because it re-alleges by reference all of the factual paragraphs preceding the claims for relief." *Espinosa v. Bluemercury, Inc.*, No. 16-cv-07202-JST, 2017 WL 1079553, at *5 (N.D. Cal. Mar. 22, 2017); *see also Physicians Care Alliance*, at *2 (quoting *Espinosa*). "In order for a complaint to be considered a shotgun pleading, it must incorporate 'all or nearly all' of the previous allegations' and 'make[] no attempt to lay out which conduct constitutes the violation alleged.'" *Physicians Care Alliance*, 2019 WL 176782, at * 2 (quoting *S.E.C. v. Fraser*, No. CV-09-00443, 2010 WL 5776401, at *9 (D. Ariz. Jan. 28, 2010)) (emphasis in original).

The Complaint does no such thing:  Larson's specific actions related to the activities of AMMO, and the other Individual Defendants are set forth in detail in the factual portion of the Complaint. *See* ¶¶5, 30, 33-44, 49-50. Furthermore, a key portion of the allegations in the Complaint consist of statements made by AMMO, and the other Individual Defendants that either failed to disclose or deliberately misrepresented the nature and scope of Larson's activities in connection with AMMO. *See* ¶¶63-74, 77-80, 89-97, 111-17, 133-40, 143-44. Larson's conduct and the misstatements regarding Larson's conduct form a coordinated concert of action by AMMO and the Individual Defendants, and this conduct gives rise to the First Cause of Action in the Complaint. *See* ¶185. This level of detail and specificity regarding which actors (including Larson) did what actions and made which statements or omitted which information is the antithesis of a shotgun pleading. *Cf.*

*Sollberger v. Wachovia Sec., LLC*, No. SACV 09-0766AGANX, 2010 WL 2674456, at *4 (C.D. Cal. June 30, 2010) ("One common type of shotgun pleading comes in cases with multiple defendants where the plaintiff uses the omnibus term 'Defendants' throughout a complaint by grouping defendants together *without identifying what the particular defendants specifically did wrong*." (emphasis added)).[36]

Larson's authorities fail to support his mischaracterization. *Destfino v. Kennedy* found that an impermissible shotgun pleading where the structure of the complaint made it so "each defendant is accused of uttering each misstatement set out in the complaint." No. CV-F-8-1269, 2008 WL 4810770, at * 3 (E.D. Cal. Nov. 3, 2008). As set forth above, the particular acts of Larson are set forth in detail and in distinction to AMMO, Inc. and the other Individual Defendants. *Hughey v. Camacho* is similar to *Destifino*; there, plaintiff did not specify which of a host of paramedics and police officers were responsible for which violations alleged. No. 2:13-cv-2665, 2014 WL 5473184, at *4 (E.D. Cal. Oct. 23, 2014). Finally, *George v. Grossmont Cuyamaca Cmty. Coll. Dist. Bd. of Governors* found that the complaint constituted a shotgun pleading because it grouped together both factually distinct policies and factually distinct institutions and actors into a single set of allegations. No. 22-cv-0424, 2022 WL 17330467, at *16 (S.D. Cal. Nov. 29, 2022). Here, there is a singular set of activities that involve Larson as it relates to a single factual scenario involving the activities of AMMO.

---

[36] Larson asserts that "Plaintiffs also lump Mr. Larson in with all the other Defendants for their Count II Rule 10b-5(b) claim asserted against every Defendant but Mr. Larson." Larson Br. at 5. As made abundantly clear from Count II's heading, Larson is not included in that count, which is explicitly alleged against AMMO, Wagenhals, Smith, Wiley, and Flynn. ¶194. Moreover, Count II relates exclusively to *statements* made by AMMO and its public officers. As set forth clearly in the Complaint, Larson was not alleged to have made misleading public statements as an officer of the Company. Indeed, this is the gravamen of the allegations regarding Mr. Larson—that he was operating as an undisclosed "shadow" corporate officer while scheming to defraud the Company. There is no confusion as to the allegations against Mr. Larson in connection with Count II.

## CONCLUSION

For all of the above reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss in full, and advance this case to discovery. Should the Court find any part of the Complaint wanting in any respect, Plaintiffs respectfully would request leave to replead. *See*, *e.g.*, *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003) (leave to amend should be granted "with extreme liberality," especially in securities cases); *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (holding that leave to amend should be granted even without a formal request if there is any possibility to cure a pleading defect).

Dated: February 5, 2026

Respectfully Submitted,

*/s/ Brian P. O'Connell*

**POMERANTZ LLP**
Joshua B. Silverman (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
Jianan Jiang (*pro hac vice*)
10 S. LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com
boconnell@pomlaw.com
ajiang@pomlaw.com

*Co-Lead Counsel for Plaintiffs*

**BRONSTEIN GEWITZ & GROSSMAN LLC**
Peretz Bronstein (*pro hac vice*)
Michael Boyle (*pro hac vice*)
60 E 42nd St., Ste. 4600
New York, NY 10165
Tel: (212) 697-6484
peretz@bgandg.com
mboyle@bgandg.com
*Co-Lead Counsel for Plaintiffs*

**KELLER ROHRBACK LLP**
Gary A. Gotto (No. 007401)
3101 N Central Ave., Ste. 1400
Phoenix, AZ 85012-2600
Tel: (602) 230-6322
ggotto@kellerrohrback.com
*Liaison Counsel for Plaintiffs*

**<u>Certificate of Service</u>**

I hereby certify that on February 5, 2026 I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrations listed for this matter.


By: */s/ Brian P. O'Connell*