**Norton Rose Fulbright US LLP**
Laura Perlov (*pro hac vice*)
Laura.Perlov@nortonrosefulbright.com
Tel: (303) 801-2682
Fax: (303) 801-2777
K. Austin Hartley (*pro hac vice*)
Austin.Hartley@nortonrosefulbright.com
1225 Seventeenth Street, Suite 3050,
Denver, Colorado 80202, United States

Andrey Spektor (*pro hac vice*)
Andrey.Spektor@nortonrosefulbright.com
Tel: (212) 318-3130
Maryclaire Kennedy (*pro hac vice*)
Maryclaire.Kennedy@nortonrosefulbright.com
1301 Avenue of the Americas
New York, New York 10019


*Attorneys for Defendant Robert D. Wiley*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dmitry Cherches; Irene Zvagelsky; and Hideyoshi Delgado; Individually and on Behalf of All Others Similarly Situated, | Case No. CV-24-02619-PHX-DJH |
| Plaintiff, | **DEFENDANT WILEY'S REPLY IN SUPPORT OF MOTION TO DISMISS** |
| v. | |
| AMMO, Inc.; Fred W. Wagenhals; Christopher D. Larson; Jared R. Smith; and Robert D. Wiley, | |
| Defendant. | |

- 1 -

**TABLE OF CONTENTS**

Introduction and Summary ............................................................................................ 1

   I.   Plaintiffs Fail to Plead with Particularity Facts From Which Strong Inference of Scienter Can Be Drawn ................................................................................... 1

   II.  Outside Actions Add Nothing to the Plaintiffs' Allegations ................................... 6

   III. Mr. Wiley's Statements are not False, Actionable or Material ............................... 8

   IV. Plaintiffs Fail to Plead Scheme Liability as to Mr. Wiley ..................................... 12

   V.  Plaintiffs Fail to Plead Causation as to Mr. Wiley ................................................. 13

Conclusion ................................................................................................................... 14

**TABLE OF AUTHORITIES**

*Borteanu v. Nikola Corp.*, 2023 WL 1472852 (D. Ariz. Feb. 2, 2023)............................ 13

*Christian v. Mattel, Inc.*, 286 F.3d 1118 (9th Cir. 2002) ............................................... 8 n.5

*Espy v. J2 Glob., Inc.*, 99 F.4th 527 (9th Cir. 2024) ........................................................ 13

*In re Genius Brands Int'l, Inc. Sec. Litig.*, 2021 WL 12327975 (C.D. Cal. Aug. 30, 2021)
............................................................................................................................................ 13

*In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130 (9th Cir. 2017)............. 11

*In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152 (S.D.N.Y. 2012).............. 2

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397 (9th Cir. 2021)....
............................................................................................................................................ 13

*Lorenzo v. SEC*, 587 U.S. 71 (2019) .................................................................................. 13

*Madey v. Duke Univ.*, 336 F. Supp. 2d 583 (M.D.N.C. 2004) ............................................ 7

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) .................... 7

*Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020) ................................................... 3

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014) ...... 5

*Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097 (9th Cir. 2021) ................. 4–6

*Sneed v. Talphera, Inc.*, 147 F.4th 1123 (9th Cir. 2025).................................................... 12

*Sylebra Capital Partners Master Fund Ltd. v. Everbridge, Inc.*, 2023 WL 3549506 (C.D. Cal. May 9, 2023) ................................................................................................................. 5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .............................. 8 n.5

*United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012) ........................................................ 6

*Vanguard Specialized Funds v. VEREIT Inc.*, 2016 WL 5858735 (D. Ariz. Oct. 3, 2016)..
............................................................................................................................................ 7

*Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785 (N.D. Cal. 2019) ................................... 6

*Webb v. SolarCity Corp.*, 884 F.3d 844 (9th Cir. 2018) ...................................................... 5

*Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021)................................................... 10–11

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009)...................... 2, 10

Introduction and Summary

Plaintiffs still cannot decide if Rob Wiley was a knowing fraudster or a mindless "puppet." They double down on the Complaint's improper group pleading by lumping Mr. Wiley together with other defendants, and, in doing so, they fail to address four fundamental deficiencies:

*First,* Plaintiffs identify no allegation particularized to Mr. Wiley from which a strong inference of scienter could be drawn—no communications directed to him, no red-flag memoranda, no auditor warnings, and no contemporaneous admission establishing that any of his statements were knowingly or recklessly false. In addition to casting Mr. Wiley as Mr. Larson's lackey—a narrative that is irreconcilable with an intent to defraud—their theory of scienter is impermissibly built on titles and signatures.

