**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Dmitry Cherches, et al.,<br>Plaintiffs,<br>v.<br>AMMO Incorporated, et al.,<br>Defendants. | No. CV-24-02619-PHX-DJH<br>**ORDER** |

Currently, there are six motions before the Court: Defendant John P. Flynn's ("Flynn") Motion to Dismiss the Amended Complaint (Doc. 64), Defendants AMMO, Inc. ("AMMO" or the "Company") and Jared R. Smith's ("Smith") Motion to Dismiss (Doc. 66), Defendant Christopher D. Larson's ("Larson") Motion to Dismiss (Doc. 67), Defendant Robert D. Wiley's ("Wiley") Motion to Dismiss (Doc. 68), and Defendant Fred W. Wagenhals's ("Wagenhals") Motion to Dismiss (Doc. 69). Lead Plaintiffs Dmitry Cherches and Irene Zvagelsky (collectively, "Lead Plaintiffs") with Plaintiff Hideyoshi Delgado (collectively with Lead Plaintiffs, "Plaintiffs") filed an Omnibus Opposition to Defendants' Motions to Dismiss (Doc. 73), and corresponding Replies were filed. (*See* Docs. 76–80). Additionally, Plaintiffs have filed a Motion for Leave to File a Sur-Reply (Doc. 81) to Larson's Motion to Dismiss.[1]

---

[1] Plaintiffs claim that a sur-reply is necessary to address newly raised arguments and evidence in Larson's Reply Brief. (Doc. 81 at 2). As the Court did not credit new arguments or evidence in the Reply that were not fairly raised in the opening Motion or not in direct response to Plaintiffs' arguments, Plaintiffs' Motion for Leave to File Sur-Reply will be denied as moot.

## I. Background

Plaintiffs have brought this putative class action against Defendants, seeking to represent themselves as well as other who purchased or otherwise acquired AMMO common stock between August 19, 2020, and May 20, 2025 (the "Class Period"). (Doc. 42 at ¶ 1). Plaintiffs claim, in short, that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. (*Id.*)

Wagenhals, Wiley, Flynn, Smith, and Larson (the "Individual Defendants") are alleged to have held officer-level positions at AMMO during the Class Period. Specifically, as stated by Plaintiff, Wagenhals "was the Company's Co-Founder and CEO from 2016 until July 24, 2023. From July 2023 until April 2025, Wagenhals served as the Company's Executive Chairman." (*Id.* at ¶ 22). Wiley "was the Company's titular CFO from the beginning of the Class Period until September 19, 2024." (*Id.* at ¶ 25). Flynn "served as Vice President of AMMO from the beginning of the Class Period through November 2022. In fiscal year 2023, Flynn continued to receive substantial compensation from AMMO as an independent contractor." (*Id.* at ¶ 26). And Smith "was the Company's CEO from July 24, 2023 until May 30, 2025. Mr. Smith previously served as President and Chief Operating Officer of AMMO from January 3, 2023 to July 24, 2023." (*Id.* at ¶ 24).

"During the Class Period, AMMO designed, produced and marketed ammunition and ammunition component products for public consumers, manufacturers, and law enforcement and military agencies." (*Id.* at ¶ 2). AMMO also went through a merger (the "Merger") in April 2021 and as a result acquired "an online marketplace called Gunbroker.com[.]" (*Id.*) The Merger was spearheaded by Steve Urvan ("Urvan"), on the Gunbroker side, and Larson, Wagenhals, and Wiley, on the AMMO side. (*Id.* at ¶¶ 4–5).

Following the Merger, AMMO operated its manufacturing business, referred to as its "Ammunition Segment," and the Gunbroker business, referred to as its "Marketplace Segment." (*Id.* at ¶ 2).

### A. Larson's Role with AMMO

Importantly, Plaintiffs allege that Larson "was the Company's Co-Founder, along

with Wagenhals," and "[t]hrough at least fiscal year 2023, Larson secretly served as shadow co-CEO and CFO." (*Id.* at ¶ 23). "[I]n fiscal year 2024 Larson continued to receive payments from a third-party service provider in exchange for revenue from the Company. Larson also continued to receive substantial compensation from the Company through at least fiscal year 2023 as an independent contractor." (*Id.*)

Plaintiffs allege that Larson's position was, however, problematic because in 2016 "the SEC charged Larson with violations of federal securities laws alleging Larson schemed to manipulate the market for the stock" of his former employer. (*Id.* at ¶ 33). Larson, ultimately, entered into a "Consent Decree" with the SEC on April 13, 2020. (*Id.* at ¶ 34). Under the terms of the Consent Decree and as pertinent here, Larson was prohibited "from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l [like AMMO], or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d) [like AMMO] for five years." (*Id.* (internal quotation marks omitted) (alterations original)).[2] In addition, Larson was permanently enjoined from practicing before the SEC as an accountant, and he later had his certified public accounting license revoked by the State of Minnesota Board of Accountancy. (*Id.*)

Notwithstanding these constraints, Plaintiffs claim that, "[i]n direct violation of the Consent Decree, Larson functioned as an executive officer, specifically a shadow co-CEO and CFO, of AMMO[.]" (*Id.* at ¶ 35). This was hidden from shareholders during the relevant portions of the Class Period. Along with failing to disclose Larson as an officer of AMMO, Plaintiffs claim that Defendants also concealed multiple related party transactions[3] involving Larson and his family members, including a no-bid contract

[2] "Executive officer" is defined as "[a registrant's] president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant." 17 C.F.R. § 240.3b–7.

[3] The registrant is required to "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest." 17 C.F.R. §

awarded to Larson's brother's construction company. (*Id.* at ¶ 50). In further violation of SEC rules, Plaintiffs allege that AMMO failed to disclose Larson's executive compensation and Laron's off-balance sheet arrangements. (*Id.* at ¶¶ 48, 51–52).

### B. Manitowoc Facility

Also transpiring during the Class Period, AMMO was constructing and opening a new manufacturing plant in Manitowoc, Wisconsin (the "Manitowoc Facility"). (*Id.* at ¶ 3). "The Company broke ground on the Manitowoc Facility in June 2021," and "[t]he [F]acility opened in 2022." (*Id.* at ¶ 53). Construction of the Facility was completed by Larson Building, which was owned by Andy Larson, Defendant Larson's brother. (*Id.*) Plaintiffs allege that, despite claims that the Facility was on time and on budget, AMMO "paid Larson Building over $25 million for this project, more than twice the $12 million budget disclosed to investors[.]" (*Id.* at ¶¶ 3, 82).

In addition to the increased cost of the project, Plaintiffs claim that "the transition to the Manitowoc Facility" caused production delays. (*Id.* at ¶ 6). Even once the Facility was operational, "production was…constrained because the Manitowoc Facility was inundated with broken presses and other machines[.]" (*Id.*) AMMO, facing the equipment failures, primer shortages, and downtime at the Facility, "engaged in substantial repackaging and re-selling of ammunition that the Company purchased from overseas." (*Id.* at ¶ 60). Despite their alleged awareness of these issues, "Defendants were not honest with investors about these problems, instead touting an impressive but misleading production capacity[.]" (*Id.* at ¶ 54).

Plaintiffs have submitted the accounts of eight Confidential Witnesses attesting to their experiences at the Manitowoc Facility or AMMO's headquarters in Scottsdale, Arizona. (*See generally id.* at ¶¶ 40–44, 54–62).

### C. Defendants' Partial Disclosures during the Class Period

Throughout the course of the Class Period, Plaintiffs allege that Defendants made a

---

229.404(a). "Related person" means, amongst other things, "[a]ny director or executive officer of the registrant" and "[a]ny immediate family member of a director or executive officer of the registrant[.]" *Id.*

series of "partial disclosures" of "materialized concealed risks." First, on November 14, 2022, AMMO announced production problems at the Facility, and on February 13, 2023, the Company announce a "40% year-over-year decrease in net revenue," mainly attributed to the Ammunition Segment. (*Id.* at ¶¶ 7–8). Subsequent disclosures, on November 9, 2023, and August 8, 2024, revealed further issues at the Manitowoc Facility and with the Ammunition Segment generally. (*Id.* at ¶¶ 10–11). Plaintiffs allege that a drop in AMMO's stock price accompanied each of these disclosures. (*Id.* at ¶¶ 7–8, 10–11). However, Plaintiffs attest that, notwithstanding these disclosures, "Defendants prevented a much more substantial decline" in stock price "by continuing to misrepresent production capacity and concealing their illicit related party dealings with Larson." (*Id.* at ¶ 103).

As to Larson's involvement with AMMO, Plaintiffs allege that Urvan filed suit against AMMO in Delaware Chancery Court, alleging that Larson was serving as de-facto CEO and CFO of AMMO, and a public version of the "Urvan Complaint" was released on May 3, 2023.[4] (*Id.* at ¶¶ 5, 9). The release of the Urvan Complaint resulted in drop in AMMO stock, but "the Company publicly denied the allegations, blunting further decline." (*Id.* at ¶ 9). On September 24, 2024, AMMO announced Wiley's resignation at the request of the Board and informed that a law firm had been retained to conduct "an independent investigation into, among other things, whether the Company and its management accurately disclosed all executive officers, and potential related party transactions in fiscal years 2020 through 2023." (*Id.* at ¶ 12). Another stock price decline occurred as a result of this notification. (*Id.*) Eventually, on May 20, 2025, AMMO admitted that "Larson had actually secretly operated as an executive officer of the Company during the Class Period," and revealed his related party transactions and off-balance sheet arrangements. (*Id.* at ¶ 13). AMMO shares "now trade at less than half of what they were valued at in November 2022." (*Id.* at ¶ 14).

AMMO has since undergone a name change, and Urvan has served as the

[4] The Court notes only that the Urvan Complaint was filed and the general subject matter of the case and, in doing so, does not treat any allegations in that proceeding as proven facts.

Company's CEO since May 30, 2025. (*Id.*) Further specific allegations will be discussed as necessary in resolving Defendants' arguments below.

**D. Procedural History**

Plaintiffs originally filed this action on September 27, 2024, naming only AMMO, Wagenhals, Smith, and Wiley as defendants. (*See* Doc. 1). From there, the issue of who would serve as lead plaintiff and lead counsel for plaintiff was hotly contested. (*See* Docs. 16–19). This issue was finally resolved upon the Court's adoption of the Magistrate Judge's Report and Recommendation (*see* Docs. 35, 39), officially granting Lead Plaintiffs' Motion. The Amended Complaint (Doc. 42) was then filed on September 22, 2025, now bringing claims against Larson and Flynn as well. Defendants' Motions to Dismiss followed the Amended Complaint, and having received the parties' extensive briefing, the current Motions are now before the Court.

**II. Judicial Notice and Incorporation by Reference**

As an initial matter, Defendants and Plaintiffs ask the Court to take judicial notice of certain documents. They further assert that certain material, such as call transcripts, are incorporated by reference in the Amended Complaint.

In resolving a motion to dismiss, courts typically limit their review to the four corners of a complaint. *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). Considering materials outside of the complaint converts a 12(b)(6) motion into a Rule 56 summary judgment motion. *Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 645 (9th Cir. 1981). "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

**A. Judicial Notice**

Rule 201 allows a court to take judicial notice of an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from

sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1–2). While a court may take judicial notice of matters of public record, a court may not take judicial notice of disputed facts within such public records. *Khoja*, 899 F.3d at 999 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)). In other words, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.*

Wagenhals's Motion noted that he "[would] be filing a separate motion requesting that the Court take judicial notice of the transcripts of the earnings calls that Plaintiffs allege involved him." (Doc. 69 at 17 n.2). Yet, no such motion was filed.

In his Motion, Flynn states "Exhibits 2–5 are Ammo's Forms 10Q and 10K, which were filed with the SEC. These Exhibits are subject to judicial notice because they are publicly available documents not subject to reasonable dispute." (Doc. 64 at 10 n.5 (citation omitted)). "SEC filings are a matter of public record and therefore are the proper subject of judicial notice." *City of Birmingham Relief and Ret. Sys. v. Acadia Pharm., Inc.*, 834 F. Supp. 3d 979, 1013 (S.D. Cal. 2026) (internal quotations and citation omitted). So, the Court will take judicial notice of the existence of these SEC filings. Even still, Flynn relies on multiple assertions, particularly in the Form 10Qs, which the Amended Complaint does not rely on, to show that the statements attributed to him were not false, but he makes no effort to offer why these "facts" are judicially noticeable. (*See* Doc. 64 at 10–11). Consequently, while the existence of these Form 10Qs will be judicially noticed, no facts within will be. *See*, *e.g.*, *Capaci v. Sports Research Corp.*, 445 F. Supp. 3d 607, 617 (C.D. Cal. 2020) ("Because defendant does not…explain why the court can judicially notice those facts, the court denies defendant's request for judicial notice."). The Court will, likewise, take judicial notice of the Form 10-K's existence but will further address the Form 10-K under incorporation by reference.