*Second,* the only statements Plaintiffs (correctly) attribute to Mr. Wiley—taken from a single earnings call—were accurate and forward-looking. *Third,* Plaintiffs continue to recycle Mr. Wiley's alleged misstatements to claim that he schemed to defraud. Some factual overlap between the two claims is permissible, but simply recasting one claim as another is not. *Fourth*, Plaintiffs have failed to plead loss causation: they allege nothing specific to Mr. Wiley that would tie any purported misstatement to a subsequent corrective disclosure that proximately caused Plaintiffs' losses.

The Complaint's four-pronged failure is a fundamental problem with the allegations against Mr. Wiley. It should be dismissed with prejudice.[1]

I.    Plaintiffs Fail to Plead with Particularity Facts From Which a Strong Inference of Scienter Can Be Drawn

Plaintiffs' Opposition exposes the Complaint's central contradiction: they assert that Mr. Wiley defrauded investors with intent or deliberate recklessness while simultaneously alleging he was merely Christopher Larson's "puppet"—a figurehead who blindly signed

---

[1]    Pursuant to Federal Rule of Civil Procedure 10(c), Mr. Wiley joins the Ammo Defendants' concurrently filed reply memoranda.

whatever was placed before him. He cannot be both. A mindless subordinate lacks the *mens rea* to scheme against anyone. If, as Plaintiffs allege, Mr. Larson drafted SEC filings and had Mr. Wiley sign them, Compl. ¶ 40, then Mr. Wiley was at most negligent—not deliberately reckless—in signing those documents. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) ("even inexcusable negligence" is insufficient to establish scienter).

The lone case on which they rely to defend this push-pull narrative does nothing to support them. They cite *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163–64 (S.D.N.Y. 2012) for the proposition that "Wiley is liable for his false statements as the maker of his statements." Pl.'s Opp. to Defs.' Mot. to Dismiss ("Opp.") 43, Dkt. No. 73. But scienter was assumed in *Smith Barney*: the court there was addressing a different question—whether a defendant could be primarily liable for statements he made, rather than secondarily liable as a control person. *Smith Barney*, 884 F. Supp. 2d at 163. That case did not address, much less hold, that scienter could be inferred from contradictory allegations about a defendant's role. Even if Plaintiffs could show that Mr. Wiley "made" certain statements by signing or speaking, that goes only to the who-spoke element; it does not plead what Mr. Wiley knew and when, or why any misstatement was intentional or deliberately reckless. Plaintiffs cannot bootstrap scienter from maker status.

And none of the allegations to which Plaintiffs now point allege facts permitting a strong inference of scienter. Opp. 43–44 (citing Compl. ¶¶25, 81, 87, 101, 130, 165). Instead of pleading *any* particularized facts about what Mr. Wiley knew, these allegations rely on: (1) his title as CFO; (2) his signature on SEC filings; (3) group pleading lumping him with other defendants; and (4) the allegation that Mr. Larson controlled him. Titles, signatures and group pleading do not establish scienter. *See, e.g.*, *Zucco*, 552 F.3d at 981, 1003–04 (holding that Sarbanes-Oxley certifications "are not enough to create a strong inference of scienter").

- 2 -

Plaintiffs invoke an "actual knowledge" clause of a merger agreement that included Mr. Wiley, and they label him an "investor-facing financial officer." Opp. 43. But a contractual clause—drafted by M&A counsel—says nothing about Mr. Wiley's state of mind or intent. And being "investor-facing" is not the same as possessing actual knowledge of fraud, particularly where—if the allegations are to be taken as true—the individual occupying that role was a "puppet." Plaintiffs must plead the who/what/when/where of the contradictory information that Mr. Wiley actually received before he spoke or signed. They have not.

Plaintiffs again invoke Confidential Witnesses, and yet the most they can muster with respect to Mr. Wiley—who did not interact with any of them—is triple hearsay: CW6's reporting that Mann told him that Mr. Wiley "noted" to Mann that the Company could not meet a transition timeline. Opp. 10. But even this unreliable hearsay cuts against scienter: it suggests Mr. Wiley disclosed a problem, not that he concealed one. Without particularized facts showing what information reached Mr. Wiley and when, it is not possible to infer scienter.