Flynn makes a similar assertion about the November 14, 2022 Earnings Call transcript being judicially noticeable as well as incorporated by reference. (Doc. 64 at 13 n.6). However, like the Form 10-K, the Court finds that this document is more

appropriately addressed through incorporation by reference but can be judicially noticed to the same extent as the other SEC filings.

As to Plaintiffs, a complaint filed by the SEC about Larson's involvement with AMMO as well as an SEC order instigating cease and desist proceedings against AMMO are attached to Plaintiffs' Response. They claim that the SEC Complaint and SEC Order Making Findings "are matters of public record, whose accuracy cannot be reasonably questioned, and are thus subject to judicial notice." (Doc. 73 at 17 n.3). However, much the same as Flynn's argument, Plaintiffs stop short of establishing that any fact alleged in the Complaint or stated in the Order is judicially noticeable. (*Id.*) Additionally, the Court notes that Larson argues in his Reply that the SEC order is not judicially noticeable. (Doc. 79 at 3). Because it is a matter of public record, the Court is not convinced that it is not judicially noticeable, but only to the same extent as the SEC filings stated above as Plaintiffs do not address the noticeability of any statements in the Order or SEC Complaint.[5]

**B. Incorporation by Reference**

Incorporation by reference prevents plaintiffs from "selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002 (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)). Considering documents, under this doctrine, is only proper where plaintiff "refers extensively to the document" or "the document forms the basis of plaintiff's claim." *Id.* (quoting *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). The court may assume the truth of the incorporated documents "as though they are part of the complaint itself." *Id.* at 1003. However, it is improper to assume the truth of an incorporated document only "to dispute facts stated in a well-pleaded complaint." *Id.*

AMMO and Smith attach to their Motion excerpts from AMMO's 2021 and 2022

[5] Because the Court did not take judicial notice of any fact asserted in the SEC Complaint or Order and considered only the well-pled allegations in the Amended Complaint to determine the sufficiency of Plaintiffs' claims, Defendants' concerns about Plaintiffs' reliance on the SEC Complaint or Order are moot points. (*See* Doc. 76 at 9–10; Doc. 79 at 3–4).

10-K forms and the Urvan Complaint, claiming that each of these documents have been incorporated by reference in the Amended Complaint. (Doc. 66 at 4 n.4). The Court agrees that the 2021 and 2022 Form 10-Ks are referenced multiple times in the Amended Complaint and substantiate, at least in part, Plaintiffs' material misstatements and omissions claim. Accordingly, the Court will consider these Form 10-Ks incorporated by reference. The Urvan Complaint presents a closer call because, though it is referenced in the Amended Complaint (*see*, *e.g.*, Doc. 42 at ¶ 5), such references are not particularly extensive. At the same time, the Court notes that Plaintiffs cite the Urvan Complaint to support the notion that Larson performed "policy making functions" at AMMO, and thus the Urvan Complaint may be considered through incorporation by reference as it lends support to Plaintiffs' claims.

Next, Wiley, in reference to two call transcripts, asserts that "[t]hese transcripts are incorporated by reference into the Complaint." (Doc. 68 at 8 n.3). These transcripts are from the November 15, 2021, and June 29, 2022, earnings calls. (Doc. 68-1 at 2). It should be noted that each of these calls is only referenced a couple of times in the entire Amended Complaint (*see generally* Doc. 42), and given the perfunctory nature of his assessment, Wiley might have been well-advised to at least discuss the extent of said reference or how they form the basis of Plaintiffs' claim.[6] Nonetheless, the Court finds that these transcripts, as well as the November 14, 2022 transcript, are incorporated by reference in the Amended Complaint.

Flynn filed a January 5, 2021 press release by AMMO as an exhibit to his Motion, and he argues that this press release is incorporated into the Amended Complaint. (Doc. 64 at 7 n.3). Flynn identifies a singular allegation in the Amended Complaint that presumably refers to this press release. (*See id.*; *see also* Doc. 42 at ¶ 32). Not only is the press release not specifically identified in this allegation, *Khoja*, 899 F.3d at 1007 ("[T]he Complaint does not reference or identify this press release at all. The Complaint only alleges facts that the press release happens to report[.]"), but also a singular reference in an eighty-four-page

[6] This deficiency is notable in many of Defendants' various requests for judicial notice and/or incorporation by reference arguments.

complaint is by no means extensive. Moreover, Flynn does not establish any claim that necessarily relies on this press release. Therefore, the January 5, 2021 press release and its contents will not be considered as it was not incorporated by reference in the Amended Complaint.

Notwithstanding the foregoing findings of incorporation, the Court will be mindful of the purpose for which any party is utilizing an incorporated document in its analysis and may decline to consider the document if said purpose is determined to be improper. *Id.* at 1006 (holding that the district court abused its discretion by incorporating certain documents for the improper purpose of fact finding).

## III. Legal Standards

Given the claims brought by Plaintiffs, differing standards apply to certain arguments raised in the briefing. While Federal Rule of Civil Procedure 12(b)(6) most commonly governs motions to dismiss, the heightened standards set forth in Rule 9(b) and the Private Securities Litigation Reform Act are also relevant here.

### A. Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim. *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011). Complaints must make a short and plain statement showing that the pleader is entitled to relief for their claims. Fed. R. Civ. P. 8(a)(2). This standard does not require "'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Put differently, there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Id.* at 679.

Dismissal of a complaint for failure to state a claim may be based on either the "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). In reviewing a motion to dismiss, courts will "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But courts are not required "to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

**B. Rule 9(b) and the PSLRA's Heightened Pleading Mandate**

Unlike most other civil claims, "the pleading burden for securities fraud claims under Sections 10(b) and 20(a) of the Exchange Act is more stringent." *In re PG&E Corp. Securities Litig.*, 806 F. Supp. 3d 962, 989 (N.D. Cal. 2025). A plaintiff bringing such claims is required to meet the heightened pleading requirements of Rule 9(b) as well as the Private Securities Litigation Reform Act ("PSLRA"). *Or. Pub. Emp. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Meeting this particularity standard generally requires a plaintiff to plead the "who, what, when, where, and how" of the alleged fraud. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (citation omitted). In the Ninth Circuit, "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Or. Pub. Emp. Ret. Fund*, 774 F.3d at 605.

The PSLRA "imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). While the particularity requirements for falsity mirror those of Rule 9(b), the PSLRA mandates stricter particularity for scienter. *See Glazer Capital Mgt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). "Namely, the plaintiff

must establish a strong inference of scienter." *In re PG&E*, 806 F. Supp. 3d at 989.

At the same time, courts bear in mind that, although "the PSLRA significantly altered pleading requirements in private securities fraud litigation, it did not impose an insurmountable standard." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) (internal quotations and citation omitted).

**IV. Discussion**

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." In carrying out this provision, Rule 10b–5 makes it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). The Rule additionally prohibits employing "any device, scheme, or artifice to defraud," and engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," relating to the sale or purchase of a security. 17 C.F.R. § 240.10b–5(a), (c).

"Scheme liability" claims refer to claims brought under Rule 10b–5(a) and (c), while "maker liability" claims refer to claims brought under Rule 10b–5(b). *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 950 (D. Ariz. 2024). Although there are differences between these types of claims, it has been "long recognized" that there is "considerable overlap among the subsections of the Rule and related provisions of the securities laws." *Lorenzo v. Sec. and Exch. Comm'n*, 587 U.S. 71, 80 (2019). Indeed, many of the same elements required for a maker liability claim need to be shown for a scheme liability claim. *Carvana*, 759 F. Supp. 3d at 950–51, 967 (listing the elements of a maker and scheme liability claim).

To begin, the Court will address the parties' arguments in regard to Plaintiffs' maker

liability claim before turning to their scheme liability claim. Although there is some variance in the arguments presented, these Defendants now contend that Plaintiff has failed to adequately plead a material misrepresentation or omission; the act in furtherance of a scheme scienter; and loss causation. Several Defendants, additionally, raise arguments concerning Plaintiffs' control person liability claim. At the outset, the Court emphasizes that it does not find compelling and will not engage with any argument that is nothing more than a factual dispute.

**A. Maker Liability**

Plaintiffs' maker liability claim is brought against AMMO, Wagenhals, Smith, Wiley, and Flynn for their alleged misrepresentations and omissions.

To state a claim under § 10(b) and Rule 10b–5(b), "a plaintiff must show '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' " *Webb v. Solarcity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011)).

As to the first element, "[a] materially false or misleading statement violates Section 10(b) and Rule 10b–5." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023). A false statement is alleged when "a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008. And "[e]ven if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09. To properly plead falsity, a securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009); 15 U.S.C. § 78u(b)(1).

Moreover, "[f]or liability to attach under Rule 10b-5(b), a party must actually

'make' the material misstatement or omission." *Carvana*, 759 F. Supp. 3d at 951. In the Ninth Circuit, company executives who sign forms submitted to the SEC are the "makers" of the statements captured in those forms for the purposes of Rule 10b–5(b). *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1062–63 (9th Cir. 2000). The Ninth Circuit has adopted the general rule of imputation for Rule 10b–5 claims, holding "that a corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who has actual or apparent authority.' " *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).

Here, Plaintiffs have alleged misrepresentations and omissions by the aforementioned Defendants that can be broadly classified into two categories: 1) statements and omissions about Larson, whether it be his position, transactions, or compensation, and 2) statements and omissions about the Manitowoc Facility. (*See generally* Doc. 42). The Court does note that the parties address an additional category of statements relating to regulatory and legal compliance as well as internal accounting standards. While the falsity of these allegations is still premised upon Larson's involvement with AMMO, in this section, the Court will address them as their own category as several parties did. Plaintiff maintains that all alleged statements are actionable, but Defendants raise various arguments to the contrary, asserting that the statements were either not false, immaterial, forward-looking, or puffery.

The Court's discussion of any alleged statement or omission will be limited to those specifically addressed in Defendants' various arguments. The Court presumes that there is no dispute as to the falsity, materiality, or actionability of any alleged misrepresentation to which a fleshed-out argument is not presented.

**1. Larson's Role and Transactions**

A main component of Plaintiffs' maker liability claim is the alleged omissions and misstatements concerning Larson's role at AMMO, related party transactions, and other similar matters. Specifically, Plaintiffs assert that Individual Defendants knew that Larson

was acting as an AMMO executive officer, and therefore the omission of Larson as an executive in AMMO's disclosures was materially misleading. (*See*, *e.g.*, Doc. 42 at ¶¶ 91–92). *See also SEC v. Dalius*, 2019 WL 13178869, at *8 (C.D. Cal. 2019) ("As alleged in the Complaint…the identity of [the company's] actual leader, and the previous frauds of this leader would all be highly relevant to a reasonable investor."); *Snellink v. Gulf Resources, Inc.*, 870 F. Supp. 2d 930, 939–40 (C.D. Cal. 2012) (finding falsity adequately pled where the plaintiffs alleged that the defendants failed to disclose certain related party transactions and concealed the CEO's employment history). The same logic applies to AMMO's alleged failure to disclose Larson's related party transactions, off balance sheet arrangements, and compensation in violation of SEC rules. (*See id.* at ¶¶ 89–90, 93–95). These misstatements or omissions were made via AMMO's Form 10-Ks and can be attributed to Wagenhals, Wiley, and/or Smith.

Defendants primarily challenge Plaintiffs' maker liability claim as it relates to Larson on the scienter element, rather than the materially false representation or omission element. So, the Court finds that the first element of Plaintiffs' maker liability claim is sufficiently pled in regard to the misstatements and omissions about Larson's involvement at AMMO. Defendants' scienter arguments will be taken up below.

**2. Manitowoc Facility**

Defendants' arguments on the materially false or misleading statement element primarily concern the statements or omissions about the Manitowoc Facility. They generally argue that the statements were either nonactionable forward-looking statements, puffery, immaterial statements, or statements that were belied by disclosed information.