Plaintiffs attempt to bolster scienter by pointing to Mr. Wiley's "abrupt resignation at the request of the Board" in September 2024, nearly eight months before the May 2025 "corrective" disclosures. Opp. 43. But, if anything, this timing cuts *against* scienter. If the Board believed Mr. Wiley was complicit in fraud, the more reasonable inference is that it would have disclosed that when announcing his departure. And its corrective statement would have been earlier and stronger. "The allegation does not resonate in common experience. And the PSLRA neither allows nor requires us to check our disbelief at the door." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020). A restatement, particularly one undertaken in the wake of an internal investigation and to align with the

exceptionally lenient regulatory resolution—no admissions, and no fines and penalties—does not retroactively establish Mr. Wiley's contemporaneous state of mind.[2]

Plaintiffs try to patch the scienter gap by invoking generalized "access" and "core operations" theories. The Ninth Circuit permits a limited "core operations" inference where specific admissions or particularized allegations show the executive actually had access to, or received, the contradictory information at the time. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021) (explaining that the "high burden" required by this disfavored theory is not met when complaint fails to plead particularized facts about the executives' personal knowledge or involvement in the operation).

Plaintiffs identify no report, meeting, email, dashboard, or contemporaneous communication to Mr. Wiley about the supposed undisclosed related-party dealings, kickbacks, or manufacturing shortfalls. Their CW accounts never place such information in Mr. Wiley's hands. Without those particulars, "core operations" cannot convert a job title and signatures into an inference of scienter, let alone a "strong" inference required by the PSLRA.[3]

---

[2]   The restatement addressed technical accounting issues, including inaccurate valuation for share-based compensation, inappropriate capitalization of certain share issuance costs, and inappropriate accounting for certain convertible notes and warrants. Outdoor Holding Company, Annual Report Amendment (10-K/A), (May 20, 2025), 4–5. These are precisely the types of complex accounting judgments that can give rise to good-faith errors or disagreements—not smoking-gun evidence of deliberate fraud. Indeed, AMMO disclosed material weaknesses in internal controls over financial reporting and that disclosure controls and procedures were not effective, and warned such weaknesses increase the risk of misstatement and could require future restatements. *Id.* at 11. The Company's own characterization frames the restatement in terms of "errors" and control deficiencies—language consistent with negligence or systemic control failures, not fraud. *Id.* at 11, 45.

[3]   Plaintiffs also refer to the Plex tracking system to support their claim that at least some of the defendants were on notice about production shortcomings, though they never assert that Mr. Wiley had access to it. *See* Opp. 9–11, 40, 52. They also do not claim that he attended facility tours, or received production updates from Mr. Mann; instead, they rely on impermissible group pleading and only allege Mr. Larson received such updates. Opp. 9, 40.

Plaintiffs make only a passing reference to Mr. Wiley when they allege that it would be "absurd" for the defendants not to have known about the core operations. Opp. 44–46. In "rare circumstances," scienter can be established "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Webb v. SolarCity Corp.*, 884 F.3d 844, 854–55, 857 (9th Cir. 2018) (observing that proof under this theory "is not easy"). But here, Plaintiffs allege that Mr. Wiley was not actually in management; he was just, we are told, Mr. Larson's frontperson. Plaintiffs also fail to plead that Mr. Wiley even had access to any of the underlying information, and access alone would, in any event, be insufficient to draw inferences of scienter. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (finding no absurdity where "there are no allegations regarding discussions of the reports' contents" underlying the alleged fraud, nothing beyond "mere access"); *accord Sylebra Capital Partners Master Fund Ltd v. Everbridge, Inc.,* 2023 WL 3549506, at *13 (C.D. Cal. May 9, 2023) (analyzing if particular executives tracked asserted false statements and noting that access by itself is insufficient). Under their own narrative it is not at all "absurd" to believe that Mr. Wiley did not have the involvement they claim should be assumed. *See, e.g.*, *Webb*, 884 F.3d at 857 (plaintiff failed to allege absurdity because it was not absurd "to think that [defendants] did not know that something was wrong").