With respect to the Manitowoc Facility, Plaintiffs claim that Defendants touted the manufacturing capacity and capabilities of the Facility, despite significant issues. In particular, Plaintiffs allege that the following statements were false or misleading:

- 2021 Form 10-K, signed by **Wagenhals and Wiley**: "On an annual basis, we can produce 650 million rounds of ammunition with the ability to scale to 1 billion rounds and 750 million ammunition casings with the ability to scale in excess of 1 billion on an annual basis. Our inspection process is intended to enhance the performance and reliability of our products." (Doc. 42 at ¶ 75; *see also id.* at ¶ 98

(reciting a similar statement in the 2022 Form 10-K)).

- November 15, 2021 Earnings Call, **Wagenhals**: "I would like to bring you up-to-date [] answer most of the questions that I get hit daily with from investors. The move-in date for our new state-of-the-art 165,000 square foot building in Manitowoc, Wisconsin is the summer of 2022. Tod Wagenhals, our Executive VP has assured me that it will be on time and under budget. We have pictures on our website for any one of you to view on a weekly basis." (*Id.* at ¶ 81).

- November 15, 2021 Earnings Call, **Wagenhals**: "We don't have a problem with primers. I mean, we hear that all the time. And it's a constant war every day, but we don't have a problem getting primers." (*Id.* at ¶ 83).

- November 15, 2021 Earnings Call, **Wiley**: "[O]n some of your other questions regarding the capacity build out every – we're increasing capacity daily, whether it be through the automation that we're putting in, the machines that we've added. It is going -- I can't give you – I'll just give you a rough number and say it's approximately 450 million currently, but something you need to keep in mind is, at the new building when we start, which should be let's say mid-summer we'll be producing out of that building, that building will produce over a billion rounds a year." (*Id.*)

- June 29, 2022 Earnings Call, **Wiley**: "Yes. I think the way to think of it is once you're fully installed and in the new facility day one that our capacity would essentially double." (*Id.* at ¶ 85).

- June 29, 2022 Earnings Call, **Wiley**: "As far as capital expenditures in relation to the new facility and the production that's coming online with that. And most of the capital expenditures virtually all to this point has been expended today." (*Id.* at ¶ 87).

- November 14, 2022 Earnings Call, **Wagenhals**: "The new plant is Humming with its ribbon-cutting ceremony a few months ago in Wisconsin. We are increasing capacity across the Board and are in a position to support the domestic and expanding overseas ammunition demand." (*Id.* at ¶ 104).

- November 14, 2022 Earnings Call, **Flynn**: "As you are undoubtedly aware, the plant opened on time and within budget. In and of itself, a notable achievement managed by a dedicated team in our Arizona office, in Wisconsin and because of the world-class work our contractor and his subs did in standing up that plant … The facility now houses equipment and machinery we have been acquiring over the past couple of years, all of which allows us to strategically and incrementally increase

production with the plan to elevate loaded ammunition moving out of the 13 May shipping docks from 400 million to 1 billion, allowing AMMO to further ascend within the global ammunition marketplace among our peers." (*Id.* at ¶ 106).

- February 14, 2023 Earnings Call, **Smith**: "[T]he maximum cases that ever came out of any previous facility related to AMMO within that 350 million to 400 million space. The capacity that's available out of [the Manitowoc Facility] exceeds 750 million in our current shift operation. So, we can double the capacity of cases. We have ample manufacturing and loading space to go after these opportunities." (*Id.* at ¶ 109).

- June 14, 2023 Earnings Call, **Smith**: "We will do this by rebranding and repackaging the AMMO, Inc signature lines to stand out on the shelf. This will communicate the strength of our best-in-class brass we manufacture and the highest quality of components we source from other premium US manufacturers. We are superior and take great pride in being a US manufacturer based in Manitowoc, Wisconsin … We are filling in the factory that came on last fall and continue to see machine efficiencies increase, while we find new demand for this capacity." (*Id.* at ¶ 114).

- July 31, 2023 Letter, **Smith**: "We are utilizing our new 185,000 square-foot facility to produce those items that create real margin for the company, and that match our engineering capabilities with the products and services needed by the shooting, law enforcement, and military communities. Additionally, we will continue to create leaner and more efficient operations while creating cash from our inventories." (*Id.* at ¶ 120).

- August 9, 2023 Press Release, **Smith**: "And our gross margins have increased on our ammunition segment as we are beginning to see the benefits of the transition to our leaner operating model with a higher focus on brass sales." (*Id.* at ¶ 122).

- August 9, 2023 Press Release, **Smith**: "Our work toward achieving our strategic goals are starting to pay off as we have already begun to see the positive effects here in the 1st quarter, with significant improvements in gross margin and strong cash flow. Despite a difficult industry environment in the near term, I remain confident that the initiatives we have undertaken in both the marketplace and ammunition divisions will continue to improve profitability." (*Id.* at ¶ 124).

- August 9, 2023 Earnings Call, **Smith**: "The second category is, we're focusing the ammunition division on enhancing margins through expansion of our rifle brass lines, continuous improvement measures, and vertical integration into projectile manufacturing. And finally, and most importantly, we're aligning the goals,

compensation and incentives of the management team with shareholder interest." (*Id.* at ¶ 126).

- August 9, 2023 Earnings Call, **Smith**: "Yes, I think for our business margins improved, we have more rifle brass capacity coming on in the two quarters ahead. That's clearly where we can make margin we can defer kind of the nonvertically integrated piece of our production over a larger dollar value and margins increase. And once again, it really, our focus is rifle ammunition and playing a much, much larger role in that rifle space, both domestically and internationally." (*Id.* at ¶ 128).

- February 8, 2024 Earnings Call, **Smith**: "Calendar 2023 was a challenging year for our industry and for the U.S. economy. Despite this backdrop, AMMO continued to transition its business to a stronger and leaner operating model as we push through this very tough economic period. We have emerged from this time with an impeccable balance sheet, and we are encouraged about the significant opportunities we have before us here in the fourth quarter and going forward." (*Id.* at ¶ 133).

Each of the foregoing statements is followed by an allegation explaining why the alleged misstatement or omission was false or misleading. (*See*, *e.g.*, *id.* at ¶¶ 76, 84, 129).

**a. Failure to Plead a Materially False or Misleading Statement**

First, Flynn argues that the statement attributed to him was not false or misleading. (Doc. 64 at 9–11). However, Flynn's argument relies, in large part, on assertions within Form 10Qs, which the Court already declined to judicially notice. The remainder of Flynn's argument ventures into the realm of a factual dispute as to the Facility's disclosed budget that the Court will not entertain at this time.

On a somewhat related note, Wiley contends that several statements attributed to him from two of the earnings calls were not actually made by him, but rather by AMMO's president at the time. (Doc. 68 at 8). In support of this argument, Wiley relies on the and November 15, 2021 and June 29, 2022 Earnings Call transcripts, attached to his Motion. These transcripts have been incorporated by reference to the Amended Complaint. However, Plaintiffs submit that another transcript that it referenced in formulating their Amended Complaint listed Wiley as the maker of the relevant statements, and therefore Plaintiff states that Wiley's argument is a factual dispute. (Doc. 73 at 42 n.12). In his Reply, Wiley then points the Court towards audio of the earnings calls that he says

definitively proves that he did not make one of the statements. (Doc. 76 at 11). The Court declines to resolve this factual dispute on a motion to dismiss. The fact that Wiley had to provide further evidence in his Reply demonstrates that this is indeed a factual dispute. Moreover, an incorporated document is not assumed true only "to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003. A factual dispute cannot be resolved at this stage of proceedings; competing evidence may not be weighed, and the well-pled allegations in the Amended Complaint are accepted as true.

Next, Wiley briefly claims that Plaintiffs' allegations are based on an improper "fraud by hindsight" theory, i.e. "later manufacturing challenges revealed earlier fraud." (Doc. 68 at 9). To be sure, a plaintiff cannot proceed on a maker liability claim that attempts to alter a defendant's "earlier statements into fraud based on later-in-time information." *Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1231 (W.D. Wash. 2014), *aff'd*, 692 Fed. App'x. 491 (9th Cir. 2017). However, unlike a case where the information conveyed was not inaccurate at the time of the alleged misstatement, Plaintiff claims that the issues regarding the Facility's production capacity were known to Defendants throughout the Class Period. (*See* Doc. 42 at ¶ 161). Whether Plaintiffs have satisfied the scienter requirement is a different consideration, but they adequately alleged that the statements regarding the Facility's production capacities were false when made.

Furthermore, to the extent that any Defendant argues that Plaintiffs did not plead a duty to disclose, this argument is similarly unavailing. "[A]s a general matter, Section 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135 (N.D. Cal. 2017) (internal quotations and citation omitted). Nonetheless, a duty to disclose does arise where an omission is misleading "because it 'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists.' " *Id.* (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Accepting the Amended Complaint's allegations as true, Plaintiffs have claimed that Defendants made statements about the construction of the Manitowoc Facility being on budget and about the Facility's

production capabilities, and once they chose to tout the Facility's capabilities and the cost of its construction, they were bound to do so in a way that would not mislead investors. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). Even if Defendants were making predictions about the Facility's potential production, where Plaintiffs have alleged that "defendants had information that the predictions they were making were in fact incorrect, [P]laintiffs have stated a claim for violation of defendant's duty to disclose material information." *In re HI/FN, Inc. Sec. Litig.*, 2000 WL 33775286, at *7 (N.D. Cal. 2000).

Turning to materiality, Flynn and Wiley both argue that their attributed misstatements concerning the Manitowoc Facility fail to clear the "materiality" bar. (Doc. 64 at 13–14; Doc. 68 at 9–10). In response, Plaintiffs first emphasize that materiality is a factual determination not appropriate at this stage and second note that they have adequately pled that the Manitowoc Facility was an integral part of AMMO's business, making any misleading statements about the Facility's functionality or costs significant. (Doc. 73 at 47–49).

Whether an omission or misstatement is alleged, the materiality of either must be sufficiently pled. *Khoja*, 899 F.3d at 1009. "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). As a baseline, a complaint's allegations must raise a reasonable expectation that discovery will reveal evidence to satisfy the materiality requirement, and they must suffice to allow the court to draw the reasonable inference that the defendant is liable. *Khoja*, 899 F.3d at 1009 (citation omitted).

Bearing in mind that "determining materiality in securities fraud cases should ordinarily be left to the trier of fact," *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (internal quotations and citation omitted), for this stage of proceedings, Plaintiffs have adequately pled that the alleged misstatements and omissions regarding the Facility were

material. During the Class Period, the Company's Ammunition Segment was a crucial part of the business, making up 63% of AMMO's revenue, and to facilitate the production of ammunition, AMMO would be opening "a newly constructed 185,000 square foot factory in Manitowoc, Wisconsin." (Doc. 42 ¶¶ 32, 155). It stands to reason that statements about the construction of the Facility that would be the lone production site for AMMO and later production issues would be material to investors. Even more so, Plaintiffs sufficiently explain why each of the alleged misstatements or omissions was false or misleading. (*See*, *e.g.*, *id.* at ¶¶ 88, 99, 107).

**b. PSLRA Safe Harbor**

Defendants next argue that many statements regarding the Manitowoc Facility are inactionable forward-looking statements, protected under the PSLRA safe harbor. (*See* Doc. 66 at 19–21; Doc. 64 at 12–13; Doc. 68 at 7–9).

Even where the necessary elements of a Section 10(b) claim are properly pled, "the allegedly false or misleading statement may still be shielded from liability by the 'safe harbor' provision of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017). Under this safe harbor, any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or that the plaintiff fails to prove was made "with actual knowledge…that the statement was false or misleading" is exempt from liability. 15 U.S.C. § 78u-5(c)(1). "That is, a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language or is made without actual knowledge that it is false or misleading." *In re Quality Sys.*, 865 F.3d at 1141.

AMMO argues that statements that estimate the future production at the Manitowoc Facility are "classic forward-looking statements." (Doc. 66 at 20–21). However, upon review of the identified allegations, many of these statements are not forward looking, or are at least mixed statements of present fact and future projections.