Finally, Plaintiffs all but concede Mr. Wiley had no concrete, personal financial reason to commit the massive fraud they allege. They claim that the evidence of motive is "strong," but cannot point to a single relevant allegation for Mr. Wiley. Opp. 56. No stock sales. No secret compensation. No kickbacks. Instead, they recount the purported motive of Mr. Larson, Opp. 55, saying nothing about the modestly-paid Mr. Wiley.

Allegations of motive are not always required, but their complete absence is also relevant. *See, e.g.*, *Prodanova*, 993 F.3d at 1107 ("Generally, we expect that a financial motive for securities fraud will be clear . . . . But here, neither theory provides a clear

financial incentive") (internal citation omitted). The scienter analysis is a holistic one, and, given all the other deficiencies in scienter here, the gap in motive is decisive. *See, e.g., id.* at 1108 ("Only where a complaint otherwise asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness will we overlook the failure to allege a plausible motive."); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 818 (N.D. Cal. 2019) (dismissing complaint on scienter and observing that, "Plaintiffs assert that lack of motive 'is not dispositive of scienter.' That may be so, but the Court may properly consider motive as a factor in its holistic analysis of scienter.").

II.     Outside Actions Add Nothing to the Plaintiffs' Allegations

Throughout their opposition, Plaintiffs try to bolster their claims by citing three external touchpoints—an SEC Administrative Order issued on December 15, 2025, a recently filed SEC action, and a "verified" complaint filed by then-litigant, now-AMMO CEO Steven Urvan. Opp. 3, 6, 29, 41, 57, 68. But a negotiated, no-admit/no-deny SEC resolution with no fines or penalties against the Company, long after Mr. Wiley resigned, is not evidence of anything, and certainly not that Mr. Wiley acted with intent or deliberate recklessness years earlier. The resolution even stated that its findings were made pursuant to the Company's offer of settlement and "are not binding on any other person or entity in this or any other proceeding." ECF No. 73 at Ex. 2 n.1. Plaintiffs' reliance on the SEC's recently-filed complaint fares no better. Unresolved allegations are just that; they are not findings. *United States v. Bailey*, 696 F.3d 794, 801 (9th Cir. 2012) ("a[n SEC] complaint is merely an accusation of conduct and not, of course, proof that the conduct alleged occurred. . . . [It] is far from evidence of anything.").

The Urvan pleading—filed while Mr. Uvan was a litigant against AMMO, and replete with allegations not based on his personal knowledge—is similarly inapposite, and adds nothing to what Mr. Wiley knew, or when.

Although Plaintiffs make much of the pleading's "verified" label, the complaint relied extensively on secondhand sourcing, including "on information and belief" assertions

and attributions to statements made by other individuals, in separate proceedings.[4] That is materially different from verified complaints in which plaintiffs attest to facts within their personal knowledge, such as events witnessed firsthand. Cases on which Plaintiffs rely make that clear—only those types of pleadings are akin to affidavits. *See Madey v. Duke Univ.*, 336 F. Supp. 2d 583, 606–07 (M.D.N.C. 2004) (distinguishing between a verified complaint that is based on "personal knowledge" and one that is pled on "information and belief" and discounting complaint because the court could not determine which of the allegations were based on personal knowledge); Opp. 41 n. 20 (citing *Vanguard Specialized Funds v. VEREIT Inc.*, 2016 WL 5858735, at \*14 (D. Ariz. Oct. 3, 2016) ("The McAlister complaint was verified *and based on personal knowledge*, meaning it could have been used in the McAlister litigation as an affidavit opposing summary judgment.") (emphasis added); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at \*8 (S.D.N.Y. Sept. 30, 2016) (dismissing complaint and observing that "Plaintiffs' reliance on a confidential witness *with whom they personally communicated* is distinguishable from a lawyer's cribbing "uncorroborated allegations") (emphasis added).

At bottom, Plaintiffs are asking this Court to infer scienter from disputed, unadjudicated allegations, the Company's settlement with the SEC, and post-departure corrective disclosures—none of which supplies particularized facts about what Mr. Wiley knew or when he knew it. Plaintiffs' own allegations support the more cogent and compelling, nonculpable inference: the young, modestly-paid Mr. Wiley was a subordinate signatory, who was, at most, negligent, not deliberately reckless, when signing documents and passing along information.