Despite AMMO pointing to cautionary language in its Form 10-Ks, statements that AMMO "can produce 650 million rounds of ammunition…and 750 million ammunition casings," or that "the capacity that's available out of [the Manitowoc Facility] exceeds 750 million *in our current shift operation* [and thus] can double the capacity of cases," speak to AMMO's capacity at that given time. (Doc. 42 at ¶¶ 75, 98, 109 (emphasis added)). *See also Lilley v. Charren*, 936 F. Supp. 708, 714 (N.D. Cal. 1996) (determining that the "challenged statements" that "pertain[ed] to the fact that the 33M–VS turbine 'can generate pollution-free electricity at a price competitive with newly constructed fossil fuel plants' " were statements of a current fact rather than forward-looking statements). Wiley's statement that "most of the capital expenditures virtually all to this point has been expended today" also constitutes a statement of present fact, and the warnings that follow this statement do not transform it into a forward-looking one. (Doc. 42 at ¶ 87). To the extent that any challenged statement concerns the Facility's current state or capabilities, such statements were not forward looking and therefore not qualified for protection under the safe harbor. *In re Quality Sys.*, 865 F.3d at 1142 ("[T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts.").

At the same time, the statements or portions of the statements, asserting that AMMO has "the ability to scale to 1 billion rounds" or "the ability to scale in excess of 1 billion [ammunition casings]" are reasonably construed as Defendants' present views of the Facility's future ability to scale up production (Doc. 42 at ¶¶ 75, 98), which the Ninth Circuit has acknowledged are forward-looking statements. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021). So too are the other alleged statements about the Manitowoc Facility's eventual production capacity. (*See*, *e.g.*, Doc. 42 at ¶¶ 83, 85). Yet, this only answers half the question as to whether the PSLRA safe harbor applies, and here, these forward-looking statements are not supported by meaningful cautionary language. *See In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042, 1055 (N.D. Cal. 2025). Defendants point to boilerplate cautionary language included in Form 10-Ks or on earnings

calls as well as warnings about supply chain issues. (*See*, *e.g.*, Doc. 66 at 21). But, given that Defendants allegedly had knowledge about AMMO's inability to scale up production at the Manitowoc Facility, due to habitual machinery failures amongst other issues, "the boilerplate risk disclosures did not meaningfully convey the significant risk that had already materialized." *In re SunPower Corp.*, 769 F. Supp. 3d at 1055. *See also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013). Moreover, the disclosure that "the delivery of some of the main components needed in the building process were delayed due to supply chain disruptions" caused lower manufacturing capacity and therefore sales, similarly, did not address the machinery issues that Plaintiffs alleged still plagued the Facility.

All that said, the Court agrees with AMMO, Smith, and Flynn that portions of two particular statements are inactionable as forward-looking statements. Flynn's statement, "[t]he facility now houses equipment and machinery we have been acquiring over the past couple of years, all of which allows us to strategically and incrementally increase production with the plan to elevate loaded ammunition moving out of the 13 May shipping docks from 400 million to 1 billion, allowing AMMO to further ascend within the global ammunition marketplace among our peers" was made in regard to AMMO's future plans and was not a statement about the Facility's actual abilities, which safely fits into the safe harbor. (Doc. 42 at ¶ 106). And Smith's statement, identified in paragraph 126, also speaks of AMMO's future aims, focuses, and objectives, and therefore also falls within the ambit of the safe harbor. (*Id.* at ¶ 126). Apart from these two statements, Defendants' Motions on this topic are denied.

**c. Puffery**

Several Defendants, briefly, argue that certain implicated statements concerning the Manitowoc Facility amount to nothing more than statements of corporate optimism. (Doc. 66 at 21–22; Doc. 69 at 18).

Statements that amount to mere "puffery" are not actionable because "the law deems such statements so amorphous as to be immaterial." *Mulligan v. Impax Laboratories, Inc.*,

36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). Puffery can be understood as vague statements of opinion or statements of corporate optimism. *Id.* However, "[e]ven a statement of opinion or an expression of corporate optimism may be deemed actionable in certain circumstances because 'there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in 'misrepresentations of existing facts.' " *Id.* (quoting *In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010)). It so follows that determining whether a statement constitutes puffery requires courts to examine the entire statement and the context in which it was made. *Id.*

First, Defendants take issue with singular words or fragments of sentences included in alleged multi-sentence statements. To be sure, Smith's statements that he was "confident that the initiatives we have undertaken" and that "we are encouraged about the significant opportunities we have before us" constitute mere corporate optimism. (Doc. 42 at ¶¶ 124, 133). However, based on the allegations following each of these statements, Plaintiffs primarily plead that other portions of these statements were false or misleading. (*See id.* at ¶¶ 125 (statements were misleading because profitability was not improving at that time and blaming the industry environment for setbacks ignored AMMO's manufacturing problems), 134 (claiming falsity as to the statement that AMMO "emerged from this time with an impeccable balance sheet")). So, even if certain words or phrases are puffery, the material portions of the alleged statement survive. The same can be said for the use of the term "world-class" to describe the work of AMMO's contractor and the modifier "state-of-the-art" to describe the Facility. (*Id.* at ¶ 106, 81). While the word may be mere puffery, omitting that particular phrase as inactionable does not impact the remainder of the statements. *See*, *e.g.*, *In re Outset Medical, Inc. Sec. Litig.*, 2026 WL 898283, at *24 (N.D. Cal. 2026) ("[T]he Court considers only certain portions of Statements 5 and 13(b) to be puffery, and other portions to be non-puffery.").

Lastly, as used, Wagenhals's statement that the Facility was "humming" amounts to more than puffery. (Doc. 42 at ¶ 104). "What might be innocuous 'puffery' or mere

statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989). Here, Plaintiffs allege that the Manitowoc Facility from its inception was plagued with equipment failures and lacked full production capabilities. (*See*, *e.g.*, Doc. 42 at ¶¶ 105, 107). Nonetheless, Wagenhals is alleged to have stated that the Facility was "humming" such that AMMO was "increasing capacity across the [b]oard" and able to support expanding ammunition demands. (*Id.* at ¶ 106). Given that ammunition production was at the heart of AMMO's business and with the context of the partial disclosures that revealed some issues at the Facility, the statement that the Manitowoc Facility was humming is not "so 'obviously unimportant' to shareholders as to warrant dismissal." *Mulligan*, 36 F. Supp. 3d at 968 (finding that statements by a company's officers that the appropriate responses to FDA warnings were "well underway" would likely be material to shareholders).

### 3. Regulatory and Legal Compliance, Risk Factors, and Internal Accounting

Several Defendants also contend, again rather succinctly, that the statements about compliance and internal accounting are inactionable. (Doc. 66 at 22; Doc. 69 at 17–19). AMMO and Smith assert that a list of allegations regarding regulatory compliance risk factors are statements of corporate optimism (Doc. 66 at 22; Doc. 42 at ¶¶ 73, 96, 112, 137); but they do not explain, and the Court does not see, how statements on regulatory matters and the risk of noncompliance are puffery. (Doc. 66 at 22). They raise the same arguments as to the statement about bringing the "accounting team up to par," and indeed Wagenhals raises almost verbatim the same argument. (*Id.*; Doc. 69 at 18). Defendants, as seen above, homed in on particular words or phrases out of the alleged statements to argue that the statements are puffery, and here it is "up to par." Yet, the full statement says that Wiley and others "have worked around the clock to bring the accounting team up to par with the growth of our company. We are fortunate to have our new accounting firm PKF in place." (Doc. 42 at ¶ 78). Whether an accounting team was commensurate with the growth of the Company is ascertainable, not a generalized statement of optimism. The

materiality of this statement remains to be determined, but these Defendants do not raise an argument as to materiality.

Finally, Wagenhals argues that Defendants "disclosed…the very risks Plaintiffs now claim materialized[.]" (Doc. 69 at 18). However, Plaintiffs claims these disclosures were misleading because what was posed as a "risk" had in several ways already transpired. Thus, this argument is unavailing.

The PSLRA and Rule 9(b) require that falsity be pled with particularity, meaning that sufficient detail must be provided to adequately allege a claim. They do not, however, require nor even permit the Court to engage with the ultimate merits of a plaintiff's claim. Accepting the allegations as true and making all reasonable inferences in favor of the non-moving party, Plaintiffs have alleged materially false statements on the foregoing topics. In short, unless otherwise stated, Defendants' Motions to Dismiss as to the misrepresentation or omission element of Plaintiffs' maker liability claim will be denied.

**C. Scienter**

The second element, scienter, is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). To act with scienter, a defendant must have made false or misleading statements either intentionally or with deliberate recklessness. *Zucco*, 552 F.3d at 991.

Adequately pleading scienter requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A strong inference need not be indisputable but must be more than plausible or reasonable. *Webb*, 884 F.3d at 850. Put differently, an inference is strong if it is at least as compelling as any opposing inference that could be drawn from the allegations. *Id.* Thus, a court asks: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

Each Defendant asserts that Plaintiffs failed to plead a strong inference of scienter,

raising arguments about the lack of motive, confidential witnesses, and corrective disclosures, amongst other things.[7] However, the Court tends to agree with Plaintiff that Defendants focus on how certain allegations are insufficient by themselves to raise a strong inference of scienter. Meanwhile, Defendants do not spend much time on the holistic component to the review of scienter allegations. The Court will, initially, lay out the subsets of allegations Plaintiffs have provided to establish scienter before considering whether these allegations give rise to a strong inference of scienter, when considered on the whole.

**1. Confidential Witnesses**

Plaintiffs' allegations of scienter rely, in part, on the statements of eight confidential witnesses ("CWs"). Where the plaintiff relies upon statements by confidential witnesses, the complaint must clear two additional hurdles: 1) the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge, and 2) those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter. *In re Quality Sys.*, 865 F.3d at 1144–45 (citing *Zucco*, 552 F.3d at 995).

Here, Plaintiffs have provided the following CWs:

- CW1 "was employed at AMMO as Vice President of Sales and Marketing from March 2020 to August 2022. CW1 reported directly to Wagenhals and interacted with Wagenhals and Larson on a daily basis. CW1 ran the sales team at the Company." (Doc. 42 at ¶ 40).

- CW2 "was employed by AMMO as a Purchasing Manager from March 2021 to October 2023. CW2 worked out of the Company's Scottsdale, Arizona headquarters and reported to Vice President Beth Cross, who reported directly to CEO Fred Wagenhals." (*Id.* at ¶ 42).

- CW3 "was employed by AMMO as a sales administrator from April 2020 to June

[7] As scienter is a necessary element of both maker and scheme liability claims, this analysis will apply equally to Plaintiffs' scheme liability claim. So, Larson's arguments on scienter will be addressed in this section while recognizing that he is not implicated under Plaintiffs' maker liability claim.

2023. CW3 worked out of the Company' Scottsdale headquarters. CW3 reported to CW1, and at times, directly to Larson and Tod Wagenhals." (*Id.* at ¶ 43).

- CW4 "was a Senior Account Executive at AMMO from 2021 through early 2024. CW4 worked out of AMMO's Scottsdale, Arizona headquarters, and reported to the VP of Sales and Marketing, CW1." (*Id.* at ¶ 44).

- CW5 "was employed at AMMO from March 2021 to June 2023, as a manufacturing engineer. CW5 worked out of Manitowoc, Wisconsin. CW5 reported to Tyler Terp, Engineering Manager, who reported to Mann, the VP of Operations at the Manitowoc Facility." (*Id.* at ¶ 55).

- CW6 "was employed as a Production Manager assigned to the Manitowoc Facility from December 2023 through September 2024. CW6 reported to Mann, the VP of Operations at the Manitowoc Facility, who reported to the CEO Jared Smith." (*Id.* at ¶ 56).

- CW7 "served as a Machine Operator for AMMO out of the Manitowoc Facility from January 2024 through April 2025. CW7 reported to CW6, who reported to Mann." (*Id.* at ¶ 59).

- CW8 "worked as a production manager at AMMO in Manitowoc, Wisconsin, reporting to Mann. CW8 had previously worked at Jagemann, and joined AMMO when AMMO opened the Manitowoc Facility in Summer of 2022, and stayed at AMMO until December 2023." (*Id.* at ¶ 60).