---

[4] For example, its discussions of internal controls, insider sales, and executive roles rest heavily on accounts "according to Hanrahan," "additional employees," and similar formulations, rather than on what Mr. Urvan himself saw or knew. Verified Complaint, ¶¶ 88, 99, 101, 104, *Steven F. Urvan v. AMMO, Inc., et al*, Docket No. 2023-470 (Del. Ch. Apr 28, 2023) (Dkt. No. BL-1).

- 7 -

III.    Mr. Wiley's Statements are not False, Actionable or Material

Stripped of statements attributable to other speakers, the only remarks Plaintiffs correctly ascribed to Mr. Wiley are his June 29, 2022 responses to an analyst's forward-looking questions about ammunition capacity and future capital expenditures. Compl. ¶¶ 85, 87. Even if Plaintiffs could overcome scienter, they fail to show that Mr. Wiley's statements were false or actionable. Both statements are also protected by the safe harbor.

Although Plaintiffs claim there is a "factual dispute" over which transcript accurately attributed certain statements to Mr. Wiley, Opp. 28, n. 12, they withhold from the Court that there is a publicly-available audio definitively showing it is *not* Mr. Wiley making one of the statements they claim is his.[5] This omission casts doubt on whether they undertook a reasonable and competent inquiry in making the allegation and, worse, in defending it once alerted to its falsity—despite repeatedly touting their supposed "independent investigation" behind allegations they parrot from outside sources. *E.g.*, Opp. 60 & 41, n. 20.

The call opened with a clear disclaimer that cautioned listeners not to place undue reliance on forward-looking projections, emphasized inherent risks and uncertainties, and directed investors to the Company's Form 10-K and 10-Q risk factors.[6] In the first part of the June 29, 2022 call on which Plaintiffs seize, Mr. Wiley addressed a request to estimate

---

[5]   Our motion cited publicly-available transcripts that attributed to another person at least one statement that Plaintiffs claimed to have been made by Mr. Wiley. Def. Wiley's Mot. to Dismiss, 4, Dkt. No. 68. Plaintiffs, refusing to admit their neglect, cited a competing transcript, claiming that proper attribution is a "factual dispute." Opp. 28 n.12. Plaintiffs do not tell the Court that there is also a publicly-available audio that definitively refutes this allegation with respect to at least one statement, from the November 2021 earnings call, cited by Plaintiffs in Compl. ¶ 83. *See* Second Quarter 2022 Conference Call*, audio recording, at 17:34–17:39 (Mr. Wiley identifies himself), *compare* at 21:57–39:57 (portion attributed to Mr. Wiley by Plaintiffs that is a clearly different voice) https://s205.q4cdn.com/606590202/files/doc_events/2021/11/1/20211115-147010-ammoinc.mp3, This is a publicly verifiable fact reviewable by the Court because Plaintiffs reference the call in their Complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) (examining if the attorneys filing the complaint "conducted a reasonable and competent inquiry before signing and filing it").

[6]   Second Quarter 2022 Conference Call at 1:16–1:42.

("how soon") the increased manufacturing capacity ("get to the billion") once the facility opened.[7] Mr. Wiley framed his answer as a conditional expectation and goal rather than statements of existing fact—how to "think of" capacity "*once*" the equipment was "fully installed"; he identified a "goal" of reaching a one-billion-round annualized run rate by fiscal year-end. *Id*. at 23:38–23:55. Plaintiffs read these conditions out of his statement.

They also omit the context. On the same call, management reiterated that the legacy plant was at capacity, that the new facility was coming online "in a few weeks," and that the one-billion-round figure described the expected capacity "once fully operational." *Id*. at 4:18–4:43, 16:27–16:32. Management also cautioned that the gains would appear in the second half, and that the Company expected to "maintain current levels" until then, with no "big ramp in revenue" until equipment was installed. *Id*. at 21:45–22:25. Management added there was a "sliding scale on the move" because execution depended on how smoothly machines worked as they came online. *Id*. at 19:45–20:07. Viewed in this context, no reasonable investor could have believed Mr. Wiley was doing anything other than describing future output that was contingent on installation and ramp up. His forward-looking response was a good faith projection; it was not false—and certainly not materially so.[8]

Plaintiffs also fail to allege how Mr. Wiley would have known about the supposed truth about the manufacturing issues. They can only point to a triple hearsay account from CW6 described above, but even that statement was only about the Company's challenge in "meet[ing] the . . . transition timeline in 2022." Opp. 53 (citing Compl. ¶ 56). First, this

---

[7]  Fourth Quarter 2022 Conference Call, audio recording, at 23:00–23:36, https://outdoorholding.com/events-and-presentations/event-details/2022/AMMO-Inc-Fiscal-Fourth-Quarter-2022-Earnings-Call/default.aspx,.