Defendants argue that the CWs lacked personal knowledge, largely did not interact with the Individual Defendants, and gave generalized recollections. (*See*, *e.g.*, Doc. 67 at 13–14; Doc. 18 at 17–18). However, "[t]he Ninth Circuit does not require that every confidential witness must have had direct contact with the Defendants." *Sneed v. AcelRx Pharm., Inc.*, 2024 WL 2059121, at *9 (N.D. Cal. 2024). Rather, "all that is required is sufficient detail to establish that a witness has personal knowledge about the facts that they reported." *Id.* That said, the Court is aware that the "Ninth Circuit has made clear that confidential witness statements cannot create a strong inference of scienter unless the confidential witness 'has reliable personal knowledge of the defendants' mental state.' " *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 766 (N.D. Cal. 2020) (quoting *Zucco*, 552 F.3d at 998). This is not to say that, where as here, many

of the confidential witnesses cannot offer reliable statements on Defendants' state of mind, their statements must be disregarded. *Cf. Shenwick*, 282 F. Supp. 3d at 1146 ("Even if the CWs statements are unreliable as to the individual Defendants' state of mind, they reliably bolster the conclusion that DAU was [the company's] primary user engagement metric.").

Based on their positions at AMMO, CW1–4 provide insight primarily into Larson's role at AMMO and their understanding that Larson's involvement in AMMO was to be kept confidential. (Doc. 42 at ¶¶ 40–44). CW1–4 were all employed by AMMO for at least portions of Class Period, and, though they had varying levels of interactions with the Individual Defendants, if any at all, they all worked at the Company's headquarters in Scottsdale, meaning they would be familiar with the daily happenings and work structure there. (*Id.*) For example, CW1's statements were based on daily interactions with Wagenhals and Larson as well as acting in a leadership role at AMMO, and therefore statements, like "leadership was well aware of the need for discretion while Larson maintained his role and influence within the organization," were not the product of mere office gossip. (Doc. 42 at ¶ 40); *In re Metawave Communs. Corp. Secs. Litig.*, 298 F. Supp. 2d 1056, 1058 (W.D. Wash. 2002) ("The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo.") (internal citations and quotations omitted). The accounting that "CW3 was informed by senior management to keep Larson's involvement in the Company confidential" is, similarly, based on personal knowledge. (Doc. 42 at ¶ 43). And the same goes for CW2's claim that "Larson and Wagenhals shared an office[.]" (*Id.* at ¶ 42).

When taken together, CW1–4s' statements contribute to scienter because they all support the premise that Larson was acting as an officer of AMMO and was doing so in a confidential manner. These statements are sufficiently based on the CWs' interactions with particularly Larson, Wagenhals, and Wiley or their knowledge about AMMO's functioning during the pertinent time. *See Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. 2012) ("Although the confidential witness allegations do not directly show that the Defendants knew their statements were false, the allegations do

provide critical background information about the company's operations during 2008 and 2009 that supports the court's finding.").

It should be noted that CW1's accounts, in particular and on their own, add substantially to inference of scienter. As the Former Vice President of Sales and Marketing, CW1 had first-hand knowledge on the operations of AMMO and the functioning of its senior executives. (Doc. 42 at ¶ 40). Thus, CW1's statements, such as "Wiley worked under Larson and was regularly referred to as Larson's 'puppet' because Wiley would simply sign financial documents and releases drafted by Larson—a situation that was openly joked about during meetings," Larson's role was "deliberately hidden by Wagenhals," and "Larson continued making key decisions at AMMO" despite the Consent Decree, go a long way in establishing a cogent scienter inference. (*Id.*)

As to CW5–8, they worked at the Manitowoc Facility during the relevant time, and their allegations largely concern machinery failures, production limitations, supply issues, and the software used to track production and downtimes. (Doc. 42 at ¶¶ 55–60). Given their on-site involvement in the Facility's operations, CW5–8 have the requisite personal knowledge to speak on the issues at the Manitowoc Facility. True, these CWs, other than CW6, do not report any personal involvement with the Individual Defendants. But their statements are offered to establish the pervasiveness of the problems at the Manitowoc Facility, not any one Individual Defendant's knowledge, and the Court "considers them only for what they say about the [C]ompany's operations at the relevant times." *Washtenaw Cnty. Emps. Ret. Sys.*, 2012 WL 3835078, at *3. The Court notes that CW1 and 4 also offer statements as to the Manitowoc Facility's problems that are, likewise, sufficiently based on their personal knowledge of AMMO's operations during their employment, but once more, only CW1 has any personal knowledge as to the information possessed by Individual Defendants. (*See* Doc. 42 at ¶ 54, 61).

The scope of the reported issues by the CW, such as "most machines fail[ing] during CW5's time at the Company," chronic "problems with the rifle presses," "dye shortages," "using outdated machines," and "persistent servo issues that kept them offline for months

at a time in the brass presses," amongst others, support an inference of scienter. (*Id.* at ¶¶ 55–57, 59–60). *See also Washtenaw Cnty. Emps. Ret. Sys.*, 2012 WL 3835078, at *3 ("The magnitude of the declining collections described by the confidential witnesses and disclosed in later corrective disclosures support a strong inference that the Defendants knew about the collections problem during the class period."). This inference is bolstered as "CW6 met with Smith during his employment, and stated that CW6 reported seeing Smith and other C-Suite executives at the Manitowoc Facility." (Doc. 42 at ¶ 57).

**2. Corrective Disclosures**

Defendants also argue that AMMO's corrective disclosures are not indicative of scienter.[8] (*See* Doc. 66 at 12–14; Doc. 69 at 13–14). Plaintiffs, however, maintain that the admissions demonstrate that Defendants were at least deliberately reckless in their omissions. (Doc. 73 at 51–53). A "corrective disclosure" can be understood as "a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266–67 (S.D. Cal. 2010) (internal quotations and citation omitted).

Plaintiffs have alleged that AMMO "admitted Larson's status as a related party and illicit related party transactions, including the kick-back scheme, in its May 20, 2025 Form 10-K/A Disclosure." (Doc. 42 at ¶ 151). In particular, AMMO stated that "Larson was in fact an executive officer of the Company during the Class Period" and that "he was the second highest paid officer at the Company[.]" (*Id.*) AMMO also disclosed multiple transactions involving Larson, such as entering into a $300,000 promissory note with an LLC wholly owned by Larson, issuing 200,000 shares of Common Stock to an entity controlled by Larson's immediate family member, and Larson receiving $813,863 from a vendor which had a Master Services Agreement with AMMO as a commission from services rendered to AMMO. (*Id.*) Plaintiffs assert that these "admissions stand in stark contrast to the Company's prior representations that it had disclosed all related party

[8] The Court does not find AMMO's reference to *S.E.C. v. Prince*, 942 F. Supp. 2d 108 (D.D.C. 2013) compelling. This case is still in the pleading phase, whereas *Prince* stated the court's findings of fact and conclusions of law post-bench trial. *Id.* at 111–12.

transactions." (*Id.* at ¶ 152).

As for the Manitowoc Facility, Plaintiffs allege that "Smith admitted in November 2023 that the 'big deal' rifle press failed by June 2023, and that he had observed in April 2023 during a walk-through of the facility that this lacked any redundancy to address equipment failures." (*Id.* at ¶ 150). Nonetheless, "Defendants made several statements in Summer of 2023 touting their shift to prioritizing rifle casings and touting the manufacturing capabilities of the new facility." (*Id.*; *see also id.* at ¶¶ 114, 120, 126).

To be sure, "the mere publication of a restatement is not enough to create a strong inference of scienter." *Zucco*, 552 F.3d at 1000. That is, however, unless one of the two recognized exceptions to this general rule exists. *Id.* "The first exception permits general allegations about management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements to create a strong inference of scienter when these allegations are buttressed with detailed and specific allegations about management's exposure to factual information within the company." *Id.* (internal quotations omitted). "The second exception…permits an inference of scienter where the information misrepresented is readily apparent to the defendant corporation's senior management. *Id.* at 1001. Several Defendants argue that neither exception is present here. However, the Court disagrees as to the allegations regarding Larson. Based on the Amended Complaint, following the Consent Decree, Larson was still making key decisions for AMMO, was known by CW1–4 as the leader of the Company, was working on the same floor as the other Company executives and C-Suite officers, and Individual Defendants interacted with Larson on daily basis. Despite this, accepting allegations as true, Defendants omitted "especially prominent facts," like Larson's executive officer status, related party transactions, and off-balance sheet arrangements. *Id.* Because this information should have been readily apparent to Individual Defendants, the Court finds AMMO's restatements indicative of scienter.

Not to mention, other courts have acknowledged that "[t]he scope and significance of the events underlying a disclosure can also support an inference of scienter." *Rihn v.*

*Acadia Pharm. Inc.*, 2016 WL 5076147, at *9 (S.D. Cal. 2016). The Court notes that the corrective disclosures as to Larson's role, related party transactions, and kickback scheme are weighty, strengthening the inference that Defendants knew about these matters when the initial disclosures were made. (*See* Doc. 42 at ¶¶ 145–48, 151). The Manitowoc Facility's importance and the alleged pervasiveness of its issues contribute to an inference of scienter. *See Rihn*, 2016 WL 5076147 at *9. However, much more convincingly, the corrective disclosure regarding the Facility obviates that Smith possessed knowledge contrary to his alleged statements and consequently is indicative of scienter. *See Lucid Alt. Fund, LP v. Five9, Inc.*, 821 F. Supp. 3d 1073, 1096–97 (N.D. Cal. 2026).

**3. Core Operations Theory**

Additionally and in line with the explanation just above, Plaintiffs allege that Defendants' scienter is "supported by the fact that the alleged misstatements and omissions concerned AMMO's core operations: its Ammunition Segment."[9] (Doc 42 at ¶ 155; Doc. 73 at 58–62).

The core operations theory presumes that "corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (internal quotations and citation omitted). There are three circumstances under which core operations allegations can support a strong inference of scienter:

> (1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the rare circumstances when they are not particularized, but the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

*Five9*, 821 F. Supp. 3d at 1098 (internal quotations and citation omitted). "Proof under this theory is not easy." *Intuitive Surgical*, 759 F.3d at 1062.

---

[9] Plaintiffs' Response also discusses allegations concerning Larson's role and related party transactions in the section discussing core operations allegations, but the allegations referenced primarily stem from CW accounts that are addressed above. (*See* Doc. 73 at 58–59). Moreover, no specific allegation about Larson's role as a core operation is pled in the Amended Complaint.

Defendants submit that Plaintiffs' allegations that the Ammunition Segment was the driving factor behind AMMO's revenue during the Class Period are insufficient to amount to the rare circumstances where core operations establish scienter. (Doc. 66 at 18; Doc. 67 at 14–15). The Court acknowledges and agrees that the situations where the core operations theory by itself establish scienter are exceedingly rare. *See*, *e.g.*, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) (finding the defendants' scienter established where they were "directly responsible for [the company's] day-to-day operations" "so it [was] hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work"). Be that as it may, core operations "allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter[.]" *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). "This view takes such allegations into account when evaluating all circumstances together." *Id.* at 786.

Plaintiffs have alleged that, before the Merger, the Ammunition Segment was its only revenue source, and afterwards the Ammunition Segment still accounted for "more than 63% of AMMO's revenue." (Doc. 42 at ¶¶ 156–57). They further note that analysts and Wiley himself routinely recognized the Ammunition Segment as AMMO's "core" sector. (*Id.* at ¶¶ 158–60). Thus, Plaintiff reasons that "it would be absurd to infer that AMMO's most senior executives were unaware of the construction and manufacturing issues experienced by the Manitowoc Facility, the only facility that would manufacture products for the Ammunition Segment after the planned move to the facility." (*Id.* at ¶ 161).

In regard to Defendants' information access, Plaintiffs have alleged that Individual Defendants each held senior-level executive positions within AMMO, and due to these roles, Individual Defendants had "access to material information available to them but not to the public." (*Id.* at ¶¶ 22–26, 28). However, with a few exceptions, the Court notes that the Amended Complaint does not contain detailed allegations about Individual Defendants' responsibilities in AMMO's operations nor Individual Defendants' "exposure to factual

information within the company." *S. Ferry LP*, 542 F.3d at 785. The only instances in the Amended Complaint that speaks to an Individual Defendant's access to information include: CW1's statement that Larson was aware of the actual production capacity numbers of the Facility from the VP of Operations; CW6's statement that he saw Smith at the Facility; and Wagenhals's statement that he "tracks production capacity every day," including by "get[ting] on a call every morning at 8 o'clock" that focused on "numbers, numbers, numbers." (Doc. 42 at ¶¶ 54, 57, 153 (emphasis omitted)). In addition, several CWs corroborate that production issues were recorded in "Plex" software, but there is no particularized allegation that any Individual Defendant accessed or reviewed the information in this software.