[8]  The Company's later November 14, 2022 call then candidly attributed a revenue shortfall in part to longer-than-anticipated transition downtime and capacity constraints at the prior facility, and noted that import supplementation had tightened—consistent with the June 29 warnings and confirming the honesty of the forward-looking objective. *See* Exhibit 6 to Decl. of LisaMarie Collins, 4, Dkt. No. 65-4

- 9 -

"vague hearsay" is unreliable. *Zucco*, 552 F.3d at 996–97 (noting "vague hearsay" from CWs insufficient to establish scienter). Second, a general statement about meeting the "transition timeline" does not show that Mr. Wiley knew any part of his response—focused on projections "once" equipment was "fully installed"—was false.

Plaintiffs similarly fail in attacking Mr. Wiley's answer about future capital expenditures. They seize on two isolated phrases—"to this point" and "today"—and ask this Court to ignore everything else in the statement. Opp. 24-25.

The analyst's question that prompted Mr. Wiley's response was itself forward-looking: "[G]iven the facility is nearly online, how should we maybe be thinking about CapEx going forward?" Compl. ¶ 87. Mr. Wiley answered in kind, using the phrase "looking forward" twice. *Id.* He spoke of "production that's coming online." *Id.* He projected that all costs had been incurred *only if* the Company did not "add significantly more capacity from this point." *Id*. And he expressed anticipation of "the benefit that . . . comes from" the new facility—a clear reference to future returns. *Id.* These are textbook forward-looking statements: projections of future capital needs, expectations of future benefits, and assumptions about future capacity decisions, offered in direct response to a forward-looking analyst inquiry.

Plaintiffs' attempt to recharacterize the statement as one about "then-existing facts" cannot survive a fair review of the call. Mr. Wiley was not reporting historical costs; he was responding to an analyst who wanted to model "CapEx going forward." That he referenced the status of expenditures "to this point" as a basis for his projection does not transform the statement into an independent representation offered to induce reliance; it was a predicate for the forward-looking projection that the Company would not require significant additional capital unless it elected to expand capacity further. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021). Even if the Court were to identify some backward-looking

component, the statement was entirely forward-looking and was accompanied by cautionary language.[9]

Courts routinely hold that a statement does not lose safe-harbor protection merely because it references present circumstances as the foundation for future expectations. Indeed, the Ninth Circuit has already rejected the argument that "embedded assertions [into forward-looking statements] concerning *present* facts" remove those statements from the safe harbor. *Wochos*, 985 F.3d at 1192 (emphasis in original). In *Wochos,* the Court recognized that "any announced 'objective' for 'future operations' necessarily reflects an implicit assertion that the goal is achievable based on current circumstances." *Id.* Nor does any case, including *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130 (9th Cir. 2017)—on which Plaintiffs heavily rely—hold that forward-looking statements forfeit safe-harbor protection the moment the speaker uses a present-tense phrase.

And even if Plaintiffs could unfairly isolate Mr. Wiley's reference to capital expenditures, their argument would still fail because the statement was neither false nor material. By the time Mr. Wiley made it in June 2022, the market already knew the Manitowoc project had cost substantially more than the initial $12 million estimate and additional capital expenditures were anticipated. That same fiscal year, almost five months earlier, the Company had disclosed it had already expended approximately $12.9 million on the facility's construction. *See* Exhibit 4 to Decl. of LisaMarie Collins, 3, Dkt. No. 65-4. And on the very same day as Mr. Wiley's statement, the Company further disclosed that it had spent "approximately $19.2 million related to purchases of production equipment and the construction of our new manufacturing facility in Manitowoc, WI*,* and that it anticipated continuing to incur significant capital and other expenditures with respect to these facilities

---

[9]  "This call is being webcast, and a replay will be available on the company's website as well. Before we begin, we would like to remind everyone that our prepared remarks contain forward-looking statements, and management may make additional forward-looking statements in response to your questions." Fourth Quarter 2022 Conference Call at 1:04–1:17.