Upon consideration of the foregoing, the Court agrees that the prominence and importance of the Ammunition Segment to AMMO's revenue as well as the executive roles held by Individual Defendants readily contribute to the inference of scienter. But the Court is not willing to find that these circumstances amount to the rare circumstances where scienter may be attributed on core operations allegations alone. *C.f. Blake v. Canoo Inc.*, 807 F. Supp. 3d 1061, 1085 (C.D. Cal. 2025) ("Given the TAC's allegations regarding the importance of the engineering services pipeline to [defendants'] three-pronged, phased go-to-market strategy, it would be absurd to suggest that the Individual Defendants…were not aware of the collapse of the pipeline in December 2020."). Nonetheless, given the other allegations contributing to scienter, whether the core operations theory supports an inference of scienter alone is a nonissue.

**4. Resignation and Stock Trading**

Plaintiffs have put forward additional allegations that they claim contribute to the inference of scienter, including Wiley's resignation as CFO and Wagenhals stock sales during the Class Period. (Doc. 42 at ¶¶ 143, 162). They also note that AMMO did not properly disclose Flynn or Larson in their Section 16(a) disclosures and that neither Flynn nor Larson filed a Form 3 or 4 for stock transactions during the Class Period. (*Id.* at ¶¶ 169–70).

**a. Wiley's Resignation**

First, Plaintiffs allege that, effective September 20, 2024, Wiley resigned "upon request of the Board." (*Id.* at ¶ 143). In the press release announcing Wiley's resignation, the Company also stated that the board had "retained a law firm to conduct an independent investigation" into "whether the Company and its management control persons at the time: (i) accurately disclosed all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (ii) properly characterized certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; and (iii) appropriately valued unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022." (*Id.*) Whereas Plaintiff claims that Wiley's resignation adds to an inference of scienter (Doc. 73 at 57), Wiley argues that his resignation adds nothing to scienter. (Doc. 68 at 143–14).

An employee's resignation supports an inference of scienter when "the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances." *Zucco*, 552 F.3d at 1002. In either case, "a plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Id.* Here, Plaintiffs rest on the instigation of the independent investigation on the same day that Wiley's resignation was announced to establish the accompanying "suspicious circumstances." But, citing *Zucco*, Wiley argues his resignation was not "so numerous or suspicious" as to raise an inference of scienter nor can his resignation shortly before the Company issued a restatement establish scienter without more. (Doc. 68 at 13–14). Wiley further states that the independent investigation was not explicitly tied to his resignation. (*Id.* at 13). Weighing these considerations, the Court finds Wiley's resignation to at least be minimally probative of scienter. Though maybe not explicitly tied to his resignation, the investigation's announcement, on the same day and into several of the same matters at issue here, speaks to some suspicious circumstances.

**b. Wagenhals's Stock Sales**

As to Wagenhals's stock trades, Plaintiffs allege that Wagenhals "took advantage of AMMO's artificially inflated stock price to reap over $1,105,891.44 in insider sales," specifically noting five trades occurring between February 15, 2024 and March 4, 2024. (Doc. 42 at ¶ 162). They continue to allege that "Wagenhals profited from stock sales in a manner that was out of line with prior trading histories over a comparable period in the past." (*Id.*) However, Wagenhals and Plaintiffs disagree as to whether the stock trades were pled with sufficient detail to be indicative of scienter. (Doc. 69 at 15–16; Doc. 73 at 68).

Generally, stock sale allegations do not raise an inference of scienter unless the plaintiffs allege specific facts showing that the sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (internal quotations and citation omitted). Among the relevant factors for a court to consider are: 1) the amount and percentage of shares sold by insiders; 2) timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history. *Id.*

The Court agrees with Defendants that Plaintiffs' conclusory assertion that these stock trades were "out of line with prior trading histories" is insufficient to support a strong inference of scienter under the heightened pleading standards. *See Curry v. Yelp Inc.*, 875 F.3d 1219, 1226–27 (9th Cir. 2017) (explaining that, where the plaintiffs made no allegations and gave no evidence of the defendants' prior trading history, the plaintiffs failed to plead that the stock sales were dramatically out of line with prior practices). In their Response, Plaintiffs point to additional evidence of Wagenhals's stock sales history that, had it appeared in the Amended Complaint, would quite possibly add to an inference of scienter (*see* Doc. 73 at 68); however, there are no supporting allegations in the Amended Complaint, a fact which cannot be altered by Plaintiffs' briefing. *See Apple Inc. v. Allan & Assoc. Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. 2020).

**c. Lack of Stock Information**

Finally, on this topic, Flynn argues that his lack of Form 4 filings is not indicative of scienter because he was not an AMMO officer. (Doc. 64 at 19–20). Similarly, Larson notes the lack of any stock sale information on his behalf. (Doc. 67 at 12). The absence of stock sale information in regard to these two Defendants assuredly does not heighten an inference of scienter at this time. But the Court is mindful that Plaintiffs have pled that they believe "adequate discovery will reveal that Chris Larson and John Flynn took advantage of AMMO's artificially inflated stock price and the material non-public information known to them to reap profits from insider sales during the Class Period." (Doc. 42 at ¶ 171). And "Rule 9(b) does not…require plaintiffs in a securities fraud case to set forth facts which, because no discovery has yet occurred, are in the exclusive possession of the defendants." *Deutsch v. Flannery*, 823 F.2d 1361, 1366 (9th Cir. 1987) (internal quotation and citation omitted). Consequently, the Court finds that the lack of stock sale information for Flynn or Larson neither contributes to nor detracts from an inference of scienter.

**5. Motive**

Lastly, several Defendants have argued that Plaintiffs have not pled any plausible motive for the alleged misrepresentations or scheme. (*See* Doc. 67 at 11–13; Doc. 69 at 15–16). Plaintiff states that, while a motive is not required to establish scienter, motive is nonetheless pled in the Amended Complaint. (Doc. 73 at 69–70).

True enough, a plaintiff need not establish a plausible motive and may still be able to show a strong inference of scienter. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021). At the same time, the Ninth Circuit has acknowledged that the absence of a plausible motive "makes it much less likely that a plaintiff can show a strong inference of scienter." *Id.* Accordingly, "where a complaint otherwise asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness," a failure to allege a motive to defraud will not prevent the plaintiff from meeting its burden of pleading a strong inference of scienter. *Id. See also In re Fastly, Inc. Sec. Litig.*, 801 F.

Supp. 3d 880, 914 (N.D. Cal. 2025).

"Generally, [the Court] expect[s] that a financial motive for securities fraud will be clear; for example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information." *Prodanova*, 993 F.3d at 1107. This premise comes to fruition here as Plaintiffs have adequately alleged that Larson and his family members reaped personal benefits, including AMMO awarding a lucrative no-bid contract to Larson's brother, issuing 200,000 shares of Common Stock to Larson's immediate family member, and $814,863 in payments to Larson from a vendor as a commission from services rendered to the Company. (*See* Doc. 42 at ¶ 151).

Larson argues, at this point, that the Amended Complaint lacks any allegation that Larson's conduct fell within the Consent Decree's prohibitions. (Doc. 67 at 12). However, *In re VeriFone Holdings*, the Ninth Circuit explained that a strong inference of scienter that anyone "*actually knew*" that their actions were improper is "not the only permissible inference. Recklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b–5." 704 F.3d at 708. Though there may not be an explicit allegation that asserting that Defendants knew Larson was acting in violation of the Consent Decree, the Amended Complaint provides plentiful allegations to infer that Defendants were acting with reckless disregard, given the alleged scope of Larson's responsibilities and influence. Even more so, the Amended Complaint contains allegations that do give rise to the inference that Individual Defendants were acting with actual knowledge of their violations. (*See*, *e.g.*, Doc. 42 at ¶ 40 ("CW1 states that Larson's role as an AMMO officer was concealed due to his SEC Consent Decree, a fact known by Wagenhals and others in the Company but deliberately hidden by Wagenhals and other Company officials.")).

In regard to Wagenhals, the Court briefly notes that the Amended Complaint contains an allegation that, in the May 20, 2025 restatements, "the Company disclosed additional related party transactions involving Wagenhals." (*Id.* at ¶ 13). This allegation without more may not establish a plausible motive, but it does hint at Wagenhals's

pecuniary motive. This motive might have further materialized had Wagenhals's stock sales been properly pled, but the allegation suffered from the defect described above.

As to the other Individual Defendants, motive is more tenuous. From the Amended Complaint, it can be ascertained that Individual Defendants acted 'to conceal" Larson's involvement in the Company due to the Consent Decree. (*See*, *e.g.*, Doc. 42 at ¶ 40). It has also been alleged that Individual Defendants shared a "close relationship," which gives some additional credence to their motive to conceal their alleged wrongdoings. (Doc. 42 at ¶ 154). However, these allegations give rise only to a speculative motive at best and are not pled with particularity. *See Lucid Alt. Fund*, 821 F. Supp. 3d 1073 (N.D. Cal. 2026) (finding allegations that "defendants acted to protect [the CEO's] nepotistic hires, many of whom worked in the sales department, and to inflate the company's holdings for a potential acquisition" to be speculative and lacking particularity). Even still, the lack of a particularized motive as to most Individual Defendants is not necessarily fatal to scienter.

### 6. Holistic Review and Competing Inferences

The Court will now consider whether, when viewed in their entirety, Plaintiffs' allegations suffice to create a strong inference of scienter as to each Individual Defendant regarding Larson's involvement with AMMO and the Manitowoc Facility in turn. Plausible opposing inferences will, likewise, be considered at this stage. *See Tellabs*, 551 U.S. at 323.

#### a. Larson's Role and Transactions

Plaintiffs have alleged that AMMO "admitted Larson's status as a related party and illicit related party transactions, including the kick-back scheme, in its May 20, 2025 Form 10-K/A Disclosure." (Doc. 42 at ¶ 151). In particular, AMMO stated that "Larson was in fact an executive officer of the Company during the Class Period" and that "he was the second highest paid officer at the Company[.]" (*Id.*) AMMO also disclosed multiple transactions involving Larson, such as entering into a $300,000 promissory note with an LLC wholly owned by Larson, issuing 200,000 shares of Common Stock to an entity controlled by Larson's immediate family member, and Larson receiving $813,863 from a

vendor which had a Master Services Agreement with AMMO as a commission from services rendered to AMMO. (*Id.*) Plaintiffs allege that these "admissions stand in stark contrast to the Company's prior representations that it had disclosed all related party transactions." (*Id.* at ¶ 152).

Furthermore, Plaintiffs assert that "given the close relationship between Larson and the other Individual Defendants, especially Wagenhals and Wiley, Defendants were aware of the related party dealings of Larson, including the contract to his brother's Company and the kickbacks that were later admitted to by the Company." (*Id.* at ¶154; *see also id.* at ¶ 41). To lend additional credence to scienter, Plaintiffs allege that "[m]ultiple CWs reported knowing that Larson was officially banned from serving as an executive officer of the Company but that the Company allowed him to serve in a de facto role anyway. CW1, a senior level executive at the company, noted that employees joked about Wiley acting as Larson's puppet."[10] (*Id.*; *see also id.* at ¶ 5 (Urvan entered into negotiations with AMMO, in 2021, which were lead on the AMMO side by Larson, Wagenhals, and Wiley); ¶ 40 ("CW1 states that Larson's role as an AMMO officer was concealed due to his SEC Consent Decree, a fact known by Wagenhals and others in the Company but deliberately hidden by Wagenhals and other Company officials."); ¶ 42 ("CW2 stated that Larson and Wagenhals shared an office, that Wagenhals and Larson ran the Company together, and that Wiley worked under the leadership of Larson."); ¶¶ 43–44 (CW3 and 4 confirming Larson's position at AMMO as well as CW3 being instructed to keep Larson's involvement confidential)). What is more, Wiley's resignation was announced at the same time that the Company announced an independent investigation into the matters presently at issue. And lastly, the Company issued extensive corrective disclosures acknowledging Larson's role at AMMO and his various transactions while there.