- 11 -

and our plans to construct a new $26 million manufacturing plant." Exhibit 5 to Decl. of LisaMarie Collins, 4, Dkt. No. 65-5. A simple graph illustrates that the market already knew the very thing that Plaintiffs now claim Mr. Wiley withheld:



Mr. Wiley's statement that no additional expenditure would be necessary absent a decision to expand capacity was therefore consistent with the Company's disclosed, actual trajectory. At a minimum, in light of the information already available to investors, the statement was not material. Plaintiffs cannot manufacture fraud by cherry-picking an isolated remark while ignoring the Company's contemporaneous disclosures of actual costs. Falsity and materiality must be assessed in full context because investors are presumed to seek out all relevant information, including from SEC filings. *See Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131–32 (9th Cir. 2025) ("Context matters because we presume that a reasonable investor—who has money on the line—acts with care and seeks out relevant information."). Plaintiffs' reliance on an initial cost estimate while disregarding subsequent disclosures does not state a viable falsity theory.

IV.    Plaintiffs Fail to Plead Scheme Liability as to Mr. Wiley

Plaintiffs have failed to adequately plead how the supposed "puppet," Mr. Wiley, schemed to defraud. They first point to the SEC's actions that they say "found" scheme liability, but, as noted above, neither the non-admissions by AMMO, nor the unproven allegations against other defendants, carry any weight. For Mr. Wiley, the only conduct they argue pleads scheme liability are his purported misstatements and omissions about Mr.

- 12 -

Larson's role and conduct. Opp. 63. Although the Supreme Court has recognized that there could be overlap between alleged conduct and misstatements, *Lorenzo v. SEC*, 587 U.S. 71, 80 (2019), scheme liability claims must still "involve deceptive conduct beyond those misrepresentation or omissions." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 2021 WL 12327975, at *13 (C.D. Cal. Aug. 30, 2021) (citing *Lorenzo* and Ninth Circuit precedent). Plaintiffs have not alleged any such conduct. Nor does making allegations about other defendants rescue their scheme claim as to Mr. Wiley. "At best, Plaintiff[s] has pleaded facts indicating that the Individuals Defendants' collective conduct" may have aided an alleged scheme, but they have not done so "on a Defendant-by-Defendant basis," and certainly not as to Mr. Wiley. *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *26 (D. Ariz. Feb. 2, 2023).

In any event, Mr. Wiley's statements were neither false nor misleading, as established in § III, *supra*. Absent an underlying false statement, Plaintiffs' theory of scheme liability collapses. *See In re Genius Brands Int'l, Inc.*, 2021 WL 12327975, at *13 ("Plaintiffs did not establish the elements of their Rule 10b-5(b) claim. They therefore did not adequately plead a violation of Rule 10b-5(a) and (c).").

V.    Plaintiffs Fail to Plead Causation as to Mr. Wiley

Plaintiffs have also failed to plead that any of Mr. Wiley's purported misstatements— "as opposed to other facts"—foreseeably caused their losses. *Espy v. J2 Glob.*, Inc., 99 F.4th 527, 540 (9th Cir. 2024) (explaining that loss causation is a "variant of proximate cause"). Loss causation requires more than pointing to generic company-level disclosures and stock price declines; a plaintiff must connect a particular defendant's statement to a corrective disclosure that revealed the falsity of that statement and thereby caused economic loss. *See, e.g.*, *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021) (holding that allegations that "lump together" various misstatements do not adequately plead causation).

- 13 -

Plaintiffs have not done that. Instead, the Complaint aggregates company-level operational difficulties, third-party allegations, and the results of an internal investigation to construct a gradual-disclosure narrative that is untethered to any statement made by Mr. Wiley. Without pleading a causal connection between Mr. Wiley's specific statements and a specific corrective disclosure that removed the inflation attributable to those statements, Plaintiffs have not adequately pled loss causation as to Mr. Wiley.

Plaintiffs' loss-causation narrative identifies a series of stock price declines between November 2022 and May 2025, Opp. 57–58, but—as discussed above—the only statements Plaintiffs correctly attribute to Mr. Wiley that could conceivably bear on loss causation were his analyst-prompted, forward-looking projections on the June 29, 2022 earnings call. Plaintiffs do not allege that any subsequent disclosure revealed that the projections were false when made—particularly in light of the information already available to investors. Nor do they plead that any market reaction was attributable to a Wiley-specific, intentional or reckless misstatement, as opposed to the Company's disclosed operational challenges.