Based on the cumulative sum of the allegations discussed above, the Court finds

[10] Wiley makes much of the "puppet" comment in his briefing. He claims that, had he been merely a puppet, he inherently could not have acted with the requisite state of mind. (*See* Doc. 68 at 11). The Court does not find this argument persuasive. Nothing in the Amended Complaint suggests that Wiley was not acting knowingly or was not acting of his own free will when signing off on decisions for Larson. Being labeled a "puppet" does not absolve Wiley of a finding of the requisite scienter.

that a strong inference of scienter has been established as to Larson, Wagenhals, Wiley, and thereby AMMO for Larson's involvement with AMMO. Defendants raise the countervailing inference that Defendants believed that Larson was in compliance with the Consent Decree as it did not wholesale prohibit Larson from working at AMMO or even being entrusted with significant responsibilities. On the other hand, Plaintiffs allege that Larson performed policy making functions in line with SEC's definition of an executive officer such that Larson, Wagenhals, and Wiley were at least deliberately reckless. Moreover, the CW1's account that Larson's position with AMMO was concealed strengthens the inference that Larson, Wagenhals, and Wiley each acted with scienter. *See*, *e.g.*, *Snellink*, 870 F. Supp 2d at 941 ("[The CEO's employment history] was likely omitted because its inclusion would have sullied [the company's] reputation—thus, the purpose in omitting the connection is manifest."). Thus, Defendants' alternative inference is no more compelling than the one established by the sum of Plaintiffs' allegations.

Nevertheless, as to Smith, the Court finds that Plaintiffs have not pled scienter with particularity. The Court recognizes that close relationships between all Individual Defendants have been alleged, but the Amended Complaint is otherwise devoid of particularized allegations about Smith's interactions with Larson that allow one to infer knowledge or reckless disregard. While it can be inferred that someone in Smith's position at AMMO would be aware of Larson's role and dealings with AMMO, the Amended Complaint does not provide sufficient allegations to turn this inference into a strong one. *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1011 (S.D. Cal. 2000) ("[F]actual allegations must transcend rational or reasonable inferences, and must instead raise a 'strong inference' of scienter.").

Scienter in regard to Flynn is not necessary to discuss to the extent it concerns Larson's involvement with AMMO because Flynn was not alleged to have made a misrepresentation or omission on this topic. And, as will be seen below, an act in furtherance of a scheme has not been sufficiently pled as to Flynn.

/ / /

### 2. The Manitowoc Facility

Scienter as to the statements regarding the Manitowoc Facility is more dubious as to all Individual Defendants.[11] First, in regard to Flynn, only his position as Vice President and the fact that the Ammunition Segment accounted for over half of AMMO's revenue at the relevant time establish his scienter. As noted above, the CW1 and CW4–8 support the notion that the Company leaders either were or should have been aware of some of the manufacturing issues at the Facility. But, especially given that there is only one statement about the Facility attributed to Flynn, these allegations are not sufficiently particularized to raise a strong inference of scienter.

Wagenhals, Wiley, and Smith present a closer call. The core operations allegations are discussed above. The Court finds these allegations are indicative of scienter but do not establish a strong inference on their own. Looking holistically at the other evidence, the Court again credits CW accounts to the extent they speak to the pervasiveness of the issues at the Facility. CW6, in particular, noted that Mann told him that "Wiley had noted that the Company was not able to meet the [its] transition timeline in 2022." (Doc. 42 at ¶ 56). But the Court is unable to discern any other particularized allegation about Wiley other than his resignation. Ultimately, the sum of these allegations does not give rise to a strong inference of Wiley's scienter as it does not indicate any particular information held by Wiley that would make his statements intentionally or recklessly misleading.

Turning to Wagenhals, the most compelling allegation in furtherance of scienter is Wagenhals's statement that he "tracks production capacity every day," and "get[s] on a call every morning at 8 o'clock" that was focused on "numbers, numbers, numbers." (*Id.* at ¶ 153). Arguably, there is no indication what information was conveyed on these calls; however, as alleged, the calls regarded production capacity, which gives rise to the cogent

[11] The Court finds that it is not necessary to discuss Larson's scienter in this Section. One CW did state that "Larson was aware" of the "actual production capacity numbers" from the VP of Operations. (Doc. 42 at ¶ 54). The problem is that Larson is not implicated under Plaintiffs' maker liability claim, and as will be discussed below, the Court does not find that Plaintiffs' scheme liability claim is adequately pled as to the Manitowoc Facility. Thus, Larson's scienter, insofar as it relates to the Facility, is irrelevant. This finding, however, does not extend to the related party transaction with Larson Building.

inference that Wagenhals was informed of the production shortcomings and machinery failures hindering the Facility. This allegation coupled with his position as CEO and the prominence of the Ammunition Segment at AMMO gives rise to a compelling inference that Wagenhals was aware that his statements of the Manitowoc Facility's production capacity were misleading during his time as CEO. Wagenhals does not offer a competing inference on this subject, and the Court is not presently convinced that a more cogent one could be presented. Therefore, scienter has been established as to Wagenhals for the statements alleged in paragraphs 75, 83, 98, and 104.

Lastly, as to Smith, there is a statement that CW6 "met with Smith during his employment" and recalled seeing Smith and other C-Suite executives at the Facility. (*Id.* at ¶ 57). This statement is not overly helpful given its lack of details, and the inference is otherwise left to Smith's position as CEO and core operation allegations, which the Court does not find sufficient to establish scienter. That said, Plaintiffs do establish a strong inference of scienter in one regard. As alleged, Smith "admitted in November 2023 that the 'big deal' rifle press failed by June 2023, and that he had observed in April 2023 during a walk-through of the facility that this lacked any redundancy to address equipment failures." (*Id.* at ¶ 150); *see In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *13 (N.D. Cal. 2025) (finding scienter sufficiently pled where "Defendants had contemporaneous knowledge of information that contradicted the representations Defendants made to their investors"). Because Smith admitted to adverse knowledge at the time of the statements, Plaintiffs have pled a strong inference of scienter as to Smith's statements touting the Facility in paragraphs 114, 120, 122, 124, and 128.

In sum, based on the totality of the allegations, Plaintiffs have pled a strong inference of scienter as to Larson, Wagenhals, Wiley, and AMMO for their scheme liability claim. On their maker liability claim, Plaintiffs showed a strong scienter inference in two regards: 1) against Wagenhals, Wiley, and AMMO for misrepresentations about Larson, and 2) against Wagenhals, Smith, and AMMO for misrepresentations about the Manitowoc Facility. A strong inference of scienter has not been alleged as to Flynn.

**D. Loss Causation**

Finally, on Plaintiffs' Section 10b claims, Defendants argue that Plaintiffs have not sufficiently alleged loss causation. *Borteanu v. Nikola Corp.*, 2023 WL 11017679, at *20 (D. Ariz. 2023) ("The Court's analysis of loss causation regarding Plaintiff's 'maker liability' theory…applies equally in force to Plaintiff's 'scheme liability' theory.").

To plead loss causation, a plaintiff must allege facts showing that the "share price fell significantly after the truth became known." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (citation omitted).

"Identifying corrective disclosures is "the most common way for plaintiffs to prove that the truth became known." *Alger Dynamic Opportunities Fund v. Acadia Pharm. Inc.*, 756 F. Supp. 3d 852, 877 (S.D. Cal. 2024) (citing *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020)) (cleaned up). A plaintiff seeking to prove loss causation by relying on one or more corrective disclosures "must show that: (1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) disclosure of the truth caused the Company's stock price to decline and the inflation attributable to the misstatements to dissipate." *In re BofI Holding*, 977 F.3d at 791.

Here, Plaintiffs allege that the "truth became known" through a series of partial disclosures relating to production issues at the Manitowoc Facility, and the Amended Complaint explains that a drop in stock price accompanied each of these disclosures. (Doc. 42 at ¶¶ 100–103, 108, 131–32); *see Jaeger v. Zillow Group, Inc.*, 644 F. Supp. 3d 857, 875 (W.D. Wash. 2022) (finding loss causation sufficiently pled where the plaintiff alleged that "the 'truth became known' as a result of the various partial disclosures" and "[a] resultant stock drop accompanied each of these disclosures"); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("That a stock price drop

comes immediately *after* the revelation of fraud can help to rule out alternative causes.). Though it should be noted that the Court's rulings on scienter make at least one of the disclosures irrelevant, the Court still finds that loss causation has been sufficiently pled for the surviving misstatements, based on the corrective disclosures.

The November 14, 2022, and February 13, 2023 disclosures reveal production capacity limitations and lost revenues, but Plaintiffs plausibly argue that the subsequent disclosure further revealed the scope of the issues at the Facility. (Doc. 42 at ¶¶ 100–103, 108). And the November 9, 2023 disclosure revealed that a particular, key piece of equipment was not functional. (*Id.* at ¶¶ 131–32). Plaintiffs have alleged misleading statements by Wagenhals and Smith commending the Facility and claim that these partial disclosures gradually revealed the misleading nature of the alleged statements. Each partial disclosure was, again, accompanied by a drop in stock price. *In re BofI Holding*, 977 F.3d at 794 (reminding that showing loss causation at this stage should not prove burdensome).

As to the loss causation for the misstatements concerning Larson, Plaintiffs have, similarly, alleged that the release of the Urvan Complaint, the announcement of Wiley's resignation and the independent investigation, and the restatement revealing Larson's involvement with AMMO each caused a drop in stock price. (Doc. 42 at ¶¶ 9, 12–13).

AMMO argues that Urvan Complaint identified Larson's role at AMMO in 2023, despite the Amended Complaint asserting the same through May 2025, and therefore the subsequent alleged disclosures on this topic did not provide any new information to the market. (Doc. 66 at 24–25). However, AMMO both states that the Urvan Complaint, wherein Urvan, "just one board member, believed Larson was an officer," is "not probative of a correction because it sa[id] nothing about what the Company believed," yet AMMO then states that the announcement of the investigation and the May 20, 2025 disclosure "cannot be used to show a correction of what was already known at the time" because "[i]nformation about Larson was disclosed in the Urvan Complaint." (*See* Doc. 77 at 17–18). How the Urvan Complaint does not constitute a corrective disclosure because it is not indicative of the Company's belief but simultaneously imparts all the necessary

information to the market such that the Company's restatement cannot be used to show a correction is unclear.

Even accepting the premise that the May 20, 2025 disclosure revealed no new information, Ninth Circuit caselaw reflects "the understanding that some information, although nominally available to the public, can still be 'new' if the market has not previously understood its significance." *In re BofI Holding*, 977 F.3d at 793. So, assuming it contained no new information, the May 20, 2025 disclosure is not necessarily foreclosed from serving as a corrective disclosure demonstrating loss causation. Nonetheless, the Court takes Plaintiffs' point that the May 20, 2025 disclosure included previously unknown information about further related party transactions and Larson's off-balance sheet arrangements. *Bernstein v. Ginkgo Bioworks Holdings, Inc.*, 2023 WL 11996105 (N.D. Cal. 2023) (finding that a report that solidified previously undisclosed relationships "satisfie[d] the loss causation element, particularly given that some information provided was not publicly available"). Therefore, the Court finds that May 20, 2025 disclosure and the announcement of the investigation suffice to show loss causation, as they were both followed by a drop in stock price the next day. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (confirming that the announcement of an investigation and subsequent corrective disclosure can form the basis of a viable loss causation theory). Because the Urvan Complaint was also followed by a next day drop in stock price (Doc. 42 at ¶ 111), it also supports Plaintiffs' loss causation. *In re BofI Holding*, 977 F.3d at 793 ("If the market regarded his factual allegations as credible and acted upon them on the assumption that they were true, as the shareholders have plausibly alleged here, [Urvan] allegations established fire and not just smoke.").

Finally, while Defendants highlight the amount of time that elapsed between the Urvan Complaint, the investigation, and the disclosure, they offer no binding authority that prescribes any time limits to a loss causation theory. Similarly, there is no requirement that market reactions may only occur on one occasion, when new information is revealed or solidified. Therefore, Plaintiffs have adequately alleged loss causation.

**E. Scheme Liability**

The Court next addresses Plaintiffs' claim brought under Rule 10b–5(a) and (c). Unlike Plaintiffs' maker liability claim, their scheme liability claim is brought against all Defendants. (*See* Doc. 42 at 77). Notably, Plaintiffs' scheme liability claim is based on Larson's involvement with AMMO, not the Manitowoc Facility. (*Id.* at ¶¶ 184–92). In their Motions, if addressed at all, Defendants generally and succinctly argue that Plaintiffs' scheme liability claim is just a repackaged version of Plaintiffs' maker liability claim, lacking any additional allegations of Defendants' conduct. (*See* Doc. 64 at 21–22; Doc. 66 at 27; Doc. 68 at 21).