The May 2025 restatement—Plaintiffs' principal alleged corrective event— addressed accounting errors, undisclosed related-party transactions, executive officer disclosure failures, and internal control weaknesses. Plaintiffs do not plead how that broad, multi-faceted disclosure corrected Mr. Wiley's statements about capital expenditures or production capacity, as opposed to revealing problems that arose or were first discovered after Mr. Wiley's departure nearly a year earlier.

For this reason, too, the Complaint fails to state a claim against Mr. Wiley, and the claims against him should be dismissed with prejudice.

## Conclusion

The Complaint is rife with incurable defects, but shows that Mr. Wiley did not lie to investors, had no motive to lie, and did not cause any losses to investors. No repleading could cure these fundamental flaws. Accordingly, Mr. Wiley respectfully requests that the Court dismiss the action as against him with prejudice.

Dated: March 5, 2026                    Respectfully submitted,

Laura Perlov (*pro hac vice*)
Laura.Perlov@nortonrosefulbright.com
Tel: (303) 801-2682
Fax: (303) 801-2777
K. Austin Hartley (*pro hac vice*)
Austin.Hartley@nortonrosefulbright.com
1225 Seventeenth Street, Suite 3050,
Denver, Colorado 80202

Andrey Spektor (*pro hac vice*)
Andrey.Spektor@nortonrosefulbright.com
Tel: (212) 318-3130
Maryclaire Kennedy (*pro hac vice*)
Maryclaire.Kennedy@nortonrosefulbright.com
1301 Avenue of the Americas
New York, New York 10019

*Attorneys for Defendant Robert D. Wiley*

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2026 a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

Gary A. Gotto
**KELLER ROHRBACK LLP**
3101 North Central Ave., Ste. 1400
Phoenix, AZ 85012-2600
Tel: 602.230.6322
ggotto@kellerrohrback.com
*Liaison Counsel for Lead Plaintiffs*

Peretz Bronstein (*pro hac vice*)
Michael Boyle (*pro hac vice*)
**BRONSTEIN GEWITZ & GROSSMAN LLC**
60 East 42nd St., Ste. 4600
New York, NY 10165
Tel: 212.697.6484
peretz@bgandg.com
mboyle@bgandg.com
*Co-Lead Counsel for Plaintiffs*

Joshua B. Silverman (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
Jianan Jiang (*pro hac vice*)
**POMERANTZ LLP**
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: 312.377.1181
Fax: 312.229.8811
jbsilverman@pomlaw.com
boconnell@pomlaw.com
ajiang@pomlaw.com

*Co-Lead Counsel for Plaintiffs*

Kyle Orne
**DLA Piper US**
kyle.orne@us.dlapiper.com
2525 East Camelback Road Suite 1000
Phoenix, Arizona 85016
Tel: 480.606.5100
Fax: 480.606.5101
Jason S. Lewis (*pro hac vice*)
jason.lewis@us.dlapiper.com
Jason M. Hopkins (*pro hac vice*)
jason.hopkins@us.dlapiper.com
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Tel: 214.743.4546
Fax: 214.743.4545

*Attorneys for Defendant*
*Chris Larson*

- 16 -

Brian Schulman
**Ballard Spahr LLP**
1 E Washington St., Ste. 2300
Phoenix, AZ 85004-2555
Tel: (602) 798-5419
Fax: (602) 798-5595
SchulmanB@ballardspahr.com

*Lead Attorney for Defendants Ammo
Incorporated and Jared R. Smith*

James D. Sallah
Jeffrey L. Cox
**Salla Astarita & Cox LLC**
3010 N. Military Trail, Ste. 210
Boca Raton, FL 33431
Tel: (561) 989-9080
jds@sallahlaw.com
jlc@sallahlaw.com

*Attorneys for Defendant Fred Wagenhals*

Therese Marie Doherty
LisaMarie Collins
James Anthony Ingram
**Mintz Levin Cohn Ferris Glovsky &
Popeo PC**
919 3rd Ave.
New York, NY 10022
Tel: (212) 692-6202
Fax: (212) 983-3115
TMDoherty@mintz.com
LFCollins@mintz.com
JIngram@mintz.com

*Attorneys for Defendant John Flynn*

- 17 -