As an initial matter, the Court quickly notes that Plaintiffs' scheme liability claim in the Amended Complaint mentions the Manitowoc Facility. (*See* Doc. 42 at ¶ 187). However, Plaintiffs' Response primarily concerns the allegations relating to Larson. (*See* Doc. 73 at 75–79). In consequence, the Court will focus its decision on scheme liability as to the Larson-related allegations, and regardless, it finds scheme liability as to the Manitowoc Facility is not sufficiently alleged to state a claim.

The elements of a scheme liability claim, under § 10(b) and Rule 10b-5(a) and (c), are materially the same as those of a maker liability claim with the exception of the first requirement. *See Carvana*, 759 F. Supp. 3d at 967 (citing *Desai v. Deutsche Bank Securities Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009)). Whereas Rule 10b–5(b) imposes liability against only those who "make any untrue statement of a material fact," subsections (a) and (c) make it unlawful "to employ any device, scheme, or artifice to defraud" or "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a)–(c). Thus, as opposed to a statement or omission, plaintiff must allege that "the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme[.]" *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1206 (N.D. Cal. 2024).

The Court finds that, for Larson, Wagenhals, and Wiley, the acts in furtherance of

scheme are readily alleged. Accepting the allegations in the Amended Complaint as true, Larson acted as the shadow CEO and CFO of AMMO in violation of the Consent Decree, and in doing so, entered into lucrative arrangements for himself and related parties. (Doc. 42 at ¶ 13). Wiley acted as a conduit to conceal Larson's presence by signing off on financial documents. (*Id.* at ¶ 40). And Wagenhals allowed Larson to run AMMO alongside him. (*Id.*) These acts, accompanied by efforts to keep Larson's role at AMMO discrete, all contributed to the scheme alleged by Plaintiffs. Therefore, as the Court's findings above to scienter and loss causation are equally applicable to this claim, Plaintiffs have pled a sufficient scheme liability claim against Larson, Wagenhals, Wiley, and AMMO.

However, again as to Smith, there are no particularized allegations; and Flynn's alleged acts, the few alleged, cannot reasonably seen as done in furtherance of the scheme. The allegation that Flynn, Larson, and Wagenhals were referred to as a "criminal triumvirate" does not speak to Flynn's actions, nor is it clear how Flynn sending someone to check on an allegedly intoxicated Larson furthered the scheme. (*See* Doc. 42 at ¶¶ 40–41). Therefore, Flynn and Smith are dismissed from Plaintiffs' scheme liability claim.

**F. Section 20(a) Violation**

Turning to Plaintiffs' third and final claim, Plaintiffs have alleged a violations of Section 20(a) of the Exchange Act against Wagenhals, Larson, and Smith. (Doc. 42 at ¶¶ 203–08). Because maintaining a Section 20(a) claim depends on establishing a primary violation of underlying federal securities law, such as Section 10(b), Defendants argue that Plaintiffs' Section 20(a) fails due to Plaintiffs' inability to plead such a violation. (*See* Doc. 66 at 26–27; Doc. 69 at 20–21). However, at this point, the Court has found that Plaintiffs' have adequately alleged primary violations of Rule 10b–5, so this argument fails. Still, Larson argues that Plaintiffs failed to sufficiently allege that Larson was a "control person," and Larson argues that he is, at least, not liable for the portions of the Class Period that he was not a control person at AMMO. (Doc. 67 at 16–18; Doc. 66 at 26–27).

"Section 20(a) requires plaintiff to allege (1) a primary violation of federal securities law; and (2) that defendant exercised actual power or control over the primary violator." *E. Ohman*, 81 F.4th at 946. " 'Control' is defined in the regulations as the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person[.]" *No. 84 Employer-Teamster Jt. Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (cleaned up). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard*, 228 F.3d at 1065 (internal citation and quotation marks omitted).

Initially, the Court does note that the only other Individual Defendant remaining in the action is Wiley. And a plaintiff "may not pursue a claim for 'controlling person' liability under Section 20(a) where they also assert direct liability under Section 10(b)." *Retail Wholesale Dept. Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 790 F. Supp. 3d 763, 781 (N.D. Cal. 2025). Therefore, given his direct liability in Plaintiffs' maker and scheme liability claims, Wagenhals will be dismissed from Plaintiffs' Section 20(a) claim. Additionally, Smith will be dismissed from this claim because the Court is without sufficient facts showing that Smith exercised control over Wiley, apart from his position as CEO. *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987) (position alone is ordinarily insufficient).

That said, the Court finds that, as to Larson, Plaintiffs' may proceed with their control person liability claim, based on the Wiley's implication in Plaintiffs' maker liability claim. Larson argues that he was not a control person and only ever acted as the "Vice President of Finance." (Doc. 67 at 17). He further claims that he is not alleged to have signed any of the Company's public filings, nor be in charge of any principal business unit. (*Id.*) However, Plaintiffs have alleged that Larson acted as the shadow CEO and CFO, jointly ran the Company with Wagenhals, and Wiley worked under Larson. (Doc. 42 at ¶¶ 38, 40, 44). Notably, they further allege Wiley would "simply sign financial documents

and releases drafted by Larson." (*Id.* at ¶ 40); *S.E.C. v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) (explaining that "indicia of 'control' include whether the person managed the company on a day-to-day basis and was involved in the formulation of financial statements"). The Court accepts these allegations as true and, when viewed in the light most favorable to Plaintiffs, finds them sufficient to maintain a claim under Section 20(a) against Larson.

To briefly address the extent of time Larson can be found liable as a control person, "[defendants] cannot be liable as control persons for the period after they left the Company," that is unless "evidence [shows] that they continued to control [the Company] after stepping down as officers[.]" *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 61 (E.D.N.Y. 2011). Limiting the time period of the claim might prove to be necessary. Nevertheless, the relevant time period will ultimately be a factual determination that the Court is not able to make at this time.

**G. Shotgun and Puzzle Pleading**

Lastly, Larson argues that Plaintiffs' Amended Complaint is an impermissible shotgun pleading. (Doc. 67 at 9–10). And Wagenhals, similarly, claims that it relies on "group pleading." (Doc. 69 at 19). The Court disagrees. Rule 8 requires that a complaint make a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[C]omplaints are 'impermissible shotgun pleadings' when they 'overwhelm defendants with an unclear mass of allegations and make it difficult to impossible for the defendants to make informed responses to the plaintiff's allegations.' " *Horne v. Seattle City Light*, 2026 WL 445559, at *1 (W.D. Wash. 2026) (citation omitted). Larson's primary contentions are that the Amended Complaint re-alleges all preceding counts, refers to "Defendants" in mass, and lumps in Larson into the maker liability although the claim is not pled against him. (Doc. 67 at 10). While the Amended Complaint at times refers to Defendants or Individual Defendants collectively, there are simultaneously allegations throughout the Amended Complaint that identify specific Defendants and their conduct. Even if Plaintiffs' claims all adopt the allegations of the

preceding counts and the claims collectively refer to Defendants, the Amended Complaint's allegations are not so indecipherable so as to violate Rule 8. *See In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1005 (N.D. Cal. 2024). The Amended Complaint is discernible on its face, and the Court was not "forced to wade through a morass of allegations, trying to determine how the facts might relate to the causes of action," to comprehend it. *Gibson v. City of Portland*, 165 F.4th 1265, 1290 (9th Cir. 2026). Therefore, the Amended Complaint will not be dismissed as a shotgun pleading.

The Court, likewise, will not dismiss the Amended Complaint as a "puzzle pleading." (Doc. 68 at 21). A complaint is "puzzle pleaded" when it makes it "recites lengthy statements attributed to the defendants, followed by a generalized list of reasons that the statements may have been false or misleading or a generalized list of omissions that were required to make the statements not misleading." *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1274 (N.D. Cal. 2019) (cleaned up). Having reviewed the Amended Complaint, it was not "exceedingly difficult to discern precisely which statements are alleged to be misleading[.]" *Matthys v. Kyverna Therapeutics, Inc.*, 2026 WL 2110072, at *4 (N.D. Cal. 2026) (internal quotations and citation omitted). Yes, the Amended Complaint includes lengthy block quotes, but it also "uses bold emphasis to identify with sufficient precision the actionable statements therein." *Id.* Because the statements alleged to be false or misleading are appropriately identified, the Amended Complaint will not be dismissed for puzzle pleading.

## V. Conclusion

For clarity's sake, the Court will sum up its rulings. First, because neither a strong inference of scienter nor a deceptive or manipulative act was sufficiently pled as to Flynn, Flynn's Motion to Dismiss will be granted.

Plaintiffs may proceed with their maker liability claim (Count II) against Wagenhals, Wiley, and AMMO on the basis of misstatements and omissions concerning Larson's role as an executive, related party transactions, off balance statements, and compensation as well as the corresponding statements as to legal and regulatory

compliance and internal accounting standards (collectively, the "Larson Allegations"). Plaintiffs may proceed with their maker liability against Wagenhals, Smith, and AMMO on the basis of the misstatements and omissions concerning the production capacity at the Manitowoc Facility, specifically those in paragraphs 75, 83, 98, 104, 114, 120, 122, 124, and 128. Any alleged misrepresentations not made by one of these Individual Defendants, not in the identified paragraphs concerning the Manitowoc Facility, and not relating to the Larson Allegations are dismissed.

Plaintiffs may proceed with their scheme liability claim (Count I) in regard to the Larson Allegations against Larson, Wagenhals, Wiley, and AMMO. Smith is dismissed from Plaintiffs' Count I.

As to control person liability (Count III), Wagenhals and Smith are dismissed from this claim, but Plaintiffs may proceed with Count III against Larson.

On a final note, Defendants all request that Plaintiffs' Amended Complaint be dismissed with prejudice. The Court has determined that the Amended Complaint will not be dismissed in its entirety and further finds that the dismissed portions and/or Defendants are not done so with prejudice. The Court is cognizant that Plaintiffs have only amended their complaint once. *C.f. Patterson v. Jump Trading, LLC*, 2026 WL 2605224, at *22 (N.D. Cal. 2026) (dismissing a securities class action complaint with prejudice after five attempts to amend). And presently, the Court is not convinced that no possible amendment could cure the defects in Plaintiffs' Amended Complaint. *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980) ("[D]ismissal is proper only if it is absolutely clear that the deficiencies of the complaint could not be cured by amendment."). Therefore, any dismissal stated herein is without prejudice. All the same, given the age of this case, the Court will not grant allotted time for Plaintiffs to amend their Complaint. Nothing precludes Plaintiffs from moving for leave to do as much; but this case needs to begin discovery in earnest, so Plaintiffs should carefully consider whether further amendment would be fruitful.

Accordingly,

**IT IS ORDERED** that Defendant Flynn's Motion to Dismiss (Doc. 64) is **GRANTED IN PART** and **DENIED IN PART**. Flynn is dismissed from this matter without prejudice.

**IT IS FURTHER ORDERED** that Defendants AMMO and Smith's Motion to Dismiss (Doc. 66) is **GRANTED IN PART** and **DENIED IN PART** as stated above.

**IT IS FURTHER ORDERED** that Defendant Larson's Motion to Dismiss (Doc. 67) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Wiley's Motion to Dismiss (Doc. 68) is **GRANTED IN PART** and **DENIED IN PART** as stated above.

**IT IS FURTHER ORDERED** that Defendant Wagenhals's Motion to Dismiss (Doc. 69) is **GRANTED IN PART** and **DENIED IN PART** as stated above.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to File Sur-Reply (Doc. 81) is **DENIED**.

**IT IS FURTHER ORDERED** that the remaining Defendants shall answer the Amended Complaint **within fourteen (14) days of the Court's Order**. This matter will be set for a Rule 16 Scheduling Conference by separate order. The parties shall jointly file their Rule 26(f) report at least **seven (7) days prior to the Scheduling Conference**.

**IT IS FINALLY ORDERED** that, moving forward in these proceedings, if any party wishes to incorporate another party's motion into their own motion on the same subject, the party must clearly identify which arguments, evidence, etc. they seek to incorporate. The Court will not accept wholesale adoptions of multiple other briefs going forward.

Dated this 28th day of September, 2026.



Honorable Diane J. Humetewa
United States District Judge